FILED: MARCH 30, 2009

09CV1934

JUDGE LINDBERG

MAGISTRATE JUDGE DENLOW

CH

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOSEPH L. DIEBOLD, JR., ON BEHALF OF THE EXXONMOBIL SAVINGS PLAN,** *AND ALL OTHERS SIMILARLY SITUATED,*   )<br><br>  )<br>  )<br>  )<br>Plaintiffs,   )<br>  )<br>v.   )<br>  )<br>**NORTHERN TRUST INVESTMENTS,**   )<br>**N.A. AND THE NORTHERN TRUST**   )<br>**COMPANY,**   )<br>  )<br>Defendants.   ) | **CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br>**CIVIL ACTION NO:**<br><br><u>Demand for Jury Trial</u> |

## CLASS ACTION COMPLAINT

Plaintiff Joseph L. Diebold is a participant in the ExxonMobil Savings Plan (the "Exxon Plan"). He brings this action on behalf of the Exxon Plan, and on behalf of all other defined benefit and defined contribution pension plans covered by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA") (collectively the "Plans"), that suffered losses caused by breaches of fiduciary duties and violations of ERISA's prohibited transaction rules committed by Defendants Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("NTC") (collectively, NTI and NTC are referred to hereafter as "Defendants" or the "Northern Trust Defendants"). Plaintiff brings this action by and through his undersigned attorneys based upon personal knowledge and information obtained through investigation by his counsel.

# I. <u>OVERVIEW</u>

1.   This Complaint arises from breaches of ERISA-mandated fiduciary duties, as well as other ERISA violations, that Defendants committed as investment manager and/or investment advisor to the Plans. Specifically, in violation of their fiduciary duties and ERISA's prohibited transaction rules, Defendants recklessly engaged in the practice known as "securities lending" for their own benefit, in a manner that involved imprudent and unreasonable risk of loss to the Plans. As a result of Defendants' self-serving securities lending practices, which violated Defendants' ERISA fiduciary responsibilities, the Plans suffered large losses.

2.    In simple terms, the practice of securities lending involves the temporary "loan" of a stock (or other security) by its long-term owner (often a large institutional investor) to a borrower who needs the stock for short term purposes. The borrower secures the loan with collateral. The collateral is then supposed to be invested in safe, short-term, liquid instruments so that the long-term owner of the stock is able to receive some investment income from the collateral investment.

3.   If the collateral is invested in secure investments, such as U.S. government bonds, a retirement plan engaging in securities lending may earn some degree of return for little risk.

4.   The Plans pooled their retirement funds in "collective trusts" managed by the Northern Trust Defendants. A collective trust is an investment option established for the collective investment of a group of institutional investors, including retirement plans and pension funds. All of the members in a collective trust share, *pro rata*, in the same gains and losses. The collective trusts at issue in this case (the "Collective Trusts") offered particular investment styles,

but all of them engaged in securities lending, and, as a result of Defendants' imprudent and improper conduct, the Plans suffered loss.

5.   The Exxon Plan, in which Plaintiff is a participant, invested, and upon information and belief still invests, in the following Collective Trusts offered and managed by Defendants: (a) NTGI-QM Collective Daily S&P 500 Equity Index Fund-Lending ("S&P 500 Fund"); (b) NTGI-QM Collective Daily Small Cap Equity Index Fund-Lending; (c) NTGI-QM Collective Daily EAFE Index Fund-Lending; (d) NTGI-QM Collective Daily Aggregate Bond Index Fund-Lending; and (e) NTGI-QM Collective Short Term Investment Fund-Lending.

6.   Each of the Collective Trusts is managed by the Northern Trust Defendants according to a stated investment policy. Some, if not all, of these funds are measured against an established benchmark. For example, the performance of the S&P 500 Fund is measured against the performance of the S&P 500.

7.   The Collective Trusts loaned securities held by the Collective Trusts (and indirectly by the Plans). Borrowers reportedly posted collateral equal to 102% of the value of the borrowed securities. Defendants then invested the collateral (the "Collateral") in other instruments through still other collective trusts. (The NTI-managed funds in which NTI invested the Collateral shall be referred to as the "Collateral Pools".)

8.   Defendants collected fees for facilitating the Collective Trusts' securities lending transactions and shared with the Plans in the investment returns of the Collateral. For example, Defendants maintain and manage a Collective Short Term Extendable Portfolio (the "STEP Pool"), which, upon information and belief, was one of the Collateral Pools that served as the

investment vehicle for 75% of the Collateral for one set of Defendants' index funds' securities lending activities.

9. As "Lending Fiduciaries" in securities lending arrangements, Defendants are supposed to guard against the risk of default by ensuring that the Collateral is safe and liquid and that such Collateral is invested prudently in Collateral Pools that are safe and liquid.

10. Upon information and belief, Defendants received 40% of any profits that the Plans earned from the Collateral Pools. Defendants also earned additional fees from securities lending transactions. Defendants did not bear any risk of investment loss in the management of the Collateral Pools.

11. Defendants inappropriately invested the Collateral in Collateral Pools that were illiquid, highly-leveraged, and unduly risky, containing mortgage-backed securities and other securitized debt instruments. These investments were inappropriately risky for retirement plan investments – especially when compared to the relatively small amount of gain that the Plans could expect to receive from securities lending arrangements. As described in greater detail below, these unduly risky investments caused the Collective Trusts that Defendants managed, and in which the Plans invested, to suffer substantial losses, disproportionate to the relatively small amount of income the Plans could possibly earn on the Collateral. For example, according to a March report, Defendants' S&P 500 Fund for securities lending clients, in which the Plan and other retirement Plans invested, lagged its benchmark by 12 basis points, a huge margin for an index fund. Another of the Collective Trusts, a mortgage-backed securities index fund, trailed its benchmark by 53 basis points. On information and belief, such losses have occurred in all of the Collective Trusts.

4

12. The fees and other compensation Defendants collected in connection with their securities lending activities were unreasonable in light of the risks taken by Defendants with the Plans' assets and the investment losses suffered by the Plans as a result of Defendants' imprudent management of the Collateral Pools. As one consultant commented, "a perennial problem with securities lending programs" occurs where the money manager gets a percentage of the earned investment gains and therefore has an incentive "to creep out there on the risk scale." Defendants put their own interests ahead of the Plans' interests by taking unnecessary and unreasonable risk in investing the Collateral Pools in order to maximize Defendants' share of the investment returns.

13. There are three primary risks associated with securities lending:

- **OPERATIONAL RISK** – the risk that the Lending Fiduciary, such as Defendants, did not administer the program as agreed. This includes the fiduciary's failure to mark to market collateralization levels and to post corporate actions and income, including all economic benefits of ownership except for proxy voting.

- **BORROWER/COUNTERPARTY DEFAULT RISK** – the risk that the borrower fails to return the securities due to insolvency or other reasons. Borrower default also leads to trade settlement risk, which is the risk that the lender sells a security on loan and that the loaned security is not returned by the borrower. Therefore the trade fails or the seller is charged with an overdraft fee.

- **COLLATERAL REINVESTMENT RISK** – the risk of investment loss from the reinvestment of the cash collateral by the Lending Fiduciary. The real risk is that the investment of the cash collateral will not earn a sufficient return to cover the agreed upon rebate rate or even to return the collateral at its original value because of interest rate, liquidity and/or credit risks.

14. Defendants' violations of ERISA arise, *inter alia*, from their imprudence, lack of care, and self-dealing with respect to Collateral reinvestment. Collateral reinvestment risk is shouldered by the lender, here the investors in the Collective Trusts, including the Plans. The lender has to cover both the rebate rate and the full principal value of the cash collateral posted

by the borrower. If the lender earns a lower return on the collateral than the rebate rate or the original value of the collateral, there will be an "investment loss" on the transaction. The risk could be minimized, and in Defendants' exercise of their fiduciary duties, should be minimized, by restricting Collateral investment to Collateral Pools that are very high quality and liquid, and then carefully managing potential asset liability duration differences.

15. The Northern Trust Defendants breached their duties of prudence, loyalty, and exclusive purpose under ERISA § 404(a) by investing Plan assets recklessly and imprudently, by acting disloyally, and by causing massive losses to the Plans through the Northern Trust Defendants' imprudent and improperly risky actions.

16. Defendants also violated certain provisions of ERISA that prohibit fiduciaries like Defendants from causing a retirement plan to engage in transactions with related parties and from engaging in self-dealing transactions. By using Plan assets for the benefit of other parties, and by collecting unreasonable fees and other compensation in connection with securities lending and placing their own interests ahead of those of the Plans, Defendants engaged in multiple prohibited transactions, which are *per se* unlawful in violation of ERISA § 406.

17. Defendants' breaches of duty and prohibited transactions have caused the Plans to incur substantial losses. Upon information and belief, in 2008, Defendants managed approximately $270 billion in Collateral. The STEP Pool, which represented only about 5% of the $270 billion in securities lending, reportedly lost 1.35% in March 2008 alone -- which was the fourth consecutive month of losses for the STEP Pool. Given the fact that retirement assets were invested in the Collateral Pools, the Collateral Pools should have been invested solely in low risk and liquid securities.

18.  ERISA §§ 409(a) and 502(a)(2) authorize ERISA plan participants, such as Plaintiff, to sue in a representative capacity for losses suffered by plans as a result of breaches of fiduciary duty. Pursuant to that authority, Plaintiff brings this action as a class action under Fed. R. Civ. P. 23 on behalf the Plan and all other similarly-situated Plans, *i.e.,* all Plans that invested Collateral in the Collateral Pools through Collective Trusts. Plaintiff seeks to restore losses to the Plans, for which the Northern Trust Defendants are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2).

19.  The Northern Trust Defendants have sole possession of a great deal of relevant information and documents concerning Plaintiff's allegations. Therefore, following discovery, Plaintiff will, to the extent necessary and appropriate, amend this Complaint, or, if required, seek leave to amend, to add additional facts that further support Plaintiff's claims.

## II. JURISDICTION AND VENUE

20.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

21.  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Northern Trust is headquartered in this District.

## III. THE PARTIES

22.  Plaintiff Joseph L. Deibold is a participant in the Exxon Plan. He resides in Prairieville, Louisiana. Through the Plan, Plaintiff invested in the S&P 500 Fund and suffered losses through Defendants' breaches of fiduciary duty and prohibited transactions as alleged herein.

23. Defendant Northern Trust Investments, N.A. is an affiliate of Defendant The Northern Trust Company. NTI is a national banking association with its principal place of business in Chicago, Illinois and is a fiduciary with respect to the Plans.

24. Defendant The Northern Trust Company is an Illinois state banking corporation with its principal place of business in Chicago, Illinois. Directly and/or through its affiliates, NTC provides investment products, including the products provided by the Northern Trust Defendants to the Plans, and it is a fiduciary or a party in interest with respect to the Plans.

## IV. DEFENDANTS' FIDUCIARY STATUS

25. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

26. Under ERISA, an investment manager or investment adviser is a fiduciary. ERISA defines investment manager as:

> (38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title) –
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;

(B) who

(i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b-1 et seq.];

(ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b-3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

ERISA § 3(38), 29 U.S.C. § 1002(38).

27. The Northern Trust Defendants served as Investment Managers for the Plans, as defined by ERISA. In this capacity, the Northern Trust Defendants were responsible for prudently and loyally managing the Plans' assets that were invested in both the Collective Trusts and the Collateral Pools.

28. In addition to serving as the Investment Manager, Defendant NTI also served as the Trustee of the Collective Trusts.

# V. SUBSTANTIVE ALLEGATIONS

### A.     Defendants' Securities Lending Arrangements

29.  Upon information and belief, with respect to the Plans, including the Exxon Plan, NTI: (i) agreed to serve as the Investment Manager for the Plans; (ii) admitted that it is a fiduciary as defined by ERISA; and (iii) agreed to follow specified "Investment Guidelines."

30. The Plans permitted their participants to allocate their account balances among various investment funds. By way of example, the Exxon Plan invested in the following five of the Collective Trusts:

(a)     NTGI-QM Collective Daily S&P 500 Equity Index Fund-Lending ("S&P 500 Fund") (456138589-001);[1]

(b)     NTGI-QM Collective Daily Small Cap Equity Index Fund-Lending (456138589-052);

(c)     NTGI-QM Collective Daily EAFE Index Fund-Lending (456138589-017);

(d)     NTGI-QM Collective Daily Aggregate Bond Index Fund-Lending (456138589-029); and

(e)     NTGI-QM Collective Short Term Investment Fund-Lending (366036794-001).

31.  Four of these five Collective Trusts are "index" funds, meaning that they were supposed to mirror the performance and risk of a benchmark index. The S&P 500 Fund was benchmarked to the S&P 500 Index; the Small Cap Equity Fund was benchmarked to the Russell 2000 Index; the Collective Daily EAFE Index Fund was benchmarked to the MSCI EAFE Index; and the Bond Index Fund was benchmarked to the Lehman Brothers 1-to-3 Year Government

---

[1] With respect to this 12-digit number, the first nine digits represent the employer identification number(s) for Defendants and the last three digits represent the Collective Trust number.

Bond Index. Each Collective Trust was also a "lending fund" – as indicated by the name of the fund – meaning that the manager of that Collective Trust, here NTI, engaged in securities lending activities.

32. The Plans agreed that NTI would invest Plan assets in specific Collective Trusts. Approximately 8,000 institutional investors, including the Plans, invest in the Northern Trust Global Investments Collective Funds, a collection of 82 different Collective Trusts managed by NTI. As of October 31, 2008, the Collective Trusts had about $160 billion in assets under management. Investors in these Collective Trusts are typically pension and savings plans like the Plans. NTI manages the Collective Trusts as Trustee.

33. Upon information and belief, almost 600 client accounts – including the Exxon Plan and the other Plans in this case – are invested in Collective Trusts that are index funds (the "Index Funds"). These client accounts are comprised of pension plans; profit sharing plans; employee benefit plans; deferred compensation plans; and government employee benefit plans. NTI is the trustee for the Index Funds under a Declaration of Trust and therefore is responsible for administering those Index Funds for the benefit of all investors in the Collective Trusts, including the Plans.

34. The Index Funds are "direct" securities lending clients of NTC as securities lending agent because the Index Funds lend their own securities directly to borrowers.

35. Upon information and belief, the Plans are "indirect" participants in securities lending. The securities held by the Index Funds are not held in the name of the Plans and other investors in the Collective Trusts, and thus the Plans do not lend any securities directly to

borrowers. Instead, the Plans own "Units" in the Index Funds, which gives them an undivided interest in all of the assets in the Index Funds, including both loaned and unloaned securities.

36. The Index Funds invest in at least two different Collateral Pools, the Core USA Collateral Pool and a Collateralized Pool that consists in whole or in part of the STEP Pool.

37. Upon information and belief, the Plans each entered a "Securities Lending Authorization Agreement" ("Agreement") that appointed NTC as NTI's agent to loan the Collective Trusts' securities to third-party borrowers.

38. Pursuant to the Agreement, Defendants loaned securities from the Collective Trusts' portfolios to third-party borrowers. In exchange, NTC received Collateral from the third-party borrowers equal to 102% of the market value of the securities.

39. Upon information and belief, NTI shared in a monthly fee equal to a percentage of the net income earned through securities lending. NTI, however, did not share in any realized *losses* the Collateral Pool investments experienced. Any losses the Collateral Pools realized were allocated *pro rata* to the Plans and other investors in the Collateral Pools.

40. Defendants earned securities lending revenue of $149.9 million in the second fiscal quarter of 2008, nearly 14% of Defendants' total income for that quarter.

### B.      The Collateral Pools Suffered Losses

41. Defendants were, or should have been, aware from publicly-known events occurring as early as 2007 that it was becoming more difficult to sell in the secondary markets fixed income investments such as those held in the Collateral Pools. NTI, however, chose not to sell securities held in the Collateral Pools. These securities later defaulted or presently are illiquid, causing substantial losses to the Plans.

42. On September 15, 2008, Lehman Brothers declared bankruptcy. As a result of this and later events in world financial markets, assets in the Collateral Pools became illiquid, especially when stock prices plummeted. This caused the Collateral Pools to have collateral deficiencies, requiring the Plans and all other investors in Collective Trusts to make up the shortfall in the value of Collateral posted by borrowers.

1. The CORE USA Collateral Pool

43. The net asset value of the Core USA Collateral Pool is maintained on a constant $1.00 basis. When the principal value of the Collateral held in the Pool drops below the level required to pay the borrowers of the loaned securities, NTI may declare that a "collateral deficiency" has occurred.

44. On September 19, 2008, NTI declared a collateral deficiency in the Core USA Collateral Pool in the amount of $885.6 million. About $100 million of this amount was attributable to Lehman Brothers bonds, which was impaired and written down. The Plans, and all other investors in Collective Trusts that invested in the Core USA Collateral Pool at that time, had *pro rata* exposure to the losses suffered.

45. The collateral deficiency allowed the net asset value of the Core USA Collateral Pool to return to $1.00, which was the value necessary to repay borrowers. NTI posted a "payable" to each of the Plans that, through Collective Trust investments, participated in the Core USA Collateral Pool. This "payable" was equal to each Plan's proportionate share of the collateral deficiency.

2.   The STEP Pool

46. The STEP Pool is a variable net asset value ("NAV") fund that is valued daily based on the market value of its holdings. As a result, reductions in market value flow through automatically to the securities lenders, that is, Plans that invest Collateral in STEP through the Collective Trusts.

47. On September 19, 2008, Defendants determined that three assets in the STEP Pool (securities issued by Lehman Brothers Holdings, Theta Finance and Sigma Finance) had become permanently impaired, that the impaired securities were distributed from the STEP Pool into a liquidating account, and that all owners of the STEP Pool had a *pro rata* interest in the liquidating account and would be required to pay the full amount of the estimated impairment. That amount flowed through to the Index Funds that invested in the STEP Pool.

48. In September 2008, the total value of the STEP Pool declined in value by 7.57% to approximately $10.4 billion, a loss of approximately $851,758,000.  By the end of October 2008, NTI reported internally that there was no liquidity in the STEP Pool. Upon information and belief, as a result of losses in the STEP Pool, a Plan with a $500 million investment in the S&P 500 Index Fund would be required to make a cash payment of $3 million to NTI.

**C.**    **The Plans Suffered Injury through Securities Lending Practices**

49.  Defendants' failure to manage prudently the Collateral Pools has caused substantial losses to the Plans. Defendants caused these losses by failing to use secure, liquid instruments for Collateral Pool investments and by failing to manage the asset liability duration differences. That is, as borrowers in the securities lending process who had posted cash as Collateral sought the

return of that Collateral, the Collateral Pools were forced to make up the shortfall between the current value of the invested Collateral and the amount promised to the borrower.

50. Ultimately, however, it was the Plans and other investors in the Collective Trusts that were required to make up the shortfall. As a result, the Plans' investments in the Collective Trusts were diminished by far more than the amount of a normal tracking error when compared to their respective benchmarks. Additionally, as borrowers demanded the return of Collateral that Defendants had invested in illiquid, longer-term investments (such as many derivatives and mortgage-backed securities) contained in the Collateral Pools, the Plans and other Collective Trust investors were forced to realize immediate losses at the nadir of the market. They were forced to book these losses because the Collateral Trusts could not hold the investments to duration.

51. The Northern Trust Defendants shared in the proceeds earned through this securities lending process. However, the Northern Trust Defendants shared none of the risk, and none of the loss, arising from the imprudent investment of Collateral in the Collateral Pools. This risk is borne by the Plans and other Collective Trust investors.

52. As described previously, certain investments made by Collateral Pools have defaulted and have been marked down in value. Other Collateral Pool investments are so illiquid as to be presently without value. As a result, Defendants have caused the Plans to suffer substantial losses. The Plans suffered these losses because Defendants have conducted the securities lending program in a negligent and imprudent manner.

53. Defendants' improper management of its securities lending program has been the subject of recent suits by fiduciaries of BP Corporation North American Inc.'s employee

retirement plans, as well as the University of Washington endowment. In addition, NTC has taken a $167.6 million charge ($105.4 million after tax) in the September 2008 quarter with respect to claims of its securities lending clients.

54. By taking unreasonable compensation in connection with lending Collective Trust securities, and taking unreasonable and imprudent risk in the management of Collateral Pools, the Northern Trust Defendants engaged in prohibited transactions for the benefit of themselves.

## VI. **APPLICABLE LAW**

55. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in relevant part, that a civil action for breach of fiduciary duty may be brought by the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan for relief under ERISA § 409, 29 U.S.C. § 1109.

56. ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in relevant part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

57. ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other monetary relief.

58. ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide in relevant part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest

of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

59. These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwith*, 680 F.2d 263, 272 n.2 (2d Cir. 1982). They entail, among other things:

> (a) The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including, in this case, the investment alternatives of the Collective Investment Funds in which Plan assets were invested;
>
> (b) The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves, including, in this case, the Northern Trust Defendants' personal interests in receiving some of the cash collateral from securities lending; and
>
> (c) The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries, including, in this case, with respect to the grave risks of securities lending.

60. According to DOL regulations and case law interpreting this statutory provision, in order to comply with the prudence requirement under ERISA § 404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to

the particular investment or course of action involved, including the role that the investment or course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

61. Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

●       A determination by the fiduciary that the particular investment or course of action is reasonably designed, as part of the portfolio, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for return associated with the investment or course of action; and

●       Consideration of the following factors as they relate to such portion of the portfolio:

○       The composition of the portfolio with regard to diversification;

○       The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

○       The project return of the portfolio relative to the funding objectives of the plan.

62. As set forth herein, the Northern Trust Defendants failed in the discharge of these duties, and, generally, in their duty to manage the assets of the Plan prudently, loyally, and in the best interests of the Plan and the Class.

63. ERISA also prohibits certain transactions with plans involving parties in interest and fiduciaries because of their high potential for abuse. Specifically, ERISA § 406 provides as follows:

(a) Transactions between plan and party in interest
    Except as provided in section 1108 of this title:
    (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107 (a) of this title.

(b) Transactions between plan and fiduciary

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

64. As set forth herein, the Northern Trust Defendants violated ERISA § 406(a) by causing the Plans to loan their assets to parties in interest, namely the borrowers of loaned securities, for the benefit of the borrowers and Defendants. Additionally, the Northern Trust Defendants violated ERISA § 406(b) by using the Plans' assets to invest in high risk and illiquid instruments through the Collateral Pools to benefit Defendants.

65. Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for relief under ERISA § 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §§ 404(a)(1) and 406.

# VII. <u>CLASS ACTION ALLEGATIONS</u>

66. **Class Definition**. Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plans and the following class of persons similarly situated (the "Class"):

> All ERISA Plans that invested or maintained investments between January 1, 2007 and the present (the "Class Period") in any Collective Trust managed or operated by The Northern Trust Company or Northern Trust Investments, N.A., where such Collective Trust invested Collateral received from borrowers of securities owned by such Collective Trust in one or more Collateral Pools managed or operated by The Northern Trust Company or Northern Trust Investments, N.A.

67. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA Plans throughout the country invested in the Collective Trusts during the Class Period, and sustained losses as a result of the Northern Trust Defendants' imprudent securities lending activities. For example, the Schedule D to the Form 5500 filed by Defendants for the S&P 500 Fund lists over 100 ERISA plans as investors in the fund. The S&P 500 Fund is but one of dozens of Collective Trusts that engaged in securities lending.

68. **Commonality**. The claims of Plaintiff and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants. Proceeding as a class action is particularly appropriate here, because Plan assets are held in Collective Trusts and/or Collateral Pools managed by the Northern Trust Defendants which treated any losses as proportional to all investors, and, therefore, Defendants' imprudent actions affected all Plans in the same manner.

69. Furthermore, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

a.      Whether Defendants are fiduciaries under ERISA;

b.      Whether Defendants breached their fiduciary duties under ERISA;

c.      Whether Defendants' acts proximately caused losses to the Plans and, if so, the appropriate relief to which the Plans are entitled;

d.      Whether Defendants received compensation, direct or indirect, in connection with securities lending transactions involving Plan assets, and whether such compensation was reasonable; and

e.      Whether Defendants caused the Plan to engage in transactions with parties in interest and with Defendants or their affiliates.

70. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class because: (a) Plaintiff seeks relief on behalf of the Plan pursuant to ERISA § 502(a)(2), and, thus, his claims on behalf of the Plan are not only typical of, but identical to, a claim under this section brought by any Class member. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

71. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that are competent and experienced in class action and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class. Plaintiff has undertaken to protect vigorously the interests of the absent members of the Class.

21

72. **Rule 23(b)(1)(A) &(B) Requirements.** Class action status in this action is warranted under Rule 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

73. **Rule 23(b)(2) Requirements.** Certification under 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

74. **Rule 23(b)(3) Requirements.** In the alternative, certification under rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII. <u>CLAIMS FOR RELIEF</u>

### COUNT 1
**AGAINST NORTHERN TRUST INVESTMENTS, N.A. AND THE NORTHERN TRUST COMPANY
FOR FAILURE PRUDENTLY AND LOYALLY TO MANAGE PLAN ASSETS**

75. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

76. Under Section 3(21) of ERISA, 29 U.S.C. § 1002(21), Defendants were at all relevant times ERISA fiduciaries with respect to the Plans and the invested assets of the Plans.

77. Under Section 3(38) of ERISA, 29 U.S.C. § 1002(38), the Northern Trust Defendants were at all relevant times the Investment Manager of the Plans.

78. The scope of the fiduciary duties and responsibilities of the Northern Trust Defendants included managing the assets of the Plans.

79. In addition to serving as the Investment Manager, the Northern Trust Defendants also served as the Trustee of the Collective Trusts, the Lending Fiduciary in securities lending transactions, and the investment manager of the Collateral Pools.

80. Defendants were obligated to discharge their duties with respect to the Plans' assets with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

81. Contrary to their duties and obligations under ERISA, Defendants failed to loyally and prudently manage the assets of the Plans. Specifically, Defendants breached their duties to the participants, in violation of ERISA § 404(a), by, *inter alia*, (a) exposing Plan assets to

excessive levels of risk through such activities; (b) failing to discharge their duties solely in the interests of the Plan participants; and (c) generally failing to invest and manage the assets of the Plans in the manner of a reasonably prudent fiduciary acting under similar circumstances.

82. Moreover, Defendants failed to conduct an appropriate investigation of the merits of their highly risky and speculative program of securities lending in light of the particular dangers that this program posed to Plan assets. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of mismanaging Plan assets in this manner.

83. As a consequence of Defendants' breaches of fiduciary duties alleged in this Count, the Plans have suffered losses. Had Defendants discharged their fiduciary duties to prudently invest Plan assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plans lost hundreds of millions of dollars of retirement savings.

84. Pursuant to ERISA §§ 409, 502(a)(2), and (a)(3), 29 U.S.C. §§ 1109(a), and 1132(a)(2), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT 2
### AGAINST NORTHERN TRUST INVESTMENTS, N.A. AND THE NORTHERN TRUST COMPANY, FOR PROHIBITED TRANSACTIONS INVOLVING PLAN ASSETS

85. Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

86. Under Section 3(21) of ERISA, 29 U.S.C. § 1002(21), Defendants were at all relevant times ERISA fiduciaries with respect to the Plans and the invested assets of the Plans.

87.  Under Section 3(38) of ERISA, 29 U.S.C. §1002(38), the Northern Trust Defendants were at all relevant times the Investment Manager of the Plans.

88.  The scope of the fiduciary duties and responsibilities of the Northern Trust Defendants included managing the assets of the Plans.

89. In addition to serving as the Investment Manager, the Northern Trust Defendants also served as the Trustee of the Collective Trusts, the Lending Fiduciary in securities lending transactions, and the investment manager of the Collateral Pools.

90. Under Section 406 of ERISA, a fiduciary is prohibited from using plan assets for the benefit of himself or a party in interest. 29 U.S.C. § 1106. As an affiliate of NTI, NTC is a party in interest under ERISA Section 406.

91.  Defendants caused the Plans to engage in numerous transactions with parties in interest, the borrowers of Plan securities, which transactions were *per se* prohibited by Section 406(a) of ERISA, 29 U.S.C. § 1106(a). Defendants also engaged in numerous self-dealing transactions in violation of Section 406(b) of ERISA, 29 U.S.C. § 1106(b), including acting for the benefit of themselves in managing the Collateral Pools and in receiving compensation, direct or indirect, from transactions involving Plan assets.

92. Notwithstanding NTC's status as a party in interest, NTC might possibly have been authorized to engage in securities lending with the Plans' assets pursuant to Prohibited Transaction Class Exemption ("PTE") 2006-16.  However, failure to comply with PTE 2006-16 in the management of a securities lending program for an employee benefit program is a *per se* violation of Section 406 of ERISA. Defendants have failed to comply with PTE 2006-16's requirements in numerous ways. Because the Defendants failed to comply with PTE-2006-16,

their operation of the securities lending program was unauthorized and a *per se* violation of Section 406 of ERISA.

93. Pursuant to ERISA §§ 409, 502(a)(2), and (a)(3), 29 U.S.C. §§ 1109(a), and 1132(a)(2), Defendants are liable to restore the losses to the Plans caused by their violations of Section 406, and to disgorge their compensation and profits thereon, and to be subject to other equitable relief as appropriate.

## XI.    REMEDY FOR BREACHES OF FIDUCIARY DUTIES

94. Defendants breached their fiduciary duties in that they knew, or should have known, the facts as alleged above, and therefore knew, or should have known, that the securities lending program was imprudent. Defendants also violated ERISA's prohibitions on certain transactions involving plan assets.

95. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan, to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary ... who breaches any of the ... duties imposed upon fiduciaries ... to make good such plan any losses to the plan ...." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

96. With respect to calculation of the losses to the Plans, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Plans would not have made or maintained their investments in the challenged securities lending program and, instead, prudent fiduciaries would have invested the Plans' assets prudently and appropriately. In this

way, the remedy restores the Plans' lost value and puts the participants in the position they would have occupied had the Plans been properly administered.

97. Plaintiff, on behalf of the Plans and the Class, is therefore entitled to relief from Defendants in the form of: (a) a monetary payment to the Plans in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, including on order permitting the Plans and the Class to withdraw assets from Collective Trusts, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2); (c) disgorgement of compensation and profits earned thereon as a result of prohibited transactions; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

98. Under ERISA, each Defendant is jointly and severably liable.

## XII.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    A determination that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plans and the Class;

C.    A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.      A Declaration that Defendants, and each of them, violated ERISA § 406, 29 U.S.C. § 1106;

E.      An Order rescinding securities lending contracts;

F.      An Order compelling Defendants to make good to the Plans and the Class all losses resulting from the securities lending program and to restore to the Plans and the Class all profits that the participants and beneficiaries would have made if Defendants had fulfilled their fiduciary obligations;

G.      Imposition of a constructive trust on any amounts by which any Defendants were unjustly enriched at the expense of the Plans and the Class as the result of beaches of fiduciary duty;

H.      Restoration of any losses to the Plans and the Class, allocated among the participants' individual accounts within the Plan and the Class, in proportion to the accounts' losses as required by ERISA;

I.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.      An Order awarding attorney fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law;

K.      An Order for equitable restitution and other appropriate equitable and injunctive relief against Defendants; and

L.      Granting such other and further relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

Plaintiff demands trial on all issues so triable.

Dated:  March 30, 2009                              Respectfully submitted,


                                                    /s/Elizabeth Hoskins Dow
                                                    Elizabeth Hoskins Dow, #6216262
                                                    BAILEY & GLASSER LLP
                                                    1003 Western Avenue
                                                    Joliet, IL 60435
                                                    Tel: (815)740-4034
                                                    Email: ldow@baileyglasser.com

Todd M. Schneider                    Brian A. Glasser
SCHNEIDER WALLACE COTTRELL           Michael L. Murphy
BRAYTON KONECKY LLP                  BAILEY & GLASSER LLP
180 Montgomery Street, Suite 2000    209 Capitol Street
San Francisco, CA 94104              Charleston, WV  25301
Telephone: (415) 421-7100            Tel: (304) 345-6555
Facsimile: (415) 421-7105            Fax: (304) 342-1110

Garrett W. Wotkyns                   Gregory Y. Porter
SCHNEIDER WALLACE COTTRELL           BAILEY & GLASSER LLP
BRAYTON KONECKY LLP                  601 Pennsylvania Ave., NW
7702 E. Doubletree Ranch Road, Suite 300   Suite 900, South Bldg.
Scottsdale, Arizona  85258           Washington, DC 20004

Todd S. Collins                      *Attorneys for Plaintiffs*
Shanon J. Carson
Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3040
Facsimile: (215) 875-4604