## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOSEPH L. DIEBOLD, JR., on behalf of the EXXONMOBIL SAVINGS PLAN, and PAUL J. HUNDT, on behalf of the TEXAS INSTRUMENTS 401(K) SAVINGS PLAN, and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | No. 09 Civ. 1934 |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | ) ) ) | Hon. William J. Hibbler, *Judge Presiding*. |
| Defendants. | ) ) | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
## MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

Michele Odorizzi
Caryn L. Jacobs
John J. Tharp, Jr.
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

Dated: February 16, 2010

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

ARGUMENT .................................................................................................................. 8

I.     Plaintiffs Have Failed To State A Claim For Imprudence.................................... 8

II.    Plaintiffs Have Failed To State A Claim Based On Their Theory
       That Defendants Engaged In Prohibited Transactions......................................... 13

III.   The Court Should Dismiss The Amended Complaint With Prejudice ............................ 16

IV.    Plaintiffs Lack Standing To Bring These Claims ............................................ 17

       A.     Plaintiffs Have Not Demonstrated That They Have Constitutional
              Standing To Sue On Their Own Behalf ................................................ 17

       B.     Plaintiffs Cannot Sue On Behalf Of The Members Of
              The Proposed Class ................................................................. 19

       C.     Plaintiffs Have No Standing To Sue For Losses Suffered
              In Collective Funds In Which They Did Not Invest Personally ........................ 20

CONCLUSION................................................................................................................22

TABLE OF EXHIBITS ........................................................................................... A-1

## TABLE OF AUTHORITIES

**CASES**

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*,
    499 F.3d 663 (7th Cir. 2007) ..................................................................... 17

*AllianceBernstein Mut. Fund Excessive Fee Litig.*, *In re*,
    2005 WL 2677753 (S.D.N.Y. 2005), *vacated on other grounds*,
    2006 WL 74439 (S.D.N.Y. 2006) ............................................................... 21

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) .................................................................................. 21

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) ........................................................................ *passim*

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................ *passim*

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
    242 F.3d 290 (5th Cir. 2001) ..................................................................... 21

*Bollig v. Christian Cmty. Homes & Servs., Inc.*,
    2003 WL 23200362 (W.D. Wis. 2003) ...................................................... 18

*BP Corp. N. Am. Inc. v. N. Trust Invs., N.A.*,
    2008 WL 5263695 (N.D. Ill. 2008) ...................................................... 5, 6, 7

*Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*,
    559 F.3d 671 (7th Cir. 2009) ....................................................................... 4

*Cent. States S.E. & S.W. Areas Health & Welfare Fund v.*
    *Merck-Medco Managed Care, LLC*,
    433 F.3d 181 (2d Cir. 2005) ...................................................................... 18

*DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*,
    920 F.2d 457 (7th Cir. 1990) ....................................................................... 9

*Difelice v. U.S. Airways, Inc.*,
    497 F.3d 410 (4th Cir. 2007) ..................................................................... 10

*Dreyfus Mut. Funds Fee Litig.*, *In re*,
    428 F. Supp. 2d 342 (W.D. Pa. 2005) ........................................................ 20

*Faber v. Metro. Life Ins. Co.*,
    2009 WL 3415369 (S.D.N.Y. 2009) ..................................................... 18, 19

ii

*Franklin Mut. Funds Fee Litig.*, In re,
    388 F. Supp. 2d 451 (D.N.J. 2005) ............................................................... 20

*Gen. Tel. Co. v. Falcon*,
    457 U.S. 147 (1982).................................................................................... 21

*Glanton ex rel. Prescription Drug Plan v. AdvancePCS Inc.*,
    465 F.3d 1123 (9th Cir. 2006) ..................................................................... 18

*Great W. Cas. Co. v. Volvo Trucks N. Am., Inc.*,
    2009 WL 588432 (N.D. Ill. 2009) ................................................................ 14

*Guerrand-Hermes v. J.P. Morgan & Co.*,
    769 N.Y.S.2d 240 (App. Div. 2003)................................................................ 9

*Harley v. Minn. Mining & Mfg. Co.*,
    284 F.3d 901 (8th Cir. 2002) ....................................................................... 18

*Hoffman v. UBS-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008).......................................................... 21

*Horvath v. Keystone Health Plan E., Inc.*,
    333 F.3d 450 (3d Cir. 2003).......................................................................... 18

*Huntington Bancshares Inc. ERISA Litig.*, In re,
    620 F. Supp. 2d 842 (S.D. Ohio 2009) ........................................... 9, 11, 12, 16

*Kamler v. H/N Telecomm. Servs., Inc.*,
    305 F.3d 672 (7th Cir. 2002) ....................................................................... 18

*Kanawi v. Bechtel Corp.*,
    590 F. Supp. 2d 1213 (N.D. Cal. 2008) .......................................................... 9

*Kauffman v. The Dreyfus Fund, Inc.*,
    434 F.2d 727 (3d Cir. 1970).................................................................... 19, 20

*Keach v. U.S. Trust Co.*,
    419 F.3d 626 (7th Cir. 2005) ......................................................................... 9

*LaRue v. DeWolff, Boberg & Assocs.*,
    128 S. Ct. 1020 (2008)................................................................................. 17

*Lehman Bros. Secs. & ERISA Litig.*, In re,
    2010 WL 354937 (S.D.N.Y. 2010)........................................................... 11, 12

*Lorazepam & Clorazepate Antitrust Litig.*, In re,
    289 F.3d 98 (D.C. Cir. 2002) ................................................................... 20, 21

iii

*Lord Abbett Mutual Funds Fee Litig.*, In re,
    463 F. Supp. 2d 505 (D.N.J. 2006), *vacated on other grounds*,
    553 F.3d 248 (3d Cir. 2009) .............................................................................. 20

*Loren v. Blue Cross & Blue Shield of Mich.*,
    505 F.3d 598 (6th Cir. 2007) ............................................................................ 18

*Nenni v. Dean Witter Reynolds, Inc.*,
    1999 WL 34801540 (D. Mass. 1999) ................................................................ 21

*The Reserve Fund Secs. & Derivative Litig.*, In re,
    2009 WL 4249128 (S.D.N.Y. 2009) .................................................................... 5

*Roth v. Sawyer-Cleator Lumber Co.*,
    16 F.3d 915 (8th Cir. 1994) ................................................................................ 9

*Siemers v. Wells Fargo & Co.*,
    2006 WL 3041090 (N.D. Cal. 2006) ................................................................. 21

*Smith v. Delta Air Lines, Inc.*,
    422 F. Supp. 2d 1310 (N.D. Ga. 2006) ............................................................ 12

*Williams v. Bank One Corp.*,
    2003 WL 22964376 (N.D. Ill. 2003) ................................................................. 20

*Zucker ex rel. AIM Small Cap Growth Fund/A v. AIM Advisors, Inc.*,
    371 F. Supp. 2d 845 (S.D. Tex. 2005) .............................................................. 20

**STATUTES**

29 U.S.C. § 1002(14) .................................................................................................. 13

29 U.S.C. § 1106(a) .................................................................................................... 13

29 U.S.C. § 1106(a)(1)(A) .......................................................................................... 13

29 U.S.C. § 1109(a) .................................................................................................... 19

29 U.S.C. § 1132(a)(2) ............................................................................................... 19

**MISCELLANEOUS**

Department of Labor Prohibited Transaction Class Exemption 2002-30,
    67 Fed. Reg. 39069 (June 6, 2002) ................................................................... 16

Department of Labor Prohibited Transaction Class Exemption 2006-16,
    71 Fed. Reg. 63786 (Oct. 31, 2006) ..................................................... 3, 8, 14, 15

Department of Labor Prohibited Transaction Class Exemption 2006-16,
    PTE 2006-16(II)(b) ................................................................................................ 15

Department of Labor Prohibited Transaction Class Exemption 2006-16,
    PTE 2006-16(II)(g) ................................................................................................ 16

Fed. R. Civ. P. 8 .................................................................................................... 8, 14

Fed. R. Civ. P. 12(b)(1) ........................................................................................ 1, 19

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1

Fed. R. Civ. P. 23 .................................................................................................... 20

Defendants Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("NTC") submit this memorandum in support of their motion to dismiss plaintiffs' amended class action complaint pursuant to Rule 12(b)(6) for failure to state a claim and Rule 12(b)(1) for lack of standing to represent the broad class alleged in the amended complaint.

## INTRODUCTION

Plaintiffs Joseph Diebold and Paul Hundt are participants in defined contribution plans offered by their respective employers, ExxonMobil and Texas Instruments (the "ExxonMobil" and "TI" plans, respectively). AC ¶¶ 1, 13-14. As plan participants, plaintiffs could select among a variety of investment alternatives. Diebold chose one NTI-managed fund (the S&P 500 Index Fund); Hundt selected three others (the Aggregate Bond, Russell 2000, and Russell 1000 Growth Equity Index Funds). *Id.* ¶¶ 13-14. Plaintiffs claim that these four funds suffered losses from securities lending as a result of the September 2008 meltdown of the financial markets. *Id.* ¶¶ 60-62, 71-73. In this lawsuit, plaintiffs seek to recover the losses suffered not only by their own plans in the four funds in which they invested, but also the securities lending losses incurred by *all* of the ERISA plans (regardless of sponsor or employer) that invested in *any* Collective Fund managed by NTI. *Id.* ¶¶ 99-100.

Plaintiffs offer the same theories that were alleged in Mr. Diebold's original complaint. In Count I, they claim that the NTI-managed funds suffered securities lending losses because the defendants made imprudent investment decisions. In Count II, plaintiffs go even further, claiming that the defendants were prohibited by ERISA from engaging in any securities lending activities at all or from being paid fees for the services they provided. Defendants previously moved to dismiss both of these claims. As to Count I, defendants argued that plaintiffs had failed to offer any factual basis for their allegations of imprudence and were instead relying entirely on hindsight, claiming that the investments must have been imprudent because they

1

resulted in losses.  As to Count II, defendants argued that plaintiffs had misread the applicable guidance from the Department of Labor ("DOL"), which specifically allows ERISA plans to participate in precisely the kind of securities lending program offered by defendants.

Plaintiffs filed an amended complaint rather than responding to defendants' motion.  But their second try fares no better than their first.  While the complaint is longer and attaches hundreds of pages of exhibits, it still fails to offer any basis other than hindsight for plaintiffs' claim that the defendants imprudently invested securities lending collateral.  It should therefore be dismissed under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  Count II is also still deficient.  Plaintiffs continue to claim that defendants' securities lending practices constituted prohibited transactions under ERISA.  But they continue to misunderstand the DOL regulations exempting securities lending from ERISA's prohibitions and fail to allege any facts to support their claim that the exemption would not apply here.  Indeed, documents the Court can and should consider in ruling on the motion to dismiss affirmatively demonstrate that defendants' securities lending program qualifies for the Prohibited Transaction Exemption provided by the DOL and thus fully complies with ERISA.

Because plaintiffs have failed, despite two attempts, to state any claim against the defendants, their complaint should be dismissed with prejudice.  But even if the Court were to conclude that plaintiffs had stated a claim, they still should not be allowed to proceed — not on their own behalf and certainly not on behalf of the broad class defined in their complaint. Plaintiffs' complaint is woefully deficient in detailing any losses that they personally have suffered as a result of the securities lending activity they complain about.  Unless and until plaintiffs can show that they personally suffered losses, they lack constitutional standing to pursue any claims against the defendants.  Even if plaintiffs could overcome that hurdle, they

cannot sue on behalf of every ERISA plan with respect to every NTI-sponsored Collective Fund. ERISA gives plan participants statutory standing to sue on behalf of *their own* plans, but nothing in ERISA creates standing to sue on behalf of *other* plans in which plaintiffs are *not* participants. And basic principles of constitutional standing preclude plaintiffs from suing on behalf of even their own plans for losses suffered in lending funds in which they admittedly had never invested.

## BACKGROUND

This case involves Collective Funds managed by NTI that engage in securities lending. As the name suggests, Collective Funds are funds in which a number of entities — including pension and savings plans — pool their assets to invest in particular strategies.  AC ¶¶ 28-30. For example, the S&P 500 Fund seeks to approximate the performance of the S&P 500 index. *Id.* ¶ 34.  Other Collective Funds offered by NTI attempt to approximate the performance of other equity or bond indices.  *Id.* ¶ 31.  All of the Collective Funds that engage in securities lending do so in order to earn additional revenue for their investors.  *Id.* ¶ 32.

NTC acts as securities lending agent for NTI's Collective Funds.  *Id.* ¶ 22 & Ex. 2.  In that capacity, NTC lends securities owned by the various Collective Funds to qualified borrowers.  *Id.* ¶¶ 22, 36 & Ex. 2.  "[O]n the day" the loan is made, 71 Fed. Reg. 63796 (Oct. 31, 2006), the borrowers must offer at least 100% of the market value of the loaned securities, usually in cash, as collateral to ensure that the securities will be returned when the loans terminate, AC ¶ 36 & Ex. 2 art. 4.1.  NTC invests the cash collateral it receives from borrowers in "collateral pools."  During the period at issue here, the Collective Funds used two different collateral pools — Core USA and the STIF/STEP custom collateral fund.[1]  *Id.* ¶¶ 43-45 & Ex. 8.

---

[1] The Russell 2000 and the Russell 1000 Growth Funds (in which Mr. Hundt invested) used Core USA; the S&P 500 Fund (in which Mr. Diebold invested) used the STIF/STEP custom collateral fund.  AC ¶ 42.  The Aggregate Bond Fund (in which Mr. Hundt invested) used both pools.  *Id.*  Plaintiffs allege, on information and belief, that the Collective Funds may also have used other collateral pools.  *Id.* ¶¶ 42, 52.

Both of these collateral pools maintain some assets in cash or overnight securities to provide the liquidity necessary to repay borrowers when loans come due. *Id.* ¶¶ 41-45 & Ex. 8. The rest is invested in longer-term fixed-income instruments, in accordance with the investment guidelines established for each collateral pool. *Id.* ¶ 41; *id.* Ex. 8 (setting forth investment guidelines for Core USA, STIF, and STEP).[2] The goal is to generate positive securities lending revenue by earning a rate of return on these investments that exceeds any fees ("rebates") paid to borrowers for the privilege of using the cash collateral. *Id.* ¶¶ 25, 29. The net revenue derived from securities lending is paid to the Collective Funds, which then pay NTC a fee for its services as lending agent equal to 40% of the net revenue. *Id.* ¶¶ 29, 35.

Plaintiffs claim that securities lending poses three potential risks for investors: (i) that the lending agent will make operational errors, such as failing to obtain the proper amount of collateral; (ii) that the borrower will default and not return the loaned securities; and (iii) that there will be investment losses in the collateral pool that will reduce the revenues earned from securities lending and create a shortfall in the amount of collateral necessary to repay borrowers. *Id.* ¶ 26. Plaintiffs do not allege any losses from either of the first two risks they identify.[3]

---

But the fund financial statements that plaintiffs have excerpted as Exhibits 4 and 5 to their amended complaint show that Core USA and STIF/STEP are the only collateral pools the Collective Funds used for collateral investment. Exs. A at note B & B at note B hereto. *See Cancer Found., Inc. v. Cerberus Capital Mgmt.*, LP, 559 F.3d 671, 675 & n.1 (7th Cir. 2009) (courts may consider entire content of documents attached to or referenced in pleading). Accordingly, plaintiffs' allegations in paragraphs 42 and 52 regarding other collateral pools are irrelevant.

[2] These investment guidelines permitted cash collateral to be invested in a wide variety of different types of fixed-income investments, including obligations of U.S. and state entities; obligations of domestic and foreign banks (such as commercial paper, time deposits, certificates of deposits, notes, and bonds); asset- and mortgage-backed securities; repurchase agreements; and floating- and variable-rate securities. AC Ex. 8 (Core USA collateral schedule and fund declarations for STIF and STEP).

[3] Plaintiffs allude to the fact that Lehman borrowed securities under NTC's lending program and that NTC declared Lehman in default of its borrower agreement. AC ¶¶ 60 & n.4, 130. But plaintiffs do not claim, nor could they, that any client suffered losses due to Lehman's default. In fact, documents

Instead, they complain that losses occurred because some of the investments in the collateral pools performed poorly. *Id.* ¶¶ 60-63.

The Court can take judicial notice of the fact that in mid-September 2008, the world experienced an unprecedented financial and credit crisis. *See, e.g.*, *id.* ¶¶ 60-62. This Court aptly described the situation as follows: "after nearly a year of stress caused by concerns over residential lending, Lehman Brothers declared bankruptcy, Bank of America acquired Merrill Lynch, and the government bailed out AIG. Shortly thereafter, the stock market plummeted and the credit market seized up." *BP Corp. N. Am. Inc. v. N. Trust Invs., N.A.*, 2008 WL 5263695, at *1 (N.D. Ill. 2008) (citations omitted) (Ex. C hereto). *See generally In re The Reserve Fund Secs. & Derivative Litig.*, 2009 WL 4249128, at *10 & n.3 (S.D.N.Y. 2009) (the Lehman bankruptcy "brought the financial markets to a standstill"; citing commentators who described post-September-2008 events as "some of the most cataclysmic failures in our economic history" and as "worse and more complicated" than those that caused the Great Depression) (Ex. D hereto).

In the wake of these events, many funds that invest primarily in fixed-income securities declined in value and suffered liquidity concerns. "Long established, conservative investment funds, such as the Reserve Fund, Common Fund, and Putnam had institutional money market funds 'break the buck' and/or restrict withdrawals" (AC Ex. 9 at N002086), forcing the Federal Reserve to intervene to prevent a run on money market funds. Securities lending programs like NTC's — which traditionally have invested exclusively in fixed-income instruments — were no exception.

---

attached to the pleadings reflect that no Northern clients sustained any losses due to borrower default. *E.g.*, AC Ex. 9 at N002090.

Core USA and STEP both held fixed-income securities issued by Lehman, which suffered permanent impairment when Lehman declared bankruptcy. *Id.* ¶¶ 60-62. Soon thereafter, two other securities in the STIF/STEP collateral pool (Sigma and Theta, which were structured investment vehicles, or SIVs, that held Lehman bonds) also suffered permanent impairments. *Id.* ¶ 62. Other fixed-income securities held in the collateral pools also declined in value, creating a gap between the value of the assets the pool held and the amount necessary to ensure repayment of all borrowers. *Id.* ¶¶ 60-61. In addition, the freeze in the credit markets made it virtually impossible to sell many of the securities held by the collateral pools, even at firesale prices. *Id.* ¶ 60. As a result, the Collective Funds that engaged in lending faced a significant liquidity crisis: if too many participants sought to withdraw from the funds, the funds might be forced to call back their loaned securities, even though they lacked sufficient liquidity to repay the collateral owing to the borrowers. *Id.* ¶¶ 63-64; Ex. 9 at N002096.

Faced with this situation, defendants quickly responded. On September 18, NTC declared a Collateral Deficiency in Core USA, posting a payable (which was allocated *pro rata* to the participants in that pool) sufficient to cover the shortfall between the market and book values of the assets held by Core USA. *Id.* ¶ 61.[4] At the same time, NTC voluntarily contributed a total of $150 million to securities lending clients who invested in certain collateral pools, including the Collective Funds that used Core USA, and pledged a 20% reduction in fees for the next year. *Id.* NTI also instituted withdrawal "safeguards" that allowed participants in its securities lending program to exit the program, but in a way that ensured that the collateral pools would retain the liquidity necessary to repay borrowers' collateral. *Id.* ¶ 65 & Exs. 28-30; *see also BP Corp.*,

---

[4] As plaintiffs note (at AC ¶ 61) the market values NTC used in determining the size of the Collateral Deficiency and the resulting payable were "vended" values obtained from third-party valuation experts. Because the markets had frozen, the "vended" values did not purport to be the values that could be obtained through market sales.

2008 WL 5263695, at *2 & n.2.  The Collective Funds chose not to exit the securities lending program and imposed their own withdrawal safeguards to ensure that client redemptions from those Collective Funds would not trigger a catastrophic run on the funds.  *See BP Corp.*, 2008 WL 5263695, at *2 & n.2.  Ordinary course transactions were not affected, however, nor were any restrictions on redemptions imposed on individual participants like Messrs. Diebold and Hundt.  *See id.* at *5.

Each lending fund that used Core USA received its share of both the Collateral Deficiency payable and NTC's $150 million voluntary contribution.  Those amounts were included in calculating the net asset values of each individual lending fund.  Similarly, losses resulting from writedowns in STEP flowed through to the Collective Funds that used the STIF/STEP funds to invest collateral.  Plaintiffs claim that in the affected funds, the reductions in collateral values caused a "tracking" variance, meaning that the funds underperformed the indices they tracked for the period in question.  AC ¶ 71.

In Count I, plaintiffs allege that defendants are ERISA fiduciaries and that they acted imprudently by investing cash collateral in the fixed-income securities that became impaired or declined in value or became illiquid in the wake of the Lehman Brothers bankruptcy.  With the benefit of perfect hindsight, plaintiffs allege that "[a]s demonstrated by the poor investment performance" of the collateral pools, some of the securities held in the collateral pools must have been too "risky" to be used as collateral pool investments.  *Id.* ¶¶ 52, 116-18.  They further claim that defendants did not disclose the risks of securities lending to plans and their fiduciaries.  *Id.* ¶ 35.

In Count II, plaintiffs claim that NTI should not have engaged in securities lending at all because ERISA supposedly prohibits (i) lending securities owned by the Collective Funds and

(ii) the payment of fees to NTC as securities lending agent. *Id.* ¶¶ 125-28. Plaintiffs recognize that a DOL exemption, Prohibited Transaction Class Exemption ("PTE") 2006-16 (Ex. E hereto), allows ERISA fiduciaries to engage in securities lending and to pay fees to affiliated securities lending agents. *Id.* ¶ 129. Nevertheless, they contend that NTC's securities lending program failed to meet the conditions set forth in that exemption.

For the reasons outlined below, neither count states a viable claim for relief.

## ARGUMENT

In *Ashcroft v. Iqbal*, the Supreme Court explained that, even under notice pleading standards, plaintiffs must provide a factual basis for their claims:

> As the Court held in [*Bell Atlantic v. Twombly*], the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement."

129 S. Ct. at 1949 (citations omitted). As demonstrated below, plaintiffs offer only "unadorned," "naked assertions" devoid of "factual enhancement," and thus have not "shown" that they are entitled to relief. *See id.*

## I.      Plaintiffs Have Failed To State A Claim For Imprudence.

Plaintiffs allege in Count I that defendants imprudently invested cash collateral in supposedly "risky" securities. AC ¶¶ 116-18. Plaintiffs focus their claim on the impairment of certain collateral pool holdings *after* Lehman's unexpected bankruptcy and the global economic cataclysm that it unleashed. *Id.* ¶¶ 61-62, 64-66, 71-74. They claim that the resulting collateral pool losses and the imposition of withdrawal "safeguards" were due to imprudence and

mismanagement, as opposed to the unprecedented worldwide credit freeze and plummeting stock markets. *Id.* ¶¶ 116-18. None of these allegations states a claim under *Twombly* and *Iqbal.*

It is well settled that ERISA's fiduciary duty of care "requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (internal quotation marks and citation omitted); *accord Keach v. U.S. Trust Co.*, 419 F.3d 626, 638 (7th Cir. 2005); *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 918 (8th Cir. 1994); *In re Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d 842, 853 (S.D. Ohio 2009). As the court observed in *Kanawi v. Bechtel Corp.*, "20/20 hindsight musings are not sufficient to maintain a cause of action alleging a breach of fiduciary duty" based on the fact that investments underperformed. 590 F. Supp. 2d 1213, 1230 (N.D. Cal. 2008).

In this case, plaintiffs have offered nothing but conclusory allegations and 20/20 hindsight. For example, one of the critical questions in a case like this is whether the securities conformed to investment guidelines at the time they were purchased. *See Guerrand-Hermes v. J.P. Morgan & Co.*, 769 N.Y.S.2d 240, 242-43 (App. Div. 2003) (ordering dismissal of breach of fiduciary duty claim because defendant complied with investment guidelines). In their amended complaint, plaintiffs suggest, in a roundabout way, that NTC may have failed to follow investment guidelines. AC ¶ 53. But they do not cite a *single* example of a security that supposedly deviated from the guidelines at the time it was purchased. That glaring omission is not the result of ignorance: as the exhibits attached to the amended complaint demonstrate, plaintiffs have the entire list of securities purchased for the two collateral pools, as well as the applicable guidelines. *See, e.g., id.* Exs. 8 & 32 at BP-0016340 through BP-0016344. Under these circumstances, the Court should give no weight to plaintiffs' vague and conclusory allegation suggesting that NTC departed from the applicable guidelines.

Similarly, the amended complaint offers no factual basis for any claim that the defendants knew or should have known *at the time they bought* fixed-income securities for the collateral pools that those securities created an undue risk of loss.  Plaintiffs also do not allege that, once the credit crisis exploded in September 2008, defendants should — or *could* — have sold the securities.  Instead, their claim appears to be that defendants should have outguessed the market — that they should have realized at some undefined point in time before September 2008 that some of the securities in the portfolio were too "risky" and should have sold them before the market recognized the risk and their market prices dropped accordingly.  But plaintiffs have offered no basis for concluding that defendants' inability to outguess the market was imprudent.

Plaintiffs try to buttress their hindsight allegations with selective citations from a smattering of articles about a slump in the housing market in 2006 and 2007.  None of this helps plaintiffs.  Their own articles reflect debate about the housing market ("Economists differ in their forecasts," *id.* Ex. 13); predictions that the market would continue to grow and/or rebound in 2007, (*id.* Exs. 13-16); and forecasts that subprime mortgages would have "no major impact on the [overwhelmingly prime] housing market," (*id.* Ex. 17).  Thus, they provide no basis for claiming that it was *per se* imprudent to invest in mortgage-backed securities.  Nor do plaintiffs identify any mortgage-backed security that they claim NTC should not have purchased or should not have continued holding at any point in time — let alone explain how, in light of these articles, the purchase or retention of such a security would have been imprudent.  And even if plaintiffs had alleged that some investments were risky when made (they have not), it is often reasonable to include investments presenting more risk in a diversified portfolio.  *Difelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (investment in "risky security" in diversified portfolio is "an appropriate means to increase return while minimizing risk").

10

Plaintiffs also do not link their allegations about subprime lending and the real estate slump to the specific securities that suffered impairments in the fall of 2008 or to the liquidity crisis that adversely impacted the value of the holdings in Core USA and STEP.  Plaintiffs' own exhibits show that in August 2008 — the month before Lehman's surprise bankruptcy filing on September 15 — subprime securities amounted to less than 1% of Core USA's holdings and had the highest (AAA) ratings.  *Id.* Ex 22 at 35.  At the same time, STEP continued to reflect positive returns even in light of extreme market duress.  *Id.* Ex. 22 at 26, 32.  Thus, plaintiffs' exhibits contradict their imprudence claims by demonstrating the high quality of the collateral pools at issue in this case.[5]

Significantly, nothing in any of the articles plaintiffs cite predicted Lehman's unforeseen bankruptcy and its punishing aftermath.  Nor do plaintiffs venture any explanation as to how or why defendants (and apparently *only* the defendants) should have foreseen that cataclysm.  "Defendants cannot be held to a standard that would require them to predict the future of the financial markets so as not to breach their fiduciary duties under ERISA."  *In re Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d at 853 (dismissing complaint alleging that inside fiduciaries should have known of and reacted to mortgage company's "massive" exposure to subprime mortgages).

*In re Lehman Brothers Securities & ERISA Litigation* makes precisely this point.  2010 WL 354937, at *5-6 (S.D.N.Y. 2010) (Ex. F hereto).  In that case, participants in Lehman's own ERISA plan who suffered significant losses when Lehman's stock became worthless following its bankruptcy filing sued the plan fiduciaries on the theory that they must have been aware that

---

[5] Plaintiffs' exhibits elsewhere describe STEP as having a very "high quality" profile (mostly AAA and AA); being conservatively managed; having been invested within its guidelines; and having no leverage. AC Exs. 8 (STEP fund declaration) & 25.  Other complaint exhibits make clear that the collateral pools had been invested in accordance with their guidelines and had "high levels of overnight liquidity," "high-quality assets," and minimal subprime exposures.  *E.g.*, *id.* Ex. 20 at N000167, N000188.

11

Lehman was likely to fail and acted imprudently by continuing to acquire and hold Lehman stock. Relying on *Twombly* and *Iqbal*, the court granted the defendants' motion to dismiss the complaint because plaintiffs had failed to offer any factual basis for their claim that the Lehman plan fiduciaries should have known that bankruptcy was imminent. *Id.* Any claim that *outsiders* like defendants should have known what was likely to happen is even less plausible.

Plaintiffs' non-disclosure allegations (AC ¶¶ 35, 119) are equally deficient. Plaintiffs do not make a *single* allegation about defendants' relationship with the fiduciaries of the ExxonMobil and TI plans, much less identify any allegedly deficient communications to or misunderstandings by those plan fiduciaries. Their assertion that those fiduciaries were somehow ill-informed about securities lending is pure guesswork. *In re Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d at 856 (plaintiffs must identify what "additional information they claim was required to be disclosed and provide a basis for that assertion"); *Smith v. Delta Air Lines, Inc.*, 422 F. Supp. 2d 1310, 1333 (N.D. Ga. 2006) ("[T]he Court will not accept as true Plaintiff's bald allegations of nondisclosure of material information.").[6] And the suggestion that defendants somehow had an obligation to make disclosures directly to participants like Messrs. Diebold and Hundt (AC ¶ 119) is even more farfetched. There is no allegation that Northern had or could have had *any* individual dealings with ExxonMobil or TI plan participants, or even had a way of discovering their identities in order to have such communications with them.

In *Twombly*, the Supreme Court explained that "some specificity in pleading" is required "before allowing a potentially massive factual controversy to proceed." 550 U.S. at 558 (internal

---

[6] Indeed, every exhibit plaintiffs attach to their complaint that reflects communications between defendants and plan fiduciaries rebuts plaintiffs' conclusory non-disclosure claim. *E.g.*, Ex. 1 (investment management agreement reflecting detailed fee disclosures to which client agreed, at pages 7-8, 19); Ex. 5 (fund financial statements provided to plan administrators detailing holdings of STEP and STIF); Exs. 9, 20-33 (detailed communications to clients about collateral pool holdings and performance); Exs. 1, 3, 6, 7, 10 & 11 (detailed fund descriptions and legal documents prepared for plan fiduciaries). *See also* Exs. G, H & I hereto (reflecting fee disclosures to ExxonMobil and TI plan fiduciaries).

quotation marks and citation omitted); *accord Iqbal*, 129 S. Ct. at 1949 (plaintiffs must plead sufficient facts to show claim had "facial plausibility"). In *Iqbal*, the Supreme Court explained that, while the "plausibility standard is not akin to a 'probability requirement,'" it asks for "more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief,'" *id.* (citation omitted), and thus fails to state a claim. Here, plaintiffs do not even allege facts "merely consistent with" liability. *Id.* Plaintiffs' allegations could be made against any securities lending agent or, indeed, against any fiduciary who invested in anything other than government-issued or guaranteed securities. *Everyone* suffered losses as a result of the worst financial crisis since the Great Depression. But no one can be held liable simply because they failed to possess a crystal ball, which is all that plaintiffs have alleged here.

## II. Plaintiffs Have Failed To State A Claim Based On Their Theory That Defendants Engaged In Prohibited Transactions.

Section 406(a) of ERISA, 29 U.S.C. § 1106(a), prohibits certain transactions between a plan and a "party in interest" unless they fall within a "prohibited transaction exemption" provided by DOL regulations. "Party in interest" may include any fiduciary, affiliate of a fiduciary, or anyone who provides services to a plan. 29 U.S.C. § 1002(14). In their second count, plaintiffs allege that certain aspects of NTC's securities lending program constituted "prohibited transactions" to which the DOL exemption supposedly does not apply. Because these allegations misconstrue the statute and are fatally conclusory, Count II must also be dismissed.

Plaintiffs cite 29 U.S.C. § 1106(a)(1)(A) for the proposition that leasing plan property to a "party in interest" is a prohibited transaction. AC ¶ 125. They contend that NTC is a "party in

interest" and that the Collective Funds "lease" plan assets to NTC, which then lends them to borrowers.  *Id.*  But the agreement under which NTI appointed NTC as securities lending agent (*id.* Ex. 2) nowhere provides that NTC is "leasing" plan assets from the Collective Funds (even assuming that the assets of the Collective Funds are deemed to be "plan assets").  Nor does plaintiffs' description of securities lending allege that securities are "leased" to NTC.  *Id.* ¶¶ 5, 22, 24, 28-41.  On the contrary, it is clear from plaintiffs' own allegations and the governing documents that NTC acts as the agent of the Collective Funds in lending securities directly to borrowers.  Thus, there is no "lease" of property and certainly no transaction in which NTC leases plan property.

Plaintiffs next speculate that it "may" be, or that it is "possible," that some of the borrowers who borrow securities lent by the Collective Funds could be "parties in interest," although they say that "discovery will be necessary to confirm" whether that is the case.  *Id.* ¶¶ 126-27.  This puts the cart before the horse.  Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions," *Iqbal*, 129 S. Ct. at 1950, particularly when those conclusions are based on speculation, *Twombly*, 550 U.S. at 555; *Great W. Cas. Co. v. Volvo Trucks N. Am., Inc.*, 2009 WL 588432, at *5 (N.D. Ill. 2009) (Ex. J hereto) ("*Twombly* requires more than [plaintiffs'] mere speculation that discovery might reveal grounds for such allegations.").  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 129 S. Ct. at 1949 (citation omitted).

Moreover, the assertion that a transaction is a "prohibited transaction" under Section 406 is the beginning, rather than the end, of the analysis.  As plaintiff acknowledges, the DOL has issued specific exemptions designed to enable ERISA plans to engage in securities lending even if the borrowers are "parties in interest."  AC ¶ 129.  PTE 2006-16 sets forth conditions a

securities lending program must meet to fall within the safe harbor it provides. Among other things, the loans must be backed by collateral equal to at least 100% of the market value of the loaned securities and the market value of those securities must be valued each trading day and the collateral adjusted so that it always has the required coverage. 71 Fed. Reg. 63796. According to plaintiff's own allegations, the securities lending program operated by NTC for the benefit of the Collective Funds met these requirements. *See* AC ¶¶ 35-36, Ex. 2 arts. 4.2, 4.3.

Plaintiffs nevertheless contend that the exemption was lost because of events that occurred *after* the credit crisis hit in September 2008. First, they argue that NTC did not meet the 100% collateralization requirement of the exemption because, on "information and belief," "borrower defaults" when Lehman declared bankruptcy "resulted" in not all of the loans being backed by collateral equal to at least 100% of the market value of the loaned securities. *Id.* ¶ 130 (citing PTE 2006-16(II)(b)). The requirement plaintiffs rely upon, however, governs the amount of collateral received "on the day on which the securities lent are delivered to the borrower." 71 Fed. Reg. 63796. Plaintiffs nowhere claim (nor could they) that NTC failed to obtain sufficient cash collateral "on the day" the securities were lent.[7]

Second, plaintiffs contend that the exemption is not met because it requires that a plan have the right to terminate a loan of securities "at any time" and the withdrawal safeguards NTC imposed in September 2008 supposedly preclude the ExxonMobil and TI plans from terminating loans. AC ¶ 132. One problem with this argument is that these plans are not themselves lending securities; instead, the Collective Funds are. This particular provision in the exemption does not apply to plans that do not lend securities. Furthermore, the Collective Funds *are* free to terminate their loans at any time. The withdrawal safeguards NTC instituted do not prohibit the

---

[7] In addition, plaintiffs' argument makes no sense. Collateral is obtained so that the lender will be protected if there is a default. As described above (at note 3), the system worked perfectly when Lehman defaulted on its loans, and no losses were suffered because of borrower defaults.

termination of loans.  Instead, they provide a specific *method* by which a lender that chooses to exit lending may do so without using more than its fair share of the liquidity in the collateral pool.  *Id.* Ex. 28 at N002105-09; *id.* Ex. 30.

Plaintiffs' final allegation is that NTC improperly used plan assets to generate securities lending revenue and thereby earn fees.  *Id.* ¶ 128.  But, as plaintiffs concede, securities lending agents are typically compensated with a "portion of the securities lending income," (*id.* ¶ 24), and DOL regulations expressly authorize such fees so long as the lending program meets the requirements of PTE 2006-16 and the lending agent's fees are "reasonable," *id.* ¶¶ 129-31 (citing PTE 2006-16(II)(g)).  Plaintiffs allege that NTC's fees were not reasonable, but provides no explanation for that conclusory assertion.

Beyond that, the plan fiduciaries for plaintiffs' plans specifically *agreed* to NTC's fees, in writing.[8]  Ex. G (ExxonMobil Collective Funds Custody Agreement ¶ 8); Ex. H (same as to TI ¶ 8); Ex. I (letter from TI directing investment).  *In re Huntington Bancshares Inc. ERISA Litig.*, 620 F. Supp. 2d at 846 n.3 (court may properly consider "any relevant ERISA plan documents" on motion to dismiss).  Plaintiffs offer no explanation as to why the judgment of their own plan fiduciaries that the fees were reasonable should not be respected.  Because plaintiffs have failed to provide any facts to support their unexplained assertion that NTC's fees were unreasonable, their claim that the payment of fees to NTC constituted a prohibited transaction should also be dismissed.

## III.    The Court Should Dismiss The Amended Complaint With Prejudice.

Defendants identified many of the foregoing deficiencies in plaintiffs' initial complaint.

---

[8] Plaintiffs also say that the use of EquiLend (which is partially owned by NTC) as an electronic platform to match borrowers and lenders "may" be prohibited by ERISA.  AC ¶ 126.  Even if such conditional allegations could satisfy *Twombly* and *Iqbal* (which they do not), this allegation also fails.  EquiLend has obtained a specific prohibited transaction exemption (PTE 2002-30) from the DOL.  Plaintiffs have not even attempted to explain why that exemption is not dispositive.

16

Dkt. #13-14.  Plaintiffs did not file their amended complaint until eight months later.  Dkt. #1, 25.  They had ample time to investigate their claims and ample access to sources of information about NTC's securities lending program (such as the preliminary injunction record in the *BP Plans* matter pending before this Court and defendants' own disclosure of collateral pool holdings and attributes).  *See, e.g.*, AC Exs. 8 & 9.  That plaintiffs *still* have not adequately stated a claim for relief reveals that they simply had no claim to begin with, and dismissal should therefore be with prejudice.  *See Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 666-68 (7th Cir. 2007) (affirming district court's denial of leave to amend).

## IV.  Plaintiffs Lack Standing To Bring These Claims.

For the foregoing reasons, the Court should dismiss plaintiffs' amended complaint with prejudice.  But if any claim survives, the Court should not allow plaintiffs to proceed unless and until they can establish that they have standing to pursue the claims they have alleged.  Even then, the Court should reject plaintiff's attempt to bring suit on behalf of *all* of the ERISA plans that invest in *all* of the NTI Collective Funds that engage in securities lending.

### A.    Plaintiffs Have Not Demonstrated That They Have Constitutional Standing To Sue On Their Own Behalf.

Plaintiffs are participants in defined contribution plans, who control their own investments and suffer losses only when those investments decline in value.  *See LaRue v. DeWolff, Boberg & Assocs.*, 128 S. Ct. 1020, 1025 (2008).  ERISA gives individual participants statutory standing to sue on behalf of their plans.  But the courts have held that, in order to meet *constitutional* standing requirements, participants in a defined contribution plan must also show that they suffered individual losses as a result of the alleged misconduct for which they seek damages on behalf of the plan.  Although the Seventh Circuit has not yet directly ruled on this issue, the Second, Third, Sixth, Eighth, and Ninth Circuits have all adopted this view.  *See, e.g.*,

*Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608 (6th Cir. 2007) ("Merely because Plaintiffs claim that they are suing on behalf of their respective ERISA plans does not change the fact that they must also establish individual standing."); *Glanton ex rel. Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (although plan participants are "congressionally authorized representatives of the injured plans," they lack constitutional standing unless "the injury they have suffered will be redressed by a favorable outcome to the litigation").[9] *See also Kamler v. H/N Telecomm. Servs., Inc.*, 305 F.3d 672, 681 (7th Cir. 2002) (stating that in an ERISA action, the plaintiff must show "that the breach of fiduciary duty caused some harm to him or her that can be remedied").

In this case, plaintiffs have not properly pled that they themselves were injured by defendants' alleged actions. As a result, they lack constitutional standing to assert *any* claims on behalf of themselves or their respective plans. Plaintiffs say that they "suffered losses" as a result of defendants' alleged breach of fiduciary duties and prohibited transactions (AC ¶¶ 13-14) but they never say when, why, or how much they lost. The paucity of these allegations is compounded by other equally-spare, carefully-crafted allegations in which Mr. Hundt says only that he "began" investing "[n]o later than 2005" and Mr. Diebold says only that he "has been invested" for "years." *Id.* ¶¶ 33-34. Such conclusory allegations are nothing more than the "unadorned, the-defendant-unlawfully-harmed-me accusation" deemed insufficient in *Iqbal*. 129 S. Ct. at 1949; *see also Faber v. Metro. Life Ins. Co.*, 2009 WL 3415369, at *4-5 (S.D.N.Y.

---

[9] *Accord Cent. States S.E. & S.W. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 200-01 (2d Cir. 2005) (plan participants seeking money damages under ERISA must "demonstrat[e] individual loss"); *Horvath v. Keystone Health Plan E., Inc.*, 333 F.3d 450, 455-56 (3d Cir. 2003); *Harley v. Minn. Mining & Mfg. Co.*, 284 F.3d 901, 906 (8th Cir. 2002) (the "limits on judicial power imposed by Article III counsel against" allowing those "who have suffered no injury in fact from suing to enforce ERISA fiduciary duties on behalf of [a] [p]lan"); *see also Bollig v. Christian Cmty. Homes & Servs., Inc.*, 2003 WL 23200362, at *2 (W.D. Wis. 2003) (Ex. K hereto) (dismissing ERISA action for monetary relief because plaintiffs had not shown individual loss that would satisfy the constitutional requirement of injury in fact).

2009) (Ex. L hereto) (no standing where alleged monetary loss was insufficiently identified or quantified).  Absent unequivocal allegations showing that plaintiffs each suffered a real loss, the complaint should be dismissed for lack of standing.

### B.      Plaintiffs Cannot Sue On Behalf Of The Members Of The Proposed Class.

Even if plaintiffs had sufficiently alleged that they suffered losses personally and could bring claims on behalf of their *own plans*, they do not have standing to sue on behalf of *other plans* in which they have no interest at all.  Section 502(a)(2) of ERISA, on which plaintiffs rely (AC ¶ 141), allows a plan participant to sue on behalf of his plan to recover losses the plan suffered as a result of a breach of ERISA duties.  29 U.S.C. §§ 1109(a), 1132(a)(2).  But plaintiffs have no statutory right to sue on behalf of any other ERISA plan in which they are not and never were participants.  Yet plaintiffs purport to bring their claims on behalf of "hundreds" of ERISA plans based solely on the claim that those plans or participants in those plans invested in NTI-managed Collective Funds that engaged in securities lending.  AC ¶¶ 99-100.

Plaintiffs do not bother to explain why they would have standing to assert claims on behalf of such a class.[10]  Their attempt mirrors the tactic rejected by the court in *Kauffman v. The Dreyfus Fund, Inc.*, 434 F.2d 727 (3d Cir. 1970).  In that case, plaintiff Kauffman brought a derivative action against certain defendants seeking damages on behalf of four mutual funds in which he had invested.  Like plaintiffs here, Kauffman then tried to parlay his derivative suit into a class action on behalf of 61 additional mutual funds in which he had no interest whatsoever. The Third Circuit reversed a decision certifying the proposed class, holding that Kauffman

---

[10] There are many reasons why class certification would be inappropriate in this case, regardless of the scope of the class.  Defendants will raise those issues at the appropriate time.  At this point, however, defendants challenge only plaintiffs' standing to act as representatives of the purported class.  This is an entirely legal question, and the issue can and should be decided at the outset of the litigation under Fed. R. Civ. P. 12(b)(1).

lacked standing either to represent the other mutual funds or to force his mutual funds to bring a class action on behalf of the entire industry:

> A shareholder . . . cannot force a corporation to bring a class action for the fundamental reason that whatever wrongs other corporations similarly situated have sustained are immaterial and irrelevant to a derivative plaintiff's limited and secondary cause of action.

*Id.* at 737. *Kauffman* has been repeatedly cited and followed by courts that have denied investors in mutual funds the right to bring class actions on behalf of not only their own but also other mutual funds in which they had no interest, on the ground that the funds were not similarly situated. *See, e.g.*, *In re Lord Abbett Mutual Funds Fee Litig.*, 463 F. Supp. 2d 505, 508 n.3 (D.N.J. 2006), *vacated on other grounds*, 553 F.3d 248 (3d Cir. 2009); *Zucker ex rel. AIM Small Cap Growth Fund/A v. AIM Advisors, Inc.*, 371 F. Supp. 2d 845, 850-51 (S.D. Tex. 2005).[11]

The same analysis applies here. While plaintiffs have statutory authority to sue on behalf of their own plans, neither ERISA nor any other statute or common law principle gives them the right (i) to sue on behalf of *other* plans in which they are not participants or (ii) to force their own plans or plan fiduciaries to represent a class of *other* employers' ERISA plans. Accordingly, plaintiffs' attempt to do so should be barred for lack of standing.

**C.    Plaintiffs Have No Standing To Sue For Losses Suffered In Collective Funds In Which They Did Not Invest Personally.**

Plaintiffs also lack constitutional standing to complain about losses in *Collective Funds* in which they never invested. "[C]onstitutional standing [is] a prerequisite to Rule 23 class certification." *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 108 (D.C. Cir.

---

[11] *See also In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d 342, 353 (W.D. Pa. 2005); *In re Franklin Mut. Funds Fee Litig.*, 388 F. Supp. 2d 451, 468 n.13 (D.N.J. 2005); *Williams v. Bank One Corp.*, 2003 WL 22964376, at *1 (N.D. Ill. 2003) (Ex. M hereto) (rejecting plaintiff's attempt in "purported derivative action" to represent trust in which he had no "ownership interest").

2002); *accord Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001).  To

have standing, a class representative must "possess the same interest and suffer the same injury"

as the absent class members.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997)

(internal quotation marks and citation omitted); *accord Gen. Tel. Co. v. Falcon*, 457 U.S. 147,

156 (1982).

As demonstrated in Part A above, plaintiffs have constitutional standing to sue on behalf

of their own plans only to the extent that they themselves can claim to have suffered losses.  In

light of this principle, plaintiff Diebold could not have sued on behalf of the ExxonMobil Plan if

the S&P 500 Fund had not suffered losses.  By the same token, he cannot sue on behalf of the

ExxonMobil Plan for losses suffered entirely by *other* ExxonMobil Plan participants in *other*

Collective Funds (those other than the S&P 500) in which he had no interest.

Outside of the ERISA context, the law is clear that investors in one mutual fund cannot

sue on behalf of investors in entirely different mutual funds.  Even in a class action, an investor

is limited to suing for harm allegedly inflicted on the particular fund in which he or she

personally invested.[12]  That plaintiffs are participants in ERISA plans does not change that basic

analysis.  Mr. Diebold cannot sue for losses suffered by ExxonMobil plan participants who chose

entirely different (namely, non-S&P 500) investment options.  Under no circumstances would he

or Mr. Hundt have standing to assert claims beyond those brought on behalf of their respective

defined contribution plans for losses suffered as a result of participant-directed investments in

---

[12] *See, e.g.*, *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008) ("Plaintiffs lack standing for claims relating to funds in which they did not personally invest."); *Nenni v. Dean Witter Reynolds, Inc.*, 1999 WL 34801540, at *2 (D. Mass. 1999) (Ex. N hereto) (same); *Siemers v. Wells Fargo & Co.*, 2006 WL 3041090, at *7-8 (N.D. Cal. 2006) (Ex. O hereto) (plaintiff lacked standing to pursue claim under § 36(b) of Investment Company Act of 1940 as to "funds other than those owned by plaintiff"); *In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, 2005 WL 2677753, at *10 (S.D.N.Y. 2005) (Ex. P hereto) (same as to funds in which plaintiffs "do not own shares"), *vacated on other grounds*, 2006 WL 74439 (S.D.N.Y. 2006).

the four specific Collective Funds in which plaintiffs invested.  Any and all other claims should be dismissed for lack of standing.

## CONCLUSION

Plaintiffs' amended complaint should be dismissed in full with prejudice.  At the very least, this Court should dismiss claims brought on behalf of all plans other than the ExxonMobil and TI plans and on behalf of all Collective Funds other than the four lending funds in which plaintiffs allegedly invested.

Respectfully submitted,

Dated: February 16, 2010

/s/ Michele Odorizzi
Michele Odorizzi
Caryn L. Jacobs
John J. Tharp, Jr.
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600