**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| JOSEPH L. DIEBOLD, JR., on behalf of the EXXONMOBIL SAVINGS PLAN, and PAUL J. HUNDT, on behalf of the TEXAS INSTRUMENTS 401(K) SAVINGS PLAN, and all others similarly situated, | ) ) ) ) ) | CIVIL ACTION NO. 09-Civ-1934  Hon. William J. Hibbler |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................... 3

    A.    Defendants Were and Are Fiduciaries for Plaintiffs and the Plans
           Under ERISA ............................................................................................. 3

    B.    Defendants Mismanaged the Collateral Pools .................................................. 4

    C.    The Plans Suffered Losses ............................................................................. 5

    D.    Defendants Violated ERISA .......................................................................... 6

III.    ARGUMENT ....................................................................................................... 6

    A.    The Proper Legal Standard for a 12(b)(6) Motion to Dismiss ............................ 6

    B.    Plaintiffs' Detailed Factual Allegations State a Claim for Breach of
           Fiduciary Duty ............................................................................................ 8

           1.    Defendants Breached Their ERISA Fiduciary Duties ............................. 8

           2.    Relevant Law Compels Denial of Defendants' Motion to
                 Dismiss ............................................................................................. 12

           3.    Defendants Are Not "Innocent Victims of Market Forces." .................... 13

           4.    "We Were Just Following Orders" Is Not a Valid Defense .................... 14

           5.    Defendants' Investment Decisions Caused Plaintiffs'
                 Losses ............................................................................................... 15

    C.    Plaintiffs Have Stated Claims for Violations of ERISA § 406 ........................... 17

           1.    Plaintiffs' Allegations Show Multiple Prohibited
                 Transaction Violations ........................................................................ 17

            2.    Defendants' Exemption Defense Is Premature ...................................... 18

    D.    Plaintiffs Have Standing ............................................................................... 20

           1.    Defendants' Investment Decisions Injured Plaintiffs ............................. 21

            2.    Plaintiffs Have Standing Under ERISA to Sue for Their
                 Respective Plans ................................................................................ 22

3.      Defendants' Other Standing Objections Are Premature and Empty ...................................................................................................... 25

IV.      CONCLUSION ............................................................................................................. 25

# **TABLE OF AUTHORITIES**

## **Cases**

*ABN AMRO, Inc. v. Capital Intern. Ltd.*, 595 F. Supp. 2d 805 (N.D. Ill. 2008) ........................ 19

*Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson*, No. 03 Civ. 1060, 2006 WL 2934391 (N.D.N.Y. Oct. 12, 2006) ....................................................................... 15

*Alves v. Harvard Pilgrim Healthcare, Inc.*, 204 F. Supp. 2d 198 (D. Mass. 2002).................... 23

*Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440 (7th Cir. 2009)................................ 20

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008) ....................................................................... 23

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ............................................................................... 7, 18

*Batra v. Investors Research Corp.*, No. 89-0528, 1992 WL 278688 (W.D. Mo. Oct. 4, 1991) ............................................................................................................................. 24

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................. 7, 18

*B.P. Corp. North America Inc. Savings Plan Investment Oversight Comm. v. Northern Trust Investments, N.A.,* No. 08-6029 (N.D. Ill. 2008) ........................................... 1

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) .................................. 7, 8, 12, 13

*Buus v. WAMU Pension Plan*, No. 07-0903, 2007 WL 4510311 (W.D. Wash. Dec. 18, 2007).......................................................................................................................... 23

*Capitol Leasing Co. v. FDIC*, 999 F.2d 188 (7th Cir. 1993)...................................................... 22

*Carter v. Pension Plan of A. Finkl & Sons, Co.*, No. 08-7169, 2009 WL 5066649 (N.D. Ill. Dec. 17, 2009) ...................................................................................................... 7, 18

*Cent. States, Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ............................................................. 23

*Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559 (1985)........................................................................................................................................ 20

*Chao v. Linder*, No. 05 C 3812, 2007 WL 1655254 (N.D. Ill. May 31, 2007) ........................... 8

*Charter v. John Hancock Life Ins. Co.*, 534 F. Supp. 2d 168 (D. Mass. 2007)......................... 23

*Compusource Oklahoma v. BNY Mellon, N.A.*, No. CIV-08-469-KEW, 2009 WL 2366112 (E.D. Okla. July 31, 2009) ...................................................................................... 13

*Cooney v. Rossiter*, 583 F.3d 967 (7th Cir. 2009) ....................................................................... 7

*Cress v. Wilson*, No. 06-2717, 2007 WL 1686687 (S.D.N.Y. June 6, 2007) .............................. 23

*DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 920 F.2d 457 (7th Cir. 1990).................. 12

*DiFelice v. U.S. Airways*, 497 F.3d 410 (4th Cir. 2007)............................................................ 11

*Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982) ................................................................... 8

*Erickson v. Pardus*, 551 U.S. 89 (2007) ................................................................................... 13

*Fallick v. Nationwide Mut. Life Ins. Co.*, 162 F.3d 410 (6th Cir. 1998)................................... 22

*FedEx Corp. v. Northern Trust Investments, N.A.*, No. 2:2008-CV-2827 (W.D. Tenn. 2008) ......................................................................................................................... 1

*Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101 (5th Cir. 1993) ............................................. 23

*Gearren v. The McGraw-Hill Companies*, ___ F. Supp. 2d ___, No. 08 Civ. 7890, 2010 WL 532315 (S.D.N.Y. Feb. 10, 2010)........................................................................ 14

*George v. Kraft Foods Global, Inc.*, ___ F. Supp. 2d ___, No. 08-C-3799, 2009 WL 4884027 (N.D. Ill. Dec. 17, 2009)........................................................................ 12, 13

*Gipson v. Wells Fargo & Co.*, No. 08-CV-4546 (DSD/FLN), 2009 WL 702004 (D. Minn. Mar. 13, 2009)....................................................................................................... 19

*Grafon Corp. v. Hausermann*, 602 F.2d 781 (7th Cir. 1979) ................................................... 22

*Guerrand-Hermes v. J.P. Morgan & Co.*, 769 N.Y.S.2d 240 (App. Div. 2003)........................ 15

*Haddock v. Nationwide Fin. Servs.*, 262 F.R.D. 97 (D. Conn. 2009)........................................ 22

*Howell v. Motorola*, 337 F. Supp. 2d 1079 (N.D. Ill. 2004)...................................................... 11

*In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885, 2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005) ................................................................................. 24

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 284 F. Supp. 2d 511 (S.D. Tex. 2003) ................................................................................................................................ 15

*In re Huntington Bancshares, Inc. ERISA Litig.*, 620 F. Supp. 2d 842 (S.D. Ohio 2009)................................................................................................................ 13, 14

*In re Ford Motor Co. ERISA Litig.*, 590 F. Supp. 2d 883 (E.D. Mich. 2006) ........................... 13

*In re Lehman Brothers Securities and ERISA Litig.*, ___ F. Supp. 2d ___, No. 09-MD-2017, 2010 WL 354937 (S.D.N.Y. Feb. 2, 2010)...................................................... 16

*In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461 (S.D.N.Y. 2005) ......................................... 15

*In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606 (N.D. Tex. 2008) ......................... 22

*In re Regions Morgan Keegan ERISA Litig.*, ___ F. Supp. 2d ___, No. 08-2192,
  2010 WL 809950 (W.D. Tenn. Mar. 9, 2010) ............................................................... 14, 19

*Kaufman v. Dreyfus Fund, Inc.*, 434 F.2d 727 (3d Cir. 1970) ............................................... 23, 24

*Keach v. U.S. Trust Co.*, 235 F. Supp. 2d 886 (C.D. Ill. 2002) .................................................. 19

*Keach v. U.S. Trust Co.*, 419 F.3d 626 (7th Cir. 2005) ............................................................. 18

*LaRue v. DeWolff, Boberg & Assoc. Inc.*, 522 U.S. 248, 256 (2008) ......................................... 25

*Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797 (7th Cir. 2008) .................................. 7

*Lockheed Martin Investment Management Co. v. Northern Trust Investments,
  N.A.*, No. 8:2009-CV-1649 (D. Md. 2009) .................................................................................. 1

*Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209 (2d Cir. 1987) ............................................. 18

*Misch v. Community Mut. Ins. Co.*, No. 94-428, 1995 WL 1055171 (S.D. Ohio
  Feb. 15, 1995) .......................................................................................................................... 23

*Pegram v. Herdrich*, 530 U.S. 211 (2000) ............................................................................ 8, 10

*Reyes v. City of Chicago*, 585 F. Supp. 2d 1010 (N.D. Ill. 2008) ................................................ 7

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994) ............................................. 16

*Sherrill v. Federal-Mogul Corp.*, 413 F. Supp. 2d 842 (E.D. Mich. 2006) ............................... 11

*Sutton v. Med. Serv. Assoc. of Penn.*, No. 92-4787, 1993 WL 273429 (E.D. Pa.
  July 20, 1993) ........................................................................................................................... 23

*Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008) ............................................................... 7

*Taylor v. United Techs. Corp.*, No. 06-cv-1494, 2008 WL 2333120 (D. Conn.
  June 3, 2008) ............................................................................................................................ 25

*Tussey v. ABB, Inc.*, No. 06-04305, 2008 WL 379666 (W.D. Mo. Feb. 11, 2008) ................... 25

*Wu v. MAMSI Life & Health Ins. Co.*, 256 F.R.D. 158 (D. Md. 2008) ...................................... 22

## Statutes

ERISA § 3(38), 29 U.S.C. § 1002(38) ......................................................................................... 3

ERISA § 404, 29 U.S.C. § 1104 ................................................................................................... 6

ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) ...................................................... 15

ERISA § 406, 29 U.S.C. § 1106 ................................................................................... 17

ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A) ...................................................... 17

ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(1)(B ..................................................... 17, 18

ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C) ............................................... 17, 18

ERISA § 406(b), 29 U.S.C. § 1106(b) ......................................................................... 17

ERISA § 409, 29 U.S.C. § 1109 ..................................................................................... 8

ERISA § 410(a), 29 U.S.C. § 1110(a) .......................................................................... 20

**Rules**

Fed. R. Civ. P. 8 ......................................................................................................... 6, 7

Fed. R. Civ. P. 12 ..................................................................................................... 7, 22

Fed. R. Civ. P. 23 ............................................................................................... 22, 23, 24

Fed. R. Civ. P. 23.1 ................................................................................................. 23, 24

**Miscellaneous**

71 Fed. Reg. 63796 (Oct. 31, 2006) ............................................................................. 19

## I.  INTRODUCTION

Plaintiffs Joseph L. Diebold and Paul J. Hundt, participants in, respectively, the ExxonMobil Savings Plan ("Exxon Plan") and the Texas Instruments 401(k) Savings Plan ("TI Plan) (collectively the "Plans"), retirement plans governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), bring this case against Defendants Northern Trust Investments, N.A. ("NTI"), and Northern Trust Company ("NTC") on behalf of the Plans and a class of similarly situated plans that suffered massive losses as a result of Defendants' mismanagement of their securities lending operation.  Instead of investing collateral pool (hereinafter "Collateral Pool") assets in safe, liquid instruments as necessary to fulfill the pools' stated purpose and risk profile, Defendants gambled with the funds entrusted to them, taking massive risk with Plaintiffs' money, taking half the earnings, and sharing none of the loss.  The 2008-09 collapse of American financial markets revealed these risky investment practices and the Plans incurred massive losses disproportionate to the incremental return that the securities lending program offered to the participating plans.  This lawsuit, and others like it, followed.

Defendants did not move to dismiss the ERISA claims in the related BP plan case before this Court, *B.P. Corp. North America Inc. Savings Plan Investment Oversight Comm., et al. v. Northern Trust Investments, N.A., et al.*, No. 08-6029 (N.D. Ill. 2008), nor similar cases brought on behalf of the Lockheed Martin plan, *Lockheed Martin Investment Management Co. v. Northern Trust Investments, N.A., et al.*, No. 8:2009-CV-1649 (D. Md. 2009), and the FedEx plan, *FedEx Corp., et al. v. Northern Trust Investments, N.A., et al.*, No. 2:2008-CV-2827 (W.D. Tenn. 2008), in other districts against the same Defendants.  Even so, Defendants insist that this case, alleging much the same facts, violations and claims as the other cases, must be dismissed. It makes no sense that the only case alleged as a class action (and that would accordingly require Defendants to act even-handedly with respect to all plans) should be dismissed while individual lawsuits brought by very large Fortune 50 plans should go forward.

Defendants make two principal arguments. First, they argue that the Complaint[1] does not contain sufficient factual detail to set forth a claim of ERISA imprudence or prohibited transactions. While replete with the requisite motion to dismiss catch-phrases — "conclusory," "hindsight," "no-one could have predicted" — Defendants' motion turns a blind eye to Plaintiffs' detailed fact allegations. True, Plaintiffs do not, at this stage, have access to Defendants' internal fiduciary decision-making process that resulted in the collapse of the Collateral Pools, but the Complaint alleges numerous facts to support a plausible claim that Defendants violated ERISA.

Indeed, the Complaint describes exactly what went wrong — Defendants exposed the Collateral Pools to excessively risky investments, unsuitable for a pool of assets that was purportedly safe, conservative, and highly liquid — and how the Plans were harmed as a result, because of the mismanagement the Plans suffered massive losses in the Collateral Pools that were passed on to the participating plans. The Complaint also alleges a motive for the imprudence: the desire to increase Defendants' profits by playing upon the asymmetrical risk structure of the securities lending operation through which Defendants pocketed 40% of any gains, but saddled the Plans with all the responsibility for any losses.

Defendants also challenge Plaintiffs' standing to pursue losses on behalf of their Plans and other similarly situated plans. The Complaint alleges that Plaintiffs suffered losses in their ERISA plan investments in the collective funds ("Collective Funds" or "Funds") as a result of the collapse of the Collateral Pools. That pleading is sufficient, particularly given that Plaintiffs do not have the data to calculate their losses. Defendants also raise premature class certification arguments. At class certification, Plaintiffs will show that the Plans and other plans participating in Defendants' securities lending program were subject to a common course of conduct. That however, is for another day.

---

[1] All references to the "Complaint" are references to the Amended Class Action Complaint (Dkt. No. 25-1), filed Dec. 3, 2009, and all citations to "Compl. ¶ _," are references to the relevant paragraphs of the Am. Complaint.

## II.    BACKGROUND

Plaintiffs are participants in defined contribution Plans covered by ERISA.  (Compl. ¶¶ 1, 13-14).  Through their respective Plans, Plaintiffs invested in Collective Funds managed by NTI (*Id.* ¶¶ 13-14, 33-34) that participated in Defendants' securities lending program. (*Id.* ¶¶ 2, 22, 28).  Defendant NTI marketed its securities lending program as a means of incrementally boosting Fund returns.  (*Id.* ¶ 2).  As investors in the Funds, the Plans, and in turn their participants, shared *pro rata* in any gains or losses the Funds experienced.  (*Id.* ¶ 30).

Investors borrowed shares from the Funds that participated in the securities lending program.  (*Id.* ¶ 5).  Borrowers post collateral equal to 102% of the value of the borrowed shares. (*Id.*).  The lending agent, here Defendant NTC, negotiates the terms of the securities loans with borrowers and decides where to invest the cash collateral received from borrowers.  (*Id.*).  Given the goals of the program, a prudent investment manager would have invested the collateral under its care in safe, liquid securities and carefully monitored the risks of any investments.  (*Id.* ¶ 6). Instead, NTC invested the collateral in Collateral Pools that were unduly risky and ultimately caused the Plans to incur tremendous losses.  (*Id.*).

## A.    Defendants Were and Are Fiduciaries for Plaintiffs and the Plans Under ERISA.

NTI served as investment manager for each of the Plans that participated in Defendants' securities lending program.  (Compl. ¶¶ 6, 18).  NTI entered into form investment manager agreements with the Plans establishing that NTI had the rights, duties and obligations of an investment manager over Plan assets and acknowledging NTI was an investment manager under ERISA § 3(38), 29 U.S.C. § 1002(38).  (*Id.* ¶ 20, *citing Investment Manager Agreement,* (Ex.1)). NTI was also a fiduciary with discretion to manage, acquire and dispose of assets in the Collateral Pools.  (*Id.* ¶ 21).

NTC was an ERISA fiduciary of the Plans with discretionary authority concerning the Plans' assets.  It served as the securities lending agent for all of the Funds.  (*Id.* ¶ 22).  It

maintained physical custody of the collateral, selected borrowers for the securities and determined from which Funds to lend requested securities. (*Id.*) It also had the power to add or delete Collateral Pools as investment options for the collateral it received. (*Id., citing Securities Lending Authorization Agreement*, (Ex. 2); *see also id.* ¶¶ 38-39). Despite their fiduciary status, Defendants received 40% of the income generated by the Collateral Pools, (*id.* ¶ 40), but shared none of the risk of loss in the Collateral Pools. (*Id.* ¶¶ 40-41, 68, 84). Defendants did not inform plan fiduciaries of this allocation of risk. (*Id.* ¶ 69).

## B. Defendants Mismanaged the Collateral Pools.

Defendants' securities lending program was supposed to generate incremental returns at low risk and without impairment to liquidity. (Compl. ¶¶ 2, 25, 41). To that end, each of the Collateral Pools NTI managed adopted investment guidelines requiring NTI to preserve capital and provide for liquidity. (*Id.* ¶ 41). The guidelines did not authorize Defendants to expose the plans and Plaintiffs to risks that could potentially dwarf the incremental returns that the securities lending program could offer them. (*Id.*) The investment guidelines for the Collateral Pools required that funds be invested in short term investments with low risk to capital or liquidity. (*Id.*) For example, the guidelines for the Core USA Collateral Pool explained that the cash collateral would be invested to maximize income "***to the extent consistent with preservation of liquidity.***" (*Id.* ¶ 41 (emphasis added)). The Short Term Extendable Portfolio ("STEP") guidelines explained it was an ultra-short duration fund attempting to outperform "high grade" short-term money market funds.

NTC ignored these investment guidelines. It invested collateral in various Collateral Pools managed by NTI, including the Core USA Collateral, STEP and the Short Term Investment Fund ("STIF"). (*Id.* ¶¶ 40-45). Instead of investing in low-risk, short-duration instruments, NTI invested billions of dollars in debt instruments, bonds, notes, and other fixed-income instruments that were both too long-term and high-risk for a collateral reinvestment. (*Id.* ¶ 46). When deciding to lend securities, NTC loaned more securities on behalf of each Fund

than was prudent, thereby causing the Collateral Pools to carry a higher aggregate market risk than the aggregate market risk carried by the Funds' securities on loan. (*Id*. ¶ 39). The Complaint describes many imprudent investments, including several with substantial exposure to asset-backed securities and risky subprime mortgages. (*Id*. ¶¶ 52-53).

Defendants knew, by 2006, that the markets for Collateral Pool investments such as asset-backed, and fixed-income instruments were becoming increasingly risky and illiquid. (Compl. ¶ 46). NTC's own chief economist and others forecast a housing recession in 2006 and anticipated further erosion in the housing sector in the years that followed. (*Id*. ¶ 47). Nonetheless, NTI continued to purchase and hold imprudent collateral investments. By 2007, Defendants were aware of the growing liquidity crisis in the credit markets and that the secondary market for the fixed-income instruments held in Collateral Pools was rapidly deteriorating. (*Id*. ¶ 47-50). But they did little to mitigate Plaintiffs' and the Plans' exposure to risky Collateral Pool investments and continued to invest in sub-prime instruments. (*Id*. ¶ 51).

## C.     The Plans Suffered Losses.

In 2008, the Collateral Pool performance deteriorated further. Several asset-backed instruments in the Collateral Pools became permanently impaired or were substantially marked down in value. (Compl. ¶¶ 52, 60). On May 31, 2008, the STEP Pool had a market value of $13.6 billion with an average maturity of 48 days. By August 31, 2008, the STEP Pool lost $2 billion dollars in market value (to $11.4 billion) with an average maturity of 45 days. (*Id*. ¶ 57). That Pool invested 63.7% in corporate debt securities, 7% in banking stocks, 10.3% in mortgage-backed securities, 6.1% in commercial mortgage backed securities and only 5.9% in cash equivalents or Treasuries. (*Id*.). The STEP Pool had a negative .36% return. (*Id*.). Other Collateral Pools suffered similar declines. (*Id*. ¶¶ 58-59). On September 19, 2008, NTI declared collateral deficiencies in four of the Collateral Pools and a fifth experienced a "loss in value." (*Id*. ¶¶ 61-63). This meant that on a pro rata basis, the Collective Funds (in which Plaintiffs and their Plans invested) had to make up the shortfall in the value of Collateral Pool assets as

5

compared to the value of the cash collateral posted by borrowers. (*Id.* ¶¶ 61, 63). Following the collateral deficiency, NTI implemented new withdrawal guidelines and restrictions. (*Id.* ¶ 64).

## D.     Defendants Violated ERISA.

Defendants' breaches of fiduciary duty caused the Funds, the Plaintiffs, and other investors to suffer substantial losses. The value of the Collateral Pools declined precipitously, causing Plan losses. (Compl. ¶ 72). Each of the Funds in which Plaintiffs' Plans invested were benchmarked to a stock or bond index, yet, as a result of Defendants' imprudence, the Funds underperformed their respective benchmarks and continue to hold securities that NTI selected and are now worthless and considered permanently impaired. (*Id.* ¶ 71). For example, by August 31, 2008, the Daily Aggregate Bond Fund had lost approximately $20 million, and the S&P 500 Fund had lost approximately $36.5 million. (*Id.* ¶ 73). Defendants have informed the plans that they are responsible for the losses and must repay Defendants their pro rata share of these losses. (*Id.* ¶¶ 13-14, 30, 61, 73).

Count I alleges that Defendants breached their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104 by: (i) exposing the Plans' assets to excessive levels of risk; (ii) failing to discharge their duties solely in the interests of the Plans' participants; (iii) failing to invest and manage the Plan assets as a reasonably prudent fiduciary; (iv) failing to undertake an adequate investigation into their highly risky and speculative investment of collateral in asset-backed and other illiquid instruments; and (v) failing to provide material information to Plaintiffs regarding the securities lending. (*Id.* ¶¶ 116-119). Count II alleges that Defendants engaged in numerous prohibited transactions with the Plans in violation of ERISA § 406, 29 U.S.C. § 1106.

## III.     ARGUMENT

## A.     The Proper Legal Standard for a 12(b)(6) Motion to Dismiss.

Defendants' abbreviated statement of the Rule 8 pleading standard leaves much unsaid. "A plaintiff's complaint need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, sufficient to provide the defendant with fair notice of the claim

and its basis." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008) (citing (Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (quotations omitted). When considering a motion to dismiss under Rule 12(b)(6), the court "construe[s] the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Id*. Rule 8 requires nothing more than that Plaintiffs' allegations bear enough facial plausibility to "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).

This Circuit has recently admonished that *Twombly* "must not be overread" to include heightened pleading of specifics, noting that "[w]ithin weeks after deciding [*Twombly*], the [Supreme] Court reversed a Tenth Circuit decision requiring fact pleading." *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008); *Carter v. Pension Plan of A. Finkl & Sons, Co.*, No. 08-7169, 2009 WL 5066649, at *3 (N.D. Ill. Dec. 17, 2009) (citing *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009)) ("Even post-*Twombly* and *Iqbal*, there is no requirement that a pleading set forth every relevant fact or recite the applicable law."); *Reyes v. City of Chicago*, 585 F. Supp. 2d 1010, 1016 (N.D. Ill. 2008) (citing *Twombly*, 550 U.S. at 556) ("[N]either specific facts nor evidence are required for pleading purposes in federal court.").

When assessing the sufficiency of an ERISA complaint, the court should also take into account plaintiffs' "limited access to crucial information." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (rejecting argument that plaintiffs did not allege sufficient facts for breach of duty in part because "[n]o matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences"). Indeed, if "plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer." *Id*. The court's reasoning in *Braden* applies here. Plaintiffs alleged detailed facts supported by several exhibits, but there are still

myriad facts in Defendants' sole possession.  Among these facts are the specific operational

details of the securities lending program, Defendants' Collateral Pool investment decisions, the

amount of compensation received by Defendants, and how (or whether) they evaluated the level

of risk appropriate for the program.  Requiring Plaintiffs to plead such facts solely within

Defendants' possessions would defeat Congress' "inten[t] that private individuals would play an

important role in enforcing ERISA's fiduciary duties — duties which have been described as 'the

highest known to the law.'"  *Braden*, 588 F.3d at 598 (quotations omitted).

**B.**      **Plaintiffs' Detailed Factual Allegations State a Claim for Breach of Fiduciary Duty.**

ERISA-imposed fiduciary duties are "the highest known to law."  *Chao v. Linder*, No. 05

C 3812, 2007 WL 1655254, at *6 (N.D. Ill. May 31, 2007) (citing *Donovan v. Bierwirth*, 680

F.2d 263, 272 (2d Cir. 1982)).  To state a breach of fiduciary duty claim, Plaintiffs must allege

that Defendants were fiduciaries who breached their duties.  *See* ERISA § 409, 29 U.S.C. §

1109; *Pegram v. Herdrich*, 530 U.S. 211, 222-24 (2000).  Count I alleges that Defendants (NTI

and NTC) were fiduciaries to Plaintiffs' Plans.  (Compl. ¶¶ 17-21, 123-124)  It alleges that while

acting as fiduciaries, Defendants breached their duties to Plaintiffs' Plans by engaging in

imprudent and disloyal conduct.  (*Id.* ¶¶ 49-63, 117-119).  Defendants do not deny their fiduciary

status or their duties. Thus, Plaintiffs focus on the remaining elements, namely breach, causation,

and loss.  Plaintiffs' losses are discussed in Part III.D.1, *infra*.  Causation issues are generally not

resolved on a motion to dismiss when the plaintiff pleads breach and loss, but the discussion

below shows that Defendants' violations of ERISA caused Plaintiffs' injuries.  We turn now to

breach.

**1.**      **Defendants Breached Their ERISA Fiduciary Duties.**

Defendants only offer two arguments against breach: (1) Plaintiffs' allegations are

"conclusory" and (2) based on "20/20 hindsight."  (Defendants' Memorandum in Support of

Their Motion to Dismiss (Dkt. No. 37) ("Mem.") at 9).  But Plaintiffs' Complaint describes in

great detail the ways in which Defendants breached their fiduciary duties to Plaintiffs and the

8

other participants in the plans.

The Investment Guidelines mandated that Defendants invest the cash collateral obtained from their securities lending program in the most cautious manner possible: in short-term, highly liquid, conservative investment vehicles. (Compl. ¶¶ 41-45). Defendants ignored the guidelines and invested the cash collateral in extremely risky, long-term investments. Such investments were breaches of Defendants' fiduciary duties to Plaintiffs, the Plans and similarly situated retirement plans and their participants. Among other things, Defendants gambled massive amounts of cash collateral by investing in the sub-prime housing market. (*Id.* ¶ 46 ("NTI invested the Collateral Pools, worth billions of dollars, in debt instruments, bonds, notes and other fixed income instruments."); *id.* ¶ 51 ("NTI . . . invest[ed] the Collateral Pools in . . . risky and sub-prime fixed-income (debt) instruments . . . includ[ing], but . . . not limited to, bank time deposits, repurchase agreements, corporate bonds, commercial paper, or asset-backed securities under which periodic interest payments were made and payment of principal was due upon maturity."); *id.* ¶ 52 ("The STIF and Core Select Pools were both invested in two structured investment vehicles (SIVs) that breached their capital value triggers . . . sponsored by Standard Chartered Bank, Whistlejacket Capital LLC, and White Pine Finance LLC . . . . [T]he STEP Pool included risky investments in the CIT Group which had an underperforming home lending business. . . . CIT Group has since declared bankruptcy. . . . Other risky investments in STEP's portfolio included: (1) Capmark Financial Group which had significant exposure in the commercial mortgage sector . . . and (2) iStar Financial, Inc., a finance company focused on the commercial real estate industry."); *id.* ¶ 60 ("[D]efendants . . . had invested the Collateral Pools in Lehman Brothers' debt instruments. As a result of the Lehman Brothers' bankruptcy and later events in the financial markets, assets in the Collateral Pools became even more illiquid, especially when the stock prices plummeted.")). All this risk was borne by the Collective Funds that held Plaintiffs' retirement savings. (*Id.* ¶¶ 3, 30).

Defendants knew the investments posed undue risk for a securities lending program. NTC's own chief economist broadcast concerns about the housing market to whomever would

listen (*id.* ¶ 47), but Defendants continued to invest in asset-backed sub-prime mortgages, SIVs, and other high-risk securities and derivatives inconsistent with the goals of liquidity, capital preservation, and low-risk incremental returns. (*Id.* ¶¶ 49-63, 117). Defendants did not provide Plaintiffs with complete information concerning their Collateral Pool investment strategies, their risk management measures, the Collateral Pool performance, and Defendants' compensation system in connection with the securities lending program. (*Id.* ¶ 119).

Defendants try to characterize the voluminous and detailed supporting allegations as nothing more than a "mere smattering" of inconsistent, public reports. (Mem. at 10). Defendants ignore that the Complaint cites detailed comments from NTC's Senior Vice President and Chief Economist, Paul Kasriel, who made numerous public statements that forecast dire prospects for the housing/sub-prime lending market, which was the very market in which Defendants were purchasing instruments with the cash collateral they received from lending out Plaintiffs' securities. (Compl. ¶ 47). Specifically, the Complaint states:

> Housing is in a recession. . . . A typical housing downturn sees a drop of 50 percent from the peak, and at this point [in November 2006] we are only about halfway there. . . . [In March 2007, NTC] economist Paul Kasriel said . . . he suspected there were lurking problems in the lax lending standards that helped fuel the latter stages of the [housing] boom. . . . We never really extended credit to people who have no known ability to pay it back and have no skin in the game. . . . How bad it's going to get, we don't know.

(*Id.*) Thus, Plaintiffs' allegations are not about isolated pessimistic or bearish statements; they are about Defendants' own direct knowledge of the asset bubble and looming credit crisis. Defendants' knowledge of the instability in the housing market, combined with the twin factual allegations that NTC loaned out a higher percentage of plan securities than was prudent (*see* Compl. ¶ 39 ("As a result of [NTC] lending a higher than prudent volume of the Funds' securities to Borrowers, the Collateral Pools for the Funds by default carried a higher aggregate market risk than the aggregate market risk carried by the Funds' securities which were on loan.")), and that the Collateral Pool investments deviated from the short-term, high-liquidity instruments in which cash collateral was supposed to be invested (*see id.* ¶ 41 ("[Plaintiffs'

Plans] did [not] authorize the Lending Agent to expose the Collateral Pools to a level of risk out of step with the incremental return that the securities lending program purported to provide to the Funds.")) clearly indicate that Defendants' Collateral Pool investments were too risky to be a part of a prudently run securities lending program.

Defendants ignore the detailed factual allegations contained in the Complaint. Instead, they suggest that it was acceptable to invest cash collateral in risky securities because "it is often reasonable to include investments presenting more risk in a diversified portfolio." (Mem. at 10). Defendants err here for multiple reasons. First, whether purchasing certain risky securities was appropriate is the primary factual issue in this case and it cannot be resolved on a motion to dismiss. *See Howell v. Motorola*, 337 F. Supp. 2d 1079, 1099 (N.D. Ill. 2004) (holding that whether an ERISA fiduciary's actions surrounding the purchase and retention of certain securities for the plan constituted breach of duty was "a question that will require extensive discovery and factual development" not suited to resolution on a motion to dismiss); *Sherrill v. Federal-Mogul Corp.*, 413 F. Supp. 2d 842, 868 (E.D. Mich. 2006) (noting that "courts have not hesitated to find that the question of prudence is a question of fact and that it is error to decide that question as a matter of law"). Second, Defendants' reliance on *DiFelice v. U.S. Airways* for its "diversification" defense is misplaced. (Mem. at 10 (citing *DiFelice v. U.S. Airways*, 497 F.3d 410 (4th Cir. 2007))). Within any given portfolio, diversification is certainly appropriate. But diversification is not an excuse to take excessive risk that is incompatible with the investment objectives of the portfolio. Taken to its logical conclusion, Defendants' argument would permit a U.S. Treasury fund to invest in pork belly futures. Plainly, investment guidelines and objectives exist for a reason and broad principles of diversification cannot justify excessive risk. Here, as opposed to the defendants in *DiFelice*, Defendants were supposed to select safe, conservative investments for the cash collateral they received. (Compl. ¶¶ 3-6, 41-45). Defendants did not do so, and Plaintiffs suffered the consequences.

That all the instant losses fell on Plaintiffs cannot be over-emphasized here. As detailed in Plaintiffs' Complaint, Defendants structured the securities lending program in a manner that

created an incentive for Defendants to take improper risks with Plaintiffs' securities. While Plaintiffs would receive 60% of the securities lending program's upside, they were pegged with 100% of the downside. (*Id.* ¶¶ 40-41, 61). Thus, Defendants had no incentive to be conservative in selecting investments to purchase with the cash collateral. Structuring the securities lending program in this manner created an inherent conflict of interest for Defendants — their profit incentive for earning lending fees was at loggerheads with their duties to Plaintiffs. Defendants ignore this point in arguing for dismissal.

### 2. Relevant Law Compels Denial of Defendants' Motion to Dismiss.

The case law uniformly mandates denial of Defendants' motion to dismiss. For example, in *George v. Kraft Foods Global, Inc.*, this Court denied the defendants' motion to dismiss the plaintiffs' claim for breach of ERISA fiduciary duties. *George v. Kraft Foods Global, Inc.*, ___ F. Supp. 2d ___, No. 08-C-3799, 2009 WL 4884027, at *13 (N.D. Ill. Dec. 17, 2009). In *George*, as here, defendants relied on *DeBruyne v. Equitable Life Assurance Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990), to support their assertion that plaintiffs were simply the victims of poor investment performance, viewed in hindsight, which could not give rise to an ERISA claim. *Compare George,* 2009 WL 4884027 at *13 (discussing and rejecting overly broad application of *DeBruyne* at the motion to dismiss stage for the proposition that ERISA "requires prudence, not prescience") *with* Mem. at 9 (citing *DeBruyne* for the rule that "ERISA's fiduciary duty of care 'requires prudence, not prescience'"). The *George* court rejected that argument and held that the plaintiffs had stated a claim for breach of ERISA fiduciary duty by alleging that the defendants "fail[ed] to utilize a meaningful process to review the continued appropriateness of the [Plan] investment options." 2009 WL 4884027 at *13.

Similarly, in *Braden,* the Eighth Circuit rejected the defendants' argument that plaintiffs were "required to describe directly the ways in which [defendants] breached their fiduciary duties." 588 F.3d at 596. Instead, the court held that "it is sufficient for a plaintiff to plead facts indirectly showing unlawful behavior, so long as the facts pled 'give the defendant fair notice of

what the claim is and the grounds upon which it rests.'" *Id*. (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (citations and quotations omitted). It was sufficient that the *Braden* plaintiffs generally alleged the size of the plan and its assets, the relevant market in which the assets were invested, and behavior by the fiduciary — including the fees it charged and its process for selection and management of securities — that tended to show that the process it used to manage the plaintiffs' assets was flawed. *Id.*; *see also Compusource Oklahoma v. BNY Mellon, N.A.*, No. CIV-08-469-KEW, 2009 WL 2366112, at *4 (E.D. Okla. July 31, 2009) (motion to dismiss denied in securities lending case where plaintiff alleged defendant breached its duties in selecting and maintaining investments out of line with investment guidelines); *In re Ford Motor Co. ERISA Litig.*, 590 F. Supp. 2d 883, 893 (E.D. Mich. 2006) (denying motion to dismiss plaintiffs' claim for breach of ERISA fiduciary duty of prudence where defendants ignored red flags concerning certain securities and failed to investigate whether it should maintain investments in such securities). Plaintiffs' pleadings here are as detailed as the plaintiffs' allegations in *George* and *Braden*.

### 3. Defendants Are Not "Innocent Victims of Market Forces."

Defendants further attempt to turn aside Plaintiffs' allegations by portraying themselves as the unlucky victims of market forces beyond their control. They rely almost exclusively on *In re Huntington Bancshares, Inc. ERISA Litig.*, to suggest they should not be held liable for losses following the general market decline. 620 F. Supp. 2d 842 (S.D. Ohio 2009). But *Huntington* has nothing to do with this case. First, *Huntington* is an ERISA breach of fiduciary duty company stock case involving an ESOP Plan. *Id.* at 843. The issue in the case was whether the Plan fiduciaries knew or should have known that the ESOP, despite being designed to invest in Huntington stock, should have sold the stock because it had become an imprudent investment. *Id.* at 847. There is much debate among the courts concerning what a plaintiff must allege in order to state a claim in an ESOP case like *Huntington*. The disagreement stems in large part from whether defendants in such cases are entitled to a presumption of prudence for investment

13

in company stock in light of the fact that ESOP plans are not designed solely for the purpose of retirement savings, but also to allow for employee ownership, and if so, whether the presumption is properly applied at the pleading stage. *Compare In re Regions Morgan Keegan ERISA Litig.*, ___ F. Supp. 2d ___, No. 08-2192, 2010 WL 809950, at *5 (W.D. Tenn. Mar. 9, 2010) ("It is improper, on a motion to dismiss, for the Court to apply evidentiary presumptions.") *with Gearren v. The McGraw-Hill Companies*, ___ F. Supp. 2d ___, No. 08 Civ. 7890, 2010 WL 532315, at *12 (S.D.N.Y. Feb. 10, 2010) (applying the presumption of prudence at the pleadings stage). Yet, this disagreement is irrelevant here since this is not a company stock case.

Second, as a factual matter, the bases for the court's conclusions in *Huntington* are wholly inapposite. Rightly or wrongly, in *Huntington* the court concluded that the defendants did not know about Huntington's problems, and could not have predicted the calamity that occurred (Huntington purchased a sub-prime lender at the worst possible time and was nearly bankrupted as a result). 620 F. Supp. 2d at 852-53. Here, in contrast, the Complaint alleged that Defendants ignored the stated risk profiles for the pools by purchasing assets that were too risky. (Compl. ¶¶ 41-46). The Complaint is based on *foresight* not hindsight. Had Defendants complied with the stated risk profile of the Collateral Pools, they would have avoided exposing the Pools to risky and inappropriate investments that caused massive losses. Finally, the court in *Huntington* noted that there were no "red flags" that triggered a duty to investigate whether the Huntington stock remained an appropriate investment. *Id.* at 852. In contrast, here Plaintiffs have alleged that NTC's own Senior Vice President and Chief Economist raised one alert after another both before and throughout the class period. (Compl. ¶ 47). The facts of this case establish that Defendants were not simply innocent market participants but were engaging in the misconduct alleged in Plaintiffs' Complaint.

### 4. "We Were Just Following Orders" Is Not a Valid Defense.

Defendants also contend that the Complaint should be dismissed because they were just following the investment guidelines for the Collateral Pools. This argument fails for many

reasons. First, Defendants cannot establish based on the pleadings that they adhered to the investment guidelines. That is a disputed fact. Second, Defendants rely on a New York state court decision to define the scope of their fiduciary duties. (Mem. at 9 (citing *Guerrand-Hermes v. J.P. Morgan & Co.*, 769 N.Y.S.2d 240, 242-43 (App. Div. 2003))). *Guerrand-Hermes* is not controlling authority for a federal ERISA case. Moreover, ERISA explicitly commands that fiduciaries should follow governing documents only when the terms of the documents are consistent with ERISA. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) ("[A] fiduciary shall discharge his duties with respect to a plan . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter . . . ."). Accordingly, ERISA case law holds that an investment fiduciary must depart from investment mandates when prudence or other duties require it. *See, e.g., Agway, Inc. Employees' 401(k) Thrift Inv. Plan v. Magnuson,* No. 03 Civ. 1060(HGM)(DEP), 2006 WL 2934391, at *18 (N.D.N.Y. Oct. 12, 2006) ("ERISA casts upon fiduciaries an affirmative, overriding obligation to reject plan terms where those terms would require such imprudent actions in contravention of the fiduciary duties imposed under ERISA."); *In re Polaroid ERISA Litig.,* 362 F. Supp. 2d 461, 473 (S.D.N.Y. 2005) ("ERISA commands fiduciaries to obey Plan documents only to the extent they are consistent with other fiduciary duties."); *In re Enron Corp. Sec., Derivative & ERISA Litig.,* 284 F. Supp. 2d 511, 549 (S.D. Tex. 2003). Here, Plaintiffs allege that prudence dictated that Defendants make different investment decisions (and also that Defendants ignored the stated risk profile for the pools). Thus, ERISA does not allow Defendants to hide behind investment guidelines that would work to the detriment of plan beneficiaries.

**5.    Defendants' Investment Decisions Caused Plaintiffs' Losses.**

Defendants attempt to portray Plaintiffs' claims as focusing on "the impairment of certain collateral pool holdings *after* Lehman's [Brothers] unexpected bankruptcy and the global economic cataclysm that it unleashed." (Mem. at 8 (emphasis in original)). Although the

impairment of Lehman investments is the symptom of Plaintiffs' losses, Defendants' investment decisions are the cause. That the symptoms appeared after Lehman's fall does not change the essential fact that Defendants and only Defendants made all the investment choices that matter. Thus, Plaintiffs do not allege that Defendants breached their fiduciary duties by failing to predict Lehman's collapse, but by deciding to acquire and retain classes of securities (including, but not limited to, Lehman's) that Defendants should never have included among their Collateral Pool investments. (Compl. ¶ 49 ("By 2007 it was abundantly clear that NTI had failed to properly select investments for some of the Collateral Pools, and had failed to divest or sell holdings from the Collateral Pools before it was imprudent to continue holding them. Internal [NTC] documents indicate that by August 2007, . . . Defendants were fully aware of the liquidity crisis in the market and the fact that the credit markets were freezing, and it was becoming more difficult to sell fixed-income investments into the secondary markets, including those fixed-income investments held by the Collateral pools."); *see generally*, *id.* ¶¶ 39-46, 49-53).

Thus, the Complaint does not seek to have the Court judge Defendants in hindsight or transform them into guarantors. As the Eighth Circuit stated in *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994), which was cited by Defendants, "[t]he basis for personal liability in each [ERISA] case is the breach of duty, which is not a guarantee but a standard of conduct that Congress has imposed and that the fiduciary can satisfy by acting reasonably." *Id.* at 920. Here, Plaintiffs seek to hold Defendants responsible for failing to meet this standard — nothing more, nothing less. *In re Lehman Brothers Securities and ERISA Litig.*, ___ F. Supp. 2d ___, No. 09-MD-2017, 2010 WL 354937 (S.D.N.Y. Feb. 2, 2010), cited by Defendants, is inapposite. *Lehman* (on appeal) involves an investment in employer stock via an investment fund expressly designed for that purpose. It would not be plausible for the plaintiffs in *Lehman* to argue that Lehman stock was a per se unsuitable investment for that fund. Here, in contrast, that is the sole issue: whether Lehman bonds were suitable for a low-risk, high liquidity fund. Entirely different issues and questions are raised in this case and in *Lehman*.

Similarly, the argument that Plaintiffs' claim for imprudence fails because Lehman's

stock was rated AAA is meaningless when the assessments of NTC's chief economic analyst wholly contradicted that positive rating. (*See* Mem. at 11). The question here is whether it was prudent for Defendants to use cash collateral, the purpose of which was to preserve the principal value of the collateral and avoid the risk of market fluctuation, for investments that it questioned in-house. And even if Defendants had not expressly questioned such investments, those investments nonetheless failed to fit the requisite investment profile of short-term, high-liquidity instruments. (Compl. ¶¶ 41-47).

**C.      Plaintiffs Have Stated Claims for Violations of ERISA § 406.**

**1.      Plaintiffs' Allegations Show Multiple Prohibited Transaction Violations.**

Count II of Plaintiffs' Amended Complaint alleges that Defendants violated ERISA's prohibited transactions provision, ERISA § 406, 29 U.S.C. § 1106, (Compl. ¶¶ 122-139), which prohibits transactions with a party in interest. Specifically, ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a fiduciary of a plan from causing a plan to enter into a transaction that constitutes a sale or exchange or lease of any property between a plan and a party in interest. Plaintiffs have pleaded factual allegations that establish Defendants' violations of both ERISA § 406 (a)(1)(A) (transactions between a plan and a party-in-interest), and ERISA § 406(b) (29 U.S.C. § 1106(b) (fiduciary transactions with plan assets in its own interest or for its own account). Defendants do not dispute that Plaintiffs adequately alleged Defendants' fiduciary status. Nor do they argue that NTC is not a party in interest, or that the transactions at issue did not occur. Thus, the basic elements of this claim go unchallenged.

Contrary to Defendants' representations (Mem. at 14), Plaintiffs allege that a prohibited lease occurred in this case. (Compl. ¶ 125). Defendants protest that there is no lease or exchange of property, but this is an issue that requires factual development and is therefore inappropriate for resolution on a motion to dismiss. Additionally, Plaintiffs plead facts supporting claims under ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(1)(B), and ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C). Although Plaintiffs did not specifically refer to ERISA

17

§§ 406(a)(1)(B) and 406 (a)(1)(C) in their Complaint, "[e]ven post- *Twombly* and *Iqbal*, there is no requirement that a pleading set forth every relevant fact or recite the applicable law. Instead, the complaint need merely set forth plausible allegations." *Carter*, 2009 WL 5066649, at *3.

ERISA § 406(a)(1)(B) prohibits the lending of money or extension of credit between a plan and a party in interest. A claim under § 406(a)(1)(B) lies here because the assets in the Collective Funds were retirement plan assets and NTI caused those assets to be made available for loan by NTC to borrowers. ERISA § 406(a)(1)(C) prohibits furnishing of services between a plan and a party in interest. The central focus of Plaintiffs' complaint — Defendants' securities lending program — constituted a furnishing of services by parties in interest, NTI and NTC, to the Plans. Factual allegations concerning Defendants' securities lending program are in virtually every paragraph of Plaintiffs' Complaint, and the manner in which Defendants provided those services to the Plans is outlined more specifically therein. (Compl. ¶¶ 28-41). Defendants do not dispute these allegations. ERISA § 406(b), 29 U.S.C. § 1106(b) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account." Plaintiffs allege that Defendants violated § 406(b) "by using the Plans' assets to invest in high-risk and illiquid instruments through the Collateral Pools to benefit Defendants through earning of fee revenue on the Collateral Pool investments." (Compl. ¶ 128). Again, Defendants do not dispute their fiduciary status, nor do Defendants deny that they dealt with Plan assets for their own interest.

### 2. Defendants' Exemption Defense Is Premature.

Rather than dispute Plaintiffs' allegations on the elements of ERISA §§ 406(a) and 406(b), Defendants contend the prohibited transactions were exempt under Prohibited Transaction Exemption 2006-16 ("PTE 2006-16"). (Mem. at 14). First, Defendants cannot establish at this stage of litigation that PTE 2006-16 applies. Defendants possess the burden of proving that an exemption from ERISA § 406 applies to the transactions at issue. *Keach v. U.S. Trust Co.*, 419 F.3d 626, 635 (7th Cir. 2005); *see Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d

1209, 1215 (2d Cir. 1987) (reasoning that "because the fiduciary has a virtual monopoly of information concerning the transaction in question, it is in the best position to demonstrate the absence of self-dealing. Placing the burden of proof on the fiduciary is thus justified."); *Gipson v. Wells Fargo & Co.*, No. 08-CV-4546 (DSD/FLN), 2009 WL 702004, at *4-5 (D. Minn. Mar. 13, 2009) (denying defendants motion to dismiss plaintiff's § 406 claims because the plaintiff's complaint did not facially establish defendant's affirmative defense). Given this burden, proving the applicability of an exemption is considered "an affirmative defense that must be pled." *Keach v. U.S. Trust Co.*, 235 F. Supp. 2d 886, 899 (C.D. Ill. 2002), *vacated in part on other grounds*, No. 01-1168, 2002 WL 31958720 (C.D. Ill. Dec. 12, 2002). And "an affirmative defense . . . is not a proper basis to dismiss a claim by a motion to dismiss unless the face of the complaint shows beyond doubt that an affirmative defense is dispositive." *ABN AMRO, Inc. v. Capital Intern. Ltd.*, 595 F. Supp. 2d 805, 851 (N.D. Ill. 2008). Defendants' PTE 2006-16 defense cannot be established from the allegations in the complaint. PTE 2006-16 contains dozens of conditions that must be met for the exemption to apply. 71 Fed. Reg. 63796 (Oct. 31, 2006). Plaintiffs' Complaint mentions a handful of those conditions and alleges that Defendants failed to comply with those conditions. (Compl. ¶¶ 130-137). Plaintiffs nowhere make allegations to support the conclusion that Defendants satisfied other conditions of PTE 2006-16.

Second, Defendants' PTE 2006-16 argument fails because Plaintiffs' factual allegations show that the elements of the exemption are ***not*** satisfied. *In re Regions Morgan Keegan ERISA Litig.*, 2010 WL 809950, at *12 (holding that because plaintiffs' pleadings "sufficiently challenge the application of [defendants' ERISA prohibited transaction exemption defense] . . . it would be inappropriate for the Court to determine [at the motion to dismiss stage] whether [the exemption] should apply to exempt Defendants from [plaintiffs' prohibited transaction] claim."). Defendants cannot meet the exemption's requirements because Defendants: (1) did not have all loans backed by collateral equal to 100% of the market value of the loaned securities (Compl. ¶ 130); (2) implemented an unreasonable fee structure in connection with its securities lending practices. (*Id*. ¶ 131); (3) placed impermissible restrictions on Plaintiffs' ability to terminate the

securities program generally, and specific loans of securities (*Id*. ¶¶ 132, 135); (4) failed to fully disclose its compensation arrangements (*Id*. ¶ 134); and (5) failed to provide lending agreements to Plaintiffs before NTC received authorization to act as lending agent. (*Id*. ¶¶ 136-137).

Defendants attempt to rebut these factual allegations with a number of factual allegations of their own. For instance, Defendants assert that Plaintiffs' "plans specifically ***agreed*** to NTC's fees, in writing." (Mem. at 16 (emphasis in original)). But even if this were so, it is clear under ERISA that a fiduciary may not be relieved from any of its duties under ERISA simply by virtue of a written agreement. *See Cent. States, Se. and Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568 (1985) ("[T]rust documents cannot excuse trustees from their duties under ERISA. . . ."); ERISA § 410(a), 29 U.S.C. § 1110(a) ("[A]ny provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."). Defendants make additional factual allegations regarding the exemptions it has obtained, the respective understandings of the parties about the plan documents that they signed, and the ability of Plaintiffs to terminate the loans.

Defendants' suggestion that the Funds were independent actors, free to terminate the loans at any time and to decide for themselves what was in the best interests of their client investors on an arms-length basis is flat wrong. (*See* Mem. at 15). In fact, NTI managed the Funds, the Collateral Pools, and NTC, the lending agent. The Funds, therefore, exercised no independent decision-making under this arrangement. (*See* Mem. at 14-16). But a motion to dismiss is not the proper forum for such arguments, which require extensive resort to additional, detailed facts that are outside the scope of Plaintiffs' Complaint.

**D.      Plaintiffs Have Standing.**

At this stage, general allegations of standing suffice because courts presume that such allegations embrace the specific facts necessary to support the claim. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). Defendants make a facial, not factual,

challenge to standing, *i.e.*, they contend that Plaintiffs have failed to allege sufficient facts, as opposed to disputing alleged facts bearing on standing. *See generally id*. at 443-44 (distinguishing between facial and factual challenges to standing). Their challenge fails.

### 1. Defendants' Investment Decisions Injured Plaintiffs.

Defendants argue that Plaintiffs have failed to allege an injury for purposes of Article III because Plaintiffs purportedly "never say when, why, or how much they lost." (Mem. at 18).[2] Mr. Diebold alleges that through his retirement plan he invested in the S&P 500 Collective Fund managed by NTI for years. (Compl. ¶¶ 13, 34). Mr. Hundt alleges that through his retirement plan he invested in the Aggregate Bond Index, Daily Russell 2000 Index, and Daily Russell 1000 Growth Equity Index Funds, all managed by NTI. (*Id.* ¶¶ 14, 33). Each of these funds participated in Defendants' securities lending program. (*See id.* ¶ 22). Pursuant to the securities lending program, each of these funds used one of two collateral pools managed by NTI — the Core USA or the STIF/STEP Collateral Pool. (*Id.* ¶¶ 43-45). Without discovery, Plaintiffs do not concede that these two collateral pools are the only collateral pools used by the Collective Funds in the putative class. (*See* Mem. at 3, n.1).

Certain investments in the Collateral Pools suffered permanent impairment in 2008. (Compl. ¶¶ 60-62). As a result of these impairments, NTC declared collateral deficiencies in the two Collateral Pools and issued so-called "payables." (*Id.* ¶¶ 61-62). This in turn forced the Collective Funds in which retirement plans invested to take pro rata shares of a liquidating account holding impaired assets and to pay the full amount of the estimated impairment. (*Id.* ¶ 62). Further, Collective Funds, and ultimately retirement plans, were required to repay principal losses in the Collateral Pools. (*Id.* ¶ 63). The investment performance of the Collective Funds was necessarily reduced by forcing the Funds to repay principal losses and to take on permanently impaired assets. As investors in these Collective Funds via their respective

---

[2] Although Plaintiffs do not dispute that Article III standing is a jurisdictional prerequisite, contrary to Defendants' contention, none of the cases cited by Defendants on page 18 and at note 9 of their Mem. address constitutional standing of participants in defined contribution plans or a requirement that participants in defined contribution plans must establish individual losses.

retirement plans, Plaintiffs shared proportionately in these losses. At this juncture, Plaintiffs cannot specify the amount of their individual losses — that will require a detailed accounting. But they have certainly pled that they invested in Collective Funds that suffered losses due to Defendants' mismanagement. To the extent that Defendants contend that Plaintiffs have failed to explicitly allege that they invested in Collective Funds in 2008, the account statements of Mr. Diebold and Hundt, showing as much and submitted herewith (*See* Exhibit A and B to Declaration of Gregory Y. Porter) may properly be considered when deciding a motion contesting subject matter jurisdiction. *Capitol Leasing Co. v. FDIC,* 999 F.2d 188, 191 (7th Cir. 1993) (per curiam) (quoting *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir. 1979)) ("The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.").

### 2. Plaintiffs Have Standing Under ERISA to Sue for Their Respective Plans.

It is undisputed that Plaintiffs have statutory standing to sue for their respective Plans. The Court's inquiry on a motion to dismiss begins and ends there. Nevertheless, Defendants contend that the Court should rule now that Plaintiffs cannot represent their alleged class because they lack standing to sue on behalf of other retirement plans.

Whether Plaintiffs can represent the class that they allege goes to Rule 23, not Rule 12. As one court explained, Defendants are "erroneously attempting to conflate the standing and class certification requirements, when, in fact, the two inquiries are logically separate and distinct." *Haddock v. Nationwide Fin. Servs.*, 262 F.R.D. 97, 110 (D. Conn. 2009) (certifying class of ERISA plans). [O]nce a potential ERISA class representative establishes . . . individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong." *Fallick v. Nationwide Mut. Life Ins. Co.*, 162 F.3d 410, 424 (6th Cir. 1998). Thus, "an individual in one ERISA benefit plan can represent a class of participants in

numerous plans other than his own, if the gravamen of the plaintiff's challenge is to the general practices which affect all of the plans." *Id*. at 422; *see also id*. at 422-24 (collecting cases).[3]

Although the Seventh Circuit has not considered whether a plaintiff who has standing under ERISA to sue for his own retirement plan may represent a class of similarly-situated plans, it has rejected attempts to conflate the standing and class certification inquiries:

> [T]he inherent problem with the idea of "standing to bring a class action" is that it conflates the standing inquiry under Rule 23 about the suitability of a plaintiff to serve as a class representative. . . . In our view, it is best to confine the term "standing" to the Article III inquiry and thus to keep it separate from the plaintiff's entitlement to relief or her ability to satisfy the Rule 23 criteria.

*Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008).

Notably, Defendants do not cite a single ERISA or Seventh Circuit case in support of their argument here. The cases they cite are easily distinguishable, and all involve mutual funds, not collective funds held in trust. In *Kaufman v. Dreyfus Fund, Inc.*, the court held that the plaintiff lacked standing to sue in his own right as a shareholder of a mutual fund because the alleged injury was to the corporation, *i.e.*, the mutual fund, not to him. 434 F.2d 727, 733-34 (3d Cir. 1970). Not having individual standing, he could not serve as a class representative for similarly situated shareholders. *Id*. at 734. Here, in contrast, it is undisputed that Plaintiffs have standing in their own right under ERISA.

The *Dreyfus* court then addressed whether a plaintiff alleging a derivative claim on behalf of four mutual funds in which he invested could represent a wider class of 61 mutual funds. The court said no because Rule 23.1 required an allegation that the plaintiff was a shareholder of the

---

[3] *Cent. States, Se. and Sw. Areas Health and Welfare Fund v. Merck-Medco Managed Care*, L.L.C., 504 F.3d 229, 241 (2d Cir. 2007) (only one named plaintiff need establish standing to seek relief for class of plans); *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101 (5th Cir. 1993); *Wu v. MAMSI Life & Health Ins. Co.*, 256 F.R.D. 158, 166-67 (D. Md. 2008); *In re RadioShack Corp. ERISA Litig.*, 547 F. Supp. 2d 606, 611 (N.D. Tex. 2008); *Buus v. WAMU Pension Plan*, No. 07-0903, 2007 WL 4510311, at *3 (W.D. Wash. Dec. 18, 2007); *Cress v. Wilson*, No. 06-2717, 2007 WL 1686687, at *10 (S.D.N.Y. June 6, 2007); *Charter v. John Hancock Life Ins. Co.*, 534 F. Supp. 2d 168, 172 (D. Mass. 2007); *Alves v. Harvard Pilgrim Healthcare, Inc.*, 204 F. Supp. 2d 198, 205 (D. Mass. 2002); *Misch v. Community Mut. Ins. Co.*, No. 94-428, 1995 WL 1055171 (S.D. Ohio Feb. 15, 1995); *Sutton v. Med. Serv. Assoc. of Penn.*, No. 92-4787, 1993 WL 273429 (E.D. Pa. July 20, 1993).

corporation or mutual fund. *Id*. at 735. Rule 23.1 does not apply here, where plaintiffs are bringing direct, not derivative claims. To be sure, the court added that class certification under Rule 23 would not be appropriate because shareholders in one mutual fund do not have "common" rights with shareholders in other mutual funds. *Id*. at 736. Commonality, however, is an element of Rule 23, not a standing requirement. Moreover, the *Dreyfus* case involved dozens of different defendants from different mutual fund families as well as investment advisors and brokers. The plaintiff there had no individual claim against any defendant other than those who served as directors or advisors to the funds in which he invested. Thus, fact that some unrelated defendant may have been engaged in a similar business practice did not give rise to a claim by the plaintiff for the simple and obvious reason that one does not have standing to sue a person who has not injured her. Not having a claim against the vast majority of the defendants, the plaintiff could not possibly certify a class of claims against them. Here, however, there are only two defendants. Defendants' challenged investment practices, namely mismanagement of Collateral Pools, apply to all putative class members because all putative class members had an interest in the Collateral Pools. Thus the named Plaintiffs have the same claim against the same defendants for the same wrongdoing as do all other putative class members.

Defendants' other cases involve similar mutual fund claims as *Dreyfus* and are similarly inapposite. Notably, Defendants fail to mention the exception in mutual fund standing cases recognized in *Batra v. Investors Research Corp.*, No. 89-0528-cv-w-6, 1992 WL 278688, at *2-3 (W.D. Mo. Oct. 4, 1991). In *Batra*, the court held that plaintiffs had standing to sue directors of funds in which they did not own shares, and the case has been described as applying where fees are assessed at the "investment company level" rather than the portfolio level. *See In re AllianceBernstein Mut. Fund Excessive Fee Litig.*, No. 04 Civ. 4885(SWK), 2005 WL 2677753, at *10 (S.D.N.Y. Oct. 19, 2005). In relevant part, the centralized control of fees recognized in the *Batra* exception is similarly apropos here where all plans were part of the same master collective trust, ("Collective Trust") and NTI made investment decisions for Collateral Pool reinvestment that affected all investors in the Collective Trust and, hence, the Collective Funds.

24

### 3. Defendants' Other Standing Objections Are Premature and Empty.

Defendants alternately contend that because Plaintiffs "cannot sue on behalf of the ExxonMobil Plan for losses suffered entirely by *other* ExxonMobil Plan participants in *other* Collective Funds," (Mem. at 21), that Plaintiffs lack standing to represent a class that includes investors in Collective Funds in which Plaintiffs did not invest. First, Defendants are wrong that Plaintiffs cannot sue on behalf of a plan for losses suffered by other plan participants. A retirement plan is an aggregation of its participant accounts and any loss to the plan causes a loss to the plan's participants. *Taylor v. United Techs. Corp.*, No. 06-cv-1494, 2008 WL 2333120, at *3 (D. Conn. June 3, 2008) (citing *Tussey v. ABB, Inc.*, No. 06-04305-CV-NKL, 2008 WL 379666 (W.D. Mo. Feb. 11, 2008)); *LaRue v. DeWolff, Boberg & Assoc. Inc.*, 522 U.S. 248, 256 (2008). Further, this argument is wrong for the precisely the same reasons discussed above, *see supra* at III.D.2.

The undisputed facts are that Defendants managed the singular Collective Trust for all of the Plans pursuant to the terms and conditions of the Declaration of Trust (Compl. ¶ 30); that Defendants managed the Collateral Pools; that the Collateral Pools were managed for the benefit of all Collective Funds formed pursuant to the Collective Trust that had an interest in those Pools; that the Collective Funds and their respective investors shared on a pro rata basis the gains and losses in the Collateral Pools, such that when NTC booked a receivable to the Core USA Pool, it was payable from *each* investor in the Collective Trust; and that Defendants owed the same duties under ERISA to all members of the alleged class. Plaintiffs have the same claims against the same defendants for the same wrongdoing as do all alleged class members.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

By:  s/ Derek W. Loeser
Lynn L. Sarko
Derek W. Loeser
Laura R. Gerber
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone: 206-623-1900
Facsimile: 206-623-3384

Todd M. Schneider
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 421-7100
Facsimile: (415) 421-7105

Elizabeth Hoskins Dow, #6216262
BAILEY & GLASSER LLP
1003 Western Avenue
Joliet, IL 60435
Telephone: (815) 740-4034
Facsimile: (217) 528-1198
Email: ldow@baileyglasser.com

Garrett W. Wotkyns
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
7702 E. Doubletree Ranch Road, Suite 300
Scottsdale, Arizona 85258

Gregory Y. Porter
BAILEY & GLASSER LLP
910 17th Street, NW
Suite 800
Washington, DC 20006

Todd S. Collins
Shanon J. Carson
Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3040
Facsimile: (215) 875-4604

Brian A. Glasser
Michael L. Murphy
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: (304) 345-6555
Facsimile: (304) 342-1110

Micah Dortch
COOPER & SCULLY, P.C.
900 Jackson St. #100
Dallas, TX 75202
Telephone: (214) 712-9500
Facsimile: (214) 712-9540

Joseph C. Peiffer
FISHMAN HAYGOOD PHELPS WALMSLEY
WILLIS & SWANSON LLP
201 St. Charles Ave., Suite 4600
New Orleans, LA 70170
Telephone: (504) 586-5252
Facsimile: (504) 586-5250

Harry Susman
SUSMAN GODFREY
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Telephone: (713) 653-7875
Facsimile: (713) 654-6686

*Counsel for Plaintiffs*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2010, I electronically filed the foregoing **Plaintiffs' Opposition to Defendants' Motion to Dismiss** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all attorneys of record.

DATED this 25th day of March, 2010.

/s/ Derek W. Loeser
Derek W. Loeser