## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

JOSEPH L. DIEBOLD, JR., on behalf of    )
the EXXONMOBIL SAVINGS PLAN, and    )
PAUL J. HUNDT, on behalf of the TEXAS    )
INSTRUMENTS 401(K) SAVINGS PLAN,    )
and all others similarly situated,    )
   )
     Plaintiffs,    )
   )    No. 09 Civ. 1934
     v.    )
   )    Hon. William J. Hibbler,
NORTHERN TRUST INVESTMENTS, N.A., and    )    *Judge Presiding*.
THE NORTHERN TRUST COMPANY,    )
   )
     Defendants.    )

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR
## MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

Michele Odorizzi
Caryn L. Jacobs
John J. Tharp, Jr.
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

Dated: April 15, 2010

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.     Plaintiffs Have Failed To State A Claim For Imprudence .................................................. 2

       A.     Plaintiffs' New Argument That Northern Failed To Comply With The Investment Guidelines For The Collateral Pools Fails As A Matter Of Law ..................................................................... 2

       B.     Plaintiffs' New Claim That The Investment Guidelines Were Themselves Imprudent Also Fails As A Matter Of Law ......................................... 3

       C.     Statements By Northern Trust's Chief Economist Do Not Provide A Plausible Basis For A Claim Of Imprudence ......................................... 5

       D.     Plaintiffs' Menu Cases Are Inapposite .................................................................10

II.     Count II Fails To State A Claim...........................................................................................12

       A.     The Securities Lending Program Cannot Be Deemed A "Prohibited Transaction" ......................................................................................12

       B.     PTE 2006-16 Exempts Both The Securities Lending Program And NTC's Fees From Any Prohibited Transaction Claims ...............................14

III.    The Court Can And Should Consider Whether Plaintiffs Can Represent The Broad Class Alleged In The Complaint.....................................................................17

CONCLUSION.......................................................................................................................20

TABLE OF EXHIBITS ..................................................................................................... A-1

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal,*
   129 S. Ct. 1937 (2009) ............................................................................. 12, 14

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ........................................................................................ 12

*Braden v. Wal-Mart Stores, Inc.,*
   588 F.3d 585 (8th Cir. 2009) ..................................................................... 10, 11

*Chemung Canal Trust Co. v. Sovran Bank/Md.,*
   939 F.2d 12 (2d Cir. 1991) .............................................................................. 18

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.,*
   2010 WL 1371417 (E.D.N.Y. 2010) ................................................................ 20

*DeBruyne v. Equitable Life Assurance Soc'y of the U.S.,*
   920 F.2d 457 (7th Cir. 1990) ............................................................................ 4

*Fallick v. Nationwide Mut. Ins. Co.,*
   162 F.3d 410 (6th Cir. 1998) .......................................................................... 18

*Ford Motor Co. ERISA Litig., In re,*
   590 F. Supp. 2d 883 (E.D. Mich. 2006) ............................................................ 9

*Fuja v. Benefit Trust Life Ins. Co.,*
   18 F.3d 1405 (7th Cir. 1994) .......................................................................... 13

*George v. Kraft Foods Global, Inc.,*
   2009 WL 4884027 (N.D. Ill. 2009) ................................................................ 10

*Great W. Cas. Co. v. Volvo Trucks N. Am. Inc.,*
   2009 WL 588432 (N.D. Ill. 2009) ................................................................... 11

*Harris v. City of W. Chi.,*
   2002 WL 31001888 (N.D. Ill. 2002) ................................................................. 1

*Huntington Bancshares Inc. ERISA Litig., In re,*
   620 F. Supp. 2d 842 (S.D. Ohio 2009) ............................................................. 8

*Jones v. Harris Assocs.,*
   2010 WL 1189560 (U.S. Mar. 30, 2010) ......................................................... 16

ii

*Landmen Partners Inc. v. The Blackstone Group, L.P.*,
    659 F. Supp. 2d 532 (S.D.N.Y. 2009) .................................................................. 5

*Leber v. Citigroup, Inc.*,
    2010 WL 935442 (S.D.N.Y. 2010) ..................................................................... 14

*Lehman Bros. Secs. & ERISA Litig., In re*,
    2010 WL 354937 (S.D.N.Y. 2010) .................................................................. 7, 8

*Mass. Mut. Life Ins. Co. v. Russell*,
    473 U.S. 134 (1985) ......................................................................................... 18

*Mehling v. N.Y. Life Ins. Co.*,
    163 F. Supp. 2d 502 (E.D. Pa. 2001) ........................................................... 14, 15

*MoneyGram Int'l Secs. Litig., In re*,
    626 F. Supp. 2d 947 (D. Minn. 2009) ................................................................ 5

*Reeder v. HSBC USA, Inc.*,
    2009 WL 4788488 (N.D. Ill. 2009) .................................................................... 1

*Reserve Fund Secs. & Deriv. Litig., In re*,
    2009 WL 4249128 (S.D.N.Y. 2009) ................................................................... 7

*Summers v. State St. Bank & Holding Co.*,
    453 F.3d 404 (7th Cir. 2006) ............................................................................. 4

*Vinole v. Countrywide Home Loans, Inc.*,
    571 F.3d 935 (9th Cir. 2009) ............................................................................. 2

**STATUTES**

ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A) ........................................................ 13

ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B) ........................................................ 13

ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C) ........................................................ 13

ERISA § 406(b), 29 U.S.C. § 1106(b) ......................................................................... 13

ERISA § 409, 29 U.S.C. § 1109 ............................................................................ 18, 19

ERISA § 502, 29 U.S.C. § 1132 ................................................................................. 18

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) ............................................................ 18, 19

**MISCELLANEOUS**

Department of Labor Prohibited Transaction Class Exemption 77-3,
    42 Fed. Reg. 18734 (Apr. 8, 1977) .................................................................................15

Department of Labor Prohibited Transaction Class Exemption 81-6,
    46 Fed. Reg. 7527 (Jan. 23, 1981) .................................................................................15

Department of Labor Prohibited Transaction Class Exemption 82-63,
    46 Fed. Reg. 14804 (Apr. 6, 1982) .................................................................................15

Department of Labor Prohibited Transaction Class Exemption 2006-16,
    71 Fed. Reg. 63786 (Oct. 31, 2006)............................................................................ 14-17

Department of Labor Prohibited Transaction Class Exemption 2006-16(II)(l),
    71 Fed. Reg. 63786 (Oct. 31, 2006)............................................................................15

Fed. R. Civ. P. 8 ................................................................................................................ 5, 12

Fed. R. Civ. P. 11 ................................................................................................................. 5

Fed. R. Civ. P. 12(b) ............................................................................................................17

Fed. R. Civ. P. 23 ............................................................................................................ 2, 17

# INTRODUCTION

Throughout their response, plaintiffs attempt to rewrite their complaint. For example, they offer two new arguments in support of their assertion in Count I that Northern imprudently invested securities lending collateral, claiming that Northern failed to follow the investment guidelines for the applicable collateral pools and that the investment guidelines were themselves imprudent. "It is well established that a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion to dismiss." *Reeder v. HSBC USA, Inc.*, 2009 WL 4788488, at *5 (N.D. Ill. 2009); *accord Harris v. City of W. Chi.*, 2002 WL 31001888, at *2 (N.D. Ill. 2002) (Hibbler, J.). That alone is reason enough to reject plaintiffs' new arguments. In any event, plaintiffs' claim that Northern violated the investment guidelines is based on a misreading of those guidelines, and their assertion that the guidelines themselves were imprudent rests on precisely the kind of 20/20 hindsight that is impermissible in an ERISA claim like this.

Apart from adding new claims, plaintiffs have effectively abandoned their allegations that the defendants failed to properly disclose information about the securities lending activities of its Collective Funds. *See* AC ¶ 119. Defendants' opening brief explained (at 12) why those allegations were without merit. In their brief (at 10), plaintiffs merely repeat their non-disclosure allegations, without offering any response whatsoever to defendants' arguments.

On their prohibited transaction claim (Count II), plaintiffs have effectively limited their challenge to the fees The Northern Trust Company ("NTC") charged for acting as securities lending agent for the Collective Funds. As to that claim, plaintiffs acknowledge that the Department of Labor has issued a broad Prohibited Transaction Exemption that expressly allows precisely the arrangement at issue here. Plaintiffs argue that the application of the exemption is an affirmative defense that cannot be decided on a motion to dismiss. But courts routinely

1

dismiss complaints based on prohibited transaction exemptions where, as here, plaintiffs are unable to offer any viable theory why the exemption would not apply.

Finally, plaintiffs urge the Court to postpone deciding whether they can represent the broad class alleged in the complaint until a class certification motion is filed. Rule 23, however, allows the Court to consider this critical legal issue now instead of later. *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 939-41 (9th Cir. 2009) (defendant can invoke Rule 23 to preemptively seek denial of class certification). In light of ERISA's clear statutory rules limiting the universe of plaintiffs who can sue on behalf of a plan, plaintiffs lack the ability to sue on behalf of pension plans other than their own. Even as to their own plans, plaintiffs cannot challenge the management of lending funds in which they personally did not invest.[1]

## ARGUMENT

## I.  Plaintiffs Have Failed To State A Claim For Imprudence.

### A.  Plaintiffs' New Argument That Northern Failed To Comply With The Investment Guidelines For The Collateral Pools Fails As A Matter Of Law.

Plaintiffs' response is largely predicated on the assertion that Northern "ignored" the investment guidelines for the Core USA and STIF/STEP collateral pools by supposedly investing cash collateral in "extremely risky, long-term investments." Pl. Br. at 4, 9. Plaintiffs argue (at 14) that if defendants "had complied with the stated risk profile of the collateral pools, they would have avoided exposing the Pools to risky and inappropriate investments that caused massive losses." In support of that argument, plaintiffs quote snippets from the statement of *general* objectives in the Core USA Investment Guidelines. *See* Pl. Br. at 4. But plaintiffs ignore the *specific* investment guidelines that were adopted to achieve those general objectives. The Core USA Investment Guidelines explained that Northern sought "to maximize current

---

[1]  There are other reasons as well to deny class certification (including lack of typically and inadequate representation), which defendants will brief if the case proceeds to the class certification stage.

2

income to the extent consistent with the preservation of capital and maintenance of liquidity *by investing cash Collateral of this section in accordance with the guidelines stated below*." AC Ex. 8 at 2 (emphasis added). The document then sets forth in detail what types of fixed-income investments could be purchased, what credit quality standards those instruments had to meet, what maturities were allowed, the mix of maturities required to protect the pool's liquidity, and what type of diversification was required. Significantly, neither in their Amended Complaint nor in their brief do plaintiffs identify a single investment that Northern Trust ever made for Core USA that supposedly deviated from these specific guidelines. Indeed, plaintiffs do not even *assert* that there were such deviations.[2]

As the attachments to the Amended Complaint demonstrate, plaintiffs had access to the investment guidelines, lists of the investments held by the collateral pools in September 2008, and a great deal of information about those investments, including maturities, liquidity levels, and credit ratings. *See, e.g*, AC Exs. 4-11, 20, 22, 24-28 & 32-33. That plaintiffs still cannot point to a single investment that failed to comply with the investment guidelines when it was purchased demonstrates that plaintiffs have no basis whatsoever for the belated assertion in their brief that Northern failed to follow its own investment guidelines.

> **B.    Plaintiffs' New Claim That The Investment Guidelines Were Themselves Imprudent Also Fails As A Matter Of Law.**

At page 15 of their response, plaintiffs offer another new theory, claiming that defendants cannot "hide behind" the investment guidelines because they had a duty to deviate from those guidelines if prudence required them to do so. Pointing to the losses suffered by the collateral

---

[2]    The same is true of the investment guidelines for STEP and STIF (AC Exs. 10 & 11), which explain in detail what types of investments were authorized and what maturity, credit quality and diversification standards were required. Again, plaintiffs do not allege that Northern Trust failed to adhere to these specific guidelines in purchasing securities for STEP or STIF, let alone identify any security that violated the guidelines at the time of purchase.

pools, plaintiffs contend that the investments Northern actually made were too risky for a securities lending program even if they complied with the investment guidelines with respect to credit quality, maturity, diversification and the like. This is yet another example of plaintiffs' penchant for 20/20 hindsight. The mere fact that a small fraction of the collateral pool investments, although within guidelines when purchased, later turned out badly does not mean that Northern acted imprudently either in making those investments or in adopting the guidelines.

Plaintiffs do not even attempt to explain what was supposedly wrong with the investment guidelines. For example, plaintiffs do not claim that the credit quality standards were too lax. Instead, plaintiffs seem to contend that Northern should have realized that certain investments were of dubious credit quality even though, at the time they were purchased, they met the high credit quality standards set forth in the guidelines. That argument, however, is based on the fundamentally flawed premise that Northern could have and should have outguessed both the rating agencies and the market. To provide a concrete example: if Northern purchased the highest rated securities (AAA) for Core USA or STIF or STEP, as it was permitted to do under the investment guidelines, the fact that the issuer of those securities later defaulted cannot possibly provide a basis for a claim that the particular purchase was imprudent — let alone a claim that the guidelines were imprudent because they allowed the purchase of such securities.

The Seventh Circuit has made it clear that ERISA's fiduciary duty of care "requires prudence, not prescience." *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) (quotation marks and citation omitted). That means that a fiduciary cannot be expected to be able to outguess the market. Indeed, in *Summers v. State St. Bank & Holding Co.*, 453 F.3d 404, 408 (7th Cir. 2006), the Court observed that "it would be *hubris* for a trust company . . . to think it could predict [an issuer's] future more accurately than the markets

4

could" and "preposterous" for a plaintiff "to challenge the market's valuation."

###### C. Statements By Northern Trust's Chief Economist Do Not Provide A Plausible Basis For A Claim Of Imprudence.

Plaintiffs argue that they have pleaded a plausible basis for claiming that the collateral pool investments were imprudent because Northern Trust's Chief Economist acknowledged the existence of a housing slump in 2006 and talked about problems that had emerged concerning subprime mortgages in the first quarter of 2007. To state a claim, however, plaintiffs must show a plausible link between the events they identify and the collateral investments that were allegedly imprudently purchased or held. *Landmen Partners Inc. v. The Blackstone Group, L.P.*, 659 F. Supp. 2d 532 (S.D.N.Y. 2009), makes this point. In that case, the court dismissed a claim that defendants had misrepresented the value of Blackstone's commercial real estate portfolio because all plaintiffs had alleged was that the defendants were aware of problems with subprime residential mortgages. *Id.* at 544-46. The court concluded that plaintiffs had failed to meet their pleading burden under Rule 8 because they had not offered any "factual enhancement" explaining why problems in the subprime residential market should have caused the defendants to foresee difficulties in the commercial real estate market. *Id.*; *see also In re MoneyGram Int'l Secs. Litig.*, 626 F. Supp. 2d 947, 970 (D. Minn. 2009) (complaint must "connect the general external market conditions" to the specific securities in defendant's portfolio).

Plaintiffs try to forge the necessary connection here by misrepresenting the allegations of their own complaint. Plaintiffs characterize their complaint (at 9) as alleging that defendants "gambled massive amounts of cash collateral by investing in the sub-prime housing market." In fact, the complaint says no such thing, nor could it consistent with Rule 11. Northern publicly disclosed, and plaintiffs have long had, lists of all of the collateral pools' holdings. Yet plaintiffs never dispute that less than 1% of Core USA's holdings were invested in subprime securities.

5

*See* Opening Br. at 11.[3]  Nor do they identify *any* subprime security in *any* collateral pool that allegedly resulted in a loss.

Unable to show that the collateral pools suffered losses because of imprudent investments in subprime securities, plaintiffs' fallback position seems to be that it was imprudent to invest in securities issued by any entity that had any exposure to real estate of any kind.  Thus, plaintiffs claim that Northern acted imprudently by purchasing fixed-income securities issued by Capmark Financial Group and iStar Financial, Inc., both of which had exposure to commercial real estate. Pl. Br. at 9 (citing AC ¶ 52).  But, as the court concluded in *Landmen*, without further factual enhancement — which plaintiffs do not even attempt to provide — it is not plausible to assume that problems in the subprime residential mortgage business alerted Northern to a serious risk of default by entities involved in an entirely different line of business (commercial real estate).

Plaintiffs also point to two structured investment vehicles, or SIVs, that were purchased for STIF as examples of allegedly imprudent collateral pool investments.  *Id.*  But plaintiffs do not claim, nor could they claim, that either SIV had significant subprime exposure.  In fact, Ex. 23 to the Amended Complaint explicitly states (at 4) that the SIVs had *no* subprime securities. Furthermore, as plaintiffs themselves allege (AC ¶ 52), after the SIVs in question failed, NTC entered into Capital Support Agreements to protect STIF and the other pools invested in the SIVs from loss.  *Id.* Ex. 23.  Thus, the SIVs could not possibly have caused plaintiffs to suffer any loss.

Finally, plaintiffs claim that it was imprudent for Northern to purchase fixed-income securities issued by CIT Group and Lehman Brothers because both had some subprime exposure. But CIT's own public SEC filings identify it as primarily a lender to small businesses in the

---

[3]     Plaintiffs' own exhibits demonstrate that the collateral pools were well-diversified.  *See* AC Ex. 20, at N000188 (Core USA); *id.* Ex. 25 (STEP).

corporate, retail, transportation, and vendor finance sectors. *See* Ex. A hereto. And Lehman Brothers was a Wall Street investment banking house with a substantial brokerage business. Plaintiffs do not even attempt to explain how or why Northern should have figured out in 2006 and 2007 that these large, well-respected firms would file for bankruptcy in 2009 and 2008, respectively.[4]

Plaintiffs' argument is essentially that Northern — and Northern alone — should have foreseen as early as 2006 the unprecedented chain of events that began with Lehman's unexpected bankruptcy in September 2008, which "brought the financial markets to a standstill" and led to "some of the most cataclysmic failures in our economic history." *In re Reserve Fund Secs. & Deriv. Litig.*, 2009 WL 4249128, at *10 & n.3 (S.D.N.Y. 2009). As the Seventh Circuit has repeatedly held, however, fiduciaries are not required to have a crystal ball.

To illustrate the point: One of the exhibits plaintiffs have attached to their Amended Complaint is a list of fixed-income securities held by STEP as of May 31, 2008. AC Ex. 26 at BP-0016338. The list includes approximately $400 million in face value of fixed-income securities issued by Lehman Brothers Holdings — the same securities that defaulted in September 2008, when Lehman went bankrupt. Significantly, these securities were priced as of May 31, 2008 between 93% and 97% of par value. Thus, as late as three-and-a-half months before Lehman's demise, the *market* must have believed that Lehman would survive and that the securities would therefore be paid in full at maturity. Plaintiffs have offered no plausible explanation why Northern would have had any better information.

In our opening brief, we cited ERISA stock drop cases in which courts have recently

---

[4]     It should also be noted that, after Lehman unexpectedly filed for bankruptcy, lawsuits were brought claiming that Lehman had deceived investors about the extent of its subprime exposure and the value of its assets. *See, e.g.*, *In re Lehman Bros. Secs. & ERISA Litig.*, 2010 WL 354937, at *2 (S.D.N.Y. 2010). Plaintiffs do not allege, nor could they allege, that Northern had any way of knowing the truth if Lehman was in fact concealing serious problems.

dismissed complaints on the ground that ERISA fiduciaries could not be held liable for failing to predict the future. In *In re Huntington Bancshares Inc. ERISA Litig.*, for example, the court held that allegations of general knowledge of the subprime crisis, coupled with the fact that in July 2007 the employer merged with another bank holding company with $1.5 billion in subprime exposure, was not enough to raise a prudence issue. 620 F. Supp. 2d 842, 850-53 (S.D. Ohio 2009). As the court explained, "Defendants cannot be held to a standard that would require them to predict the future of the financial markets so as not to breach their fiduciary duties under ERISA." *Id*. at 853. Similarly, in *In re Lehman Bros. Secs. & ERISA Litig.*, the court dismissed a complaint brought against fiduciaries of the Lehman pension plan on the ground that plaintiffs had failed to offer any factual basis for their claim that those fiduciaries should have known that the company's bankruptcy was imminent and should have taken Lehman stock off the menu of pension options available to Lehman employees. 2010 WL 354937, at *5-*6.

Plaintiffs argue that these cases are distinguishable because courts apply a presumption of prudence where claims are made that it was imprudent to continue offering the plan sponsor's own stock and no such presumption is applicable here. But that presumption was not invoked in *Huntington Bancshares*, where the court concluded that even without it, plaintiffs had not pled sufficient facts to support their claim that the defendants should have realized that the stock was an imprudent investment. 620 F. Supp. 2d at 850. Although a presumption of prudence was applied in the *Lehman* case, the *factual* question on which the decision to dismiss turned is the very same question that should be asked here: have plaintiffs alleged any plausible basis for their claim that the defendants should have realized that Lehman's bankruptcy was imminent and that the investments in question had therefore become imprudent? In this case, as in *Lehman*, there are no allegations to suggest that Northern could have known — when even Lehman

8

insiders did not — that Lehman would fail and that it was therefore imprudent either to purchase or continue to hold Lehman debt.[5]

In evaluating plaintiffs' claims, it is important to keep in mind the nature and purpose of the securities NTC purchased for the collateral pools. NTC was not buying equities, with the hope of realizing gains by buying and selling stock. Instead, it bought fixed-income debt securities for the purpose of earning income from interest payments. AC ¶ 25, Exs. 8, 10 & 11. So long as the securities were paid in full at maturity, the return of 100% of the principal would ensure that there was sufficient collateral to return to the borrowers when the loans were terminated. Thus, even if the market value of a security declined, there would be no reason to sell if Northern believed it would be paid in full at maturity. Indeed, selling a fixed-income security at a discount would force the collateral pool to realize unnecessary losses if the security matured at par.[6]

Significantly, plaintiffs do not allege *when* Northern purchased the securities that ultimately resulted in losses. Thus, the complaint provides no plausible basis for believing that Northern bought fixed-income securities at a point in time when it knew or should have known that those securities carried an undue risk of default. Much later, a small fraction of the securities in the collateral pools declined in value or became impaired. But plaintiffs offer no plausible basis for believing that Northern acted imprudently in not disposing of those securities earlier. Plaintiffs do not allege that Northern had any special knowledge that would have enabled it to outguess the market by predicting which securities posed a serious default risk.

---

[5]    Ironically, one of the cases plaintiffs themselves rely upon, *In re Ford Motor Co. ERISA Litig.*, 590 F. Supp. 2d 883, 890-94 (E.D. Mich. 2006), was also a stock-drop case, in which the bulk of the opinion was devoted to a discussion of what the presumption of prudence means in the context of a motion to dismiss. For that reason, the *Ford* case is irrelevant to the case at bar.

[6]    Had Northern sold these securities at a loss in 2007, plaintiffs undoubtedly would have brought this action a year earlier, claiming that it had acted imprudently by *selling* securities at a loss when it should have held them to maturity.

And even if Northern could have identified securities that it wanted to sell, plaintiffs do not allege that Northern *could have* avoided any foreseeable losses by selling earlier at a higher price.[7]

### D.    Plaintiffs' Menu Cases Are Inapposite.

In a last-ditch effort to avoid dismissal, plaintiffs argue (at 12-13) that they should not be required to provide a factual basis for their allegations of imprudence until they have had discovery.  In support, they rely on two "menu" cases in which participants sued plan fiduciaries for allegedly breaching their duty to prudently select and then oversee the performance of investment options.  Neither case involved factual allegations that are remotely similar to those here.  In both *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598-99 (8th Cir. 2009), and *George v. Kraft Foods Global, Inc.*, 2009 WL 4884027, at *4 (N.D. Ill. 2009), the plaintiffs alleged that the plan fiduciaries had made investments choices that, in light of the facts known at the time the decisions were made, were inexplicable.  For example, in *Braden*, plaintiffs alleged that they had failed to offer available mutual fund options that would have resulted in lower fees, failed to switch after the mutual funds they initially chose underperformed their benchmarks, and made allegedly improper revenue sharing payments to the broker that served as plan trustee.  588 F.3d at 598-99.  Similarly, in *George*, plaintiffs alleged that the plan fiduciaries had offered the employer's stock through a fund that was structured in a way that virtually guaranteed that it would underperform the market and claimed that two other mutual fund choices were "expected" at the time they were selected "to underperform relative to comparable investment alternatives." 2009 WL 4884027, at *4.

---

[7]    Plaintiffs themselves allege that as early as August 2007 the credit markets were freezing, making it hard to find buyers for the kind of fixed-income investments held by the collateral pools.  Pl. Br. at 16 (quoting AC ¶ 49).

Here, by contrast, plaintiffs do not challenge the decisions made by the fiduciaries of the ExxonMobil and TI plans to offer lending Collective Funds on the menu of options that each plan made available to its participants. The issue here is whether Northern acted prudently in conducting securities lending for these Funds. For all of the reasons outlined above, plaintiffs have not alleged that Northern's collateral pool investment guidelines were inappropriate or unusual in the industry, nor have they alleged that Northern deviated from those guidelines when purchasing individual fixed-income securities. Instead, plaintiffs' argument is that Northern failed to anticipate the unprecedented events that led to a lengthy freeze in the credit markets, the collapse of a number of major corporations, and a worldwide recession rivaling the Great Depression. Unlike in *George* and *Braden*, plaintiffs here have provided no plausible basis for inferring that defendants knew that the investments they were making were imprudent at the time they were made. Instead, all plaintiffs have offered is speculation and hindsight.

Plaintiffs make much of the *Braden* Court's observation that "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." 588 F.3d at 598. Plaintiffs argue that they too lack "inside information" about Northern's selection of collateral pool investments and therefore should be entitled to take discovery before the Court rules on the merits of their complaint. In fact, however, as the exhibits to the Amended Complaint show, plaintiffs have had access to a wide variety of documents about Northern's collateral pool investments. Moreover, *Twombly* requires more than "mere speculation that discovery might reveal grounds for [plaintiffs'] allegations." *Great W. Cas. Co. v. Volvo Trucks N. Am. Inc.*, 2009 WL 588432, at *5 (N.D. Ill. 2009). In *George* and *Braden*, the courts allowed discovery to proceed because they concluded, based on the very different facts alleged there, that plaintiffs had alleged sufficient facts to "nudge[] their [breach

of fiduciary duty] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Here, by contrast, plaintiffs have not alleged "facts suggestive of illegal conduct," and therefore are not entitled to discovery.  *Id.* at 564 n.8; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1954 (2009) (a plaintiff whose "complaint is deficient under Rule 8 . . . is not entitled to discovery").

## II.  Count II Fails To State A Claim.

### A.  The Securities Lending Program Cannot Be Deemed A "Prohibited Transaction."

In Count II of their Amended Complaint, plaintiffs contend that the entire securities lending program constituted a prohibited transaction.  Based on that premise, defendants seek recovery of 100% of the investment losses in the collateral pools regardless of whether those investments were imprudent.  AC ¶ 139.  To sustain that claim, plaintiffs would have to show that *all* of the loans of securities constituted transactions with parties in interest that are prohibited by ERISA.  As defendants' opening brief demonstrated (at 14), plaintiffs' vague allegations that some unidentified borrowers may have been parties in interest are too speculative to meet their burden under *Iqbal* and *Twombly*.  Plaintiffs offer no rejoinder to that argument. Instead, they have simply dropped any claim that the securities lending program constituted a prohibited transaction because the borrowers were parties in interest.

Now, plaintiffs' only argument is that the *defendants* qualify as parties in interest.  That change in position is important because it means that plaintiffs do not even get to first base on their claim that the loans of securities constituted prohibited transactions.  While plaintiffs offer three different theories as to how a securities lending transaction might be conceptualized as a transaction between ERISA plans and NTC, all of those theories fail as a matter of law.

12

Plaintiffs' first theory, under ERISA § 406(a)(1)(A), is that the securities lending program entails a sale, exchange or lease of plan property to NTC. As defendants' opening brief demonstrated (at 14), plaintiffs' own allegations and the Securities Lending Authorization Agreement (the "SLAA") (AC Ex. 2) make clear that the Collective Funds do not sell, exchange or lease plan property to NTC. Instead, NTC acts as the Collective Funds' agent in lending securities owned by the Collective Funds to third-party borrowers. Plaintiffs' only response (at 17) is that their claim requires further "factual development." Having failed to offer any plausible basis for contradicting the clear terms of the SLAA, however, plaintiffs are not entitled to the opportunity to engage in costly discovery in the vain hope of developing some factual basis for their claim. *See Fuja v. Benefit Trust Life Ins. Co.*, 18 F.3d 1405, 1409 (7th Cir. 1994) ("[C]ontract interpretation is a question of law.").

The same is true of plaintiffs' other theories. Although it is not alleged in the complaint, plaintiffs claim that the loans involved the lending of money or extension of credit between the Collective Funds and NTC, and therefore were prohibited transactions under § 406(a)(1)(B). They also contend that NTC was dealing with plan assets in its own interest or for its own account, which brings § 406(b) into play. Both of these theories also fail in light of the SLAA, which makes clear that NTC was acting as the authorized agent of the Collective Funds in arranging loans of securities to third-party borrowers, rather than engaging in any type of credit transaction with the Collective Funds or using Collective Fund assets for its own account.

The only other ERISA provision plaintiffs cite is § 406(a)(1)(C), which makes a party in interest's furnishing of services to a plan a prohibited transaction. We assume for purposes of argument that NTC's agreement with the Collective Funds to act as their securities lending agent in return for a fee would fall within § 406(a)(1)(C). If so, plaintiffs can challenge NTC's receipt

13

of securities lending fees. But the loans to borrowers are separate transactions,[8] which for all of the reasons outlined above cannot be treated as transactions between a plan and a party in interest. Accordingly, even if plaintiffs can challenge NTC's fees, it cannot challenge the entire securities lending program as a prohibited transaction.

###     B.     PTE 2006-16 Exempts Both The Securities Lending Program And NTC's Fees From Any Prohibited Transaction Claims.

Even if plaintiffs could challenge both the securities lending transactions and NTC's fee arrangement as prohibited transactions, their claims would still fail as a matter of law because PTE 2006-16, 71 Fed. Reg. 63786 (Oct. 31, 2006) (Opening Br. Ex. E), expressly exempts securities lending programs like Northern's from ERISA's prohibited transaction provisions.

Plaintiffs contend that the Court should not consider this argument on a motion to dismiss because compliance with a Prohibited Transaction Exemption is an affirmative defense as to which defendants bear the burden of proof. In *Leber v. Citigroup, Inc.*, however, the court granted a motion to dismiss even though it acknowledged that compliance with a PTE might well be an affirmative defense, because plaintiffs had failed to explain why the conduct in question failed to fall within the exemption. 2010 WL 935442, at *9-*10 (S.D.N.Y. 2010). The court explained that a "complaint must allege conduct that is plausibly actionable under the relevant statute and must go beyond creating a 'sheer possibility that a defendant has acted unlawfully.'" *Id.* at *10 (quoting *Iqbal*, 129 S. Ct. at 1949). Thus, "where the complaint does not allege any basis for presuming that a defendant's conduct fell outside a statutory exemption — and therefore that a defendant's conduct might plausibly entitle a plaintiff to relief — it is deficient." *Id.*; *see also Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2001)

---

[8]     This analysis is confirmed by the fact that the DOL's prohibited transaction exemption that specifically addresses securities lending, PTE 2006-16, provides separate exemptions for the loan transactions and for the payment of fees to a securities lending agent that qualifies as a party in interest. *See* 71 Fed. Reg. 63786.

(dismissing prohibited transaction claim because plaintiffs had failed to allege that the requirements of PTE 77-3 did not apply).

Plaintiffs here have not alleged any plausible basis for believing that Northern's long-standing and highly respected securities lending program fell outside the exemption provided by PTE 2006-16. Both Collective Fund Custody Agreements entered into by plaintiffs' respective plan fiduciaries provide that securities lending would be in accordance with PTE 81-6 and 82-63, which were the predecessors to PTE 2006-16. *See* Opening Br. Ex. G at 3-4; *id.* Ex. H at 3. Plaintiffs have not pleaded any plausible basis for believing that Northern failed to comply with that obligation. Plaintiffs reiterate the allegation in their complaint that Northern failed to secure collateral equal to 100% of the market value of the loaned securities when borrowers defaulted. But they do not even attempt to rebut defendants' argument (at 15-16) that this assertion is based on a misreading of PTE 2006-16.[9]

The only other argument plaintiffs make — that the withdrawal restrictions imposed in September 2008 violated the requirement that loans be callable at any time — also fails as a matter of law. Plaintiffs do not dispute that NTC complied with its obligation under the SLAA (AC Ex. 2, Art. 5.1) to ensure that every borrowing agreement gave the agent (on behalf of the Collective Fund) the right to terminate any loan of securities at any time. Instead, plaintiffs argue that when NTC imposed withdrawal restrictions on participants in securities lending, NTI, as the Trustee of the Collective Funds, no longer had the practical ability to terminate the Funds' participation by calling all of its loans. Although wrong (*see* AC Ex. 2, Art. 14.1), this argument is irrelevant. The exemption requires only that the lender have the right *vis-à-vis the borrowers*

---

[9] Plaintiffs' theory that a failure by a defaulting borrower to maintain 100% collateralization could somehow eliminate the exemption is also belied by Section II(l) of PTE 2006-16. 71 Fed. Reg. at 63797. That section expressly provides that a borrower's failure to comply with the conditions of the exemption does not turn the transaction into a prohibited transaction.

to terminate loans at will. *See* 71 Fed. Reg. at 63792 ("The plan may terminate the arrangement at any time so that it may dispose of the securities at any time."). Plaintiffs do not claim, nor could they claim, that NTI did not have that right.

Plaintiffs have also offered no plausible explanation why the fees NTC charged do not fall within PTE 2006-16's exemption for "reasonable" fees. *See* 71 Fed. Reg. at 63797. Plaintiffs do not claim (nor could they claim) that the 40% fee was outside the normal range of fees charged by securities lending agents in general or NTC in particular to clients who are not ERISA plans. *See Jones v. Harris Assocs.*, 2010 WL 1189560, at *9-*11 (U.S. Mar. 30, 2010). Indeed, plaintiffs do not appear to be challenging the *amount* of the fee at all. Instead, their challenge is to the *disclosures* concerning those fees. That claim also fails as a matter of law.

Plaintiffs do not deny that the plan fiduciaries for the ExxonMobil and TI plans expressly approved, in writing, NTC's receipt of a monthly fee equal to 40% of the net revenue generated by securities lending (*i.e.*, revenue minus rebates paid to borrowers). *See* Opening Br. Ex. G at 3-4; *id.* Ex. H at 3-4. They speculate, however, that their plan fiduciaries *may* not have understood that NTC would not share in any investment losses suffered by the collateral pools. But this is precisely the kind of guesswork that is woefully insufficient to support a claim under *Iqbal* and *Twombly*. Plaintiffs have no basis for assuming that the plan fiduciaries — who have not chosen to participate in this lawsuit — did not understand how the fee arrangement worked. Those fiduciaries were and are sophisticated professionals who are responsible for investing the assets of very large pension plans. They specifically chose lending funds and therefore must have understood how securities lending works. Under those circumstances, Northern had no obligation to explain that it would not share investment losses. PTE 2006-16 does not purport to impose sweeping disclosure obligations on lending fiduciaries like NTI. Instead, it requires only

16

disclosure of information that NTI reasonably believed to be necessary, along with information the plan fiduciaries may reasonably request. *See* 71 Fed. Reg. at 63797. Plaintiffs do not allege any plausible basis for believing that NTI failed to comply with that obligation.[10]

### III. The Court Can And Should Consider Whether Plaintiffs Can Represent The Broad Class Alleged In The Complaint.

In response to questions defendants raised concerning plaintiffs' individual standing to bring this lawsuit, plaintiffs have submitted heavily redacted account statements to show that they remained invested in the specific Collective Funds identified in the complaint from 2007 through the first quarter of 2009. Because plaintiffs do not attempt to explain, let alone to quantify, what losses (if any) they incurred as a result of the Collective Funds' securities lending activities during that time, the record remains unclear as to their constitutional standing to bring this lawsuit. But even assuming, for purposes of argument, that plaintiffs will be able to show such losses, that does not mean they can represent the broad class alleged in the complaint. That class would include *every* ERISA pension plan (regardless of employer) that invested in *any* NTI lending Collective Fund (regardless of whether plaintiffs invested in that Fund) during the purported class period, as well as all named fiduciaries and participants in all of those plans.

Plaintiffs contend that it is premature to consider this issue because it is technically not a question of standing, but rather an issue concerning the scope of permissible representation under Rule 23. But plaintiffs' proposed class definition raises an important legal issue concerning plaintiffs' *statutory* right to sue under ERISA, which the Court can and should consider now, whether under Rule 12(b) or under Rule 23.

---

[10]     Plaintiffs also try to use the fact that defendants do not share losses to buttress their prudence argument. The notion that NTC had an incentive to invest collateral imprudently, however, ignores the fact that defaults would cause securities lending revenue to decline, which would adversely impact NTC's fees, and would subject NTC to precisely this type of lawsuit.

Plaintiffs bring this case pursuant to ERISA § 502(a)(2), which allows a participant to sue under § 409 to seek recovery of losses suffered by his plan as a result of a breach of fiduciary duty. In *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985), the Supreme Court held that "recovery for a violation of § 409 inures to the benefit of the plan as a whole." Thus, when a participant brings a lawsuit like this, he does so "in a representative capacity on behalf of the plan as a whole." *Id*. at 142 n.9. ERISA does not allow a participant to sue on behalf of plans in which he is not a participant. Opening Br. at 20-22. As the Second Circuit observed in *Chemung Canal Trust Co. v. Sovran Bank/Md.*, "in the absence of some indication of legislative intent to grant additional parties standing to sue, the list in § 502 should be viewed as exclusive." 939 F.2d 12, 14 (2d Cir. 1991). In *Chemung*, the court held that a former fiduciary was not allowed to bring suit on behalf of a plan. *Id.* It necessarily follows that plaintiffs here do not have a right under ERISA to bring lawsuits on behalf of plans in which they are not and never have been participants. Plaintiffs cite no authority to the contrary.

In their original complaint, plaintiffs sought to represent only the ERISA *plans* that had invested in NTI's lending Collective Funds. That was a recognition of the fact that any lawsuit challenging the prudence of plan investments can only be brought on behalf of the plans themselves. After defendants pointed out in their first motion to dismiss that plaintiffs had no statutory power to sue on behalf of other pension plans, they amended their proposed class definition to include not only the plans themselves, but also all of the *participants and named fiduciaries* in all of such pension plans.

In so doing, plaintiffs apparently sought to take advantage of the inapposite ruling in *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998). Pl. Br. at 22. That case held that Article III concerns did not preclude a participant in one health insurance plan governed by

ERISA from representing a class of participants in similar health plans administered by the same company. Plaintiffs argue that *Fallick*'s reasoning allows them to bring claims against the defendants on behalf of participants in all of the ERISA plans that invested in Northern's lending Collective Funds. But that reads far too much into *Fallick*. *Fallick* does not discuss statutory standing under ERISA. Moreover, it dealt with a fundamentally different type of claim, in which the plaintiff argued that he personally had been improperly denied benefits as a result of a policy the insurer (Nationwide) had adopted for all of the health insurance plans it administered. Thus, plaintiffs sought to recover for themselves, rather than for their plan.[11]

In this case, unlike *Fallick*, plaintiffs seek to recover only under ERISA § 409 for the individual *plans* that invested in lending Collective Funds; they do not seek any individual recovery for themselves or for any other participants. Under ERISA § 502(a)(2), plaintiffs can sue in a representative capacity on behalf of their own plans. But ERISA does not give them the right to sue on behalf of *other* plans in which they have never participated — any more than a participant in a mutual fund could bring a class action on behalf of mutual funds in which he had never invested. *See* Opening Br. at 19-20. For that reason alone, the Court should strike plaintiffs' request to represent a class consisting of pension plans (and their participants and named fiduciaries) other than those sponsored by ExxonMobil and TI.[12]

In addition, plaintiffs should not be able to seek damages on behalf of even their own

---

[11]    Virtually all of the cases plaintiffs cite at 23 n.3 of their response follow the same pattern, allowing individual participants who claim to have been denied benefits to sue an insurance company on behalf of a class of participants in their own and other plans offering the same coverage.

[12]    Oddly, plaintiffs complain at page 1 of their brief that defendants have moved to dismiss the complaint in this action even though defendants did not file such motions in cases brought by plan fiduciaries for the BP, Lockheed Martin and FedEx plans. The allegations in those cases, however, differ in a variety of respects from the allegations made here, reinforcing the conclusion that it would make no sense to allow individual participants in just two of the ERISA plans that invested in NTI's lending Collective Funds to sue on behalf of all such ERISA plans. These are issues that will be explored in depth if and when plaintiffs file a class certification motion.

ExxonMobil or TI plans with respect to the scores of lending Collective Funds in which plaintiffs did not individually invest.[13]  Plaintiffs do not deny that investors in one mutual fund would not be able to represent a class seeking damages for losses suffered in an entirely different mutual fund.  *See* Opening Br. at 21.  Nor do they deny that the same principle should apply here.  Instead, plaintiffs argue that some courts have recognized an exception to that ordinary rule where plaintiffs allege that the same policy or practice injured a number of different mutual funds.  More recent cases, however, reject such an argument.  In *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, the court dismissed claims brought against (among others) a Citigroup entity that formed and sold interests in mortgage trusts.  2010 WL 1371417, at *1, *7-*8 (E.D.N.Y. 2010).  Although the securities there were sold through a common registration statement that allegedly contained similar misleading statements with respect to 18 different trusts (facts not alleged or present here), the court held that plaintiffs lacked standing to sue with respect to the 16 trusts in which they had not invested.  *Id*. at *7-*8.  In support, the court cited two other recent cases in which courts had dismissed claims for lack of standing as to particular trusts in which they had not purchased any interest.  *Id.* at *8. Plaintiffs offer no reason why the same principle should not apply here.

## CONCLUSION

For the foregoing reasons and the reasons outlined in defendants' opening brief, plaintiffs' Amended Complaint should be dismissed.

Respectfully submitted,


Dated: April 15, 2010                              /s/ Michele Odorizzi

---

[13]          Plaintiffs invested in only four lending Collective Funds, identified in the Opening Br. at 3 n.1.

Michele Odorizzi
Caryn L. Jacobs
John J. Tharp, Jr.
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JOSEPH L. DIEBOLD, JR., on behalf of the EXXONMOBIL SAVINGS PLAN, and PAUL J. HUNDT, on behalf of the TEXAS INSTRUMENTS 401(K) SAVINGS PLAN, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 09 Civ. 1934

Hon. William J. Hibbler,
*Judge Presiding*.

**TABLE OF EXHIBITS ACCOMPANYING**
**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

| Exhibit | Document |
|---|---|
| **A** | Excerpts from CIT Group Inc.'s Form 10-K for the fiscal year having ended December 31, 2008 |
| **B** | *Reeder v. HSBC USA, Inc.*, 2009 WL 4788488 (N.D. Ill. 2009) |
| **C** | *Harris v. City of W. Chi.*, 2002 WL 31001888 (N.D. Ill. 2002) |
| **D** | *In re Reserve Fund Secs. & Deriv. Litig.*, 2009 WL 4249128 (S.D.N.Y. 2009) |
| **E** | *In re Lehman Bros. Secs. & ERISA Litig.*, 2010 WL 354937 (S.D.N.Y. 2010) |
| **F** | *George v. Kraft Foods Global, Inc.*, 2009 WL 4884027 (N.D. Ill. 2009) |
| **G** | *Great W. Cas. Co. v. Volvo Trucks N. Am. Inc.*, 2009 WL 588432 (N.D. Ill. 2009) |
| **H** | *Leber v. Citigroup, Inc.*, 2010 WL 935442 (S.D.N.Y. 2010) |
| **I** | *Jones v. Harris Assocs.*, 2010 WL 1189560 (U.S. Mar. 30, 2010) |
| **J** | *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, 2010 WL 1371417 (E.D.N.Y. 2010) |