IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOSEPH L. DIEBOLD, JR., on behalf of the ExxonMobil Savings Plan, and PAUL J. HUNDT, on behalf of the Texas Instruments 401(K) Savings Plan, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NORTHERN TRUST INVESTMENTS, N.A., AND THE NORTHERN TRUST COMPANY, <br><br> Defendants. | Case No. 09 C 1934 <br><br> The Honorable William J. Hibbler |

MEMORANDUM OPINION AND ORDER

Joseph Diebold and Paul Hundt participate in defined contribution plans offered by their employers, ExxonMobil and Texas Instruments (the Exxon and TI Plans) respectively. Participants in the Plans selected collective funds into which they wished to invest. Diebold selected one and Hundt selected three additional funds managed by Northern Trust Investments. Diebold and Hundt allege that these funds suffered losses because Northern Trust Investments (NTI) and Northern Trust Company (NTC) mismanaged the securities lending program in which the funds they selected participated. The Defendants move to dismiss.

**I. Factual Background**

NTI serves as the investment manager for the Exxon and TI Plans, with the rights, duties and obligations of an investment manager over plan assets. As participants in the Exxon and TI plans, Diebold and Hundt could select from various investment alternatives. Diebold invested in NTI's

1

S&P 500 Index Fund. Hundt invested in NTI's Aggregate Bond Index Fund, the Russell 2000 Index Fund, and the Russell 1000 Growth Equity Index Fund. Each of these index funds participated in NTI's securities lending program, which is at the heart of the parties' dispute.

NTI "lends" the stocks or bonds it holds in various Index Funds to certain borrowers. The borrowers post collateral equal to 102% of the value of the borrowed shares. As the value of the borrowed securities fluctuates, so too does the collateral held by NTI. In the event the value of the borrowed securities decreases, collateral is returned to the borrower. In the event the value of the borrowed securities increases, more collateral must be posted. Because NTI must adjust the amount of collateral it holds, some of that collateral must be held in liquid assets. NTI invests the remainder of the collateral to generate a return for the funds that participate in securities lending.

As the investment manager for the Plans, NTI had the discretion to manage, acquire, and dispose of collateral assets. NTI delegated this authority to NTC, which manages NTI's securities lending programs, negotiating terms with borrowers and investing the collateral received by NTI. NTC takes its fee as a percentage of the profits from the securities lending program, but does not share in the risk for the investment of the collateral.

To manage the collateral, NTC created three different collateral pools — the Core USA pool, the Short Term Investment Fund (STIF) pool, and the Short Term Extendible Portfolio (STEP) Pool. Each of these pools retained some assets in cash or overnight securities to provide a measure of liquidity necessary to repay borrowers when loans came due. NTC invested the remainder of the assets in the collateral pools in longer-term fixed-income instruments in accordance with investment guidelines established for each pool.

The investment guidelines required NTI to manage the pools to preserve capital and provide

2

liquidity. For example, the guidelines governing the Core USA pool allowed NTC to invest collateral in obligations of the United States government or its agencies, obligations of state governments, obligations of domestic and foreign banks, asset-backed securities (including mortgage-backed securities), fully collateralized repurchase agreements, among other investment alternatives. (See Am. Compl., Ex. 8). The STEP/STIF collateral pools authorized investment into similar instruments. (See Am. Compl., Ex. 8). Each of the pools contained further guidelines restricting investments with regard to credit quality, maturity and liquidity, and diversification. (See Am. Compl., Ex. 8).

Diebold and Hundt allege that NTI and NTC imprudently managed the collateral pools, which caused the funds in which they had invested to lose money. For example, the Plaintiffs allege that beginning in 2006, NTI became aware that the market risk of asset-backed investments was increasing and that it was becoming difficult to sell fixed-income investments like those held in the collateral pools. The Plaintiffs further allege that around the same time the Defendants were aware of the impending recession surrounding the housing market. The Plaintiffs allege that by 2007 Defendants were aware of a liquidity crisis in the credit market, in which much of the assets of the collateral pools were invested.

The Plaintiffs claim that despite this knowledge, the Defendants took no steps to amend the securities lending program or change the investment strategy for the collateral pools. As a result, the Plaintiffs allege, the financial crisis triggered by concerns over residential lending (particularly in the sub-prime market) and the collapse of several financial firms including Lehman Brothers and Merrill Lynch, caused the credit market to seize up and the stock market to precipitously fall, resulting in tremendous losses in the collateral pools. In response to the financial crises, the Defendants altered

their withdrawal guidelines. The Plaintiffs allege that the new withdrawal guidelines were not consistent with the Declaration of Trust for the Collective Trusts.

In Count I, the Plaintiffs claim that the Defendants breached their fiduciary duties by: 1) exposing the assets in the collateral pools to excessive levels of risk; 2) failing to discharge their duties solely in the interest of the Plans; and 3) failing to invest and manage the assets of the Plan in the manner of a reasonably prudent fiduciary. In Count II, the Plaintiffs claim that because the securities lending program involved transactions between the Plans and their fiduciaries, it constituted a prohibited transaction that did not fall within the Department of Labor's exemption allowing fiduciaries to engage in securities lending programs.

## II. Standard of Review

Motions to dismiss test the sufficiency, not the merits, of the case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.1990). In resolving a motion to dismiss, the Court treats well-pleaded allegations as true, and draws all reasonable inferences in the plaintiff's favor. *Disability Rights Wisc., Inc. v. Walworth County Bd. Of Supervisors*, 522 F.3d 796, 799 (7th Cir.2008). Legal conclusions, however, are not entitled to any assumption of truth. *Ashcroft v. Iqbal*, --- U.S. ----, ----, 129 S.Ct. 1937, 1940, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss under federal notice pleading, a plaintiff must provide a short and plain statement of his claim that provides "the grounds of his entitlement to relief" by alleging "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (internal quotation marks, brackets, and citation omitted).

Although recent Supreme Court decisions put to rest the 'no set of facts' pleading standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), the Supreme

4

Court reminds lower courts that it has not adopted fact pleading or otherwise cast doubt on the validity of Rule 8. *See Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). Rather, the Supreme Court instructs that abstract recitations of the elements of a cause of action or conclusory legal statements that do not distinguish the case at hand from any other hypothetical case in that field of law fall short of the notice requirement of Rule 8. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) (interpreting *Twombly*, *Erickson*, and *Iqbal*). Put another way, a plaintiff must plead facts in sufficient context that plausibly suggests an entitlement to legal relief. *Twombly*, 550 U.S. at 561-62; *Swanson v. Citibank, N.A.*, — F.3d —, 2010 WL 2977297, at * 3 (7th Cir. Jul. 30, 2010) ("plaintiff must give enough details about the subject-matter of the case to present a story that holds together."). The amount of context necessary to make a claim "plausible" necessarily will vary depending on the complexity of a case. *Swanson*, 2010 WL 2977297, at * 3.

### III. Analysis

*A.   Count I*

Section 404 of ERISA imposes standards of fiduciary duty, including the duty to act with the "care, skill, prudence, and diligence" that a prudent person operating in similar circumstances would employ. 29 U.S.C. § 1104(1)(B); *see also Jenkins v. Yeger*, 444 F.3d 916, 924 (7th Cir. 2006). The duty of prudence does not require a fiduciary to become a guarantor of a plaintiff's investment. *DeBruyne v. Equitable Life Assurance Soc'y of the United States*, 920 F.2d 457, 465 (7th Cir. 1990). Merely because an investment loses money does not demonstrate that a fiduciary has violated its standard of care. *Id.* Rather, a fiduciary acts imprudently, for example, when it fails to adequately investigate or monitor a plaintiff's investments, *Jenkins*, 444 F.3d at 525-26, or adequately diversify

or structure a plaintiff's investments, *Armstrong v. LaSalle Bank Nat'l Ass'n*, 446 F.3d 728, 732 (7th Cir. 2006); *Eyler v. C.I.R.*, 88 F.3d 445, 454 (7th Cir. 1996).

The Defendants first argue that the Plaintiffs "have offered nothing but conclusory allegations and 20/20 hindsight" in support of their imprudence claim. Defendants point to the fact that despite attaching the entire list of securities purchased for the two collateral pools (Am. Compl., Ex. 32) and the applicable guidelines (Am. Compl., Ex. 8), the Plaintiffs have failed to point to a single investment that deviated from the guidelines or was otherwise indicative of an imprudent investment strategy.

The Defendants both understate the allegations made by the Plaintiffs and overstate the requirements imposed by the Supreme Court's recent interpretations of Rule 8. Defendants are correct that the Plaintiffs do not identify a single investment that was indicative of an imprudent investment strategy. But Rule 8 does not require the Plaintiffs to be so detailed in their allegations. In fact, whether a particular investment choice was imprudent is a particularly fact-sensitive inquiry that would not be appropriate to resolve on a motion to dismiss. The Plaintiffs have alleged that the Defendants were confronted with a set of circumstances — notably that for two years the market risk of asset-backed investments was increasing and that it was becoming difficult to sell fixed-income investments like those in the collateral pools — that would have caused a prudent investor to amend its securities lending program to protect the assets of the collateral pools.

Defendants next argue that 20/20 hindsight concerning the best possible course of investment cannot provide the basis for Plaintiffs' claims. Defendants are correct that ERISA does not require fiduciaries to guarantee a return or to forecast the long-term future of a company or a particular market. *See, e.g., DeBruyne*, 920 F.2d at 965; *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 862-63

(N.D. Ill. 2009). The Plaintiffs, however, do more than suggest that Defendants should guarantee a rate of return on their investments. The Plaintiffs allege that Defendants ignored warning signs that would have alerted a prudent fiduciary to follow a different investment strategy.

Defendants argue that Plaintiffs still have not made sufficient allegations. For example, the Defendants point out that many of the articles cited to by the Plaintiffs in their Amended Complaint indicate that economists and experts disputed the health of the economy, in particular the economic well-being of the housing market. While the articles cited by the Plaintiffs in their Amended Complaint may not be sufficient to state a claim that it was *per se* imprudent to invest in mortgage-backed securities, the fact that economists displayed concern over the health of the economy may be sufficient to suggest plausibly that a prudent fiduciary would have altered their investment of the collateral pools' assets. If, for example, a prudent investor would have increased the percentage of liquid assets in the collateral pool in response to the economic situation that confronted the Defendants and yet the Defendants allowed the percentage of liquid assets in the collateral pool to remain the same, Defendants may have acted imprudently.

To support a judgment, Plaintiffs may well have to demonstrate more than just the fact that Defendants knew that the asset-backed securities market faced stress. Instead, the Plaintiffs would need to demonstrate what reasonably prudent fiduciaries would have done when faced with similar information. *See Brieger*, 629 F. Supp. 2d at 863 (discussing duty of prudence when fiduciary faced with information about value of company stock). That, however, is a fact-intensive question that may be appropriate to resolve on summary judgment, but is not appropriate to resolve on a motion to dismiss. *George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1048-49 (N.D. Ill. 2009); *Sherill v. Federal-Mogul Corp.*, 413 F. Supp. 2d 842, 867-68 (E.D. Mich. 2006).

The Plaintiffs have provided sufficient factual detail in their Amended Complaint to provide the Defendants with notice of their claims and to suggest the Plaintiffs have a right to relief. At its core, the Plaintiffs have alleged that, given the information the Defendants had about the economy, a prudent fiduciary would have altered the way in which the assets of the collateral pool were managed. The Court DENIES Defendants' Motion to Dismiss Count I of the Amended Complaint.

*B.    Count II*

In Count II, the Plaintiffs allege that the Defendants engaged in prohibited transactions in violation of Section 406 of ERISA. *See* 29 U.S.C. § 1106. Section 406(a)(1)(A) prohibits a fiduciary of a plan from causing the plan to enter into a transaction that constitutes a sale, exchange, or lease of any property between a plan and a party in interest. 29 U.S.C. § 1106(a)(1)(A). Section 406(b)(1) prohibits fiduciary transactions with plan assets in its own interest or for its own account. 29 U.S.C. § 1106(b)(1).[1] The Plaintiffs allege that Defendants violated both of these provisions.[2]

Plaintiffs allegations regarding Section 406(a)(1)(A) center on the Defendants' securities lending program. According to the Plaintiffs, in order to lend securities, NTI and NTC entered into

---

[1] Plaintiffs allegation that Defendants violated Section 406(b)(1) of ERISA merits little discussion. As best the Court can determine, Plaintiffs seem to allege that Defendants violated this provision of ERISA by charging them a fee to manage the Funds' securities lending program even though securities lending was risky. But charging a fee for its services does not mean that NTC or NTI dealt with plan assets in its own interest or for its own account. The Securities Lending Authorization Agreement (Exhibit 2 to the Amended Complaint) makes clear that NTC acted as an agent in the securities lending program.

[2] Despite an amended Complaint that contains 144 numbered paragraphs within 59 pages, replete with factual detail and references to very specific provisions of ERISA, the Plaintiffs argue for the first time in response to Defendants' motion that their factual allegations support claims under Sections 406(a)(1)(B) and 406(a)(1)(C) of ERISA. Plaintiffs utterly fail to offer any explanation beyond these cursory statements and brief citation to the relevant sections of ERISA. These conclusory statements are insufficient to state a claim for relief and the Court will not allow the Plaintiffs to pile additional claims on top of their lengthy pleadings and to spring a surprise trap upon both the Defendants and the Court.

lending agreements with each other and then later with borrowers and that these agreements constituted a "lease of property" between the Plans and a party in interest (NTC).[3] The Plaintiffs also allege that it may be possible that some of the borrowers are parties in interest as well.

Plaintiffs need to provide sufficient factual context surrounding their claim that plausibly suggests an entitlement to relief. *Swanson*, 2010 WL 2977297, at *3. They have not. Instead, the Plaintiffs have offered nothing more than a conclusory assertion that the lending program run by the Defendants operated as a lease between NTI and NTC. Whether Defendants' acts constituted a lease is a pure legal conclusion and is not entitled to a presumption of truth. *Brooks*, 578 F.3d at 581. Plaintiffs must offer some factual context that identifies the basis for their claim that the Defendants' securities lending program in fact constituted a lease of securities. Similarly, the Plaintiffs offer nothing more than speculation about the mere possibility that some of the borrowers might be parties in interest. Under the standards set forth by *Twombly*, *Erickson*, and *Iqbal*, however, it is no longer sufficient for Plaintiffs to plead their case in possibilities.

Even if Plaintiffs' allegations plausibly suggested they were entitled to relief pursuant to Section 406(a)(1)(A), they have pleaded themselves out of court. Plaintiffs' own allegations demonstrate the failure of their claim. The Plaintiffs' allegations and the Securities Lending Authorization Agreement (which they attach to the Amended Complaint) make clear that the Funds

---

[3] Defendants argue that the securities lending program falls within an exemption to Section 406(a)(1)(A)'s mandate. The Department of Labor has created an exemption to Section 406(a)(1)(A) to enable plans to participate in securities lending programs. Prohibited Transaction Exemption (PTE) 2006-16, 71 Fed. Reg. 63786, 63795. Among other things PTE 2006-16 requires that the fees charged for a securities lending program be reasonable. 71 Fed. Reg. 63786. Defendants insist that their fees were reasonable because Plaintiff agreed to them. Whether Defendants' fees were reasonable, however, is a question of fact that the Court cannot resolve on a motion to dismiss.

do not sell, exchange or lease plan property to NTC. Rather, the Plaintiffs repeatedly allege that NTC acts as the Lending Agent for NTI, lending securities owned by the Plans to third-party borrowers. See Am. Compl. ¶ 22, 24, 36-40 & Ex. 2 (the Securities Lending Authorization Agreement). Because NTC acts as the lending agent for NTI, as the Plaintiffs have pleaded, NTI is not exchanging or leasing plan property with a party in interest, and there is no violation of Section 406(a)(1)(A).

The Court holds that the Plaintiffs have failed to state a claim that the Defendants engaged in prohibited transactions pursuant to Section 406(a)(1)(A).

C.  *Standing*

The Defendants raise several arguments in the alternative related to Plaintiffs' standing. Because the Court has found that Count I of the Amended Complaint states a claim, the Court will address these arguments.

First, the Defendants argue that the Plaintiffs have not adequately alleged that they themselves have suffered individual losses. ERISA requires individuals to allege breaches of fiduciary duty to seek remedies that benefit the Plan as a whole. *See Magin v. Monsanto Co.*, 420 F.3d 679, 687 (7th Cir. 2005); 29 U.S.C. § 1132(a)(2). Several circuits have adopted the view that in order to meet the constitutional standing requirement (and thus confer subject matter jurisdiction on this Court), participants in a defined contribution plan must also show that they suffered individual losses as a result of the alleged misconduct. *See, e.g., Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607-08 (6th Cir. 2007) (collecting cases). Defendants argue that Plaintiffs have not adequately pleaded that they suffered individual losses.

This argument merits little discussion. The Plaintiffs allege that they participated in various Plans and that the Defendants' breach of fiduciary duty in the way in which they managed the

securities lending activity of those Plans caused the Plans to decrease in value. Defendants acknowledge that the Plaintiffs allege that they invested in the Plans that decreased value and that they suffered losses but asks the Court to find these allegations too threadbare because they don't state when they began their investment or how much they lost. This level of detail, however, is not required. It requires no speculation whatsoever to conclude that if the Plans lost money after the point in which the Plaintiffs had invested in them caused by the Defendants' breach of fiduciary duty that that breach also caused the Plaintiffs to individually suffer losses.

Defendants also argue that Plaintiffs lack standing to represent the members of the prospective class — both because they are not participants in other plans that they purport to represent but in which they did not invest and because they cannot recover losses in collective funds in which they (or, derivatively, the Plans in which they invested) never participated. The Court believes these arguments are better taken up on a motion for class certification and will address them at that time, if necessary.

For the foregoing reasons, the Court GRANTS in part and DENIES in part the Defendants' Motion to Dismiss. The Court DENIES the Motion to Dismiss Count I of the Amended Complaint and GRANTS the Motion to Dismiss Count II of the Amended Complaint.

IT IS SO ORDERED.

9/7/10
Dated

Hon. William J. Hibbler
U.S. District Court