# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOSEPH L. DIEBOLD, JR., on behalf of the EXXONMOBIL SAVINGS PLAN, and PAUL J. HUNDT, on behalf of the TEXAS INSTRUMENTS 401(K) SAVINGS PLAN, and all others similarly situated, | ) ) ) ) ) ) | No. 09-Civ-1934 |
| Plaintiffs, | ) ) | Hon. William J. Hibbler |
| v. | ) ) | |
| NORTHERN TRUST INVESTMENTS, N.A., and THE NORTHERN TRUST COMPANY, | ) ) ) | |
| Defendants. | ) | |

## SECOND AMENDED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................ 1

II.    JURISDICTION AND VENUE .......................................................................... 5

III.   THE PARTIES.................................................................................................... 5

     A.    Plaintiffs. ................................................................................................ 5

     B.    Defendants. ............................................................................................ 6

IV.   DEFENDANTS' FIDUCIARY STATUS ......................................................... 6

V.    SECURITIES LENDING OVERVIEW........................................................... 10

VI.   NORTHERN TRUST'S SECURITIES LENDING PROGRAM ................... 11

     A.    The Northern Trust Defendants Administered the Securities
           Lending Program for each of the Plans in the Class. ......................... 11

     B.    Plaintiffs' Invested a Portion of their Retirement Savings in
           Northern Trust's Lending Funds.......................................................... 13

     C.    The Collateral Pools.............................................................................. 16

                a.    STEP Pool................................................................................ 17

                b.    STIF Pool.................................................................................. 18

                c.    Core USA Pool. ....................................................................... 18

           1.    Northern Trust's Mismanagement of the Collateral Pools. .................... 18

                a.    Early Warning Signs of Collateral Pool Problems. ................... 21

                b.    Collateral Pool Performance Worsens in Mid-2008.................. 24

                c.    Northern Trust Locks Down Plan Assets Invested in
                      Lending Funds and Imposed Draconian Withdrawal
                      Restrictions on Plans................................................................ 28

           2.    Northern Trust's Flawed and Ineffective Risk Management
               Program................................................................................................ 29

     D.    The Plans Suffered Injury through Northern Trust's Securities
           Lending Practices................................................................................... 31

E.      ERISA Imposes Stringent Fiduciary Duties on Defendants ............................... 33

F.      Defendants Earned Substantial Fees While Grossly Mismanaging
        the Collateral Pools and Causing the Plans to Suffer Substantial
        Losses ................................................................................................................ 35

G.      The Northern Trust Defendants Took Unreasonable Compensation
        for Themselves .................................................................................................. 37

H.      The Northern Trust Defendants Engaged in Prohibited
        Transactions. ..................................................................................................... 41

VII.    CLASS ACTION ALLEGATIONS ............................................................................. 45

VIII.   CLAIMS FOR RELIEF ................................................................................................ 49

IX.     REMEDY FOR BREACHES OF FIDUCIARY DUTY ............................................... 56

X.      PRAYER FOR RELIEF ............................................................................................... 57

## I.    INTRODUCTION

1.      Plaintiffs Joseph L. Diebold, Jr., a participant in the ExxonMobil Savings Plan, and Paul J. Hundt, a participant in the Texas Instruments 401(k) Savings Plan, bring this Second Amended Class Action Complaint on behalf of the participants, beneficiaries, and named fiduciaries of their Plans, and on behalf of all other similarly situated defined benefit and defined contribution pension plans covered by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA") ("Plan" or collectively, the "Plans") that suffered losses as a result of Northern Trust's imprudent management of its securities lending program. Plaintiffs allege the following based on personal knowledge, and on information and belief based upon facts obtained through investigation by their counsel, or review of publicly available documents.

2.      This is an Amended Class Action Complaint against Defendant Northern Trust Investments, N.A. ("NTI"), and its affiliate, The Northern Trust Company, ("Northern").[1] NTI manages funds in which a large number of ERISA-qualified 401(k) plans invest. Billions of dollars of the Plans' assets are invested in these funds, which hold publicly traded securities. NTI developed a securities lending program that it marketed to the Plans as providing a means to incrementally boost the returns of their funds. The Northern Trust funds that engaged in securities lending are referred to herein as "Lending Funds" or "Funds."

3.      In exchange for this incremental investment return, Plans participating in Northern Trust's securities lending program were exposed to massive risk. And, in point of fact, Northern Trust's securities lending program was operated in a reckless and imprudent manner. As a result, while each Plan had the opportunity to achieve *incremental* returns to fund

---

[1]  NTI and Northern will be referred to, collectively, as "Defendants."

performance, each Plan also assumed massive and undisclosed risks wholly unsuited to the goals of preserving liquidity and seeking incremental returns at low risk.

4.      The losses incurred by Plaintiffs' Plans and the other Plans in the Class are the result of Defendants' mismanagement of the collateral pools ("Collateral Pools") established by NTI for the purpose of securing the loaned securities and generating the incremental return that Northern's securities lending operation was intended to provide for the participating Plans.

5.      Those who borrowed shares from the Lending Funds posted collateral equal to 102% of the value of the borrowed shares in order to secure the shares. As the lending agent, ("Lending Agent") Defendant Northern negotiated all terms of the securities lending agreements with borrowers ("Borrower" or "Borrowers"), and decided which Collateral Pools the collateral it received would be invested in. As Investment Manager of the Lending Funds and the Collateral Pools, Defendant NTI was an ERISA fiduciary, bound to the highest duty known to law. Among those duties is the obligation to act prudently, loyally, and with an eye single to the best interests of the Plans and Plan participants.

6.      Whereas a prudent investment manager would have invested the collateral securing the Lending Fund shares in safe, liquid securities and carefully monitored the risk of the Collateral Pool investments, Defendants made imprudent investment decisions that ultimately forced the Plans to assume tremendous losses. In relevant part, Defendant NTI invested the collateral in illiquid and unduly risky asset-backed securities and other securitized debt instruments. Later, the risky securities held in the Collateral Pools lost substantial value and were no longer adequate to cover the value of lent securities held by the borrowers.

7.      By 2007, the performance of some of NTI's Collateral Pools was clearly suffering, and the Pools began incurring significant losses. Because the Pools held billions of

dollars in collateral cash reinvestments, small declines in the Pools' value compared to their benchmarks actually represented the loss of millions of dollars of retirement money for the Plans' participants. However, instead of taking remedial action in 2007 to stave off the then-manageable losses, Northern Trust imprudently stayed the course, and lost even more Plan assets in 2008 and 2009.

8.      When the Plans' fiduciaries tried to redeem their investments and exit the Lending Funds, the Defendants imposed new withdrawal restrictions and barred Plans from divesting without also either taking the impaired and valueless securities from the Collateral Pools and/or paying Northern Trust in order to prop up the value of the Fund for other investors. Thus, Northern Trust forced the Plans who were harmed by Northern Trust's imprudence to make up the losses caused by Northern Trust itself, an unfair and untenable requirement given Northern Trust's responsibility for the losses in the first instance. Northern Trust repeated this same pattern of fiduciary abuses in all the Collateral Pools, and thus, caused substantial losses to all the Plans for precisely the same reasons.

9.      Accordingly, Plaintiffs allege that the Defendants breached their fiduciary duties under ERISA and caused substantial losses to the Plans that participated in Northern Trust's securities lending operation. More specifically, in Count I, Plaintiffs allege that the Defendants breached their duties of prudence, loyalty, and exclusive purpose under ERISA § 404(a), 29 U.S.C. § 1104(a) (2006), by investing Plan assets recklessly and imprudently, by acting disloyally, and by causing losses to the Plans. The Defendants failed to properly select investments for the Collateral Pools, failed to monitor the risk that the Pools faced, failed to divest holdings from the Pools in a timely fashion in order to spare the Plans from tremendous

losses, and failed to provide complete and accurate information to the Plans regarding securities lending.

10.    In violation of their fiduciary duties to the Plans, Defendants took unreasonably large compensation (separate and apart from their fees for managing the Lending Funds and Collateral Pools) for managing the securities lending program. Indeed, Defendants took **forty percent of all net income—*i.e.*, the spread, generated by the Collateral Pools for the benefit of the Lending Funds**. Thus, only 60% of the net income generated through the securities lending program managed by Defendants inured to the Plans. Defendants took from the Plans – to whom they owed fiduciary obligations – much higher compensation for managing securities than they collected from other institutional investors who had negotiated securities lending compensation with Defendants in arm's length transactions, where the investors were represented by independent fiduciaries—*i.e.*, fiduciaries unaffiliated with Defendants. Moreover, the forty percent received by Defendants far exceeds industry standards.

11.    Defendants' excessive compensation is not surprising given that their investment 7relationship with the Plans was fraught with conflicts and self-dealing. As shown in greater detail below, Defendants, on the one hand, managed the Lending Funds and purportedly represented the Lending Funds and the Plans in setting the terms of and executing a Securities Lending Agreement with Defendants, while, on the other hand, they represented themselves as the Lending Agent. The Defendants, acting as Lending Agent, then allocated to themselves, or an affiliate, the responsibility for managing the collateral investment program via the Collateral Pools. Essentially, Defendants, all of whom operate under the same corporate umbrella, negotiated with themselves the terms of their compensation, discretion, authority, and even

4

liability. Not surprisingly, these arrangements led to Defendants setting and receiving excessive and unreasonable compensation for themselves.

12.     Every dollar Defendants collected in excess of reasonable compensation was one dollar less that the Plans, and their respective participants and beneficiaries, received. Moreover, the Plans suffered additional losses in the form of lost investment opportunity on the securities lending income wrongfully taken by Defendants for themselves where such income would have been reinvested in the respective Lending Funds, rather than taken by Defendants for their own profit and use. As a result, the Plans suffered hundreds of millions of dollars in losses due to Defendant's fiduciary breaches and prohibited self-dealing.

13.     In Counts II and III, respectively, Plaintiffs allege breaches of fiduciary duty and prohibited transactions arising from the Northern Trust Defendants' placing their own interests ahead of those of the Plans through self-dealing, using Plan assets for their own benefit, and collecting unreasonable fees and other compensation in connection with the securities lending program that they set up and administered.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

15.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Defendants are headquartered and conduct business in this District.

## III.     THE PARTIES

### A.     Plaintiffs.

16.     Plaintiff Joseph L. Diebold, Jr., is a participant in the ExxonMobil Savings Plan. He resides in Prairieville, Louisiana. Through his Plan, Plaintiff Diebold invested in the S&P 500

Fund and suffered losses through Defendants' breaches of fiduciary duty and prohibited transactions as alleged herein. The ExxonMobil Savings Plan also offered participants the opportunity to invest in additional Northern Trust Lending Funds, including, but not limited to, the Aggregate Bond Index Fund, the Small Cap Equity Index Fund, the EAFE Index Fund, and the Short Term Investment Fund.

17.     Plaintiff Paul J. Hundt is a participant in the Texas Instruments 401(k) Savings Plan. He resides in Garland, Texas. Through his Plan, Plaintiff Hundt invested in the Aggregate Bond Index Fund, the Daily Russell 2000 Index Fund and the Daily Russell 1000 Growth Equity Index Fund, and suffered losses through Defendants' breaches of fiduciary duty and prohibited transactions as alleged herein.

**B.     Defendants.**

18.     Defendant NTI is an affiliate of Defendant Northern. NTI is a national banking association with its principal place of business in Chicago, Illinois and is a fiduciary and/or a party-in-interest with respect to the Plans.

19.     Defendant Northern is an Illinois state banking corporation with its principal place of business in Chicago, Illinois. Directly and/or through its affiliates, Northern provides investment products and services, including the products and services provided by NTI to the Plans, and Northern is a fiduciary and/or a party-in-interest with respect to the Plans.

## IV.   DEFENDANTS' FIDUCIARY STATUS

20.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other person who in fact performs fiduciary functions. Thus, a person is a fiduciary to the extent,

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). Here, Defendants were ERISA fiduciaries for the following reasons.

21. Defendant NTI served as the ERISA investment manager for each and every Plan that participated in Northern Trust's securities lending program, and, as such, was an ERISA fiduciary.

22. ERISA § 3(38), 29 U.S.C. § 1002(38) defines investment manager as:

any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title) -

(A) who has the power to manage, acquire, or dispose of any asset of a plan;

(B) who

(i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b-1 et seq.];

(ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b-3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan. ERISA § 3(38), 29 U.S.C. § 1002(38).

7

23.     According to the form investment manager agreements that Defendant NTI entered with the Plans, NTI had the rights, duties, and obligations of an investment manager over the assets in each Plan's investment accounts. *See Investment Manager Agreement*, § 1(c), February 29, 2008. (Ex. 6, attached hereto.)[2] In these agreements, NTI also explicitly acknowledged its status as an investment manager pursuant to ERISA § 3(38). In relevant part, the investment manager agreement stated that NTI represented that it was: (i) registered as an investment adviser under the Investment Advisers Act of 1940; (ii) a bank as defined in the Advisers Act, or (iii) an insurance company qualified to perform the investment manager services under the laws of more than one state. *Id.* at § 2(a), 1(d). Further, NTI as investment manager warrantied that it was, and would continue during the term of the agreement to be an "investment manager" as defined in Section 3(38) of ERISA. *Id.* at § 24(vi). NTI also acknowledged its status as an ERISA fiduciary to the Plans. *Id.* at § 2(b). Thus, Defendant NTI was an investment manager under ERISA.

24.     NTI was an investment manager for the Plans and had discretionary authority to manage the Plans' Lending Funds and Collateral Pools (including the power to acquire and dispose of) assets in the investment accounts when it selected and chose securities for the Lending Funds and Collateral Pools.

25.     NTI also served as the trustee of the Northern Trust Global Investments Common Funds and the Northern Trust Global Investments Collective Funds. *See Securities Lending Authorization Agreement*, August 1, 2006, ("Lending Agreement"), at 1 (Ex. 3.)

26.     Northern served as the securities lending agent, ("Lending Agent") for the securities of all the Lending Funds. In this capacity, Northern served as an agent for NTI, the

---

[2] All documents referred to as "Ex. ___", throughout this document are attached hereto.

Trustee of the Collective Trusts, and also the lender of the Funds' securities. As Lending Agent, Northern had physical custody of the collective trusts and collateral, selected borrowers for the securities, determined creditworthiness of potential borrowers, contracted to lend the Funds' securities to borrowers, determined which of the Lending Funds or collective trusts to loan securities from, and received cash collateral in exchange for the loan. Northern also had the right to add or delete Collateral Pools as investment options for the cash collateral it received, as well as the discretion to make loans or advances to the Lending Funds in case of a collateral deficiency, and charged the Funds monthly securities lending fees. *See* Lending Agreement (Ex. 3.) Thus, Northern, as Lending Agent, was also an ERISA fiduciary for the Plans in that it had discretionary authority or control respecting management or disposition of the Plans' assets when it was lending the Plans' securities.

27.     Northern was also a fiduciary for purposes of setting its own compensation. Northern essentially set its own compensation by entering into a Lending Agreement with its affiliate NTI, which set the percentage of securities lending revenue Northern received as Lending Agent. *See* Lending Agreement at 21 (Ex. 3.) Northern also controlled its compensation through the negotiation of rebates with borrowers (the lower the rebate, the greater Northern's compensation) and, through its affiliate NTI, the management of Collateral Pools where the return on investment (and commensurate risks) determined Northern's revenue from securities lending and where the fees collected by NTI and other affiliates for managing and operating the Collateral Pools necessarily impacted on the securities lending compensation received by Northern.

28.     As such, Defendants are ERISA fiduciaries because they exercised discretionary authority and control respecting management or disposition of the Plans' assets and rendered

investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of the Plans that participated in Defendants' securities lending program. *See* ERISA § 3(21)(A)(i-ii), 29 U.S.C. § 1002(21)(A)(i-ii).

## V.   SECURITIES LENDING OVERVIEW

29.     Securities lending is the temporary transfer of securities owned by a lender to a borrower, and in return, the borrower typically provides assets as collateral to the lender. Securities lending can operate as an investment technique that provides stable incremental returns to the lender in exchange for the temporary "loan" of a stock to a borrower who needs the stock for short term purposes. Borrowers typically include investment banks, hedge funds, arbitragers and other financial market actors that wish to short stocks. Index funds are a particularly ready source of stocks for shorting, since the portfolio turnover in index funds is relatively low and predictable, and index funds typically have a stable inventory of stocks for loan. Gene D'Avolio, *The Market for Borrowing Stock*, 66 J. FIN. ECON. 271, 277 (2002). Short sellers locate securities available for borrowing through lending agents who act as clearinghouses for securities lending and borrowing by matching supply with demand. The lending agent is compensated by being given a portion of the securities lending income.

30.     The collateral received from the borrowers is supposed to be invested by the lending agent in safe, short-term, liquid instruments so that the owner of the stock receives some additional income from the reinvestment of the collateral. Thus, securities lending programs can provide institutional investors with a marginal increase in the returns to their stocks and other securities, provided that the collateral is properly reinvested. In the event that the collateral is not appropriately invested, or risk controls are otherwise lacking in the investment management process, the marginal return is accompanied by outsize risk.

31.     There are three primary risks associated with securities lending:

10

• OPERATIONAL RISK - the risk that the lending agent does not administer the program as agreed. This includes the fiduciary's failure to mark to market collateralization levels and to post corporate actions and income, including all economic benefits of ownership except for proxy voting.

• MARKET/COLLATERAL REINVESTMENT RISK - the risk of investment loss from the reinvestment of the cash collateral by the lending agent. The real risk is that the investment of the cash collateral will not earn a sufficient return to cover the agreed upon rebate rate or even to return the collateral at its original value because of interest rate, liquidity and/or credit risks.

• BORROWER/COUNTERPARTY DEFAULT RISK - the risk that the borrower fails to return the securities it has received due to insolvency or other reasons. Borrower default also leads to trade settlement risk, which is the risk that the lender sells a security on loan and that the loaned security is not returned by the borrower. Therefore the trade fails or the seller is charged with an overdraft fee.

32.     As a result of these risks, while a securities lending program *can* be exercised in

manner suitable for retirement plan investments, it is easily exploited, as was the case here,

which can create an unduly high risk for retirement plan investors. As the *Wall Street Journal*

described:

> Imagine you hire a real-estate agent to sublet your house. Now imagine he keeps
> 30% to 50% of the rent for himself. Finally, imagine that the real-estate agent
> makes you pay for the damages that resulted when the tenants he brought in
> trashed your house….If you think that sounds unfair, get a load of how the
> mutual-fund industry has milked investors through the arcane practice of
> securities lending. Like subletting your house, securities lending is sensible and
> beneficial in the right hands -- but can wreak havoc when it is done wrong.

Jason Zweig, *The Intelligent Investor: Is Your Fund Pawning Shares at Your Expense?* Wall St.

J., May 30, 2009.

## VI.    NORTHERN TRUST'S SECURITIES LENDING PROGRAM

**A.      The Northern Trust Defendants Administered the Securities Lending Program for each of the Plans in the Class.**

33.     Based on review of publicly available documents, all of the Plans in the class

hired NTI to serve as the Investment Manager for their Lending Funds. Defendant NTI managed

the assets of the Lending Funds in collective trusts established specifically for ERISA-qualified

plans. Defendants NTI and Northern together administered the securities lending program for each of the Lending Funds in consistent fashion; consequently, the program had the same problems for each Plan in the Class.

34. The following is a diagram of Northern Trust's securities lending program for the Plans.



35. Each of the Lending Funds was set up as a commingled fund, also referred to as a "Participating Trust" pursuant to a Declaration of Trust.[3] Decl. of Trust § 1.09, § 2.01. (Ex. 2.) The commingled funds were established for the collective investment of a group of institutional

---

[3] On January 31, 2006, Northern Trust amended and restated one or more Collective Funds Trusts for which it served as Trustee. *See Amendment and Restatement of Declaration of Trust of the Northern Trust Global Investments Quantitative Management Collective Funds Trust*, ("Decl. of Trust"). (Ex. 2.) The Northern Trust Global Investments Quantitative Management Collective Funds Trust had originally been effective as of November 22, 2002.

investors, here the defined contribution and defined benefit Plans in the Class. All the investors in each commingled fund shared, pro rata, in any gains and losses for the Fund. During 2007 and 2008, Northern Trust's Collective Funds Trusts held over fifty commingled funds. *See Annual Report for Northern Trust Global Investments Collective Funds Trust for Domestic Equities, July 31, 2007*. (Ex. 12); *Annual Report for Northern Trust Global Investments Collective Funds Trust for Fixed Income, July 31, 2007*. (Ex. 34).

36.     NTI created each commingled fund that was offered to participants in the Plans by executing a Fund Declaration that described each Lending Fund's investment policy and objective. Decl. of Trust, §3.01(a). (Ex. 2.) For example, the Aggregate Bond Fund's investment objective was to approximate the overall performance of Lehman Brothers Aggregate Bond Index. *Fund Declaration for NTGI-QM Collective Daily Aggregate Bond Fund Lending*, January 31, 2006. (Ex. 7.)

37.     The Fund Declarations were created and prepared by NTI specifically for distribution to Plan sponsors and fiduciaries. Each of the Fund Declarations stated that the Fund "may participate" in securities lending pursuant to the Lending Agreement, and also stated that the *lending agent* would "indemnify, defend and hold harmless *the Fund* from and against any losses, damages, costs, and expenses the Fund may incur *as a result of failure of the lending agent to perform its duties and responsibilities* under the lending agreement." (emphasis added) (Ex. 7, §6; Ex. 9, §6.)

**B.     Plaintiffs' Invested a Portion of their Retirement Savings in Northern Trust's Lending Funds.**

38.     No later than 2005, Plaintiff Hundt began making investments in Northern Trust's Lending Funds, including the Aggregate Bond Index Fund, the Daily Russell 2000 Index Fund and the Daily Russell 1000 Growth Equity Index Fund, all commingled funds managed by NTI

pursuant to its investment management agreement with the Texas Instruments 401(k) Savings Plan. Northern Trust pooled Plaintiff Hundt's investments in these Funds with investments from investors in other Plans.

39.     For several years, Plaintiff Diebold has been invested in Northern Trust's S&P 500 Fund, a commingled fund managed by NTI pursuant to its investment management agreement with the ExxonMobil Savings Plan. Northern Trust pooled Plaintiff Diebold's investments in this Fund with investments from investors in other Plans. Northern Trust marketed the S&P 500 Fund as mirroring the performance and risk of its benchmark index, the S&P 500. *See NTGI-QM Collective Daily S&P 500 Equity Index Fund Lending Fund Declaration*, (Ex. 9); *Investment Management Agreement between BP Corporation and Northern Trust Investments*, *Exhibit B, Investment Guidelines*, February 29, 2008 (Ex. 6).

40.     The Fund Declarations for the Lending Funds also stated that Northern Trust's securities lending program was conducted in accordance with the Department of Labor's Prohibited Transaction Class Exemption, 2006-16, and that the Lending Agent retained 40% of the securities lending revenue earned when Northern Trust lent out the Fund's securities. (Ex. 7, §6; Ex. 9, §6.) Even though the Fund Declarations were designed for plan sponsors and fiduciaries, these documents did not disclose the potential risk that each Fund bore for any future loss of collateral by Northern Trust in its investment management of the Collateral Pools.

41.     To lend the Funds' securities, NTI, as Trustee of the Collective Trusts, entered into the Lending Agreement with its own internal counterparty, Northern, serving as the Lending Agent. The Lending Agreement authorized lending of the Funds' securities provided that the loans were made to creditworthy borrowers who posted collateral equivalent to not less than 100% of the initial market value of the borrowed securities. *Lending Agreement,* § 4.1. (Ex. 3.)

14

42.     With the Lending Agreement in place, Northern, the Lending Agent, was contractually responsible for finding borrowers for the securities by purportedly reviewing their creditworthiness, and entering into a borrower agreement, ("Borrower Agreement") to lend the Lending Fund's securities (and indirectly, the Plans' securities) to a borrower ("Borrower"). Per the Borrower Agreement, Northern also agreed to pay each Borrower interest for the cash collateral it received.

43.     Upon information and belief, Northern actually negotiated the securities lending transactions on behalf of the Funds with borrowers by utilizing the services of EquiLend, a joint venture of various securities lending agents and securities borrowers, in which Northern, had an equity interest. *See Annex II To Lending Agreement, and Attachment A.* (Ex. 3.) EquiLend is a subsidiary of EquiLend Holdings L.L.C., which is a holding company owned by Barclays Global Investors, Bear, Stearns & Co. Inc., Credit Suisse First Boston, The Goldman Sachs Group, Inc., J.P. Morgan Chase & Co., Lehman Brothers, Merrill Lynch, Morgan Stanley, Northern Trust Corporation, State Street Corporation and UBS. *Id.* EquiLend purportedly provided a borrower and/or lender with the option of initiating an order of securities to one or more counterparties. When an offer was approved, EquiLend matched the parties' settlement instructions and sent a shared trade ticket to each of the participants' proprietary trading and settlement systems. In *Annex II* to the form lending agreements, Northern stated that the Funds were not charged any additional fees for utilizing EquiLend, but that the fees were paid by Northern. *Id.*

44.     As Lending Agent, Northern also had contractual responsibility for deciding which of the Lending Funds' securities to lend to Borrowers. *Lending Agreement* § 2.2. (Ex. 3.) Upon information and belief, when Northern decided which securities to lend, Northern lent out a higher percentage of securities on behalf of each Fund than was prudent. As a result of

Northern lending a higher than prudent volume of the Funds' securities to Borrowers, the Collateral Pools for the Lending Funds by default carried a higher aggregate market risk than the aggregate market risk carried by the Lending Funds' securities which were on loan.

## C. The Collateral Pools.

45. After Northern loaned the securities and received the cash collateral from the Borrower, it invested the cash collateral in the various Collateral Pools managed by NTI. In order for securities lending to be profitable, the revenue generated from NTI's Collateral Pool re-investments had to be higher than the interest rate Northern paid to the Borrowers for the cash collateral. Revenue generated from the Collateral Pools passed directly to Northern and then on to the Funds, and indirectly, the Plans. Northern charged the Plans a fee equal to approximately 40 percent of the earnings of the Collateral Pool for their Funds. Thus, the Funds received approximately 60 percent of the revenue generated from the Collateral Pool reinvestments.

46. Each of NTI's Collateral Pools had investment guidelines that were set forth in a collateral schedule which required NTI to manage the Collateral Pools in the manner necessary to preserve capital and provide for liquidity. For example, the Core USA Collateral Pool schedule stated, "[c]ash [c]ollateral of the Core U.S.A. Collateral Section is invested to seek to maximize current income to the extent consistent with the preservation of capital and maintenance of liquidity…." *The Northern Trust Company Securities Lending Collateral Schedule*, *Core U.S.A. Collateral Section.* (Ex. 24.) Contrary to the manner in which the Northern Trust Defendants operated the securities lending program, the collateral schedule did not state that the Plans or lenders bore the full risk of any principal loss by the Lending Agent, nor did it authorize the Lending Agent to expose the Collateral Pools to a level of risk out of step with the incremental return that the securities lending program purported to provide to the Funds.

47.     Northern invested the collateral it received on behalf of the Lending Funds in at least three different Collateral Pools, including, but not limited to, the Core USA Collateral Pool ("Core USA") and a Custom Collateralized Pool consisting of a combination of two pools, the Short Term Investment Fund ("STIF"), and the Short Term Extendable Portfolio ("STEP"). Upon information and belief, the Lending Funds in the Class may also have had their securities lending cash collateral invested in the Core Collateral Pool, the European Core Collateral Pool, the Global Core Collateral Pool, and/or the Core Select Collateral Pool, or other unspecified Northern Trust Collateral Pools. *See Northern Trust's Actions to Support Clients,* N002101. (Ex. 22.) The chart below shows some of the Collateral Pools that the Defendants used for Plaintiffs' cash collateral reinvestments:

| Northern Trust Lending Funds | Collateral Pools for the Lending Funds |
|---|---|
| Aggregate Bond Fund-Lending | STIF/STEP (for 40% of the fund) and Core USA (for 60% of the fund) |
| Russell 2000 Fund-Lending | Core USA |
| S&P 500 Equity Fund-Lending | Custom Cash Collateral (75% in STEP, and 25% in STIF). |
| Short Term Government Fund-Lending | Core USA |

a.      **STEP Pool.**

48.     The Short Term Extendible Portfolio (STEP) Pool was an ultra short duration total return fund that attempted to outperform high grade, short term money market instruments. *NTGI Collective Short Term Extendable Portfolio Fund Declaration, January 31,*

*2006.* (Ex. 11.) The STEP Pool was a market value basis fund and the fund was valued daily to reflect market prices. *Id.*

### b. STIF Pool.

49.    The Short Term Investment Fund (STIF) Pool was maintained as short term investment fund, whose assets are valued on a cost, rather than market value basis, and was intended to be composed of high-grade money market instruments with short maturities. *NTGI Collective Short Term Investment Fund Declaration*, May 31, 2007 (Ex. 8.) The STIF was required to maintain a dollar-weighted average portfolio maturity of 90 days or less. *Id.*

### c. Core USA Pool.

50.    The Core USA Collateral Pool was a large commingled collateral pool that had upwards of $ 70 billion in assets during the relevant time period. This pool was used for the Northern Trust Russell 2000 Fund, and the Short Term Government Fund, among others. The net asset value of the Core USA Collateral Pool was maintained on a constant $1.00 basis.

### 1. Northern Trust's Mismanagement of the Collateral Pools.

51.    NTI invested the Collateral Pools, worth billions of dollars, in debt instruments, bonds, notes, and other fixed income instruments. Beginning some time no later than 2006, NTI began making imprudent investment decisions regarding the instruments it determined to use to invest the cash collateral. Given the massive size of the Collateral Pools, and Defendant NTI's purported sophistication and investment expertise, Defendant NTI was aware from publicly-known events in 2006 through the relevant time period that the market risk of asset-backed investments was increasing, and that it was becoming more difficult to sell fixed-income investments such as those held in the Collateral Pools into the market. Indeed, the Northern Trust Defendants cannot deny their knowledge of these circumstances in light of

public statements at the time by, among others, Northern Trust's own economists regarding the increased risk the housing bubble posed to the economy.

52.     Paul L. Kasriel is Northern Trust's Senior Vice President and Chief Economist, and Northern Trust's website states that "[i]n January 2009, The Wall Street Journal and Forbes cited Paul as one of the few who identified early on the formation of the housing bubble and foresaw the economic and financial market havoc that would ensue after the bubble inevitably burst." Northern Trust Corp., http://www.northerntrust.com/ (follow "Insights & Research" hyperlink, then follow "Economist Biographies" hyperlink) (last visited Oct. 15, 2009). Indeed, the news articles on the condition of the economy in general and the housing market in particular frequently cited the bearish assessment of Mr. Kasriel or other Northern Trust economists regarding the housing market and the impending sub-prime crisis:

- "Housing is in a recession. It's not that the whole economy is in a recession, but housing is in a recession." Sharon Stangenes, *Housing chill less severe in Midwest; New construction firmer in the region*, Chi. Trib., July 20, 2006, at Business 2 (quoting Paul Kasriel) (Ex. 48);

- "Additional price declines [in the housing market] should not be surprising . . . . We have a recession in the housing market . . . . Usually it takes two or three years to stabilize." Mark Trumbull & Ron Scherer, *How long will housing slump last?* Christian Science Monitor, Sept. 26, 2006, at USA 1 (quoting Asha Bangalore, an economist at Northern Trust in Chicago) (Ex. 46);

- "This cumulative tightening of monetary policy is dragging down the overall economy, and nowhere is it more apparent than in the housing sector." Knowledge @ W.P. Carey, *The shape of things to come in the U.S. economy,* Nov. 22, 2006, (quoting Paul Kasriel).

19

(Ex. 41.) Kasriel further opined that because the housing market loomed so large in the economic expansion of the past few years, he expected it to have "equal weight pulling the economy down in the upcoming quarters." *Id.*;

- "A typical housing downturn sees a drop of 50 percent from the peak, and at this point we are only about halfway there . . . ." Bill Sluis, *The Agenda, Coming this week*, Chi. Trib., Nov. 13, 2006 (quoting Paul Kasriel) (Ex. 45);

- "People who a year ago could have purchased a house with a subprime mortgage aren't going to be able to purchase a home . . . . And many people who have subprime mortgages that are now subject to rate reset will not be able to refinance. That means increased foreclosures and more inventory on a market that already has too much." Chris Isidore, *Home prices: Don't expect quick rebound*, CNNMoney.com, Mar. 9, 2007, (quoting Paul Kasriel) (Ex. 44);

- "So you've got increased supply and reduced demand, and that's not a good combination . . . . I think the housing recession is not over, that the subprime issues will prolong it . . . ." Jamie Smith Hopkins, *Delinquencies Increase Among 'Subprime' Loans; Credit Crunch Could Bring Extended Housing Slump,* Baltimore Sun, Mar. 15, 2007, at 1A (quoting Paul Kasriel) (Ex. 43);

- "Northern Trust economist Paul Kasriel says he saw no reason to revise his negative view on housing this fall. He thought the speculation on the way up had led to a glut of homes on the market that couldn't be easily worked through, and he suspected there were lurking problems in the lax lending standards that helped fuel the latter stages of the boom." Justin Lahart, *Ahead of the Tape*, Wall St. J., Mar. 19, 2007, at C1 (Ex. 47); and

- "We never really extended credit to people who have no known ability to pay it back and have no skin in the game . . . . It's uncharted territory . . . . How bad it's going to get, we don't know . . . . We'll find out." Justin Lahart, *Stock Market Quarterly Review – Essay: Denouement of Subprime Story Yet to Be Written – Ripples From the Downturn May Dictate the Fate of Several Parts of the Economy*, Wall St. J., Apr. 2, 2007, at C9 (quoting Paul Kasriel) (Ex. 42).

53.     At a minimum, in light of Northern Trust's own statements regarding the risks facing the housing market, Defendants should have taken steps to ensure that the fixed income investments in the Collateral Pools were not overly exposed to problems in the housing sector, including the subprime sector, in light of the Company's own public statements regarding the increased risks in this sector and to the larger economy.

### a.     Early Warning Signs of Collateral Pool Problems.

54.     By 2007 it was abundantly clear that NTI had failed to properly select investments for some of the Collateral Pools, and had failed to divest or sell holdings from the Collateral Pools before it was imprudent to continue holding them. Internal Northern Trust documents indicate that by August 2007, the Northern Trust Defendants were fully aware of the liquidity crisis in the market and the fact that the credit markets were freezing, and it was becoming more difficult to sell fixed-income investments into the secondary markets, including those fixed-income investments held by the Collateral Pools. *Securities Lending Update, September 25, 2008*. (Ex. 14.)

55.     These early warning signs of problems with Northern Trust's Collateral Pool investments are clear from both Northern Trust's third quarter 2007 Earnings Call, and from reviewing the 2007 investment performance of some of the Collateral Pools. During its October 17, 2007, earnings call, Steven L. Fradkin, Northern Trust's Executive Vice President

and Chief Financial Officer, reported that the "credit market environment in this year's third quarter had a negative impact on securities lending results." Bloomberg Transcript, Northern Trust Corp. Q3 2007 Earnings Call, October 17, 2007, p. 5. (Ex. 39.) Fradkin went on to state that the credit market disruption had negatively impacted returns in "one cash collateral investment fund" but did not disclose which Collateral Pool was affected. *Id.* Northern Trust's documents from 2007 reveal that it was likely the STEP Pool's investment return which had the negative returns and lagged its index return by over 2%, (the STEP Pool had a total return of 3.27% whereas its benchmark index, 1 month LIBOR had a return of 5.31%). *Quantitative Index Review, NTGI Collective Short Term Extendable Portfolio Performance*. (Ex. 13.)

56.     Despite these warning signs, the Defendants undertook no remedial efforts to slow or stop the Funds' securities lending activities, or to change the investments that the Pools were had made. NTI continued to invest the Collateral Pools in the same types of risky and subprime fixed-income (debt) instruments as it always had. These instruments included, but were not limited to, bank time deposits, repurchase agreements, corporate bonds, commercial paper, or asset-backed securities under which periodic interest payments were made and payment of principal was due upon maturity. Later, some of these same instruments defaulted or became illiquid, causing substantial losses to the Plans.

57.     As demonstrated by the poor investment performance of the Collateral Pools during the relevant period, NTI imprudently invested the cash Northern received from Borrowers in Collateral Pool investments that had substantial exposure to asset-backed securities and the risky subprime mortgage sector.

- The STIF and Core Select Pools were both invested in two structured investment vehicles (SIVs) that breached their capital value triggers and were downgraded in early

2008. In February of 2008, Northern Trust issued a press release, and also filed a Form 8-K announcing its decision to prop up eight Northern Trust-managed cash funds, including two Collateral Pools, the STIF, and the Core Select Pool, as a result of Northern Trust's investment of $550 million in two SIVs sponsored by Standard Chartered Bank, Whistlejacket Capital LLC, and White Pine Finance LLC. Bloomberg Transcript, Northern Trust Corp. Business Update Call, February 22, 2008, p. 1. (Ex. 36.) Northern Trust's decision to prop up the funds came after Whistlejacket was downgraded by the rating agencies.

- Similarly, the STEP Pool included risky investments in the CIT Group which had an underperforming home lending business that it sold in mid 2008, and ratings of only A- from Standard & Poores on the STEP holdings as of August 31, 2008. *Securities Lending Collateral Pool Update*. (Ex. 13.) CIT Group has since declared bankruptcy, and NTI was forced to sell the CIT Group investments at a substantial loss for the Funds. Other risky investments in STEP's portfolio included: (1) Capmark Financial Group which had significant exposure in the commercial mortgage sector, and ratings of only BBB- from Standard & Poors on the STEP holdings as of August 31, 2008; and (2) iStar Financial Inc., a finance company focused on the commercial real estate industry, and ratings of only BBB from Standard & Poors on the STEP holdings as of August 31, 2008. *Id.* Rather than being highly rated investment securities, these ratings on the STEP Pool's holdings from Standard & Poors all indicate that the securities were highly susceptible to adverse economic conditions or changing circumstances in terms of the obligor's capacity to meet its financial commitment, something that Defendants were well aware was likely to happen in the housing sector from as early as 2006.

58.     Upon information and belief, NTI's Collateral Pool investments constituted violations of NTI's investment manager agreements with the Plans. Pursuant to the agreements, NTI contractually agreed with each Plan not to enter into any transactions not authorized by the Investment Guidelines in a manner which would cause the investment accounts not to achieve their respective investment objectives. (Ex. 6, § 3.) However, NTI, which was aware of weaknesses in the economy, and the housing sector, continued to invest the Pools in risky securities.

59.     As a result of NTI's investment imprudence, market events in early 2008 only exacerbated the investment problems that the Collateral Pools had displayed in 2007. Thus, in March, 2008, the STEP Pool earned a return of -1.35%. (Ex. 1.)

60.     In April of 2008, Northern Trust disclosed performance problems in the Lending Funds' Collateral Pools to the Plans. *See Letter from Guy J. Sclafani to Gregory Williamson*, April 8, 2008. (Ex. 1.) Sclafani, Northern Trust Global Investments Vice President wrote, "In March, STEP earned a return of -1.35% . . . . Prices on securities held by STEP have fallen, dramatically in some cases, more because of the reduced liquidity than a reduction in creditworthiness."

61.     As the fiduciary for Plans' investments in the Collateral Pools, charged with the highest duty known to law, NTI should have carefully evaluated the risks facing the Pools, adequately disclosed to the Plans the risk they were facing in exchange for the fees they were paying, and acted promptly and decisively to limit losses to the Collateral Pools by decreasing risk in the Pools and otherwise ensuring prudent investment of the Collateral Pools.

             **b.     Collateral Pool Performance Worsens in Mid-2008.**

62.     While the problems with the STEP Pool's performance were evident during 2007, during mid 2008 its performance continued to deteriorate further. As of May 31, 2008,

the STEP Pool had a market value of $13,691,333,575.08, with an average maturity of 48 days. The Fund was distributed such that 57.50% was in corporate debt instruments, 6.4% in banking, and 15.7% in cash equivalents. By August 31, 2008, the STEP Pool's market value had declined over $2 billion, and had a market value of $11,426,574,645.96 with an average maturity of 45 days. The Fund was distributed such that 63.7% was in corporate, with an additional 7.0% in banking, 10.3% in mortgage-backed securities, 6.1% in commercial MBS, and only 5.9% in cash equivalents or 1.7% Treasuries. *Quantitative Index Review, NTGI Collective Short Term Extendable Portfolio Performance.* (Ex. 13.) As of the end of August 2008, the benchmark return for the Pool, 1 month LIBOR was 1.82%, while the Pool's return was -.36%. *Id.*

63.    Like the STEP Pool, the Core USA Collateral Pool also suffered significant declines in value during 2008. As of May 31, 2008, the value of the Core USA Collateral Fund was $68.02 billion, but by August 31, 2008, its value had declined nearly $6 billion to $62.13 billion. *Northern Trust Global Investments, Investment Profile: Core USA Cash Collateral Fund May 31, 2008.* (Ex. 20); *Quantitative Index Review, Investment Profile: Core USA Cash Collateral Fund August 31, 2008.* (Ex. 13.)

64.    The STIF Pool too suffered declines in value during this time. As of May 31, 2008, the STIF Pool had a market value of $36.97 billion, with an average maturity of 48 days. The Fund was distributed such that 12.30% was in corporate, 21.70% in banking, and 35.20% in cash equivalents. Additionally, of the securities in the fund, 11% was commercial paper with 6.2% in asset backed commercial paper, and 21.80% fixed rate notes or bonds, 15.10% in variable rate notes, including 1.5% issued by SIVs. By August 31, 2008, the STIF Pool's market value had decreased to $35.1 billion, with an average maturity of 5 days, and

the Fund was distributed so that 10.3% was in corporate, 29.0% in banking, and 33.9% in cash equivalents. *Quantitative Index Review, NTGI-Collective Short Term Investment Fund (STIF) August 31, 2008.* (Ex. 13.)

65.     On September 15, 2008, Lehman Brothers declared bankruptcy. At the time, Defendants had both lent securities to Lehman Brothers as a Borrower, and had invested the Collateral Pools in Lehman Brothers' debt instruments.[4] As a result of the Lehman Brothers' bankruptcy and later events in the financial markets, assets in the Collateral Pools became even more illiquid, especially when stock prices plummeted. Certain of the NTI investments made with cash collateral received from Borrowers defaulted; and others were marked down in value and/or, upon information and belief, have become so illiquid that such investments could be sold, if at all, substantially below the values at which they were carried by the Collateral Pools. Collateral Pool fund holdings that were declared permanently impaired included those issued by Lehman Brothers, Washington Mutual, and the Reserve Fund. *Northern Trust Collateral Deficiency*, N002094. (Ex. 22.)

66.     On September 19, 2008, NTI declared that there was a collateral deficiency in four Collateral Pools, including the Core USA Collateral Pool. Northern Trust also announced that one additional Collateral Pool had experienced a "loss in value." The amount of the collateral deficiency was calculated based on the difference between book value and vended (as opposed to liquidation) prices at that time. *Securities Lending Update, September 25, 2008*,

---

[4] Lehman Brothers bankruptcy filing affected both Northern's Borrower agreements, and the value of the instruments in NTI's Collateral Pools. After Lehman Brothers filed for bankruptcy, Northern declared Lehman Brothers International Europe, ("LBIE") in default under the terms of the applicable borrower agreements, and all collateral became available to compensate clients that had outstanding loans to LBIE per those agreements. Northern began liquidating all collateral and repurchasing securities, and crediting client accounts. Ninety-five percent of the clients received replacement securities in full within two days. While Lehman Brothers Inc ("LBI") had not filed for bankruptcy, Northern Trust also recalled all loans outstanding with LBI, and by September 17, 2008, had recalled 77% of the value of securities on loan to LBI. On September 17, 2008, Northern Trust also declared LBI in default under the Borrower Agreement. *Northern Trust Borrowers*, N002090. (Ex. 22.)

N000167. (Ex. 14.) Approximately $100 million of this collateral deficiency was attributable to Lehman Brothers' bonds, which were impaired and written down. The Plans, and all other investors in Collective Trusts that invested in the Core USA Collateral Pool at that time, had pro rata exposure to these impairments and write-downs. Declaring a collateral deficiency allowed the net asset value of the Core USA Collateral Pool to return to $1.00, which was the value necessary to repay borrowers. As a result of the collateral deficiency, NTI posted a "payable" to each of the Plans that, through Collective Trust investments, participated in the Core USA Collateral Pool. This "payable" was equal to each Plan's proportionate share of the collateral deficiency, and became a debt owed by the Plans to the Defendants. Thus, the imprudent investment decisions made by NTI regarding the holdings of the Collateral Pools, resulted in sudden and substantial illiquid holdings for the Pools when the debt market collapsed in 2008.

67.     Northern Trust's September 19, 2008, collateral deficiency declaration also extended to the STEP Pool, where three assets (securities issued by Lehman Brothers Holdings, Theta Finance and Sigma Finance) had become permanently impaired. These impaired securities were distributed from the STEP Pool into a liquidating account, and all Funds with ownership of the STEP Pool received a pro rata interest in the liquidating account and were required to pay the full amount of the estimated impairment. In September 2008, the total value of the STEP Pool declined in value by 7.57% to approximately $10.4 billion. By the end of October 2008, NTI reported internally that there was *no* liquidity in the STEP Pool.

68.     As a result of the collateral deficiency, the Plans were immediately required to repay principal losses not previously passed on to them. *Redemptions – Common and Collective Funds, N002177.* (Ex. 23.) Thus, the Plans' investments in the Collective Trusts

were diminished by far more than the amount of a normal tracking error when compared to their respective Fund benchmarks. As the securities borrowers demanded the return of collateral that Northern Trust had invested in illiquid, longer-term investments (such as derivatives and mortgage-backed or asset-backed securities) contained in the Collateral Pools, the Plans were forced to realize immediate losses at the nadir of the market, and to book these losses because the Collateral Trusts could no longer hold the investments to duration.

**c.  Northern Trust Locks Down Plan Assets Invested in Lending Funds and Imposed Draconian Withdrawal Restrictions on Plans.**

69.  Following NTI's declaration of the collateral deficiency in mid-September 2008, many clients sought to exit Defendants' funds and accounts, seeking immediate liquid payouts. For example, the retirement plans of BP, and investors from the University of Washington unsuccessfully "tried to withdraw entirely from four Northern Trust Corp. Funds engaged in securities lending." Eleanor Laise, *401(k)s Hit by Withdrawal Freezes - Investors Cry Foul as Some Funds Close Exits*, Wall St. J., May 5, 2009. Instead of allowing these clients to exit as they had in the past, NTI implemented new withdrawal guidelines and restrictions for exit from the Lending Funds that were not consistent with the Declaration of Trust for the Collective Trusts. *Client Withdrawal Guidelines Direct and Indirect Investors, Revised 10/14/08.* (Ex. 17.)

70.  NTI's new withdrawal guidelines required that Plans that sought to discontinue using their investment management services repay NTI for the losses incurred when NTI mismanaged the Collateral Pool investments. For Plans in the Core USA Collateral Pool, the portfolio manager was instructed to liquidate a representative sample of the investments in partial repayment of the Borrower, (with Defendants also reserving their right to process the entire Core USA redemption in-kind), with any balance owed to the Borrower then deducted

28

from a Plan's redemption proceeds, which meant, in practical terms, that Plans were issued an

account payable from the Collateral Pool Trust reflecting the reduced value at which the

illiquid securities were sold. *Id.* For clients in the STIF/STEP Blend Pools, the Plans' pro rata

share of units in the Pool was to be distributed in-kind into a liquidation account, with the

STEP Pool units further segregated and distributed in-kind into a liquidation account until the

Plan directed NTI to sell the distributed securities. Notably, a Plan that further took the step to

request the in-kind distribution from the Defendants would "trigger an additional liability

payable to Northern Trust." *Id.* This loss was in addition to the reimbursement of principal

losses to Defendants by the Plans following the declaration of the collateral deficiency,

because this loss stemmed from the conversion of additional unrealized losses to realized

losses as a consequence of the in-kind distribution. *Id.*; (Ex. 23).

71.     NTI's requirement that Plans seeking to leave the Index Lending Funds make a

payment to the Collective Trust to cover the reduced value of the illiquid securities in their

Fund's Collateral Pools was unprecedented and self-serving. Previously, in cases of unrealized

losses in the Collateral Pools, Northern Trust had assumed some of the unrealized losses

contingently, under the assumption that the losses were only temporary. However, in the fall of

2008, securities lending clients were required to repay principal losses previously not passed to

them, but treated instead as negative income. *Redemptions - Common and Collective Funds

Redemption, N002177*. (Ex. 23.) Given that it was NTI's imprudent and negligent (at the very

least) actions that led to the losses in the Collateral Pools, the Defendants, and not the Plans'

harmed by NTI's imprudence should have made up the losses to the Collateral Pools.

**2.     Northern Trust's Flawed and Ineffective Risk Management Program.**

72.     Northern Trust's risk management efforts were flawed and ineffective, as

demonstrated by the tremendous market risk that the Plans were forced to bear when Northern

Trust declared the collateral deficiency in the Funds' Collateral Pools. Northern Trust's risk management program was overseen by Northern's Securities Lending Collateral Committee. *Northern Trust Global Securities Lending, October 2008, N002095*, (Ex. 22.) However, in effect, this risk management program was primarily designed to protect Northern Trust, rather than the Plans, whose securities were lent. In relevant part, the Collateral Committee's role included both evaluating the asset quality, client base, pool liquidity, market environment, and market value of the underlying assets, *and* determining whether there was a collateral deficiency and requiring shortfalls to be repaid to Northern by all the Plans.

73.     Northern Trust's self-serving approach to risk management in seeking to protect its own bottom line, but not the Plans for which it served as Investment Manager and Lending Agent is also evidenced in the contract NTI set up *with Northern* to govern the securities lending agreements. For example, the Lending Agreement stated that "the risk of any loss of collateral or investment of cash collateral (including a loss of income or principal, or loss of market value)" was to be allocated pro rata among all participating lenders in the case of collateral deficiency, and that any loss resulting from insufficiency of collateral not recoverable from the borrower, or within the scope of the Lending Agent's obligations would be "borne solely by the Lender." *Lending Agreement, August 1, 2006*, § 3.5. (Ex. 3.)

74.     Despite being contractually required to fully inform Plan fiduciaries of this allocation of risk, upon information and belief, this crucial information was not adequately conveyed to the Plans' fiduciaries. While the Lending Agreement contained an Annex requiring that Northern provide the "Authorizing Fiduciary" (referring to a fiduciary for each Plan) with the information needed to determine whether authorization for lending of the Plan's securities should be granted to Northern, upon information and belief, the Lending Agreement was

routinely not provided to the Plans' fiduciaries and/or the Defendants did not require that the Authorizing Fiduciaries actually sign these Annexes. (Ex. 3.)

75. Thus, NTI as Trustee of the Collective Trusts negotiated and entered into the Lending Agreements directly with Northern, and in doing so, obligated each of the Lending Funds (and indirectly the Plans) to shoulder the responsibility for any collateral deficiency for the loaned securities created by the imprudent management of the Collateral Pools by NTI. However, this obligation was not adequately disclosed to the Plans' fiduciaries. In addition, to the extent that this information was disclosed to some degree, Northern Trust did not inform Plan fiduciaries of the potential extreme risk of loss of Plan assets caused by Defendants' mismanagement of the securities lending program.

**D.     The Plans Suffered Injury through Northern Trust's Securities Lending Practices.**

76. Each of the Funds in which Plaintiff Diebold and Plaintiff Hundt's Plans are invested was benchmarked to a stock or bond index. As a result of the imprudence of NTI's Collateral Pool reinvestment strategy, the Funds have underperformed their respective benchmarks, and now also include securities that NTI selected for the Pools that are worthless, and considered permanently impaired. As of July, 2009, assets from the STEP Pool that NTI had moved to the STEP Liquidation Fund were valued in the $.15-.17 range for Lehman cash bonds, and the Theta and Sigma investments remained valued at $0. *Northern Trust*, *STEP & STIF Comprehensive Report for July 2009*, Market Commentary, p. 3. (Ex. 37.)

77. The Collateral Pools that Northern Trust managed varied widely in asset size. During the summer of 2008, one Pool had over $73 billion in assets, (Core USA Collateral Fund) while another had less than $3 billion (Core Cash Collateral Fund). *Securities Lending Update, September 25, 2008*. (Ex. 14.) The value of the Pools declined precipitously in mid 2008, causing severe losses in each Pool. As of October 20, 2008, the total unrealized losses in STEP equaled

approximately 10% of the fund's total market value. Northern Trust has informed Plans that they are solely responsible for the losses and must repay the Defendants for the losses.

78.     As a result of the losses in the Pools, the Lending Funds, (and indirectly the Plans) collectively suffered substantial investment losses. For example, as of August 31, 2008, the NTGI-QM Collective Daily Aggregate Bond Fund had lost approximately $20 million (between 2007 and 2008, the Fund had approximately $16 billion in assets, and the difference in returns of -0.125% off of its benchmark from securities lending represents a loss of approximately $20 million). Similarly, as of the August 31, 2008, the S&P 500 Fund had lost approximately $36.5 million from the prior year (between 2007 and 2008, the NTGI-QM Collective Daily S&P 500 Fund held approximately $25 billion in assets, and a difference in returns of -0.146% for a fund holding $25 billion represents a loss of $36.5 million). Notably, these estimates of losses arose *before* the tremendous downturn in the markets in September of 2008. *Northern Trust Global Investments, BP-0016308*. (Ex. 20); *Quantitative Index Review*. (Ex. 13.)

79.     As a result of the investment losses borne by the Funds, on September 25, 2008, Northern Trust Corporation announced that it would contribute approximately $150 million to make up a portion of the collateral deficiency in five securities lending collateral pools, including the Core USA Pool, and the Core, European Core, Global Core and Core Select Funds. *Securities Lending Update, September 25, 2008*. (Ex. 14.) This payment was not sufficient to cover the losses suffered by the Funds in these Collateral Pools.

80.     Further, the Funds may continue to incur additional losses resulting from: (i) additional defaults of securities held in the Collateral Pools, (ii) additional declines in the value

of securities held in the Collateral Pools, and (iii) realization of losses upon the sale of illiquid

securities held in the Collateral Pools necessitated by the repayment of securities loans.

**E.     ERISA Imposes Stringent Fiduciary Duties on Defendants.**

81.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in relevant part, that a

civil action for breach of fiduciary duty may be brought by the Secretary of Labor, or a

participant, beneficiary or fiduciary of a plan for relief under ERISA § 409, 29 U.S.C. § 1109.

82.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in relevant part:

> any person who is a fiduciary with respect to a plan who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter
> shall be personally liable to make good to such plan any losses to the plan
> resulting from each such breach, and to restore to such plan any profits of such
> fiduciary which have been made through use of assets of the plan by the fiduciary,
> and shall be subject to such other equitable or remedial relief as the court may
> deem appropriate, including removal of such fiduciary.

83.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide

in relevant part that a fiduciary shall discharge his duties with respect to a plan solely in the

interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims.

84.     These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as

the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law."

*Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982). They entail, among other things:

> (a) The duty to conduct an independent and thorough investigation into, and to
> continually monitor, the merits of all the investment alternatives of a plan,
> including, in this case, the investment alternatives of the Collective Investment
> Funds in which Plan assets were invested;

(b) The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves, including, in this case, the Northern Trust Defendants' personal interests in receiving some of the cash collateral from securities lending; and

(c) The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries, including, in this case, with respect to the grave risks of securities lending.

85. According to DOL regulations and case law interpreting this statutory provision, in order to comply with the prudence requirement under ERISA § 404(a), a fiduciary must show that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or course of action involved, including the role that the investment or course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

86. Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or course of action is reasonably designed, as part of the portfolio, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for return associated with the investment or course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o The composition of the portfolio with regard to diversification;

    o The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o The projected return of the portfolio relative to the funding objectives of the plan.

87.     The Northern Trust Defendants failed in the discharge of these duties, and,
generally, in their duty to manage the assets of the Plans prudently, loyally, and in the best
interests of the Plans and the Class.

**F.     Defendants Earned Substantial Fees While Grossly Mismanaging the Collateral
Pools and Causing the Plans to Suffer Substantial Losses.**

88.     Defendants' securities lending program operated in an extremely risky and
dangerous manner for the Plans that participated in it, but was highly profitable for Defendants.
Despite Northern Trust's mismanagement of the Collateral Pools, since the third quarter of 2007,
Northern Trust has collected over $300 million in fees from its securities lending programs.

89.     On a monthly basis, NTI received a fee equal to a percentage of the net income
earned through each Lending Fund's Collateral Pool income. According to Northern Trust,
compensation from its securities lending comes from "sharing in our client's earnings." Northern
Trust Corp. Annual Report (Form 10-K), at 26, Feb. 28, 2009. (Ex. 25.) NTI, however, did not
share in any realized losses of these same Collateral Pool investments. Losses in the Collateral
Pools were instead allocated pro rata to the Plans and other investors in the Collateral Pools.

90.     On April 17, 2007, Northern Trust Corporation reported that in the first quarter
of 2007, its securities lending fees totaled $46.0 million. Bloomberg Transcript, Northern Trust
Corp. "Q1 2007 Earnings Call" April 17, 2007. (Ex. 38.)

91.     On October 17, 2007, Northern Trust Corporation reported that in the third
quarter of 2007, its securities lending fees totaled $33.0 million. Press Release, Northern Trust
Corp., "Northern Trust Corporation Reports Record Third Quarter 2007 Earnings of $.93 per
share, up 26% from the Prior Year," October 17, 2007. (Ex. 26.)

92.     On January 16, 2008, Northern Trust Corporation reported that in the fourth
quarter 2007, its securities lending fees totaled $55.1 million. Press Release, Northern Trust

Corp., "Northern Trust Corporation Reports Record Full Year 2007 Operating Earnings of $3.66 per Share, up 22% from the Prior year. Reported Earnings are $3.24 per Share, up 8% from the prior year," January 16, 2008. (Ex. 27.)

93. On April 15, 2008, Northern Trust Corporation reported that in the first quarter of 2008, its securities lending fees totaled $31.9 million. Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Record First Quarter 2008 Operating Earnings of $1.03 per share, up 23% from Prior Year. Reported earnings are $1.71 per share, up 104% from Prior Year," April 25, 2008. (Ex. 28.)

94. On July 16, 2008, Northern Trust Corporation reported that in the second quarter 2008 its securities lending fees totaled a record $149.9 million, up 104% compared with the prior year quarter reflecting "improved spreads on the investment of cash collateral and an approximate $25 million partial recovery of prior period unrealized losses in one mark-to-market investment fund." Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Second Quarter 2008 Earnings of $.96 per share, up 4% from the Prior Year," July 16, 2008. (Ex. 29.)

95. On January 21, 2009, Northern Trust Corporation reported that in the fourth quarter 2008 its securities lending fees totaled $44.2 million compared with $55.1 million in the fourth quarter of 2007, which Northern Trust stated reflected "lower volumes." Press Release, Northern Trust Corp., "Northern Trust News Release, "Northern Trust Corporation Reports Record Fourth Quarter Operating Earnings of $1.39 per Common Share, Up 43%," January 21, 2009. (Ex. 31.)

96.     Thus, while the Plans were exposed to massive risk, and incurred substantial losses as a result of Northern Trust's imprudence, Northern Trust garnered hundreds of millions of dollars of no-risk fees.

**G.     The Northern Trust Defendants Took Unreasonable Compensation for Themselves.**

97.     The Northern Trust Defendants violated ERISA through their self-dealing and taking unreasonable compensation for managing the securities lending program on behalf of the Lending Funds.

98.     As shown above, the Northern Trust Defendants were (and are) fiduciaries responsible for managing the Plans' investments in the Lending Funds and Collateral Pools prudently and solely in the interests of the Plans and their respective participants and beneficiaries. The Northern Trust Defendants received investment advisory, custodial, trustee, and administrative fees for managing the Lending Funds. In addition to investing and managing the Plans' assets in accordance with a given Lending Fund's stated objectives, the Northern Trust Defendants also invested Plan assets through their securities lending program.

99.     Through the securities lending program, the Lending Funds, and the Plans indirectly, made securities available for loan. The Northern Trust Defendants set the terms and conditions, via the Lending Agreement, between the Lending Funds and Northern. Northern, acting as the "Lending Agent," decided which securities would be loaned to which borrowers, collected the collateral from the borrowers, and invested the collateral in one or more Collateral Pools.

100.     The Northern Trust Defendants established and managed the Collateral Pools and received investment advisory, custodial, trustee, and administrative fees for managing them. In addition, the Northern Trust Defendants took forty percent of the spread, that is, the income, after expenses and rebates, generated by the Collateral Pools. The Northern Trust Defendants

controlled all aspects of the securities lending program and all agreements and contracts created and executed thereunder.

101.    These arrangements were fraught with conflicts and self-dealing. The Northern Trust Defendants managed the Collective Trusts and purportedly represented the Lending Funds and the Plans in setting the terms of and executing the Lending Agreement with NTI acting as the "representative" of the Lending Funds and Northern representing itself. *See* Lending Agreement (Ex. 3.) Northern, as Lending Agent, then allocated to NTI the responsibility for managing the collateral via the Collateral Pools. Essentially, the Northern Trust Defendants negotiated with themselves the terms of their compensation, discretion, authority, and even liability. Not surprisingly, these arrangements led them to set and receive excessive and unreasonable compensation for themselves.

102.    Although Northern received forty percent of the net income produced by the Collateral Pools pursuant to this self-dealing arrangement, in arm's length securities lending agreements, where the investors were represented by independent fiduciaries, Defendants received far less compensation. For example, Defendants' securities lending arrangements with the City Employees' Retirement System of Los Angeles reflects that as of November 1, 2007, that retirement system received 85% of securities lending income, in contrast to the 60% of securities lending income received by the Plans. In other words, Northern received 62.5% securities lending income when it negotiated at arm's length than it did when it set its own fees. *See* Amended Schedule C to Securities Lending Authorization Agreement Between Board of Administration of the City Employees' Retirement System of the City of Los Angeles and the Northern Trust Company, November 1, 2007 (Ex. 49.)

103.    Further, the forty percent received by Northern far exceeds industry standards.

104.    A survey of retirement plan sponsors reports that in 2011, over 50% of respondents paid 15% of securities lending income to the lending agent. In prior years, the survey reported that the prevalent fee split was 75/25 in favor of the plan. US Plan Sponsors on Securities Lending, Collateral Management and Custody in 2011, at 20 (Ex. 50).

105.    As one financial columnist explained, a "few exemplary firms, like T. Rowe Price Group and Vanguard Group, rebate all securities-lending income (net of expenses) back to the funds that generated it. The total cost of Vanguard's securities-lending program is well under 1%, says Tom Higgins, chief financial officer of the funds. That suggests that most of the 30%-to-50% toll charged by other fund managers is pure profit -- in effect, money for nothing." *Is Your Fund Pawning Shares at Your Expense?*, Jason Sweig, Wall Street Journal, May 30, 2009 (Ex. 51).

106.    An August 2002 survey by Plansponsor.com found that the norm for division of securities lending income was between 70 and 80% to the lender, *i.e.*, the investors. Charles Ruffel, *Lending Logic* (available at

http://www.plansponsor.com/MagazineArticle.aspx?id=6442460188&magazine=6442459) (Ex. 52).

107.    A leading consultant and investment advisor to retirement plans and other institutional investors, Enis Knupp & Associates, Inc., reported in an October 2003 article that securities lending agents typically receive 15 to 35% of the income from collateral investment. *Less is More: Securities Lending Revisited*, Enis Knupp & Associates, Inc., 2003 (Ex. 53). The trend for large investors, however, has been toward a split of 80-20 in favor of the investor. *Lending Logic*, *supra*. (Ex. 52).

108.     A vice-president at Citibank, Brendan McCarthy, commented, "anyone over $1 billion in assets still at 60/40 should be talking to agent lenders … and any large [investors] ($ billion and better) not at 80/20 should likewise be talking to lenders." *Lending Logic*, *supra*, (Ex. 52). Collectively the Lending Funds represented by NTI in its securities lending dealings with Northern held tens of billions of dollars in assets. But NTI did not use this massive bargaining power to negotiate reasonable compensation with Northern.

109.     The Lending Funds at issue in this case collectively possessed billions of dollars of holdings. For example, the NTGI-QM Collective Daily Aggregate Bond Index Fund alone (fund number 029), had over $8 billion in assets at the end of 2009. *See* NTGI-QM Collective Daily Aggregate Bond Index Fund – Lending, 2009 Form 5500 at Schedule H, page 2. And the NTGI-QM Collective Daily S&P 500 Equity Index Fund (fund number 001), had over almost $14 billion in assets at the end of 2009. *See* NTGI-QM Collective Daily S&P 500 Equity Index Fund – Lending,  2009 Form 5500 at Schedule H, page 2. The Northern Trust Defendants, fiduciaries of the Lending Funds, of course failed to take advantage of the massive bargaining power and leverage to negotiate a favorable compensation arrangement for its clients. Instead, they gave themselves a sweetheart deal, 40% of the net lending income, which was not the product of arm's length negotiations.

110.     Each month, pursuant to the Lending Agreement (Ex. 3), Northern received compensation from the Collateral Pools, it engaged in a self-dealing transaction with the Plans' assets. Each Defendant was a fiduciary for the Plans, as alleged above. Therefore, each Defendant was, by definition, also a party-in-interest to the Plans.

111.     In setting, receiving, and controlling their own compensation, as well as creating and managing the Collateral Pool investments, Defendants caused all of the securities

lending transactions, from making the securities available for loan, to contracting with themselves, to investing the collateral in Collateral Pools, to managing the Collateral Pools, to receiving income from the Collateral Pools. These repeated violations over many years were breaches of their duty of loyalty under ERISA § 404(a) and violations of per se rules against self-dealing transactions under ERISA § 406.

112.     As a result of the Northern Trust Defendants' fiduciary breaches and self-dealing, the Plans and their respective participants and beneficiaries suffered hundreds of millions of dollars in losses. Every dollar collected by Defendants in excess of reasonable compensation was one dollar less for the Plans. Moreover, the Plans also suffered additional losses in the form of lost investment opportunity on the securities lending income wrongfully taken by Defendants for themselves. That income would have been reinvested in the respective Lending Funds and would have produced additional gains for the Plans.

**H.     The Northern Trust Defendants Engaged in Prohibited Transactions.**

113.     ERISA also prohibits certain transactions with plans involving "parties in interest" and fiduciaries, because of their high potential for abuse. *See* ERISA § 406, 29 U.S.C. § 1106; *see also Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson*, 201 F.3d 1212, 1222 (9th Cir. 2000), *amended by* 208 F.3d 1170 (9th Cir. 2000) ("The prohibited transaction provision . . . protect[s] a plan's participants and beneficiaries from a depletion of plan assets through shady, inside deals . . . .").

114.     Because the Northern Trust securities lending program involved transactions between Plans and NTI and Northern—who were fiduciaries—the program would normally involve prohibited transactions. *See* ERISA § 406.  Under the DOL's authority under ERISA, however, the DOL has provided for a class exemption, PTE 2006-16, 71 Fed. Reg. 63786,

41

63798, permitting certain loans of securities by employee benefit plans in what would otherwise be a prohibited interested party transaction pursuant to ERISA § 406(a).

115.    PTE 2006-16 exempts lending of securities by plans to certain banks and broker-dealers—*provided that certain conditions are met.* Here, while the terms of the Investment Management Agreements that NTI entered into with each Plan, as well as the Fund Declarations, represented to Plan fiduciaries that Northern Trust's securities lending program would be conducted in accordance with DOL PTE 2006-16, Northern Trust failed to comply with PTE 2006-16's requirements in a number of ways. Failure to comply with PTE 2006-16 in the management of a securities lending program for an employee benefit program is a *per se* violation of ERISA § 406.

116.    Northern Trust's failure to meet the requirements for an exemption pursuant to PTE 2006-16, Section II, which would have removed the restrictions imposed by section 406(a)(1)(A) through (D) of ERISA, included, but was not limited to the following.

117.    Second, pursuant to PTE 2006-16, Section II(g), the exemption is not available unless all fees and other consideration received by the plan in connection with the loan of securities are reasonable. Here, the fees the Plans paid of 40% of the revenue earned from the collateral reinvestment were not reasonable in view of the risk that the Plans were required to assume — 100% of the risk of loss for Northern Trust's investment management of the Collateral Pools — and in view of prevailing industry rates for securities lending services as well as the rates Northern charged to securities lending clients pursuant to arm's length agreements. Thus, Northern Trust failed to meet the condition required under PTE 2006-16, Section II(g).

118.    Third, under Section II(j), a plan must be able to terminate a loan at any time and the borrower must deliver certificates identical to the borrowed securities within five

business days, or the time negotiated for such delivery by the plan and the borrower. Upon

information and belief, when Plans attempted to terminate their participation in the securities

lending programs, Northern Trust refused to deliver securities certificates to the lenders within

five business days, and also required Plans to pay for receipt of the securities. Thus, Northern

Trust failed to meet the condition for exemption required under PTE 2006-16, Section II(j) as

well.

119.     Just as Northern Trust's failure to meet the requirements of PTE 2006-16,

Section II, confirms that it should not be exempted from ERISA § 406(a)(1)(A) through (D), so

too, Northern Trust's failure to meet the threshold conditions under PTE 2006-16 Section IV

mean that it is not entitled to an exemption from ERISA § 406(b)(1), which restricts transactions

between a plan and a fiduciary.

120.     Pursuant to PTE 2006-16, Section IV(d) requires full disclosure regarding

compensation arrangements, and in particular, under Section IV(d)(1) "prior written

authorization of a plan fiduciary . . . independent of the Lending Fiduciary and any affiliate

thereof . . . ." Upon information and belief, Plaintiffs' Plans and their fiduciaries did not receive

adequate disclosure of the compensation to be paid to Defendants, particularly with regard to the

amount of risk of loss that the Plans would be forced to bear in the case of collateral deficiency.

On information and belief, the Northern Trust Defendants failed to provide the Lending

Agreements to the Plans before authorizing Northern to act as the Lending Agent. And, it was

only in the Lending Agreement that a Plan may have been put on notice that it bore 100% of the

risk for any collateral deficiency in the Collateral Pools managed by Northern Trust. By failing

to get prior written authorization for the securities lending compensation arrangement from the

Plans, and failing to provide a copy of the Lending Agreement to the Plans at least 30 days prior

to the implementation of the arrangement, and generally failing to provide complete and accurate information regarding the risks to the Plans of participation in the securities lending program, the Northern Trust Defendants failed to comply with subsections IV(d)(1) and also IV(f) of PTE 2006-16.

121.     Pursuant to PTE 2006-16, Section IV(d)(2) states that the arrangement under which the compensation is paid may be terminated "by the authorizing fiduciary" (here, the Plans' fiduciaries) within the lesser of the time negotiated by the parties or five days. 71 Fed. Reg. 63797. Upon information and belief, the Plans were not permitted to terminate their securities lending agreements within five business days when they formally asked Northern Trust to terminate the securities lending. Thus, Northern Trust failed to meet the condition required under PTE 2006-16, Section IV(d)(2).

122.     Pursuant to PTE 2006-16, Section IV(e), authorization for the securities lending compensation arrangements is not to be made unless the fiduciaries for the Plans have received "any reasonably available information which the Lending Fiduciary reasonably believes to be necessary to determine whether such authorization should be made or renewed, and any other reasonably available information regarding the matter that the authorizing fiduciary may reasonably request." 71 Fed. Reg. at 63797. Thus, full disclosure of compensation arrangements is paramount under PTE 2006-16. As stated *supra,* in paragraphs 38, 56, and 67-70, Northern Trust failed adequately to disclose the compensation arrangements to the Plan fiduciaries, failed to disclose the full extent of its compensation arrangement with EquiLend, and failed to disclose the risk that each Lending Fund would face under Northern Trust's Collateral Pool investment management. Thus, Northern Trust failed to meet the conditions required under PTE 2006-16, Section IV(e).

123.     Pursuant to PTE 2006-16, Section IV(f)(1), subsection (d) does not apply for commingled investment funds, provided that the information described in Section IV(e) "shall be furnished by the Lending Fiduciary to the authorizing fiduciary described in section IV(d) with respect to each plan whose assets are invested in the account or fund, not less than 30 days prior to implementation of the arrangement . . . and where requested, upon the reasonable request of the authorizing fiduciary; . . . ." 71 Fed. Reg. at 63797. As set forth in paragraphs 67-70, *supra*, the information that should have been provided to the Plan fiduciaries was not provided. Thus, Northern Trust failed to meet the condition required under PTE 2006-16, Section IV(e), to be granted the special exception to disclosure for the commingled investment funds at issue in this Amended Class Action Complaint.

124.     Further, Northern took unreasonable compensation for itself for managing the securities lending program.  *Cf.* ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2)

## VII.   CLASS ACTION ALLEGATIONS

125.     **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plans and the following class of similarly-situated persons (the "Class"):

> All qualified ERISA Plans, and the participants, beneficiaries, and named fiduciaries of those plans that invested or maintained investments between January 1, 2007 and the present (the "Class Period") in any Collective Trust managed or operated by The Northern Trust Company or Northern Trust Investments, N.A., where such Collective Trust invested Collateral received from borrowers of securities owned by such Collective Trust in one or more Collateral Pools managed or operated by Northern Trust Investments, N.A., or The Northern Trust Company.

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating the Defendants' fiduciary breach with respect to all of the Plans and participants in the class.

126.    **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA Plans throughout the country invested in these Collective Trusts during the Class Period, and sustained losses as a result of the Northern Trust Defendants' imprudent securities lending activities. For example, Schedule D to the Form 5500 filed by Defendants for the S&P 500 Fund for the fiscal year ending in July 2007 alone lists over 100 ERISA Plans as investors in the fund. Northern Trust Global Investments, NTGI-QM Collective Daily S&P 500 Equity Fund - Lending, Annual Return/Report of Employee Benefit Plan (Form 5500), at Schedule D, Part II (May 15, 2008). The S&P 500 Fund is but one of over fifty Collective Trusts that engaged in securities lending.

127.    **Commonality.** The claims of Plaintiffs and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants with regard to management of its securities lending program in which each Plan participated, and for which Defendants' conduct was the very same. First, with regard to each and every Plan, NTI agreed to serve as Investment Manager for the Plan; admitted that it was a fiduciary as defined by ERISA, agreed to follow specified "Investment Guidelines," had full discretionary authority to manage the investment of assets of each Plan; and was paid a management fee for its services. Second, the Plans all invested in commingled funds set up by NTI pursuant to the *Declaration of Trust of the Northern Trust Global Investments Collective Funds Trust*, effective January 31, 2006, wherein NTI, as Trustee was authorized to lend securities from the Lending Funds in which all of the Plans' assets were invested. *See* Decl. of Trust § 3.07(d). (Ex. 2.) Third, NTI, as Trustee, contracted with Northern, as Lending Agent. Northern vetted the creditworthiness of

Borrowers for all the lent securities, entered into Borrower Agreements with securities'
Borrowers, lent the Lending Funds' securities to the Borrowers, collected the cash collateral to
be put into the Collateral Pools that were managed by NTI, and charged fees to the Funds. *See
Lending Agreement*, August 1, 2006. (Ex. 6.) Finally, every Plan in the putative class that was
invested in the Collective Trusts suffered losses for exactly the same reasons – NTI's
mismanagement of the Collateral Pools and collection of unreasonable securities lending
compensation. When these Plans all suffered investment losses in 2007 and 2008 as a result of
NTI's mismanagement of its securities lending Collateral Pools, Northern Trust stated that it
intended to respond to every Plan's inquiries and request for divestment in exactly the same
manner. As a result, Plaintiffs' Plans are similarly situated to every other Plan in the putative
class.

      128.  Proceeding as a class action is particularly appropriate here because the Plans'
assets were held in commingled funds, or Collective Trusts. The cash collateral Defendants
further received was reinvested in commingled Collateral Pools managed by NTI, which treated
any losses as proportional to all investors. Further, the Defendants purportedly instituted
draconian Fund withdrawal guidelines so as to treat all Plans uniformly. Therefore, Defendants'
imprudent actions affected all Plans in exactly the same manner.

      129.  Furthermore, common questions of law and fact exist as to all members of the
Class and predominate over any questions solely affecting individual members of the Class. The
many questions of law and fact common to the Class include:

      a.      Whether Defendants NTI and Northern are fiduciaries under ERISA;

      b.      Whether Defendants NTI and Northern, in arranging for, selecting,
executing the securities lending transactions, and reinvesting the cash collateral on behalf of the
Funds in various investments selected by NTI, and retaining fees for the same, discharged their
fiduciary duties with respect to the Plans solely in the interest of the participants and

47

beneficiaries and for the exclusive purpose of providing benefits to the participants and their beneficiaries;

c.      Whether Defendants' actions proximately caused losses to the Plans and, if so, the appropriate relief to which the Plans are entitled;

d.      Whether Defendants NTI and Northern received compensation, direct or indirectly, for example, through EquiLend, in connection with securities lending transactions involving the Plans' assets, and whether such compensation was reasonable; and

e.      Whether Northern received unreasonable compensation for its securities lending services.

130.    **Typicality.** Plaintiffs claims are typical of the claims of the members of the Class because Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), and, thus, their claims on behalf of the Plans are not only typical of, but identical to, a claim under this section brought by any other Class member. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same facts, using the same legal arguments to prove Defendants' liability, and would be seeking the same relief.

131.    **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel that are competent and experienced in class action and ERISA litigation. Plaintiffs have no interests antagonistic to, or in conflict with those of the Class. Plaintiffs have undertaken to protect vigorously the interests of the absent members of the Class.

132.    **Rule 23(b)(1)(A) &(B) Requirements.** Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to

individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

133. **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties here because Defendants have averred that they sought to treat each Plan exactly the same.

134. **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VIII. CLAIMS FOR RELIEF

### COUNT I
**Against Northern Trust Investments, N.A. and The Northern Trust Company**
**For Failure to Prudently and Loyally Manage Plan Assets**

135. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

136. Under ERISA § 3(21), 29 U.S.C. § 1002(21), Defendants NTI and Northern were at all relevant times ERISA fiduciaries with respect to the Plans and the invested assets of the Plans.

137. The scope of the fiduciary duties and responsibilities of the Northern Trust Defendants included discretionary authority or control respecting managing the assets of the Plans.

138.     Under ERISA § 3(38), 29 U.S.C. § 1002(38), NTI was at all relevant times the Investment Manager of the Plans.

139.     In addition to serving as the Investment Manager for the Collective Trusts, or Funds of the Plans, NTI also served as the Trustee of the Collective Trusts, and Investment Manager of the Collateral Pools.

140.     Pursuant to ERISA § 3(21)(A)(i), 29 USC § 1002 (21)(A)(i), Defendant Northern was at all times the Lending Agent for the Funds' securities. In this capacity, Northern was an ERISA fiduciary because it had discretionary authority or control respecting management or disposition of the Plans' assets when it negotiated the Borrower agreements, used EquiLend to determine which securities to lend, lent the Funds' securities, and charged fees for those same services.

141.     Defendants were obligated to discharge their duties with respect to the Plans' assets with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

142.     Contrary to their duties and obligations under ERISA, Defendants failed to loyally and prudently manage the assets of the Plans. Specifically, Defendants breached their duties to the participants, in violation of ERISA § 404(a), by, *inter alia*: (i) exposing the Plans' assets to excessive levels of risk through their securities lending activities; (ii) failing to discharge their duties solely in the interests of the Plans' participants; and, (iii) generally failing to invest and manage the assets of the Plans in the manner of a reasonably prudent fiduciary acting under similar circumstances. With regard to each of the failures identified in

this paragraph, Defendants did so through their mismanagement of the assets of the Collateral Pools.

143.    Moreover, Defendants failed to conduct an appropriate investigation of the merits of their highly risky and speculative program of securities lending in light of the particular dangers that this program posed to the Plans' assets. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of investing assets of the Collateral Pools in a manner that exposed the pools to significant risk of substantial loss, such that their reinvestment value would fall below the value of the underlying securities. A prudent fiduciary acting under similar circumstances would have invested the Collateral Pools in safe, liquid securities commensurate with the stated purpose providing an incremental return to the Plans and other investors that participated in the program, rather than investing the Pools in the risky asset-backed sub-prime mortgages, SIVs, and other high-risk securities and derivatives.

144.    As a consequence of Defendants' breach of fiduciary duties alleged in this Count, the Plans and the Plans' participants and beneficiaries have suffered tremendous losses. Had Defendants discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breach of fiduciary duty alleged herein, the Plans collectively lost hundreds of millions of dollars of retirement savings.

145.    Further, Defendants did not provide material information to Plaintiffs regarding the securities lending program. Defendants failed to provide, among other things, complete information about: (i) the investment strategies the Defendants were pursuing for the Collateral Pool investments; (ii) the risk management program employed by Northern Trust; (iii) the performance of the Collateral Pools and the losses experienced by the Pools in 2007 and 2008,

as well as the reasons for those losses; and (iv) Defendants' compensation in connection with the securities lending program. These failures are particularly galling as the securities lending program was designed to provide an incremental boost to a Plan's return on investments; however, the program was operated in an imprudent manner far out of step with the potential for gain provided by the program. As a result, the Plans' participants, and beneficiaries lacked material information necessary for making informed decisions regarding investment in Northern Trust's securities lending program

146.    Pursuant to ERISA §§ 409, 502(a)(2), and (a)(3), 29 U.S.C. §§ 1109(a), and 1132(a)(2) and (3), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

147.    The Defendants were unjustly enriched by the fiduciary breaches described in this Count.

## COUNT II
### Against Northern Trust Investments, N.A. and The Northern Trust Company
### For Failure to Prudently and Loyally Manage Plan Assets

148.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

149.    Under ERISA § 3(21), 29 U.S.C. § 1002(21), Defendants NTI and Northern were at all relevant times ERISA fiduciaries with respect to the Plans and the invested assets of the Plans.

150.    The scope of the fiduciary duties and responsibilities of the Northern Trust Defendants included discretionary authority or control respecting their management of the Plans' assets.

151.    Under ERISA § 3(38), 29 U.S.C. § 1002(38), NTI was at all relevant times the Investment Manager of the Plans.

152.    In addition to serving as the Investment Manager for the Collective Trusts, or Funds of the Plans, NTI also served as the Trustee of the Collective Trusts, and Investment Manager of the Collateral Pools.

153.    Pursuant to ERISA § 3(21)(A)(i), 29 USC § 1002 (21)(A)(i), Defendant Northern was at all times the Lending Agent for the Funds' securities. In this capacity, Northern was an ERISA fiduciary because it had discretionary authority or control respecting management or disposition of the Plans' assets when it negotiated the Borrower agreements, used EquiLend to determine which securities to lend, lent the Funds' securities, and charged fees for those same services.

154.    Defendants were obligated to discharge their duties with respect to the Plans' assets with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

155.    Defendants breached their fiduciary duties by setting and taking for themselves unreasonable compensation for securities lending services.

## COUNT III

### Against Northern Trust Investments, N.A. and The Northern Trust Company, For Prohibited Transactions Involving Plan Assets

156.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

157.     As set forth *supra*, as Investment Manager, Defendant NTI served as an ERISA fiduciary for each Plan. Under ERISA § 3(21), 29 U.S.C. § 1002(21), NTI was, at all relevant times an ERISA fiduciary with respect to the Plans and the invested assets of the Plans. Under ERISA § 3(38), 29 U.S.C. § 1002(38), NTI was at all relevant times the Investment Manager for the Plans. The scope of the fiduciary duties and responsibilities of the Northern Trust Defendants included managing the assets of the Plans in the Lending Funds and the Collateral Pools. In addition to serving as the Investment Manager, NTI also served as the Trustee of the Collective Trusts.

158.     Similarly, Defendant Northern was at all times an ERISA fiduciary when it served as Lending Agent for the Trustee in order to implement the securities lending operation, including the fact that it had discretionary authority to select Borrowers, enter into contracts to lend the Funds' securities, determine which securities to lend to which Borrowers, determine which Collateral Pools to place the cash in, and render investment advice for a fee by charging the Collective Trusts for the securities lending. (Ex. 3.) Thus, Northern too, was an ERISA fiduciary for the Plans because it had discretionary authority or control respecting management or disposition of assets of the Plans in its role as Lending Agent.

159.     Section 406(a)(1) of ERISA prohibits a fiduciary of a plan from causing a plan to enter into a transactions with a party in interest. 29 U.S.C. § 1106(a)(1). Northern and NTI

were fiduciaries and therefore, by definition, parties in interest to the Plans. 29 U.S.C.

§ 1002(3)(14)(A). Northern and NTI entered into Lending Agreements with each other

whereby Northern provided securities lending services to the Lending Funds. These

transactions constituted a furnishing of services to the Plans by Northern, in violation of 29

ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A). Further, the compensation Northern and

NTI received was unreasonable. *See* ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

160.     Section 406(b)(1) of ERISA also prohibits a fiduciary, such as Northern or NTI

from "deal[ing] with the assets of the plan in his own interest or for his own account . . . ." 29

U.S.C. § 1106(b)(1). The Northern Trust Defendants violated ERISA § 406(b)(1) by using the

Plans' assets to invest in high risk and illiquid instruments through the Collateral Pools to

benefit Defendants through earnings of fee revenue on the Collateral Pool investments.

Through the securities lending program that Northern Trust ran for the ExxonMobil Savings

Plan, the Texas Instruments 401(k) Savings Plan, and other Plans in the class while taking for

itself 40% of any profits earned from the collateral reinvestment on the securities lent,

Northern Trust dealt with the assets of a plan for its own interest.

161.     Further, because the Northern Trust Defendants failed to comply with PTE

2006-16, their operation of the securities lending program for the Plans was unauthorized and a

*per se* violation of § 406(b)(1) of ERISA. 29 U.S.C. § 1106.

162.     Northern Trust's violations of ERISA § 406 have caused the Plans to suffer

substantial losses, and the risk of future losses, on account of their Collateral Pool investment

holdings. Pursuant to ERISA §§ 409, 502(a)(2)-(3), 29 U.S.C. §§ 1109(a), and 1132(a)(2)-(3),

Defendants are liable to restore the losses to the Plans caused by their violations of § 406, and

to disgorge their compensation and profits thereon, and to be subject to other equitable relief as appropriate.

## IX.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

163.    Defendants breached their fiduciary duties in that they knew, or should have known, the facts as alleged above, and therefore knew, or should have known, that the securities lending program was imprudent. Defendants also violated ERISA's prohibitions on certain transactions involving plan assets.

164.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes the Secretary of Labor, or a participant, beneficiary or fiduciary, to bring a civil action for appropriate relief under section 1109. Section 1109 states:

> Any person who is a fiduciary . . . who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate . . . .

165.    Plaintiffs, on behalf of the Plans and the Class, are therefore entitled to relief from Defendants in the form of: (i) a monetary payment to the Plans in an amount to be proven at trial, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, including on order permitting the Plans and the Class to withdraw assets from the Collective Trusts, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and(3); (iii) disgorgement of compensation and profits earned thereon as a result of prohibited transactions; (iv) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (v) taxable costs and interest on these amounts, as provided by law; and (vi) such other legal or equitable relief as may be just and proper.

166.    Under ERISA, each Defendant is jointly and severally liable.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    A determination that this action is a proper class action and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    A Declaration that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plans and the Class;

C.    A Declaration that Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.    A Declaration that Defendants, and each of them, violated ERISA § 406, 29 U.S.C. § 1106;

E.    An Order rescinding the Plans' securities lending contracts;

F.    An Order compelling Defendants to make good to the Plans and the Class all losses resulting from the securities lending program and to restore to the Plans and the Class all profits that the participants and beneficiaries would have made if Defendants had fulfilled their fiduciary obligations;

G.    Imposition of a constructive trust on any amounts by which any Defendants were unjustly enriched at the expense of the Plans and the Class as the result of beaches of fiduciary duty;

H.    Restoration of any losses to the Plans and the Class, allocated among the participants' individual accounts within the Plans and the Class, in proportion to the accounts' losses as required by ERISA;

I.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.      An Order awarding attorney fees pursuant to the common fund doctrine, 29

U.S.C. § 1132(g), and other applicable law;

K.      An Order for equitable restitution and other appropriate equitable and injunctive

relief against Defendants; and

L.      Granting such other and further relief as the Court may deem just and proper.

DATED this 15th day of February, 2012.

BAILEY & GLASSER LLP


By: /s/Elizabeth Hoskins Dow
Elizabeth Hoskins Dow
BAILEY & GLASSER LLP
1003 Western Avenue
Joliet, IL 60435
Tel: (815)740-4034
Email: ldow@baileyglasser.com

Todd M. Schneider
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
180 Montgomery Street, Suite 2000
San Francisco, CA 94104
Tel: (415) 421-7100
Fax: (415) 421-7105

Gregory Y. Porter
BAILEY & GLASSER LLP
910 17th Street, NW
Suite 800
Washington, DC 20016
Tel: (202) 463-2101
Fax: (202) 463-2103

Garrett W. Wotkyns
SCHNEIDER WALLACE COTTRELL
BRAYTON KONECKY LLP
7702 E. Doubletree Ranch Road, Suite 300
Scottsdale, AZ 85258
Tel: (480) 607-4368
Fax: (480) 348-3999

Brian A. Glasser
Michael L. Murphy
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Tel: (304) 345-6555
Fax: (304) 342-1110

Mr. Harry Susman
SUSMAN GODFREY
1000 Louisiana, Suite 5100
Houston, TX 77002-5096
Tel: (713) 653-7875
Fax: (713) 654-6686

Micah Dortch
COOPER & SCULLY, P.C.
900 Jackson St. #100
Dallas, TX 75202
Tel: (214) 712-9500
Fax: (214) 712-9540

Joseph Peiffer
FISHMAN HAYGOOD PHELPS
WALMSLEY WILLIS & SWANSON, L.L.P.
201 St. Charles Avenue - Suite 4600
New Orleans, LA 70170-4600
Tel: (504) 586-5252
Fax: (504) 586-5250

Todd S. Collins
Shanon J. Carson
Ellen T. Noteware
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3040
Fax: (215) 875-4604

Lynn L. Sarko
Derek Loeser
Laura Gerber
KELLER ROHRBACK
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Tel: (206) 623-1900
Fax: (206) 623-3384

*Attorneys for Plaintiffs*