**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

JOSEPH L. DIEBOLD, JR., on behalf of the
EXXONMOBIL SAVINGS PLAN, and PAUL J.
HUNDT, on behalf of the TEXAS
INSTRUMENTS 401(K) SAVINGS PLAN, and
all others similarly situated,

                                  Plaintiffs,

       v.

NORTHERN TRUST INVESTMENTS, N.A.,
and THE NORTHERN TRUST COMPANY,

                                Defendants.

Hon. Charles R. Norgle

Civil Action No. 09-Civ-1934

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT

Defendants Northern Trust Investments, Inc., and The Northern Trust Company

("Defendants"), by and through their attorneys, pursuant to Fed. R. Civ. P. 8(b), file the

following Answer[*] and Affirmative Defenses to Plaintiffs' Second Amended Class Action

Complaint in the above-captioned case. To the extent any allegations are not expressly admitted

herein, they are hereby denied. Pursuant to Fed. R. Civ. P.8(b), any statement as to which

defendants lack knowledge or information sufficient to form a belief about the truth shall have

the effect of a denial.

---

[*] No answer is required with respect to the headings, prayers for relief, and other contents of the Amended
Complaint that do not set forth allegations of fact and are not included within numbered paragraphs as
required by Fed. R. Civ. P. 10(b).

## I.    INTRODUCTION

1.      Plaintiffs Joseph L. Diebold, Jr., a participant in the ExxonMobil Savings Plan, and Paul J. Hundt, a participant in the Texas Instruments 401(k) Savings Plan, bring this Second Amended Class Action Complaint on behalf of the participants, beneficiaries, and named fiduciaries of their Plans, and on behalf of all other similarly situated defined benefit and defined contribution pension plans covered by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA") ("Plan" or collectively, the "Plans") that suffered losses as a result of Northern Trust's imprudent management of its securities lending program. Plaintiffs allege the following based on personal knowledge, and on information and belief based upon facts obtained through investigation by their counsel, or review of publicly available documents.

**ANSWER TO PARAGRAPH 1:**    Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations about Plaintiffs' alleged participation in the ExxonMobil Savings Plan or the Texas Instruments 401(k) Savings Plan; their intent to represent a class; and the second sentence of this paragraph.  Defendants deny the remaining allegations of this paragraph.

2.      This is an Amended Class Action Complaint against Defendant Northern Trust Investments, N.A. ("NTI"), and its affiliate, The Northern Trust Company, ("Northern")[1].NTI manages funds in which a large number of ERISA-qualified 401(k) plans invest. Billions of dollars of the Plans' assets are invested in these funds, which hold publicly traded securities. NTI developed a securities lending program that it marketed to the Plans as providing a means to

---

[1] NTI and Northern will be referred to, collectively, as "Defendants."

incrementally boost the returns of their funds. The Northern Trust funds that engaged in securities lending are referred to herein as "Lending Funds" or "Funds."

**ANSWER TO PARAGRAPH 2:** Defendants admit that Plaintiffs purport to bring an amended class action complaint against Defendants and that Plaintiffs purport to use defined terms herein, but deny that Plaintiffs are entitled to bring this action on behalf of a class. Defendants admit that NTI acts as the trustee pursuant to the Declaration of Trust as defined herein; that ERISA-qualified 401(k) plans invest in collective funds governed by the Declaration of Trust; and that such collective funds hold publicly-traded securities. In light of the vague and contingent nature of the definition of "Plans," Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations regarding amounts invested. Defendants deny any remaining allegations of this paragraph.

3. In exchange for this incremental investment return, Plans participating in Northern Trust's securities lending program were exposed to massive risk. And, in point of fact, Northern Trust's securities lending program was operated in a reckless and imprudent manner. As a result, while each Plan had the opportunity to achieve *incremental* returns to fund performance, each Plan also assumed massive and undisclosed risks wholly unsuited to the goals of preserving liquidity and seeking incremental returns at low risk.

**ANSWER TO PARAGRAPH 3:** Defendants deny the allegations of this paragraph.

4. The losses incurred by Plaintiffs' Plans and the other Plans in the Class are the result of Defendants' mismanagement of the collateral pools ("Collateral Pools") established by NTI for the purpose of securing the loaned securities and generating the incremental return that Northern's securities lending operation was intended to provide for the participating Plans.

**ANSWER TO PARAGRAPH 4:** Defendants deny the allegations of this paragraph.

2

5.      Those who borrowed shares from the Lending Funds posted collateral equal to 102% of the value of the borrowed shares in order to secure the shares. As the lending agent, ("Lending Agent") Defendant Northern negotiated all terms of the securities lending agreements with borrowers ("Borrower" or "Borrowers"), and decided which Collateral Pools the collateral it received would be invested in. As Investment Manager of the Lending Funds and the Collateral Pools, Defendant NTI was an ERISA fiduciary, bound to the highest duty known to law. Among those duties is the obligation to act prudently, loyally, and with an eye single to the best interests of the Plans and Plan participants.

**ANSWER TO PARAGRAPH 5:**      To the extent this paragraph purports to describe various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to describe the legal effect of such agreements or applicable legal principles, no answer to such legal conclusions is required.  To the extent that this paragraph purports to describe all securities lending arrangements concerning the Lending Funds, Defendants deny those allegations and any remaining allegations of this paragraph.

6.      Whereas a prudent investment manager would have invested the collateral securing the Lending Fund shares in safe, liquid securities and carefully monitored the risk of the Collateral Pool investments, Defendants made imprudent investment decisions that ultimately forced the Plans to assume tremendous losses. In relevant part, Defendant NTI invested the collateral in illiquid and unduly risky asset-backed securities and other securitized debt instruments. Later, the risky securities held in the Collateral Pools lost substantial value and were no longer adequate to cover the value of lent securities held by the borrowers.

**ANSWER TO PARAGRAPH 6:**      Defendants deny the allegations of this paragraph.

3

7.      By 2007, the performance of some of NTI's Collateral Pools was clearly suffering, and the Pools began incurring significant losses. Because the Pools held billions of dollars in collateral cash reinvestments, small declines in the Pools' value compared to their benchmarks actually represented the loss of millions of dollars of retirement money for the Plans' participants. However, instead of taking remedial action in 2007 to stave off the then-manageable losses, Northern Trust imprudently stayed the course, and lost even more Plan assets in 2008 and 2009.

**ANSWER TO PARAGRAPH 7:**      Defendants deny the allegations of this paragraph.

8.      When the Plans' fiduciaries tried to redeem their investments and exit the Lending Funds, the Defendants imposed new withdrawal restrictions and barred Plans from divesting without also either taking the impaired and valueless securities from the Collateral Pools and/or paying Northern Trust in order to prop up the value of the Fund for other investors. Thus, Northern Trust forced the Plans who were harmed by Northern Trust's imprudence to make up the losses caused by Northern Trust itself, an unfair and untenable requirement given Northern Trust's responsibility for the losses in the first instance. Northern Trust repeated this same pattern of fiduciary abuses in all the Collateral Pools, and thus, caused substantial losses to all the Plans for precisely the same reasons.

**ANSWER TO PARAGRAPH 8:**      Defendants deny the allegations of this paragraph.

9.      Accordingly, Plaintiffs allege that the Defendants breached their fiduciary duties under ERISA and caused substantial losses to the Plans that participated in Northern Trust's securities lending operation. More specifically, in Count I, Plaintiffs allege that the Defendants breached their duties of prudence, loyalty, and exclusive purpose under ERISA § 404(a), 29 U.S.C. § 1104(a) (2006), by investing Plan assets recklessly and imprudently, by acting

4

disloyally, and by causing losses to the Plans. The Defendants failed to properly select investments for the Collateral Pools, failed to monitor the risk that the Pools faced, failed to divest holdings from the Pools in a timely fashion in order to spare the Plans from tremendous losses, and failed to provide complete and accurate information to the Plans regarding securities lending.

**ANSWER TO PARAGRAPH 9:**   Defendants admit that Plaintiffs purport to advance such allegations, but Defendants otherwise deny the allegations of this paragraph.

10.     In violation of their fiduciary duties to the Plans, Defendants took unreasonably large compensation (separate and apart from their fees for managing the Lending Funds and Collateral Pools) for managing the securities lending program. Indeed, Defendants took **forty percent of all net income—***i.e.***, the spread, generated by the Collateral Pools for the benefit of the Lending Funds**. Thus, only 60% of the net income generated through the securities lending program managed by Defendants inured to the Plans. Defendants took from the Plans – to whom they owed fiduciary obligations – much higher compensation for managing securities than they collected from other institutional investors who had negotiated securities lending compensation with Defendants in arm's length transactions, where the investors were represented by independent fiduciaries—*i.e.*, fiduciaries unaffiliated with Defendants. Moreover, the forty percent received by Defendants far exceeds industry standards.

**ANSWER TO PARAGRAPH 10:**   Defendants deny the allegations of this paragraph.

11.     Defendants' excessive compensation is not surprising given that their investment relationship with the Plans was fraught with conflicts and self-dealing. As shown in greater detail below, Defendants, on the one hand, managed the Lending Funds and purportedly represented the Lending Funds and the Plans in setting the terms of and executing a Securities Lending

Agreement with Defendants, while, on the other hand, they represented themselves as the Lending Agent. The Defendants, acting as Lending Agent, then allocated to themselves, or an affiliate, the responsibility for managing the collateral investment program via the Collateral Pools. Essentially, Defendants, all of whom operate under the same corporate umbrella, negotiated with themselves the terms of their compensation, discretion, authority, and even liability. Not surprisingly, these arrangements led to Defendants setting and receiving excessive and unreasonable compensation for themselves.

**ANSWER TO PARAGRAPH 11:**  Defendants deny the allegations of this paragraph.

12.     Every dollar Defendants collected in excess of reasonable compensation was one dollar less that the Plans, and their respective participants and beneficiaries, received. Moreover, the Plans suffered additional losses in the form of lost investment opportunity on the securities lending income wrongfully taken by Defendants for themselves where such income would have been reinvested in the respective Lending Funds, rather than taken by Defendants for their own profit and use. As a result, the Plans suffered hundreds of millions of dollars in losses due to Defendant's fiduciary breaches and prohibited self-dealing.

**ANSWER TO PARAGRAPH 12:**  Defendants deny the allegations of this paragraph.

13.     In Counts II and III, respectively, Plaintiffs allege breaches of fiduciary duty and prohibited transactions arising from the Northern Trust Defendants' placing their own interests ahead of those of the Plans through self-dealing, using Plan assets for their own benefit, and collecting unreasonable fees and other compensation in connection with the securities lending program that they set up and administered.

**ANSWER TO PARAGRAPH 13:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required.  Defendants

admit that Plaintiffs purport to advance such allegations, but Defendants otherwise deny the allegations of this paragraph.

## II.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

**ANSWER TO PARAGRAPH 14:**  Defendants admit that Plaintiffs purport to seek relief under ERISA, but deny that Plaintiffs have stated a claim or are entitled to any relief.  Defendants admit that Plaintiffs purport to bring their claims as a class action, but deny that Plaintiffs are entitled to bring their claims as a class action.  The remaining allegations of this paragraph state legal conclusions as to which no answer is required.

15.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Defendants are headquartered and conduct business in this District.

**ANSWER TO PARAGRAPH 15:**  Defendants admit that they are headquartered and conduct business in this District.  The remaining allegations of this paragraph state legal conclusions as to which no answer is required.

## III.    THE PARTIES

**A.    Plaintiffs.**

16.    Plaintiff Joseph L. Diebold, Jr., is a participant in the ExxonMobil Savings Plan. He resides in Prairieville, Louisiana. Through his Plan, Plaintiff Diebold invested in the S&P 500 Fund and suffered losses through Defendants' breaches of fiduciary duty and prohibited transactions as alleged herein. The ExxonMobil Savings Plan also offered participants the

7

opportunity to invest in additional Northern Trust Lending Funds, including, but not limited to, the Aggregate Bond Index Fund, the Small Cap Equity Index Fund, the EAFE Index Fund, and the Short Term Investment Fund.

**ANSWER TO PARAGRAPH 16:** Defendants lack knowledge sufficient to form a response about the truth of the allegations of the first and second sentences of this paragraph. Defendants deny the third sentence of this paragraph. Defendants admit that, at points in time, the ExxonMobil Savings Plan offered participants the opportunity to invest in the NTGI-QM Collective Daily S&P 500 Equity Index Fund – Lending; the NTGI-QM Collective Daily EAFE Equity Index Fund – Lending; the NTGI-QM Collective Daily Aggregate Bond Index Fund – Lending; and the NTGI-QM Collective Daily Extended Equity Market Index Fund – Lending. Defendants deny any remaining allegations of this paragraph.

17. Plaintiff Paul J. Hundt is a participant in the Texas Instruments 401(k) Savings Plan. He resides in Garland, Texas. Through his Plan, Plaintiff Hundt invested in the Aggregate Bond Index Fund, the Daily Russell 2000 Index Fund and the Daily Russell 1000 Growth Equity Index Fund, and suffered losses through Defendants' breaches of fiduciary duty and prohibited transactions as alleged herein.

**ANSWER TO PARAGRAPH 17:** Defendants lack knowledge sufficient to form a response about the truth of the allegations of the first and second sentences of this paragraph. Defendants deny the remaining allegations of this paragraph.

**B. Defendants.**

18. Defendant NTI is an affiliate of Defendant Northern. NTI is a national banking association with its principal place of business in Chicago, Illinois and is a fiduciary and/or a party-in-interest with respect to the Plans.

**ANSWER TO PARAGRAPH 18:** Defendants admit that NTI is an affiliate of Northern and is a national banking association with its principal place of business in Chicago, Illinois. To the extent this paragraph purports to describe various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" and "party-in-interest" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny the remaining allegations of this paragraph.

19.     Defendant Northern is an Illinois state banking corporation with its principal place of business in Chicago, Illinois. Directly and/or through its affiliates, Northern provides investment products and services, including the products and services provided by NTI to the Plans, and Northern is a fiduciary and/or a party-in-interest with respect to the Plans.

**ANSWER TO PARAGRAPH 19:** Defendants admit that Northern is an Illinois state banking corporation with its principal place of business in Chicago, Illinois. To the extent this paragraph purports to describe various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such agreements or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" and "party-in-interest" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

## IV.     DEFENDANTS' FIDUCIARY STATUS

20. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other person who in fact performs fiduciary functions. Thus, a person is a fiduciary to the extent,

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
>
> (ii)     he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or
>
> (iii)     he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). Here, Defendants were ERISA fiduciaries for the following reasons.

**ANSWER TO PARAGRAPH 20:**  To the extent this paragraph purports to characterize the cited ERISA provisions, Defendants refer to the statute for its contents and deny any allegations inconsistent therewith.  To the extent this paragraph purports to describe the legal effect of such documents or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations.  Defendants deny any remaining allegations of this paragraph.

21. Defendant NTI served as the ERISA investment manager for each and every Plan that participated in Northern Trust's securities lending program, and, as such, was an ERISA fiduciary.

**ANSWER TO PARAGRAPH 21:**  To the extent this paragraph purports to describe various documents, Defendants refer to those documents for their content and deny any allegations

inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such documents or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "investment manager" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny the remaining allegations of this paragraph.

     22.     ERISA § 3(38), 29 U.S.C. § 1002(38) defines investment manager as:

> any fiduciary (other than a trustee or named fiduciary, as defined in section 1102(a)(2) of this title) -
>
> > (A) who has the power to manage, acquire, or dispose of any asset of a plan;
> >
> > (B) who
> >
> > > (i)     is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b-1 et seq.];
> > >
> > > (ii)     is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b-3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;
> > >
> > > (iii)     is a bank, as defined in that Act; or
> > >
> > > (iv)     is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and
> >
> > (C) has acknowledged in writing that he is a fiduciary with respect to the plan. ERISA § 3(38), 29 U.S.C. § 1002(38).

11

**ANSWER TO PARAGRAPH 22:** To the extent this paragraph purports to characterize the cited ERISA provisions, Defendants refer to the statute for its contents and deny any allegations inconsistent therewith. To the extent the allegations of this paragraph state legal conclusions, no answer is required. Defendants deny any remaining allegations of this paragraph.

23. According to the form investment manager agreements that Defendant NTI entered with the Plans, NTI had the rights, duties, and obligations of an investment manager over the assets in each Plan's investment accounts. *See Investment Manager Agreement*, § 1(c), February 29, 2008. (Ex. 6, attached hereto.) In these agreements, NTI also explicitly acknowledged its status as an investment manager pursuant to ERISA § 3(38). In relevant part, the investment manager agreement stated that NTI represented that it was: (i) registered as an investment adviser under the Investment Advisers Act of 1940; (ii) a bank as defined in the Advisers Act, or (iii) an insurance company qualified to perform the investment manager services under the laws of more than one state. *Id*. at § 2(a), 1(d). Further, NTI as investment manager warrantied that it was, and would continue during the term of the agreement to be an "investment manager" as defined in Section 3(38) of ERISA. *Id*. at § 24(vi). NTI also acknowledged its status as an ERISA fiduciary to the Plans. *Id*. at § 2(b). Thus, Defendant NTI was an investment manager under ERISA.

**ANSWER TO PARAGRAPH 23:** Defendants deny the allegations of this paragraph.

24. NTI was an investment manager for the Plans and had discretionary authority to manage the Plans' Lending Funds and Collateral Pools (including the power to acquire and dispose of) assets in the investment accounts when it selected and chose securities for the Lending Funds and Collateral Pools.

**ANSWER TO PARAGRAPH 24:** To the extent this paragraph purports to describe various

12

agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such agreements or applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

25. NTI also served as the trustee of the Northern Trust Global Investments Common Funds and the Northern Trust Global Investments Collective Funds. *See Securities Lending Authorization Agreement*, August 1, 2006, ("Lending Agreement"), at 1 (Ex. 3.)

**ANSWER TO PARAGRAPH 25:** To the extent this paragraph purports to describe the cited Securities Lending Authorization Agreement, Defendants refer to the document for its content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such agreements or applicable legal principles, no answer to such legal conclusions is required. Defendants admit that NTI acts as the trustee pursuant to the Declaration of Trust as defined herein. Defendants deny any remaining allegations of this paragraph.

26. Northern served as the securities lending agent, ("Lending Agent") for the securities of all the Lending Funds. In this capacity, Northern served as an agent for NTI, the Trustee of the Collective Trusts, and also the lender of the Funds' securities. As Lending Agent, Northern had physical custody of the collective trusts and collateral, selected borrowers for the securities, determined creditworthiness of potential borrowers, contracted to lend the Funds' securities to borrowers, determined which of the Lending Funds or collective trusts to loan securities from, and received cash collateral in exchange for the loan. Northern also had the right to add or delete Collateral Pools as investment options for the cash collateral it received, as well as the discretion to make loans or advances to the Lending Funds in case of a collateral

13

deficiency, and charged the Funds monthly securities lending fees. *See* Lending Agreement (Ex. 3.) Thus, Northern, as Lending Agent, was also an ERISA fiduciary for the Plans in that it had discretionary authority or control respecting management or disposition of the Plans' assets when it was lending the Plans' securities.

**ANSWER TO PARAGRAPH 26:** To the extent this paragraph cites various documents, including the referenced Securities Lending Authorization Agreement, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such documents or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

27.    Northern was also a fiduciary for purposes of setting its own compensation. Northern essentially set its own compensation by entering into a Lending Agreement with its affiliate NTI, which set the percentage of securities lending revenue Northern received as Lending Agent. See Lending Agreement at 21 (Ex. 3.) Northern also controlled its compensation through the negotiation of rebates with borrowers (the lower the rebate, the greater Northern's compensation) and, through its affiliate NTI, the management of Collateral Pools where the return on investment (and commensurate risks) determined Northern's revenue from securities lending and where the fees collected by NTI and other affiliates for managing and operating the Collateral Pools necessarily impacted on the securities lending compensation received by Northern.

**ANSWER TO PARAGRAPH 27:** To the extent this paragraph purports to characterize the referenced Securities Lending Authorization Agreement, or documents governing the relationships with various plans, funds, or borrowers, Defendants refer to those documents for

their contents and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such agreements or applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants deny those allegations. Defendants deny any remaining allegations of this paragraph.

28. As such, Defendants are ERISA fiduciaries because they exercised discretionary authority and control respecting management or disposition of the Plans' assets and rendered investment advice for a fee or other compensation, direct or indirect, with respect to moneys or other property of the Plans that participated in Defendants' securities lending program. *See* ERISA § 3(21)(A)(i-ii), 29 U.S.C. § 1002(21)(A)(i-ii).

**ANSWER TO PARAGRAPH 28:** To the extent this paragraph purports to describe various documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such documents or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

## V. SECURITIES LENDING OVERVIEW

29. Securities lending is the temporary transfer of securities owned by a lender to a borrower, and in return, the borrower typically provides assets as collateral to the lender. Securities lending can operate as an investment technique that provides stable incremental returns to the lender in exchange for the temporary "loan" of a stock to a borrower who needs the stock for short term purposes. Borrowers typically include investment banks, hedge funds,

arbitragers and other financial market actors that wish to short stocks. Index funds are a particularly ready source of stocks for shorting, since the portfolio turnover in index funds is relatively low and predictable, and index funds typically have a stable inventory of stocks for loan. Gene D'Avolio, *The Market for Borrowing Stock*, 66 J. FIN. ECON. 271, 277 (2002). Short sellers locate securities available for borrowing through lending agents who act as clearinghouses for securities lending and borrowing by matching supply with demand. The lending agent is compensated by being given a portion of the securities lending income.

**ANSWER TO PARAGRAPH 29:** To the extent this paragraph purports to describe all securities lending practices and programs and the reasons for engaging in securities lending or borrowing securities, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. To the extent this paragraph purports to characterize the referenced article by Mr. D'Avolio, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

30.     The collateral received from the borrowers is supposed to be invested by the lending agent in safe, short-term, liquid instruments so that the owner of the stock receives some additional income from the reinvestment of the collateral. Thus, securities lending programs can provide institutional investors with a marginal increase in the returns to their stocks and other securities, provided that the collateral is properly reinvested. In the event that the collateral is not appropriately invested, or risk controls are otherwise lacking in the investment management process, the marginal return is accompanied by outsize risk.

**ANSWER TO PARAGRAPH 30:** To the extent this paragraph purports to describe in conclusory and undefined terms how Plaintiffs believe that cash collateral from securities lending should be invested in all cases and what Plaintiffs mean by proper, appropriate, safe,

liquid, or risky investments, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants specifically deny that all cash collateral from securities lending is invested in the same manner. Answering further, Defendants state that at all times, cash collateral from Northern's securities lending program was properly and appropriately invested, and Defendants deny any remaining allegations of this paragraph.

31. There are three primary risks associated with securities lending:

- OPERATIONAL RISK - the risk that the lending agent does not administer the program as agreed. This includes the fiduciary's failure to mark to market collateralization levels and to post corporate actions and income, including all economic benefits of ownership except for proxy voting.

- MARKET/COLLATERAL REINVESTMENT RISK - the risk of investment loss from the reinvestment of the cash collateral by the lending agent. The real risk is that the investment of the cash collateral will not earn a sufficient return to cover the agreed upon rebate rate or even to return the collateral at its original value because of interest rate, liquidity and/or credit risks.

- BORROWER/COUNTERPARTY DEFAULT RISK - the risk that the borrower fails to return the securities it has received due to insolvency or other reasons. Borrower default also leads to trade settlement risk, which is the risk that the lender sells a security on loan and that the loaned security is not returned by the borrower. Therefore the trade fails or the seller is charged with an overdraft fee.

**ANSWER TO PARAGRAPH 31:** Defendants admit that, as an investment activity, securities lending carries risk, including the identified risks. Defendants deny any remaining allegations of this paragraph.

32. As a result of these risks, while a securities lending program can be exercised in manner suitable for retirement plan investments, it is easily exploited, as was the case here, which can create an unduly high risk for retirement plan investors. As the *Wall Street Journal* described:

> Imagine you hire a real-estate agent to sublet your house. Now
> imagine he keeps 30% to 50% of the rent for himself. Finally,

> imagine that the real-estate agent makes you pay for the damages
> that resulted when the tenants he brought in trashed your house....If
> you think that sounds unfair, get a load of how the mutual-fund
> industry has milked investors through the arcane practice of
> securities lending. Like subletting your house, securities lending is
> sensible and beneficial in the right hands -- but can wreak havoc
> when it is done wrong.

Jason Zweig, *The Intelligent Investor: Is Your Fund Pawning Shares at Your Expense?* Wall St.

J., May 30, 2009.

**ANSWER TO PARAGRAPH 32:** Defendants deny the allegations of this paragraph.

## VI.     NORTHERN TRUST'S SECURITIES LENDING PROGRAM

**A.     The Northern Trust Defendants Administered the Securities Lending Program for each of the Plans in the Class.**

33.     Based on review of publicly available documents, all of the Plans in the class hired NTI to serve as the Investment Manager for their Lending Funds. Defendant NTI managed the assets of the Lending Funds in collective trusts established specifically for ERISA-qualified plans. Defendants NTI and Northern together administered the securities lending program for each of the Lending Funds in consistent fashion; consequently, the program had the same problems for each Plan in the Class.

**ANSWER TO PARAGRAPH 33:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegation concerning Plaintiffs' review of "publicly available documents." To the extent this paragraph purports to describe various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such agreements or applicable legal principles, no answer to such legal conclusions is required. Defendants admit that NTI acts as the trustee pursuant to the Declaration of Trust as defined herein. Defendants deny the remaining allegations of this paragraph.

34.     The following is a diagram of Northern Trust's securities lending program for the Plans.



**ANSWER TO PARAGRAPH 34:**  To the extent this diagram requires an answer, Defendants deny the allegations of this paragraph.

35.     Each of the Lending Funds was set up as a commingled fund, also referred to as a "Participating Trust" pursuant to a Declaration of Trust.[2] Decl. of Trust § 1.09, § 2.01. (Ex. 2.) The commingled funds were established for the collective investment of a group of institutional

_____

[2] On January 31, 2006, Northern Trust amended and restated one or more Collective Funds Trusts for which it served as Trustee. *See Amendment and Restatement of Declaration of Trust of the Northern Trust Global Investments Quantitative Management Collective Funds Trust*, ("Decl. of Trust"). (Ex. 2.) The Northern Trust Global Investments Quantitative Management Collective Funds Trust had originally been effective as of November 22, 2002.

investors, here the defined contribution and defined benefit Plans in the Class. All the investors in each commingled fund shared, pro rata, in any gains and losses for the Fund. During 2007 and 2008, Northern Trust's Collective Funds Trusts held over fifty commingled funds. *See Annual Report for Northern Trust Global Investments Collective Funds Trust for Domestic Equities, July 31, 2007*. (Ex. 12); *Annual Report for Northern Trust Global Investments Collective Funds Trust for Fixed Income, July 31, 2007*. (Ex. 34).

**ANSWER TO PARAGRAPH 35:**  To the extent this paragraph purports to describe the cited documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

36.     NTI created each commingled fund that was offered to participants in the Plans by executing a Fund Declaration that described each Lending Fund's investment policy and objective. Decl. of Trust, §3.01(a). (Ex. 2.) For example, the Aggregate Bond Fund's investment objective was to approximate the overall performance of Lehman Brothers Aggregate Bond Index. *Fund Declaration for NTGI-QM Collective Daily Aggregate Bond Fund Lending*, January 31, 2006. (Ex. 7.)

**ANSWER TO PARAGRAPH 36:**  To the extent this paragraph purports to describe the cited documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph

37.     The Fund Declarations were created and prepared by NTI specifically for distribution to Plan sponsors and fiduciaries. Each of the Fund Declarations stated that the Fund "may participate" in securities lending pursuant to the Lending Agreement, and also stated that the lending agent would "indemnify, defend and hold harmless *the Fund* from and against any losses, damages, costs, and expenses the Fund may incur *as a result of failure of the lending*

*agent to perform its duties and responsibilities* under the lending agreement." (emphasis added)
(Ex. 7, §6; Ex. 9, §6.)

**ANSWER TO PARAGRAPH 37:** To the extent this paragraph purports to describe the cited
documents, Defendants refer to those documents for their content and deny any allegations
inconsistent therewith. Defendants admit that Fund Declarations were prepared for distribution
to, among others, plan sponsors and/or fiduciaries. Defendants deny any remaining allegations
of this paragraph.

**C.      Plaintiffs' Invested a Portion of their Retirement Savings in Northern Trust's
         Lending Funds.**

        38.      No later than 2005, Plaintiff Hundt began making investments in Northern Trust's
Lending Funds, including the Aggregate Bond Index Fund, the Daily Russell 2000 Index Fund
and the Daily Russell 1000 Growth Equity Index Fund, all commingled funds managed by NTI
pursuant to its investment management agreement with the Texas Instruments 401(k) Savings
Plan. Northern Trust pooled Plaintiff Hundt's investments in these Funds with investments from
investors in other Plans.

**ANSWER TO PARAGRAPH 38:** Defendants admit that the referenced index funds are
collective funds governed by the Declaration of Trust, pursuant to which NTI is named as
trustee, refer to that document for its content, and deny any allegations inconsistent therewith.
Defendants lack knowledge or information sufficient to form a belief as to the truth of the
allegations of this paragraph concerning the making and thus the pooling of Hundt's investments,
and deny any remaining allegations of this paragraph.

        39.      For several years, Plaintiff Diebold has been invested in Northern Trust's S&P
500 Fund, a commingled fund managed by NTI pursuant to its investment management

agreement with the ExxonMobil Savings Plan. Northern Trust pooled Plaintiff Diebold's investments in this Fund with investments from investors in other Plans. Northern Trust marketed the S&P 500 Fund as mirroring the performance and risk of its benchmark index, the S&P 500. *See NTGI-QM Collective Daily S&P 500 Equity Index Fund Lending Fund Declaration, (Ex. 9); Investment Management Agreement between BP Corporation and Northern Trust Investments, Exhibit B, Investment Guidelines*, February 29, 2008 (Ex. 6).

**ANSWER TO PARAGRAPH 39:** To the extent this paragraph purports to describe the cited documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants admit that the referenced index fund is a collective fund governed by the Declaration of Trust, pursuant to which NTI is named as trustee, refer to that document for its content, and deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph concerning the making and thus the pooling of Diebold's investments, and deny any remaining allegations of this paragraph.

40. The Fund Declarations for the Lending Funds also stated that Northern Trust's securities lending program was conducted in accordance with the Department of Labor's Prohibited Transaction Class Exemption, 2006-16, and that the Lending Agent retained 40% of the securities lending revenue earned when Northern Trust lent out the Fund's securities. (Ex. 7, §6; Ex. 9, §6.) Even though the Fund Declarations were designed for plan sponsors and fiduciaries, these documents did not disclose the potential risk that each Fund bore for any future loss of collateral by Northern Trust in its investment management of the Collateral Pools.

**ANSWER TO PARAGRAPH 40:** To the extent this paragraph purports to describe the cited documents, Defendants refer to those documents for their content and deny any allegations

inconsistent therewith. Defendants admit that the cited documents disclosed, among other things, the securities lending agent's compensation. Defendants deny the remaining allegations of this paragraph.

41.     To lend the Funds' securities, NTI, as Trustee of the Collective Trusts, entered into the Lending Agreement with its own internal counterparty, Northern, serving as the Lending Agent. The Lending Agreement authorized lending of the Funds' securities provided that the loans were made to creditworthy borrowers who posted collateral equivalent to not less than 100% of the initial market value of the borrowed securities. *Lending Agreement*, § 4.1. (Ex. 3.)

**ANSWER TO PARAGRAPH 41:**  To the extent this paragraph purports to describe various documents, including the Securities Lending Authorization Agreement, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

42.     With the Lending Agreement in place, Northern, the Lending Agent, was contractually responsible for finding borrowers for the securities by purportedly reviewing their creditworthiness, and entering into a borrower agreement, ("Borrower Agreement") to lend the Lending Fund's securities (and indirectly, the Plans' securities) to a borrower ("Borrower"). Per the Borrower Agreement, Northern also agreed to pay each Borrower interest for the cash collateral it received.

**ANSWER TO PARAGRAPH 42:**  To the extent this paragraph purports to describe various documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent this paragraph purports to describe the legal effect of such documents or of applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

23

43.     Upon information and belief, Northern actually negotiated the securities lending transactions on behalf of the Funds with borrowers by utilizing the services of EquiLend, a joint venture of various securities lending agents and securities borrowers, in which Northern, had an equity interest. *See Annex II To Lending Agreement, and Attachment A.* (Ex. 3.) EquiLend is a subsidiary of EquiLend Holdings L.L.C., which is a holding company owned by Barclays Global Investors, Bear, Stearns & Co. Inc., Credit Suisse First Boston, The Goldman Sachs Group, Inc., J.P. Morgan Chase & Co., Lehman Brothers, Merrill Lynch, Morgan Stanley, Northern Trust Corporation, State Street Corporation and UBS. *Id*. EquiLend purportedly provided a borrower and/or lender with the option of initiating an order of securities to one or more counterparties. When an offer was approved, EquiLend matched the parties' settlement instructions and sent a shared trade ticket to each of the participants' proprietary trading and settlement systems. In Annex II to the form lending agreements, Northern stated that the Funds were not charged any additional fees for utilizing EquiLend, but that the fees were paid by Northern. *Id*.

**ANSWER TO PARAGRAPH 43:**   To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

44.     As Lending Agent, Northern also had contractual responsibility for deciding which of the Lending Funds' securities to lend to Borrowers. *Lending Agreement* § 2.2. (Ex. 3.) Upon information and belief, when Northern decided which securities to lend, Northern lent out a higher percentage of securities on behalf of each Fund than was prudent. As a result of Northern lending a higher than prudent volume of the Funds' securities to Borrowers, the Collateral Pools for the Lending Funds by default carried a higher aggregate market risk than the aggregate market risk carried by the Lending Funds' securities which were on loan.

24

**ANSWER TO PARAGRAPH 44:** To the extent the first sentence of this paragraph cites the Securities Lending Authorization Agreement, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

**D.    The Collateral Pools.**

45.    After Northern loaned the securities and received the cash collateral from the Borrower, it invested the cash collateral in the various Collateral Pools managed by NTI. In order for securities lending to be profitable, the revenue generated from NTI's Collateral Pool re-investments had to be higher than the interest rate Northern paid to the Borrowers for the cash collateral. Revenue generated from the Collateral Pools passed directly to Northern and then on to the Funds, and indirectly, the Plans. Northern charged the Plans a fee equal to approximately 40 percent of the earnings of the Collateral Pool for their Funds. Thus, the Funds received approximately 60 percent of the revenue generated from the Collateral Pool reinvestments.

**ANSWER TO PARAGRAPH 45:** To the extent the first sentence of this paragraph purports to describe various documents, including the Securities Lending Authorization Agreement, collateral pool guidelines, and Fund Declarations, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph

46.    Each of NTI's Collateral Pools had investment guidelines that were set forth in a collateral schedule which required NTI to manage the Collateral Pools in the manner necessary to preserve capital and provide for liquidity. For example, the Core USA Collateral Pool schedule stated, "[c]ash [c]ollateral of the Core U.S.A. Collateral Section is invested to seek to maximize current income to the extent consistent with the preservation of capital and

maintenance of liquidity...." *The Northern Trust Company Securities Lending Collateral Schedule, Core U.S.A. Collateral Section*. (Ex. 24.) Contrary to the manner in which the Northern Trust Defendants operated the securities lending program, the collateral schedule did not state that the Plans or lenders bore the full risk of any principal loss by the Lending Agent, nor did it authorize the Lending Agent to expose the Collateral Pools to a level of risk out of step with the incremental return that the securities lending program purported to provide to the Funds.

**ANSWER TO PARAGRAPH 46:**  To the extent this paragraph purports to describe the cited documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

47.    Northern invested the collateral it received on behalf of the Lending Funds in at least three different Collateral Pools, including, but not limited to, the Core USA Collateral Pool ("Core USA") and a Custom Collateralized Pool consisting of a combination of two pools, the Short Term Investment Fund ("STIF"), and the Short Term Extendable Portfolio ("STEP"). Upon information and belief, the Lending Funds in the Class may also have had their securities lending cash collateral invested in the Core Collateral Pool, the European Core Collateral Pool, the Global Core Collateral Pool, and/or the Core Select Collateral Pool, or other unspecified Northern Trust Collateral Pools. *See Northern Trust's Actions to Support Clients*, N002101. (Ex. 22.) The chart below shows some of the Collateral Pools that the Defendants used for Plaintiffs' cash collateral reinvestments:

| Northern Trust Lending Funds | Collateral Pools for the Lending Funds |
|---|---|
| **Aggregate Bond Fund-Lending** | STIF/STEP (for 40% of the fund) and Core USA (for 60% of the fund) |
| **Russell 2000 Fund-Lending** | Core USA |

26

| **Northern Trust Lending Funds** | **Collateral Pools for the Lending Funds** |
|---|---|
| **S&P 500 Equity Fund-Lending** | Custom Cash Collateral (75% in STEP, and 25% in STIF). |
| **Short Term Government Fund-Lending** | Core USA |

**ANSWER TO PARAGRAPH 47:** Defendants deny the allegations of this paragraph.

### a.     STEP Pool.

48.     The Short Term Extendible Portfolio (STEP) Pool was an ultra short duration total return fund that attempted to outperform high grade, short term money market instruments. *NTGI Collective Short Term Extendable Portfolio Fund Declaration, January 31, 2006*. (Ex. 11.) The STEP Pool was a market value basis fund and the fund was valued daily to reflect market prices. *Id*.

**ANSWER TO PARAGRAPH 48:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

### b.     STIF Pool.

49.     The Short Term Investment Fund (STIF) Pool was maintained as short term investment fund, whose assets are valued on a cost, rather than market value basis, and was intended to be composed of high-grade money market instruments with short maturities. *NTGI Collective Short Term Investment Fund Declaration*, May 31, 2007 (Ex. 8.) The STIF was required to maintain a dollar-weighted average portfolio maturity of 90 days or less. *Id*.

**ANSWER TO PARAGRAPH 49:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations

inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

### c. Core USA Pool.

50. The Core USA Collateral Pool was a large commingled collateral pool that had upwards of $ 70 billion in assets during the relevant time period. This pool was used for the Northern Trust Russell 2000 Fund, and the Short Term Government Fund, among others. The net asset value of the Core USA Collateral Pool was maintained on a constant $1.00 basis.

**ANSWER TO PARAGRAPH 50:** To the extent this paragraph purports to describe investment guidelines applicable to Core USA, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants admit that, at a point in time, Core USA held as much as $70 billion in assets, and that, for a period of time, certain collateral from the securities lending activities of the index funds referenced in this paragraph was invested in Core USA. Defendants deny the remaining allegations of this paragraph.

### 1. Northern Trust's Mismanagement of the Collateral Pools.

51. NTI invested the Collateral Pools, worth billions of dollars, in debt instruments, bonds, notes, and other fixed income instruments. Beginning some time no later than 2006, NTI began making imprudent investment decisions regarding the instruments it determined to use to invest the cash collateral. Given the massive size of the Collateral Pools, and Defendant NTI's purported sophistication and investment expertise, Defendant NTI was aware from publicly-known events in 2006 through the relevant time period that the market risk of asset-backed investments was increasing, and that it was becoming more difficult to sell fixed-income investments such as those held in the Collateral Pools into the market. Indeed, the Northern Trust Defendants cannot deny their knowledge of these circumstances in light of public statements at

the time by, among others, Northern Trust's own economists regarding the increased risk the housing bubble posed to the economy.

**ANSWER TO PARAGRAPH 51:**    To the extent the first sentence of this paragraph purports to describe collateral pool guidelines, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.    Answering further, Defendants admit that cash collateral was invested in fixed-income instruments pursuant to and in compliance with such guidelines.    Defendants deny the remaining allegations of this paragraph.

52.    Paul L. Kasriel is Northern Trust's Senior Vice President and Chief Economist, and Northern Trust's website states that "[i]n January 2009, The Wall Street Journal and Forbes cited Paul as one of the few who identified early on the formation of the housing bubble and foresaw the economic and financial market havoc that would ensue after the bubble inevitably burst." Northern Trust Corp., http://www.northerntrust.com/ (follow "Insights & Research" hyperlink, then follow "Economist Biographies" hyperlink) (last visited Oct. 15, 2009). Indeed, the news articles on the condition of the economy in general and the housing market in particular frequently cited the bearish assessment of Mr. Kasriel or other Northern Trust economists regarding the housing market and the impending sub-prime crisis:

- "Housing is in a recession. It's not that the whole economy is in a recession, but housing is in a recession." Sharon Stangenes, *Housing chill less severe in Midwest; New construction firmer in the region*, Chi. Trib., July 20, 2006, at Business 2 (quoting Paul Kasriel) (Ex. 48);

- "Additional price declines [in the housing market] should not be surprising . . . . We have a recession in the housing market . . . . Usually it takes two or three years to stabilize." Mark Trumbull & Ron Scherer, *How long will housing slump last?* Christian Science

Monitor, Sept. 26, 2006, at USA 1 (quoting Asha Bangalore, an economist at Northern
Trust in Chicago) (Ex. 46);

- "This cumulative tightening of monetary policy is dragging down the overall economy,
and nowhere is it more apparent than in the housing sector." Knowledge @ W.P. Carey,
*The shape of things to come in the U.S. economy*, Nov. 22, 2006, (quoting Paul Kasriel).
(Ex. 41.) Kasriel further opined that because the housing market loomed so large in the
economic expansion of the past few years, he expected it to have "equal weight pulling
the economy down in the upcoming quarters." *Id.*;

- "A typical housing downturn sees a drop of 50 percent from the peak, and at this point we
are only about halfway there . . . ." Bill Sluis, *The Agenda, Coming this week*, Chi. Trib.,
Nov. 13, 2006 (quoting Paul Kasriel) (Ex. 45);

- "People who a year ago could have purchased a house with a subprime mortgage aren't
going to be able to purchase a home . . . . And many people who have subprime
mortgages that are now subject to rate reset will not be able to refinance. That means
increased foreclosures and more inventory on a market that already has too much." Chris
Isidore, Home prices: Don't expect quick rebound, CNNMoney.com, Mar. 9, 2007,
(quoting Paul Kasriel) (Ex. 44);

- "So you've got increased supply and reduced demand, and that's not a good
combination . . . . I think the housing recession is not over, that the subprime issues will
prolong it . . . ." Jamie Smith Hopkins, *Delinquencies Increase Among 'Subprime' Loans;
Credit Crunch Could Bring Extended Housing Slump*, Baltimore Sun, Mar. 15, 2007, at
1A (quoting Paul Kasriel) (Ex. 43);

- "Northern Trust economist Paul Kasriel says he saw no reason to revise his negative view

on housing this fall. He thought the speculation on the way up had led to a glut of homes on the market that couldn't be easily worked through, and he suspected there were lurking problems in the lax lending standards that helped fuel the latter stages of the boom." Justin Lahart, *Ahead of the Tape*, Wall St. J., Mar. 19, 2007, at C1 (Ex. 47); and

- "We never really extended credit to people who have no known ability to pay it back and have no skin in the game . . . . It's uncharted territory . . . . How bad it's going to get, we don't know . . . . We'll find out." Justin Lahart, *Stock Market Quarterly Review – Essay: Denouement of Subprime Story Yet to Be Written – Ripples From the Downturn May Dictate the Fate of Several Parts of the Economy*, Wall St. J., Apr. 2, 2007, at C9 (quoting Paul Kasriel) (Ex. 42).

**ANSWER TO PARAGRAPH 52:** To the extent this paragraph purports to describe various documents and articles, Defendants refer to those documents and articles for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

53. At a minimum, in light of Northern Trust's own statements regarding the risks facing the housing market, Defendants should have taken steps to ensure that the fixed income investments in the Collateral Pools were not overly exposed to problems in the housing sector, including the subprime sector, in light of the Company's own public statements regarding the increased risks in this sector and to the larger economy.

**ANSWER TO PARAGRAPH 53:** Defendants' actions were prudent at all times and, to the extent this paragraph alleges that Defendants failed to act prudently, Defendants deny those allegations and any remaining allegations of this paragraph.

a. **Early Warning Signs of Collateral Pool Problems.**

54.     By 2007 it was abundantly clear that NTI had failed to properly select investments for some of the Collateral Pools, and had failed to divest or sell holdings from the Collateral Pools before it was imprudent to continue holding them. Internal Northern Trust documents indicate that by August 2007, the Northern Trust Defendants were fully aware of the liquidity crisis in the market and the fact that the credit markets were freezing, and it was becoming more difficult to sell fixed-income investments into the secondary markets, including those fixed-income investments held by the Collateral Pools. *Securities Lending Update*, *September 25, 2008*. (Ex. 14.)

**ANSWER TO PARAGRAPH 54:**  To the extent this paragraph purports to describe referenced documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants' actions were prudent at all times and, to the extent this paragraph alleges that Defendants failed to act prudently, Defendants deny those allegations and Defendants deny any remaining allegations of this paragraph.

55.     These early warning signs of problems with Northern Trust's Collateral Pool investments are clear from both Northern Trust's third quarter 2007 Earnings Call, and from reviewing the 2007 investment performance of some of the Collateral Pools. During its October 17, 2007, earnings call, Steven L. Fradkin, Northern Trust's Executive Vice President and Chief Financial Officer, reported that the "credit market environment in this year's third quarter had a negative impact on securities lending results." Bloomberg Transcript, Northern Trust Corp. Q3 2007 Earnings Call, October 17, 2007, p. 5. (Ex. 39.) Fradkin went on to state that the credit market disruption had negatively impacted returns in "one cash collateral investment fund" but did not disclose which Collateral Pool was affected. *Id*. Northern Trust's documents from 2007 reveal that it was likely the STEP Pool's investment return which had the negative returns and

lagged its index return by over 2%, (the STEP Pool had a total return of 3.27% whereas its benchmark index, 1 month LIBOR had a return of 5.31%). *Quantitative Index Review, NTGI Collective Short Term Extendable Portfolio Performance.* (Ex. 13.)

**ANSWER TO PARAGRAPH 55:**  To the extent this paragraph purports to describe the cited documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

56.    Despite these warning signs, the Defendants undertook no remedial efforts to slow or stop the Funds' securities lending activities, or to change the investments that the Pools were had made. NTI continued to invest the Collateral Pools in the same types of risky and subprime fixed-income (debt) instruments as it always had. These instruments included, but were not limited to, bank time deposits, repurchase agreements, corporate bonds, commercial paper, or asset-backed securities under which periodic interest payments were made and payment of principal was due upon maturity. Later, some of these same instruments defaulted or became illiquid, causing substantial losses to the Plans.

**ANSWER TO PARAGRAPH 56:**  Defendants deny the allegations of this paragraph.

57.    As demonstrated by the poor investment performance of the Collateral Pools during the relevant period, NTI imprudently invested the cash Northern received from Borrowers in Collateral Pool investments that had substantial exposure to asset-backed securities and the risky subprime mortgage sector.

• The STIF and Core Select Pools were both invested in two structured investment vehicles (SIVs) that breached their capital value triggers and were downgraded in early In February of 2008, Northern Trust issued a press release, and also filed a Form 8-K announcing its decision to prop up eight Northern Trust-managed cash funds, including

33

two Collateral Pools, the STIF, and the Core Select Pool, as a result of Northern Trust's investment of $550 million in two SIVs sponsored by Standard Chartered Bank, Whistlejacket Capital LLC, and White Pine Finance LLC. Bloomberg Transcript, Northern Trust Corp. Business Update Call, February 22, 2008, p. 1. (Ex. 36.) Northern Trust's decision to prop up the funds came after Whistlejacket was downgraded by the rating agencies.

- Similarly, the STEP Pool included risky investments in the CIT Group which had an underperforming home lending business that it sold in mid 2008, and ratings of only A- from Standard & Poors on the STEP holdings as of August 31, 2008. *Securities Lending Collateral Pool Update*. (Ex. 13.) CIT Group has since declared bankruptcy, and NTI was forced to sell the CIT Group investments at a substantial loss for the Funds. Other risky investments in STEP's portfolio included: (1) Capmark Financial Group which had significant exposure in the commercial mortgage sector, and ratings of only BBB- from Standard & Poors on the STEP holdings as of August 31, 2008; and (2) iStar Financial Inc., a finance company focused on the commercial real estate industry, and ratings of only BBB from Standard & Poors on the STEP holdings as of August 31, 2008. *Id*. Rather than being highly rated investment securities, these ratings on the STEP Pool's holdings from Standard & Poors all indicate that the securities were highly susceptible to adverse economic conditions or changing circumstances in terms of the obligor's capacity to meet its financial commitment, something that Defendants were well aware was likely to happen in the housing sector from as early as 2006.

**ANSWER TO PARAGRAPH 57:**  To the extent this paragraph purports to describe the cited documents, Defendants refer to those documents for their content and deny any allegations

inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

58.     Upon information and belief, NTI's Collateral Pool investments constituted violations of NTI's investment manager agreements with the Plans. Pursuant to the agreements, NTI contractually agreed with each Plan not to enter into any transactions not authorized by the Investment Guidelines in a manner which would cause the investment accounts not to achieve their respective investment objectives. (Ex. 6, § 3.) However, NTI, which was aware of weaknesses in the economy, and the housing sector, continued to invest the Pools in risky securities.

**ANSWER TO PARAGRAPH 58:**  Defendants deny the allegations of this paragraph.

59.     As a result of NTI's investment imprudence, market events in early 2008 only exacerbated the investment problems that the Collateral Pools had displayed in 2007. Thus, in March, 2008, the STEP Pool earned a return of -1.35%. (Ex. 1.)

**ANSWER TO PARAGRAPH 59:**  Defendants deny the allegations of this paragraph.

60.     In April of 2008, Northern Trust disclosed performance problems in the Lending Funds' Collateral Pools to the Plans. *See Letter from Guy J. Sclafani to Gregory Williamson*, April 8, 2008. (Ex. 1.) Sclafani, Northern Trust Global Investments Vice President wrote, "In March, STEP earned a return of -1.35% . . . . Prices on securities held by STEP have fallen, dramatically in some cases, more because of the reduced liquidity than a reduction in creditworthiness."

**ANSWER TO PARAGRAPH 60:**  To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

61.     As the fiduciary for Plans' investments in the Collateral Pools, charged with the highest duty known to law, NTI should have carefully evaluated the risks facing the Pools, adequately disclosed to the Plans the risk they were facing in exchange for the fees they were paying, and acted promptly and decisively to limit losses to the Collateral Pools by decreasing risk in the Pools and otherwise ensuring prudent investment of the Collateral Pools.

**ANSWER TO PARAGRAPH 61:** To the extent this paragraph purports to describe legal duties or the legal effect of various agreements, no answer to such legal conclusions is required. To the extent that this paragraph purports to claim that Defendants' conduct violated contractual requirements, Defendants deny those allegations and any remaining allegations of this paragraph.

### b.     Collateral Pool Performance Worsens in Mid-2008.

62.     While the problems with the STEP Pool's performance were evident during 2007, during mid 2008 its performance continued to deteriorate further. As of May 31, 2008, the STEP Pool had a market value of $13,691,333,575.08, with an average maturity of 48 days. The Fund was distributed such that 57.50% was in corporate debt instruments, 6.4% in banking, and 15.7% in cash equivalents. By August 31, 2008, the STEP Pool's market value had declined over $2 billion, and had a market value of $11,426,574,645.96 with an average maturity of 45 days. The Fund was distributed such that 63.7% was in corporates with an additional 7.0% in banking, 10.3% in mortgage-backed securities, 6.1% in commercial MBS, and only 5.9% in cash equivalents or 1.7% Treasuries. *Quantitative Index Review, NTGI Collective Short Term Extendable Portfolio Performance*. (Ex. 13.) As of the end of August 2008, the benchmark return for the Pool, 1 month LIBOR was 1.82%, while the Pool's return was -.36%. *Id*.

**ANSWER TO PARAGRAPH 62:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations

36

inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

63. Like the STEP Pool, the Core USA Collateral Pool also suffered significant declines in value during 2008. As of May 31, 2008, the value of the Core USA Collateral Fund was $68.02 billion, but by August 31, 2008, its value had declined nearly $6 billion to $62.13 billion. *Northern Trust Global Investments, Investment Profile: Core USA Cash Collateral Fund May 31, 2008*. (Ex. 20); *Quantitative Index Review, Investment Profile: Core USA Cash Collateral Fund August 31, 2008*. (Ex. 13.)

**ANSWER TO PARAGRAPH 63:** To the extent this paragraph purports to describe the cited documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

64. The STIF Pool too suffered declines in value during this time. As of May 31, 2008, the STIF Pool had a market value of $36.97 billion, with an average maturity of 48 days. The Fund was distributed such that 12.30% was in corporates, 21.70% in banking, and 35.20% in cash equivalents. Additionally, of the securities in the fund, 11% was commercial paper with 6.2% in asset backed commercial paper, and 21.80% fixed rate notes or bonds, 15.10% in variable rate notes, including 1.5% issued by SIVs. By August 31, 2008, the STIF Pool's market value had decreased to $35.1 billion, with an average maturity of 5 days, and the Fund was distributed so that 10.3% was in corporates, 29.0% in banking, and 33.9% in cash equivalents. *Quantitative Index Review, NTGI-Collective Short Term Investment Fund (STIF) August 31, 2008*. (Ex. 13.)

**ANSWER TO PARAGRAPH 64:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

65.     On September 15, 2008, Lehman Brothers declared bankruptcy. At the time, Defendants had both lent securities to Lehman Brothers as a Borrower, and had invested the Collateral Pools in Lehman Brothers' debt instruments.[3] As a result of the Lehman Brothers' bankruptcy and later events in the financial markets, assets in the Collateral Pools became even more illiquid, especially when stock prices plummeted. Certain of the NTI investments made with cash collateral received from Borrowers defaulted; and others were marked down in value and/or, upon information and belief, have become so illiquid that such investments could be sold, if at all, substantially below the values at which they were carried by the Collateral Pools. Collateral Pool fund holdings that were declared permanently impaired included those issued by Lehman Brothers, Washington Mutual, and the Reserve Fund. *Northern Trust Collateral Deficiency*, N002094. (Ex. 22.)

**ANSWER TO PARAGRAPH 65:**  To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

66.     On September 19, 2008, NTI declared that there was a collateral deficiency in four Collateral Pools, including the Core USA Collateral Pool. Northern Trust also announced that one additional Collateral Pool had experienced a "loss in value." The amount of the

---

[3] Lehman Brothers bankruptcy filing affected both Northern's Borrower agreements, and the value of the instruments in NTI's Collateral Pools. After Lehman Brothers filed for bankruptcy, Northern declared Lehman Brothers International Europe, ("LBIE") in default under the terms of the applicable borrower agreements, and all collateral became available to compensate clients that had outstanding loans to LBIE per those agreements. Northern began liquidating all collateral and repurchasing securities, and crediting client accounts. Ninety-five percent of the clients received replacement securities in full within two days. While Lehman Brothers Inc ("LBI") had not filed for bankruptcy, Northern Trust also recalled all loans outstanding with LBI, and by September 17, 2008, had recalled 77% of the value of securities on loan to LBI. On September 17, 2008, Northern Trust also declared LBI in default under the Borrower Agreement. *Northern Trust Borrowers*, N002090. (Ex. 22.)

collateral deficiency was calculated based on the difference between book value and vended (as opposed to liquidation) prices at that time. *Securities Lending Update, September 25, 2008*, N000167. (Ex. 14.) Approximately $100 million of this collateral deficiency was attributable to Lehman Brothers' bonds, which were impaired and written down. The Plans, and all other investors in Collective Trusts that invested in the Core USA Collateral Pool at that time, had pro rata exposure to these impairments and write-downs. Declaring a collateral deficiency allowed the net asset value of the Core USA Collateral Pool to return to $1.00, which was the value necessary to repay borrowers. As a result of the collateral deficiency, NTI posted a "payable" to each of the Plans that, through Collective Trust investments, participated in the Core USA Collateral Pool. This "payable" was equal to each Plan's proportionate share of the collateral deficiency, and became a debt owed by the Plans to the Defendants. Thus, the imprudent investment decisions made by NTI regarding the holdings of the Collateral Pools, resulted in sudden and substantial illiquid holdings for the Pools when the debt market collapsed in 2008.

**ANSWER TO PARAGRAPH 66:**  To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

67.     Northern Trust's September 19, 2008, collateral deficiency declaration also extended to the STEP Pool, where three assets (securities issued by Lehman Brothers Holdings, Theta Finance and Sigma Finance) had become permanently impaired. These impaired securities were distributed from the STEP Pool into a liquidating account, and all Funds with ownership of the STEP Pool received a pro rata interest in the liquidating account and were required to pay the full amount of the estimated impairment. In September 2008, the total value of the STEP Pool

declined in value by 7.57% to approximately $10.4 billion. By the end of October 2008, NTI reported internally that there was *no* liquidity in the STEP Pool.

**ANSWER TO PARAGRAPH 67:** Defendants deny the allegations of this paragraph.

68.    As a result of the collateral deficiency, the Plans were immediately required to repay principal losses not previously passed on to them. *Redemptions – Common and Collective Funds*, N002177. (Ex. 23.) Thus, the Plans' investments in the Collective Trusts were diminished by far more than the amount of a normal tracking error when compared to their respective Fund benchmarks. As the securities borrowers demanded the return of collateral that Northern Trust had invested in illiquid, longer-term investments (such as derivatives and mortgage-backed or asset-backed securities) contained in the Collateral Pools, the Plans were forced to realize immediate losses at the nadir of the market, and to book these losses because the Collateral Trusts could no longer hold the investments to duration.

**ANSWER TO PARAGRAPH 68:** Defendants deny the allegations of this paragraph.

      c.    **Northern Trust Locks Down Plan Assets Invested in Lending Funds and Imposed Draconian Withdrawal Restrictions on Plans.**

69.    Following NTI's declaration of the collateral deficiency in mid-September 2008, many clients sought to exit Defendants' funds and accounts, seeking immediate liquid payouts. For example, the retirement plans of BP, and investors from the University of Washington unsuccessfully "tried to withdraw entirely from four Northern Trust Corp. Funds engaged in securities lending." Eleanor Laise, *401(k)s Hit by Withdrawal Freezes - Investors Cry Foul as Some Funds Close Exits*, Wall St. J., May 5, 2009. Instead of allowing these clients to exit as they had in the past, NTI implemented new withdrawal guidelines and restrictions for exit from

the Lending Funds that were not consistent with the Declaration of Trust for the Collective

Trusts. *Client Withdrawal Guidelines Direct and Indirect Investors, Revised 10/14/08.* (Ex. 17.)

**ANSWER TO PARAGRAPH 69:** To the extent this paragraph purports to describe various

documents, Defendants refer to those documents for their content and deny any allegations

inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

70. NTI's new withdrawal guidelines required that Plans that sought to discontinue

using their investment management services repay NTI for the losses incurred when NTI

mismanaged the Collateral Pool investments. For Plans in the Core USA Collateral Pool, the

portfolio manager was instructed to liquidate a representative sample of the investments in

partial repayment of the Borrower, (with Defendants also reserving their right to process the

entire Core USA redemption in-kind), with any balance owed to the Borrower then deducted

from a Plan's redemption proceeds, which meant, in practical terms, that Plans were issued an

account payable from the Collateral Pool Trust reflecting the reduced value at which the illiquid

securities were sold. *Id.* For clients in the STIF/STEP Blend Pools, the Plans' pro rata share of

units in the Pool was to be distributed in-kind into a liquidation account, with the STEP Pool

units further segregated and distributed in-kind into a liquidation account until the Plan directed

NTI to sell the distributed securities. Notably, a Plan that further took the step to request the in-

kind distribution from the Defendants would "trigger an additional liability payable to Northern

Trust." *Id.* This loss was in addition to the reimbursement of principal losses to Defendants by

the Plans following the declaration of the collateral deficiency, because this loss stemmed from

the conversion of additional unrealized losses to realized losses as a consequence of the in-kind

distribution. *Id.*; (Ex. 23).

**ANSWER TO PARAGRAPH 70:** To the extent this paragraph purports to describe the cited

documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

71. NTI's requirement that Plans seeking to leave the Index Lending Funds make a payment to the Collective Trust to cover the reduced value of the illiquid securities in their Fund's Collateral Pools was unprecedented and self-serving. Previously, in cases of unrealized losses in the Collateral Pools, Northern Trust had assumed some of the unrealized losses contingently, under the assumption that the losses were only temporary. However, in the fall of 2008, securities lending clients were required to repay principal losses previously not passed to them, but treated instead as negative income. *Redemptions - Common and Collective Funds Redemption, N002177.* (Ex. 23.) Given that it was NTI's imprudent and negligent (at the very least) actions that led to the losses in the Collateral Pools, the Defendants, and not the Plans' harmed by NTI's imprudence should have made up the losses to the Collateral Pools.

**ANSWER TO PARAGRAPH 71:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

### 2. Northern Trust's Flawed and Ineffective Risk Management Program.

72. Northern Trust's risk management efforts were flawed and ineffective, as demonstrated by the tremendous market risk that the Plans were forced to bear when Northern Trust declared the collateral deficiency in the Funds' Collateral Pools. Northern Trust's risk management program was overseen by Northern's Securities Lending Collateral Committee. *Northern Trust Global Securities Lending, October 2008, N002095*, (Ex. 22.) However, in effect, this risk management program was primarily designed to protect Northern Trust, rather than the Plans, whose securities were lent. In relevant part, the Collateral Committee's role included both

42

evaluating the asset quality, client base, pool liquidity, market environment, and market value of the underlying assets, *and* determining whether there was a collateral deficiency and requiring shortfalls to be repaid to Northern by all the Plans.

**ANSWER TO PARAGRAPH 72:** Defendants deny the allegations of this paragraph.

73. Northern Trust's self-serving approach to risk management in seeking to protect its own bottom line, but not the Plans for which it served as Investment Manager and Lending Agent is also evidenced in the contract NTI set up *with Northern* to govern the securities lending agreements. For example, the Lending Agreement stated that "the risk of any loss of collateral or investment of cash collateral (including a loss of income or principal, or loss of market value)" was to be allocated pro rata among all participating lenders in the case of collateral deficiency, and that any loss resulting from insufficiency of collateral not recoverable from the borrower, or within the scope of the Lending Agent's obligations would be "borne solely by the Lender." *Lending Agreement, August 1, 2006*, § 3.5. (Ex. 3.)

**ANSWER TO PARAGRAPH 73:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

74. Despite being contractually required to fully inform Plan fiduciaries of this allocation of risk, upon information and belief, this crucial information was not adequately conveyed to the Plans' fiduciaries. While the Lending Agreement contained an Annex requiring that Northern provide the "Authorizing Fiduciary" (referring to a fiduciary for each Plan) with the information needed to determine whether authorization for lending of the Plan's securities should be granted to Northern, upon information and belief, the Lending Agreement was

43

routinely not provided to the Plans' fiduciaries and/or the Defendants did not require that the Authorizing Fiduciaries actually sign these Annexes. (Ex. 3.)

**ANSWER TO PARAGRAPH 74:**  To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

75.     Thus, NTI as Trustee of the Collective Trusts negotiated and entered into the Lending Agreements directly with Northern, and in doing so, obligated each of the Lending Funds (and indirectly the Plans) to shoulder the responsibility for any collateral deficiency for the loaned securities created by the imprudent management of the Collateral Pools by NTI. However, this obligation was not adequately disclosed to the Plans' fiduciaries. In addition, to the extent that this information was disclosed to some degree, Northern Trust did not inform Plan fiduciaries of the potential extreme risk of loss of Plan assets caused by Defendants' mismanagement of the securities lending program.

**ANSWER TO PARAGRAPH 75:**  Defendants deny the allegations of this paragraph.

**E.      The Plans Suffered Injury through Northern Trust's Securities Lending Practices.**

76.     Each of the Funds in which Plaintiff Diebold and Plaintiff Hundt's Plans are invested was benchmarked to a stock or bond index. As a result of the imprudence of NTI's Collateral Pool reinvestment strategy, the Funds have underperformed their respective benchmarks, and now also include securities that NTI selected for the Pools that are worthless, and considered permanently impaired. As of July, 2009, assets from the STEP Pool that NTI had moved to the STEP Liquidation Fund were valued in the $.15-.17 range for Lehman cash bonds, and the Theta and Sigma investments remained valued at $0. *Northern Trust, STEP & STIF Comprehensive Report for July 2009*, Market Commentary, p. 3. (Ex. 37.)

44

**ANSWER TO PARAGRAPH 76:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations regarding Plaintiffs' investments.  To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith.  Defendants deny the remaining allegations of this paragraph.

77.     The Collateral Pools that Northern Trust managed varied widely in asset size. During the summer of 2008, one Pool had over $73 billion in assets, (Core USA Collateral Fund) while another had less than $3 billion (Core Cash Collateral Fund). *Securities Lending Update, September 25, 2008.* (Ex. 14.) The value of the Pools declined precipitously in mid 2008, causing severe losses in each Pool. As of October 20, 2008, the total unrealized losses in STEP equaled approximately 10% of the fund's total market value. Northern Trust has informed Plans that they are solely responsible for the losses and must repay the Defendants for the losses.

**ANSWER TO PARAGRAPH 77:**  To the extent this paragraph purports to describe various documents, including documents allocating responsibility for principal losses on invested cash collateral to investors, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

78.     As a result of the losses in the Pools, the Lending Funds, (and indirectly the Plans) collectively suffered substantial investment losses. For example, as of August 31, 2008, the NTGI-QM Collective Daily Aggregate Bond Fund had lost approximately $20 million (between 2007 and 2008, the Fund had approximately $16 billion in assets, and the difference in returns of -0.125% off of its benchmark from securities lending represents a loss of approximately $20 million). Similarly, as of the August 31, 2008, the S&P 500 Fund had lost approximately $36.5 million from the prior year (between 2007 and 2008, the NTGI-QM

45

Collective Daily S&P 500 Fund held approximately $25 billion in assets, and a difference in returns of -0.146% for a fund holding $25 billion represents a loss of $36.5 million). Notably, these estimates of losses arose before the tremendous downturn in the markets in September of 2008. *Northern Trust Global Investments, BP-0016308*. (Ex. 20); *Quantitative Index Review*. (Ex. 13.)

**ANSWER TO PARAGRAPH 78:** To the extent this paragraph purports to describe various documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

79. As a result of the investment losses borne by the Funds, on September 25, 2008, Northern Trust Corporation announced that it would contribute approximately $150 million to make up a portion of the collateral deficiency in five securities lending collateral pools, including the Core USA Pool, and the Core, European Core, Global Core and Core Select Funds. *Securities Lending Update, September 25, 2008*. (Ex. 14.) This payment was not sufficient to cover the losses suffered by the Funds in these Collateral Pools.

**ANSWER TO PARAGRAPH 79:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny that the referenced payment was made to the collateral pools, and deny any remaining allegations of this paragraph.

80. Further, the Funds may continue to incur additional losses resulting from: (i) additional defaults of securities held in the Collateral Pools, (ii) additional declines in the value of securities held in the Collateral Pools, and (iii) realization of losses upon the sale of illiquid securities held in the Collateral Pools necessitated by the repayment of securities loans.

**ANSWER TO PARAGRAPH 80:** To the extent that this paragraph purports to allege that

Defendants are responsible for any future losses, Defendants deny the allegations of this paragraph. Defendants admit the allegations of this paragraph to the extent that it purports to claim that it is possible that the Collateral Pools, as with any investment, "may" incur losses in the future.

**F.      ERISA Imposes Stringent Fiduciary Duties on Defendants.**

81.      ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in relevant part, that a civil action for breach of fiduciary duty may be brought by the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan for relief under ERISA § 409, 29 U.S.C. § 1109.

**ANSWER TO PARAGRAPH 81:**  The allegations of this paragraph state legal conclusions to which no answer is required.

82.      ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in relevant part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

**ANSWER TO PARAGRAPH 82:**  The allegations of this paragraph state legal conclusions to which no answer is required.

83.      ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide in relevant part that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to

47

participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

**ANSWER TO PARAGRAPH 83:** The allegations of this paragraph state legal conclusions to which no answer is required.

84. These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.2 (2d Cir. 1982). They entail, among other things:

> (a) The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including, in this case, the investment alternatives of the Collective Investment Funds in which Plan assets were invested;
>
> (b) The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves, including, in this case, the Northern Trust Defendants' personal interests in receiving some of the cash collateral from securities lending; and
>
> (c) The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries, including, in this case, with respect to the grave risks of securities lending.

**ANSWER TO PARAGRAPH 84:** The allegations of this paragraph state legal conclusions to which no answer is required.

85. According to DOL regulations and case law interpreting this statutory provision, in order to comply with the prudence requirement under ERISA § 404(a), a fiduciary must show

that: (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or course of action involved, including the role that the investment or course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

**ANSWER TO PARAGRAPH 85:**  The allegations of this paragraph state legal conclusions to which no answer is required.

86.     Again, according to DOL regulations, "appropriate consideration" in this context includes, but is not necessarily limited to:

- A determination by the fiduciary that the particular investment or course of action is reasonably designed, as part of the portfolio, to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for return associated with the investment or course of action; and

- Consideration of the following factors as they relate to such portion of the portfolio:

    o   The composition of the portfolio with regard to diversification;

    o   The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and

    o   The projected return of the portfolio relative to the funding objectives of the plan.

**ANSWER TO PARAGRAPH 86:**  The allegations of this paragraph state legal conclusions to which no answer is required.

87.     The Northern Trust Defendants failed in the discharge of these duties, and, generally, in their duty to manage the assets of the Plans prudently, loyally, and in the best interests of the Plans and the Class.

**ANSWER TO PARAGRAPH 87:**  Defendants deny the allegations of this paragraph.

G.      **Defendants Earned Substantial Fees While Grossly Mismanaging the Collateral Pools and Causing the Plans to Suffer Substantial Losses.**

88.      Defendants' securities lending program operated in an extremely risky and dangerous manner for the Plans that participated in it, but was highly profitable for Defendants. Despite Northern Trust's mismanagement of the Collateral Pools, since the third quarter of 2007, Northern Trust has collected over $300 million in fees from its securities lending programs.

**ANSWER TO PARAGRAPH 88:**  Defendants deny the allegations of this paragraph.

89.      On a monthly basis, NTI received a fee equal to a percentage of the net income earned through each Lending Fund's Collateral Pool income. According to Northern Trust, compensation from its securities lending comes from "sharing in our client's earnings." Northern Trust Corp. Annual Report (Form 10-K), at 26, Feb. 28, 2009. (Ex. 25.) NTI, however, did not share in any realized losses of these same Collateral Pool investments. Losses in the Collateral Pools were instead allocated pro rata to the Plans and other investors in the Collateral Pools.

**ANSWER TO PARAGRAPH 89:**  To the extent this paragraph purports to describe the cited document and the agreements governing securities lending, including the Securities Lending Authorization Agreement, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants admit that entities engaged in securities lending are liable for their pro rata share of principal losses resulting from the investment of collateral from the lending of securities, and deny that Defendants are liable for any such losses. Defendants deny any remaining allegations of this paragraph.

90.      On April 17, 2007, Northern Trust Corporation reported that in the first quarter of 2007, its securities lending fees totaled $46.0 million. Bloomberg Transcript, Northern Trust Corp. "Q1 2007 Earnings Call" April 17, 2007. (Ex. 38.)

**ANSWER TO PARAGRAPH 90:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

91. On October 17, 2007, Northern Trust Corporation reported that in the third quarter of 2007, its securities lending fees totaled $33.0 million. Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Record Third Quarter 2007 Earnings of $.93 per share, up 26% from the Prior Year," October 17, 2007. (Ex. 26.)

**ANSWER TO PARAGRAPH 91:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

92. On January 16, 2008, Northern Trust Corporation reported that in the fourth quarter 2007, its securities lending fees totaled $55.1 million. Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Record Full Year 2007 Operating Earnings of $3.66 per Share, up 22% from the Prior year. Reported Earnings are $3.24 per Share, up 8% from the prior year," January 16, 2008. (Ex. 27.)

**ANSWER TO PARAGRAPH 92:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

93. On April 15, 2008, Northern Trust Corporation reported that in the first quarter of 2008, its securities lending fees totaled $31.9 million. Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Record First Quarter 2008 Operating Earnings of $1.03 per

share, up 23% from Prior Year. Reported earnings are $1.71 per share, up 104% from Prior Year," April 25, 2008. (Ex. 28.)

**ANSWER TO PARAGRAPH 93:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

94. On July 16, 2008, Northern Trust Corporation reported that in the second quarter 2008 its securities lending fees totaled a record $149.9 million, up 104% compared with the prior year quarter reflecting "improved spreads on the investment of cash collateral and an approximate $25 million partial recovery of prior period unrealized losses in one mark-to-market investment fund." Press Release, Northern Trust Corp., "Northern Trust Corporation Reports Second Quarter 2008 Earnings of $.96 per share, up 4% from the Prior Year," July 16, 2008. (Ex. 29.)

**ANSWER TO PARAGRAPH 94:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

95. On January 21, 2009, Northern Trust Corporation reported that in the fourth quarter 2008 its securities lending fees totaled $44.2 million compared with $55.1 million in the fourth quarter of 2007, which Northern Trust stated reflected "lower volumes." Press Release, Northern Trust Corp., "Northern Trust News Release, "Northern Trust Corporation Reports Record Fourth Quarter Operating Earnings of $1.39 per Common Share, Up 43%," January 21, 2009. (Ex. 31.)

**ANSWER TO PARAGRAPH 95:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations

inconsistent therewith.  Defendants deny any remaining allegations of this paragraph.

96.     Thus, while the Plans were exposed to massive risk, and incurred substantial losses as a result of Northern Trust's imprudence, Northern Trust garnered hundreds of millions of dollars of no-risk fees.

**ANSWER TO PARAGRAPH 96:**  Defendants deny the allegations of this paragraph.

**H.     The Northern Trust Defendants Took Unreasonable Compensation for Themselves.**

97.     The Northern Trust Defendants violated ERISA through their self-dealing and taking unreasonable compensation for managing the securities lending program on behalf of the Lending Funds.

**ANSWER TO PARAGRAPH 97:**  To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required.  Defendants deny any remaining allegations of this paragraph.

98.     As shown above, the Northern Trust Defendants were (and are) fiduciaries responsible for managing the Plans' investments in the Lending Funds and Collateral Pools prudently and solely in the interests of the Plans and their respective participants and beneficiaries. The Northern Trust Defendants received investment advisory, custodial, trustee, and administrative fees for managing the Lending Funds.  In addition to investing and managing the Plans' assets in accordance with a given Lending Fund's stated objectives, the Northern Trust Defendants also invested Plan assets through their securities lending program.

**ANSWER TO PARAGRAPH 98:**  To the extent this paragraph states legal conclusions, no answer is required. To the extent this paragraph purports to characterize documents governing the relationships with various plans and funds, Defendants refer to those documents for their

contents and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such agreements or applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants deny those allegations. Defendants deny any remaining allegations of this paragraph.

99. Through the securities lending program, the Lending Funds, and the Plans indirectly, made securities available for loan. The Northern Trust Defendants set the terms and conditions, via the Lending Agreement, between the Lending Funds and Northern. Northern, acting as the "Lending Agent," decided which securities would be loaned to which borrowers, collected the collateral from the borrowers, and invested the collateral in one or more Collateral Pools.

**ANSWER TO PARAGRAPH 99:** Defendants deny that the Plans lent any of their securities, whether directly or indirectly, and deny the third sentence of this paragraph. To the extent this paragraph purports to characterize the referenced Securities Lending Authorization Agreement, or documents governing the relationships with various plans, funds, or borrowers, Defendants refer to those documents for their contents and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such agreements or applicable legal principles, no answer to such legal conclusions is required. Defendants deny any remaining allegations of this paragraph.

100. The Northern Trust Defendants established and managed the Collateral Pools and received investment advisory, custodial, trustee, and administrative fees for managing them. In addition, the Northern Trust Defendants took forty percent of the spread, that is, the income, after expenses and rebates, generated by the Collateral Pools. The Northern Trust Defendants

controlled all aspects of the securities lending program and all agreements and contracts created and executed thereunder.

**ANSWER TO PARAGRAPH 100:** Defendants deny the allegations of this paragraph.

101.   These arrangements were fraught with conflicts and self-dealing. The Northern Trust Defendants managed the Collective Trusts and purportedly represented the Lending Funds and the Plans in setting the terms of and executing the Lending Agreement with NTI acting as the "representative" of the Lending Funds and Northern representing itself. See Lending Agreement (Ex. 3.) Northern, as Lending Agent, then allocated to NTI the responsibility for managing the collateral via the Collateral Pools. Essentially, the Northern Trust Defendants negotiated with themselves the terms of their compensation, discretion, authority, and even liability. Not surprisingly, these arrangements led them to set and receive excessive and unreasonable compensation for themselves.

**ANSWER TO PARAGRAPH 101:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required. Defendants deny any remaining allegations of this paragraph.

102.   Although Northern received forty percent of the net income produced by the Collateral Pools pursuant to this self-dealing arrangement, in arm's length securities lending agreements, where the investors were represented by independent fiduciaries, Defendants received far less compensation. For example, Defendants' securities lending arrangements with the City Employees' Retirement System of Los Angeles reflects that as of November 1, 2007, that retirement system received 85% of securities lending income, in contrast to the 60% of securities lending income received by the Plans. In other words, Northern received 62.5% securities lending income when it negotiated at arm's length than it did when it set its own fees.

55

See Amended Schedule C to Securities Lending Authorization Agreement Between Board of

Administration of the City Employees' Retirement System of the City of Los Angeles and the

Northern Trust Company, November 1, 2007 (Ex. 49.)

**ANSWER TO PARAGRAPH 102:** To the extent this paragraph purports to advance the

prohibited transaction allegations dismissed by the Court, no answer is required. Defendants

deny any remaining allegations of this paragraph.

103.     Further, the forty percent received by Northern far exceeds industry standards.

**ANSWER TO PARAGRAPH 103:** Defendants deny the allegations of this paragraph.

104.     A survey of retirement plan sponsors reports that in 2011, over 50% of

respondents paid 15% of securities lending income to the lending agent. In prior years, the

survey reported that the prevalent fee split was 75/25 in favor of the plan. US Plan Sponsors on

Securities Lending, Collateral Management and Custody in 2011, at 20 (Ex. 50).

**ANSWER TO PARAGRAPH 104:** To the extent this paragraph purports to describe the cited

document, Defendants refer to that document for its content and deny any allegations

inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

105.     As one financial columnist explained, a "few exemplary firms, like T. Rowe Price

Group and Vanguard Group, rebate all securities-lending income (net of expenses) back to the

funds that generated it. The total cost of Vanguard's securities-lending program is well under

1%, says Tom Higgins, chief financial officer of the funds. That suggests that most of the 30%-

to-50% toll charged by other fund managers is pure profit -- in effect, money for nothing." *Is

Your Fund Pawning Shares at Your Expense?*, Jason Sweig, Wall Street Journal, May 30, 2009

(Ex. 51).

**ANSWER TO PARAGRAPH 105:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

106. An August 2002 survey by Plansponsor.com found that the norm for division of securities lending income was between 70 and 80% to the lender, i.e., the investors. Charles Ruffel, *Lending Logic* (available at

http://www.plansponsor.com/MagazineArticle.aspx?id=6442460188&magazine=6442459) (Ex. 52).

**ANSWER TO PARAGRAPH 106:** To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

107. A leading consultant and investment advisor to retirement plans and other institutional investors, Enis Knupp & Associates, Inc., reported in an October 2003 article that securities lending agents typically receive 15 to 35% of the income from collateral investment. *Less is More: Securities Lending Revisited*, Enis Knupp & Associates, Inc., 2003 (Ex. 53). The trend for large investors, however, has been toward a split of 80-20 in favor of the investor. *Lending Logic*, supra. (Ex. 52).

**ANSWER TO PARAGRAPH 107:** To the extent this paragraph purports to describe the cited documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

108. A vice-president at Citibank, Brendan McCarthy, commented, "anyone over $1 billion in assets still at 60/40 should be talking to agent lenders ... and any large [investors] ($

billion and better) not at 80/20 should likewise be talking to lenders." *Lending Logic*, *supra*, (Ex. 52). Collectively the Lending Funds represented by NTI in its securities lending dealings with Northern held tens of billions of dollars in assets. But NTI did not use this massive bargaining power to negotiate reasonable compensation with Northern.

**ANSWER TO PARAGRAPH 108:**  To the extent this paragraph purports to describe the cited document, Defendants refer to that document for its content and deny any allegations inconsistent therewith.  Defendants admit that the referenced index funds collectively hold several billions of dollars in assets.  Defendants deny any remaining allegations of this paragraph.

109.    The Lending Funds at issue in this case collectively possessed billions of dollars of holdings. For example, the NTGI-QM Collective Daily Aggregate Bond Index Fund alone (fund number 029), had over $8 billion in assets at the end of 2009. See NTGI-QM Collective Daily Aggregate Bond Index Fund – Lending, 2009 Form 5500 at Schedule H, page 2. And the NTGI-QM Collective Daily S&P 500 Equity Index Fund (fund number 001), had over almost $14 billion in assets at the end of 2009. *See* NTGI-QM Collective Daily S&P 500 Equity Index Fund – Lending, 2009 Form 5500 at Schedule H, page 2. The Northern Trust Defendants, fiduciaries of the Lending Funds, of course failed to take advantage of the massive bargaining power and leverage to negotiate a favorable compensation arrangement for its clients. Instead, they gave themselves a sweetheart deal, 40% of the net lending income, which was not the product of arm's length negotiations.

**ANSWER TO PARAGRAPH 109:**  To the extent this paragraph purports to describe various documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants admit that the referenced index funds collectively hold

several billions of dollars in assets. Defendants deny any remaining allegations of this paragraph.

110. Each month, pursuant to the Lending Agreement (Ex. 3), Northern received compensation from the Collateral Pools, it engaged in a self-dealing transaction with the Plans' assets. Each Defendant was a fiduciary for the Plans, as alleged above. Therefore, each Defendant was, by definition, also a party-in-interest to the Plans.

**ANSWER TO PARAGRAPH 110:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required. To the extent this paragraph purports to describe various agreements, including the referenced Securities Lending Authorization Agreement, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such agreements or applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" and "party-in-interest" status are vague and undefined and, accordingly, Defendants deny those allegations. Defendants deny any remaining allegations of this paragraph.

111. In setting, receiving, and controlling their own compensation, as well as creating and managing the Collateral Pool investments, Defendants caused all of the securities lending transactions, from making the securities available for loan, to contracting with themselves, to investing the collateral in Collateral Pools, to managing the Collateral Pools, to receiving income from the Collateral Pools. These repeated violations over many years were breaches of their duty of loyalty under ERISA § 404(a) and violations of per se rules against self-dealing transactions under ERISA § 406.

**ANSWER TO PARAGRAPH 111:** To the extent this paragraph purports to advance the

prohibited transaction allegations dismissed by the Court, no answer is required. To the extent this paragraph purports to characterize the Securities Lending Authorization Agreement, or documents governing the relationships with various plans, funds, or borrowers, Defendants refer to those documents for their contents and deny any allegations inconsistent therewith. Defendants deny any remaining allegations of this paragraph.

112.    As a result of the Northern Trust Defendants' fiduciary breaches and self-dealing, the Plans and their respective participants and beneficiaries suffered hundreds of millions of dollars in losses. Every dollar collected by Defendants in excess of reasonable compensation was one dollar less for the Plans. Moreover, the Plans also suffered additional losses in the form of lost investment opportunity on the securities lending income wrongfully taken by Defendants for themselves. That income would have been reinvested in the respective Lending Funds and would have produced additional gains for the Plans.

**ANSWER TO PARAGRAPH 112:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required. Defendants deny any remaining allegations of this paragraph.

## I.    The Northern Trust Defendants Engaged in Prohibited Transactions.

113.    ERISA also prohibits certain transactions with plans involving "parties in interest" and fiduciaries, because of their high potential for abuse. See ERISA § 406, 29 U.S.C. § 1106; *see also Rutledge v. Seyfarth, Shaw, Fairweather & Geraldson*, 201 F.3d 1212, 1222 (9th Cir. 2000), amended by 208 F.3d 1170 (9th Cir. 2000) ("The prohibited transaction provision . . . protect[s] a plan's participants and beneficiaries from a depletion of plan assets through shady, inside deals . . . .").

**ANSWER TO PARAGRAPH 113:** To the extent this paragraph purports to advance the

60

prohibited transaction allegations dismissed by the Court, no answer is required.  To the extent this paragraph purports to characterize the cited ERISA provisions and the *Rutledge* opinion, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  To the extent the allegations of this paragraph state legal conclusions, no answer is required.  Defendants deny any remaining allegations of this paragraph.

114.    Because the Northern Trust securities lending program involved transactions between Plans and NTI and Northern—who were fiduciaries—the program would normally involve prohibited transactions. *See* ERISA § 406. Under the DOL's authority under ERISA, however, the DOL has provided for a class exemption, PTE 2006-16, 71 Fed. Reg. 63786, 63798, permitting certain loans of securities by employee benefit plans in what would otherwise be a prohibited interested party transaction pursuant to ERISA § 406(a).

**ANSWER TO PARAGRAPH 114:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required.  To the extent this paragraph purports to characterize the cited ERISA provisions and Department of Labor regulations, Defendants refer to those provisions and regulations for their content and deny any allegations inconsistent therewith.   To the extent the allegations of this paragraph state legal conclusions, no answer is required.  Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants deny those allegations.  Defendants deny any remaining allegations of this paragraph.

115.    PTE 2006-16 exempts lending of securities by plans to certain banks and broker-dealers—*provided that certain conditions are met*. Here, while the terms of the Investment Management Agreements that NTI entered into with each Plan, as well as the Fund Declarations, represented to Plan fiduciaries that Northern Trust's securities lending program would be

conducted in accordance with DOL PTE 2006-16, Northern Trust failed to comply with PTE

2006-16's requirements in a number of ways. Failure to comply with PTE 2006-16 in the

management of a securities lending program for an employee benefit program is a *per se*

violation of ERISA § 406.

**ANSWER TO PARAGRAPH 115:** To the extent this paragraph purports to advance the

prohibited transaction allegations dismissed by the Court, no answer is required. To the extent

this paragraph purports to describe various documents and agreements, Defendants refer to those

documents and agreements for their content and deny any allegations inconsistent therewith. To

the extent this paragraph purports to characterize the cited ERISA provisions and Department of

Labor regulation, Defendants refer to those provisions and regulation for their content and deny

any allegations inconsistent therewith. To the extent the allegations of this paragraph state legal

conclusions, no answer is required. Defendants deny any remaining allegations of this

paragraph.

116.    Northern Trust's failure to meet the requirements for an exemption pursuant to

PTE 2006-16, Section II, which would have removed the restrictions imposed by section

406(a)(1)(A) through (D) of ERISA, included, but was not limited to the following.

**ANSWER TO PARAGRAPH 116:** To the extent this paragraph purports to advance the

prohibited transaction allegations dismissed by the Court, no answer is required. To the extent

this paragraph purports to characterize the cited ERISA provisions and Department of Labor

regulation, Defendants refer to those provisions and regulation for their content and deny any

allegations inconsistent therewith. To the extent the allegations of this paragraph state legal

conclusions, no answer is required. Defendants deny any remaining allegations of this

paragraph.

117.     First, pursuant to PTE 2006-16, Section II(g), the exemption is not available unless all fees and other consideration received by the plan in connection with the loan of securities are reasonable. Here, the fees the Plans paid of 40% of the revenue earned from the collateral reinvestment were not reasonable in view of the risk that the Plans were required to assume — 100% of the risk of loss for Northern Trust's investment management of the Collateral Pools — and in view of prevailing industry rates for securities lending services as well as the rates Northern charged to securities lending clients pursuant to arm's length agreements. Thus, Northern Trust failed to meet the condition required under PTE 2006-16, Section II(g).

**ANSWER TO PARAGRAPH 117:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required.  To the extent this paragraph purports to characterize the cited Department of Labor regulation, Defendants refer to that regulation for its content and deny any allegations inconsistent therewith.  To the extent the allegations of this paragraph state legal conclusions, no answer is required. Defendants deny any remaining allegations of this paragraph.

118.     Second, under Section II(j), a plan must be able to terminate a loan at any time and the borrower must deliver certificates identical to the borrowed securities within five business days, or the time negotiated for such delivery by the plan and the borrower. Upon information and belief, when Plans attempted to terminate their participation in the securities lending programs, Northern Trust refused to deliver securities certificates to the lenders within five business days, and also required Plans to pay for receipt of the securities. Thus, Northern Trust failed to meet the condition for exemption required under PTE 2006-16, Section II(j) as well.

**ANSWER TO PARAGRAPH 118:**  To the extent this paragraph purports to advance the

prohibited transaction allegations dismissed by the Court, no answer is required. To the extent this paragraph purports to characterize the cited Department of Labor regulation, Defendants refer to that regulation for its content and deny any allegations inconsistent therewith. To the extent the allegations of this paragraph state legal conclusions, no answer is required. Defendants deny any remaining allegations of this paragraph.

119.    Further, Northern took unreasonable compensation for itself for managing the securities lending program. *Cf.* ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2)

**ANSWER TO PARAGRAPH 119:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required. Defendants deny any remaining allegations of this paragraph.

## VII.    CLASS ACTION ALLEGATIONS

120.    **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plans and the following class of similarly-situated persons (the "Class"):

> All qualified ERISA Plans, and the participants, beneficiaries, and named fiduciaries of those plans that invested or maintained investments between January 1, 2007 and the present (the "Class Period") in any Collective Trust managed or operated by The Northern Trust Company or Northern Trust Investments, N.A., where such Collective Trust invested Collateral received from borrowers of securities owned by such Collective Trust in one or more Collateral Pools managed or operated by Northern Trust Investments, N.A., or The Northern Trust Company.

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating the Defendants' fiduciary breach with respect to all of the Plans and participants in the class.

**ANSWER TO PARAGRAPH 120:** Defendants admit that Plaintiffs purport to bring a class

action, but deny that they are entitled to bring this action on behalf of a class.  Defendants deny all remaining allegations of this paragraph.

121.    **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA Plans throughout the country invested in these Collective Trusts during the Class Period, and sustained losses as a result of the Northern Trust Defendants' imprudent securities lending activities. For example, Schedule D to the Form 5500 filed by Defendants for the S&P 500 Fund for the fiscal year ending in July 2007 alone lists over 100 ERISA Plans as investors in the fund. Northern Trust Global Investments, NTGI-QM Collective Daily S&P 500 Equity Fund - Lending, Annual Return/Report of Employee Benefit Plan (Form 5500), at Schedule D, Part II (May 15, 2008). The S&P 500 Fund is but one of over fifty Collective Trusts that engaged in securities lending.

**ANSWER TO PARAGRAPH 121:** To the extent this paragraph purports to describe various documents, Defendants refer to those documents for their content and deny any allegations inconsistent therewith.  Defendants deny that this action may be maintained as a class action. Defendants deny the remaining allegations of this paragraph.

122.    **Commonality**. The claims of Plaintiffs and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants with regard to management of its securities lending program in which each Plan participated, and for which Defendants' conduct was the very same. First, with regard to each and every Plan, NTI agreed to serve as Investment Manager for the Plan; admitted that it was a fiduciary as defined by ERISA, agreed to follow specified "Investment Guidelines," had full discretionary authority

to manage the investment of assets of each Plan; and was paid a management fee for its services. Second, the Plans all invested in commingled funds set up by NTI pursuant to the *Declaration of Trust of the Northern Trust Global Investments Collective Funds Trust*, effective January 31, 2006, wherein NTI, as Trustee was authorized to lend securities from the Lending Funds in which all of the Plans' assets were invested. See Decl. of Trust § 3.07(d). (Ex. 2.) Third, NTI, as Trustee, contracted with Northern, as Lending Agent. Northern vetted the creditworthiness of Borrowers for all the lent securities, entered into Borrower Agreements with securities' Borrowers, lent the Lending Funds' securities to the Borrowers, collected the cash collateral to be put into the Collateral Pools that were managed by NTI, and charged fees to the Funds. *See Lending Agreement*, August 1, 2006. (Ex. 6.) Finally, every Plan in the putative class that was invested in the Collective Trusts suffered losses for exactly the same reasons – NTI's mismanagement of the Collateral Pools and collection of unreasonable securities lending compensation. When these Plans all suffered investment losses in 2007 and 2008 as a result of NTI's mismanagement of its securities lending Collateral Pools, Northern Trust stated that it intended to respond to every Plan's inquiries and request for divestment in exactly the same manner. As a result, Plaintiffs' Plans are similarly situated to every other Plan in the putative class.

**ANSWER TO PARAGRAPH 122:**   Defendants deny the allegations of this paragraph.

123.     Proceeding as a class action is particularly appropriate here because the Plans' assets were held in commingled funds, or Collective Trusts. The cash collateral Defendants further received was reinvested in commingled Collateral Pools managed by NTI, which treated any losses as proportional to all investors. Further, the Defendants purportedly instituted

draconian Fund withdrawal guidelines so as to treat all Plans uniformly. Therefore, Defendants' imprudent actions affected all Plans in exactly the same manner.

**ANSWER TO PARAGRAPH 123:** To the extent that this paragraph makes reference to the allocation of losses to investors pursuant to the Securities Lending Authorization Agreement or to the investment of cash collateral pursuant to that document, the investment guidelines, and the Fund Declarations, Defendants refer to those documents for their contents and deny any allegations inconsistent therewith. Defendants deny the remaining allegations of this paragraph.

124.     Furthermore, common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. The many questions of law and fact common to the Class include:

a.       Whether Defendants NTI and Northern are fiduciaries under ERISA;

b.       Whether Defendants NTI and Northern, in arranging for, selecting, executing the securities lending transactions, and reinvesting the cash collateral on behalf of the Funds in various investments selected by NTI, and retaining fees for the same, discharged their fiduciary duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to the participants and their beneficiaries;

c.       Whether Defendants' actions proximately caused losses to the Plans and, if so, the appropriate relief to which the Plans are entitled;

d.       Whether Defendants NTI and Northern received compensation, direct or indirectly, for example, through EquiLend, in connection with securities lending transactions involving the Plans' assets, and whether such compensation was reasonable; and

e.       Whether Northern received unreasonable compensation for its securities lending services.

**ANSWER TO PARAGRAPH 124:** Defendants deny the allegations of this paragraph.

125.     **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), and, thus,

their claims on behalf of the Plans are not only typical of, but identical to, a claim under this section brought by any other Class member. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same facts, using the same legal arguments to prove Defendants' liability, and would be seeking the same relief.

**ANSWER TO PARAGRAPH 125:** Defendants deny the allegations of this paragraph.

126. **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel that are competent and experienced in class action and ERISA litigation. Plaintiffs have no interests antagonistic to, or in conflict with those of the Class. Plaintiffs have undertaken to protect vigorously the interests of the absent members of the Class.

**ANSWER TO PARAGRAPH 126:** Defendants deny the allegations of this paragraph.

127. **Rule 23(b)(1)(A) &(B) Requirements**. Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

**ANSWER TO PARAGRAPH 127:** Defendants deny the allegations of this paragraph.

128.    **Rule 23(b)(2) Requirements**. Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, hereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties here because Defendants have averred that they sought to treat each Plan exactly the same.

**ANSWER TO PARAGRAPH 128:** Defendants deny the allegations of this paragraph.

129.    **Rule 23(b)(3) Requirements**. In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

**ANSWER TO PARAGRAPH 129:** Defendants deny the allegations of this paragraph.

## VIII.   CLAIMS FOR RELIEF

### COUNT I
**Against Northern Trust Investments, N.A. and The Northern Trust Company**
**For Failure to Prudently and Loyally Manage Plan Assets**

130.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

**ANSWER TO PARAGRAPH 130:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

131.    Under ERISA § 3(21), 29 U.S.C. § 1002(21), Defendants NTI and Northern were at all relevant times ERISA fiduciaries with respect to the Plans and the invested assets of the Plans.

**ANSWER TO PARAGRAPH 131:** To the extent this paragraph states legal conclusions, no answer is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

132. The scope of the fiduciary duties and responsibilities of the Northern Trust Defendants included discretionary authority or control respecting managing the assets of the Plans.

**ANSWER TO PARAGRAPH 132:** To the extent this paragraph states legal conclusions, no answer is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

133. Under ERISA § 3(38), 29 U.S.C. § 1002(38), NTI was at all relevant times the Investment Manager of the Plans.

**ANSWER TO PARAGRAPH 133:** To the extent this paragraph purports to characterize the cited ERISA provisions or documents governing the relationships with various plans, Defendants refer to the statute and those documents for their contents and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of ERISA or such documents, it states legal conclusions to which no answer is required. Answering further, the allegations concerning "Investment Manager" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

134. In addition to serving as the Investment Manager for the Collective Trusts, or Funds of the Plans, NTI also served as the Trustee of the Collective Trusts, and Investment Manager of the Collateral Pools.

**ANSWER TO PARAGRAPH 134:** To the extent this paragraph purports to characterize the Declaration of Trust and/or the agreements with various plans, Defendants refer to those documents for their contents and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such documents, it states legal conclusions to which no answer is required. Answering further, Defendants admit that NTI acts as the trustee pursuant to the Declaration of Trust as defined herein. Answering further, the allegations concerning "Investment Manager" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

135. Pursuant to ERISA § 3(21)(A)(i), 29 USC § 1002 (21)(A)(i), Defendant Northern was at all times the Lending Agent for the Funds' securities. In this capacity, Northern was an ERISA fiduciary because it had discretionary authority or control respecting management or disposition of the Plans' assets when it negotiated the Borrower agreements, used EquiLend to determine which securities to lend, lent the Funds' securities, and charged fees for those same services.

**ANSWER TO PARAGRAPH 135:** To the extent this paragraph purports to characterize the cited ERISA provisions, the Securities Lending Authorization Agreement, or documents governing the relationships with various plans, funds, or borrowers, Defendants refer to the statute and those documents for their contents and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of ERISA or such documents, it

71

states legal conclusions to which no answer is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

136.    Defendants were obligated to discharge their duties with respect to the Plans' assets with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

**ANSWER TO PARAGRAPH 136:** To the extent the allegations of this paragraph state legal conclusions, no answer is required. Defendants deny any remaining allegations of this paragraph.

137.    Contrary to their duties and obligations under ERISA, Defendants failed to loyally and prudently manage the assets of the Plans. Specifically, Defendants breached their duties to the participants, in violation of ERISA § 404(a), by, *inter alia*: (i) exposing the Plans' assets to excessive levels of risk through their securities lending activities; (ii) failing to discharge their duties solely in the interests of the Plans' participants; and, (iii) generally failing to invest and manage the assets of the Plans in the manner of a reasonably prudent fiduciary acting under similar circumstances. With regard to each of the failures identified in this paragraph, Defendants did so through their mismanagement of the assets of the Collateral Pools.

**ANSWER TO PARAGRAPH 137:** Defendants deny the allegations of this paragraph.

138.     Moreover, Defendants failed to conduct an appropriate investigation of the merits of their highly risky and speculative program of securities lending in light of the particular dangers that this program posed to the Plans' assets. Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of investing assets of the Collateral Pools in a manner that exposed the pools to significant risk of substantial loss, such that their reinvestment value would fall below the value of the underlying securities. A prudent fiduciary acting under similar circumstances would have invested the Collateral Pools in safe, liquid securities commensurate with the stated purpose providing an incremental return to the Plans and other investors that participated in the program, rather than investing the Pools in the risky asset-backed sub-prime mortgages, SIVs, and other high-risk securities and derivatives.

**ANSWER TO PARAGRAPH 138:**  Defendants deny the allegations of this paragraph.

139.     As a consequence of Defendants' breach of fiduciary duties alleged in this Count, the Plans and the Plans' participants and beneficiaries have suffered tremendous losses. Had Defendants discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided. Therefore, as a direct and proximate result of the breach of fiduciary duty alleged herein, the Plans collectively lost hundreds of millions of dollars of retirement savings.

**ANSWER TO PARAGRAPH 139:**  Defendants deny the allegations of this paragraph.

140.     Further, Defendants did not provide material information to Plaintiffs regarding the securities lending program. Defendants failed to provide, among other things, complete information about: (i) the investment strategies the Defendants were pursuing for the Collateral Pool investments; (ii) the risk management program employed by Northern Trust; (iii) the performance of the Collateral Pools and the losses experienced by the Pools in 2007 and 2008, as

73

well as the reasons for those losses; and (iv) Defendants' compensation in connection with the securities lending program. These failures are particularly galling as the securities lending program was designed to provide an incremental boost to a Plan's return on investments; however, the program was operated in an imprudent manner far out of step with the potential for gain provided by the program. As a result, the Plans' participants, and beneficiaries lacked material information necessary for making informed decisions regarding investment in Northern Trust's securities lending program

**ANSWER TO PARAGRAPH 140:** Defendants deny the allegations of this paragraph.

141.     Pursuant to ERISA §§ 409, 502(a)(2), and (a)(3), 29 U.S.C. §§ 1109(a), and 1132(a)(2) and (3), Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

**ANSWER TO PARAGRAPH 141:** Defendants deny the allegations of this paragraph.

142.     The Defendants were unjustly enriched by the fiduciary breaches described in this Count.

**ANSWER TO PARAGRAPH 142:** Defendants deny the allegations of this paragraph.

**COUNT II**
**Against Northern Trust Investments, N.A. and The Northern Trust Company**
**For Failure to Prudently and Loyally Manage Plan Assets**

143.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

**ANSWER TO PARAGRAPH 143:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

144.    Under ERISA § 3(21), 29 U.S.C. § 1002(21), Defendants NTI and Northern were at all relevant times ERISA fiduciaries with respect to the Plans and the invested assets of the Plans.

**ANSWER TO PARAGRAPH 144:**  To the extent this paragraph states legal conclusions, no answer is required.  Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants deny those allegations.  Defendants deny any remaining allegations of this paragraph.

145.    The scope of the fiduciary duties and responsibilities of the Northern Trust Defendants included discretionary authority or control respecting their management of the Plans' assets.

**ANSWER TO PARAGRAPH 145:**  To the extent this paragraph states legal conclusions, no answer is required.  Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants deny those allegations.  Defendants deny any remaining allegations of this paragraph.

146.    Under ERISA § 3(38), 29 U.S.C. § 1002(38), NTI was at all relevant times the Investment Manager of the Plans.

**ANSWER TO PARAGRAPH 146:**  To the extent this paragraph purports to characterize the cited ERISA provisions or documents governing the relationships with various plans, Defendants refer to the statute and those documents for their contents and deny any allegations inconsistent therewith.  To the extent this paragraph purports to describe the legal effect of ERISA or such documents, it states legal conclusions to which no answer is required.  Answering further, the allegations concerning "Investment Manager" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those

75

allegations.  Defendants deny any remaining allegations of this paragraph.

147.    In addition to serving as the Investment Manager for the Collective Trusts, or Funds of the Plans, NTI also served as the Trustee of the Collective Trusts, and Investment Manager of the Collateral Pools.

**ANSWER TO PARAGRAPH 147:** To the extent this paragraph purports to characterize the Declaration of Trust and/or the agreements with various plans, Defendants refer to those documents for their contents and deny any allegations inconsistent therewith.  To the extent this paragraph purports to describe the legal effect of such documents, it states legal conclusions to which no answer is required.  Answering further, Defendants admit that NTI acts as the trustee pursuant to the Declaration of Trust as defined herein.  Answering further, the allegations concerning "Investment Manager" status are vague and undefined and, accordingly, Defendants lack knowledge or information sufficient to form a belief about the truth of those allegations. Defendants deny any remaining allegations of this paragraph.

148.    Pursuant to ERISA § 3(21)(A)(i), 29 USC § 1002 (21)(A)(i), Defendant Northern was at all times the Lending Agent for the Funds' securities. In this capacity, Northern was an ERISA fiduciary because it had discretionary authority or control respecting management or disposition of the Plans' assets when it negotiated the Borrower agreements, used EquiLend to determine which securities to lend, lent the Funds' securities, and charged fees for those same services.

**ANSWER TO PARAGRAPH 148:** To the extent this paragraph purports to characterize the cited ERISA provisions, the Securities Lending Authorization Agreement, or documents governing the relationships with various plans, funds, or borrowers, Defendants refer to the statute and those documents for their contents and deny any allegations inconsistent therewith.

To the extent this paragraph purports to describe the legal effect of ERISA or such documents, it states legal conclusions to which no answer is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants deny those allegations. Defendants deny any remaining allegations of this paragraph.

149.     Defendants were obligated to discharge their duties with respect to the Plans' assets with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

**ANSWER TO PARAGRAPH 149:**  To the extent the allegations of this paragraph state legal conclusions, no answer is required. Defendants deny any remaining allegations of this paragraph.

150.     Defendants breached their fiduciary duties by setting and taking for themselves unreasonable compensation for securities lending services.

**ANSWER TO PARAGRAPH 150:** Defendants deny the allegations of this paragraph.

**COUNT III**
**Against Northern Trust Investments, N.A. and The Northern Trust Company, For**
**Prohibited Transactions Involving Plan Assets**

151.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

**ANSWER TO PARAGRAPH 151:** Defendants repeat and reallege their answers to each paragraph above as their answer to this paragraph as though fully set forth herein.

152.    As set forth supra, as Investment Manager, Defendant NTI served as an ERISA fiduciary for each Plan. Under ERISA § 3(21), 29 U.S.C. § 1002(21), NTI was, at all relevant times an ERISA fiduciary with respect to the Plans and the invested assets of the Plans. Under ERISA § 3(38), 29 U.S.C. § 1002(38), NTI was at all relevant times the Investment Manager for the Plans. The scope of the fiduciary duties and responsibilities of the Northern Trust Defendants included managing the assets of the Plans in the Lending Funds and the Collateral Pools. In addition to serving as the Investment Manager, NTI also served as the Trustee of the Collective Trusts.

**ANSWER TO PARAGRAPH 152:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required. To the extent the allegations of this paragraph state legal conclusions, no answer is required. To the extent this paragraph purports to describe various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such documents or of applicable legal principles, no answer to such legal conclusions is required. Answering further, Defendants admit that NTI acts as the trustee pursuant to the Declaration of Trust as defined herein. Answering further, the allegations concerning "Investment Manager" and "fiduciary" status are vague and undefined and, accordingly, Defendants deny those allegations. Defendants deny any remaining allegations of this paragraph.

153.    Similarly, Defendant Northern was at all times an ERISA fiduciary when it served as Lending Agent for the Trustee in order to implement the securities lending operation, including the fact that it had discretionary authority to select Borrowers, enter into contracts to lend the Funds' securities, determine which securities to lend to which Borrowers, determine

which Collateral Pools to place the cash in, and render investment advice for a fee by charging

the Collective Trusts for the securities lending. (Ex. 3.) Thus, Northern too, was an ERISA

fiduciary for the Plans because it had discretionary authority or control respecting management

or disposition of assets of the Plans in its role as Lending Agent.

**ANSWER TO PARAGRAPH 153:** To the extent this paragraph purports to advance the

prohibited transaction allegations dismissed by the Court, no answer is required. To the extent

the allegations of this paragraph state legal conclusions, no answer is required. To the extent this

paragraph purports to characterize the cited Securities Lending Authorization Agreement, or

documents governing the relationships with various plans, funds, or borrowers, Defendants refer

to the statute and those documents for their contents and deny any allegations inconsistent

therewith. To the extent this paragraph purports to describe the legal effect of such documents or

of applicable legal principles, no answer to such legal conclusions is required. Answering

further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly,

Defendants deny those allegations. Defendants deny any remaining allegations of this

paragraph.

154. Section 406(a)(1) of ERISA prohibits a fiduciary of a plan from causing a plan to

enter into a transactions with a party in interest. 29 U.S.C. § 1106(a)(1). Northern and NTI were

fiduciaries and therefore, by definition, parties in interest to the Plans. 29 U.S.C. §

1002(3)(14)(A). Northern and NTI entered into Lending Agreements with each other whereby

Northern provided securities lending services to the Lending Funds. These transactions

constituted a furnishing of services to the Plans by Northern, in violation of 29 ERISA §

406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A). Further, the compensation Northern and NTI received

was unreasonable. *See* ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

79

**ANSWER TO PARAGRAPH 154:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required. To the extent the allegations of this paragraph state legal conclusions, no answer is required. To the extent this paragraph purports to describe the cited ERISA provisions and various agreements, Defendants refer to those documents for their content and deny any allegations inconsistent therewith. To the extent this paragraph purports to describe the legal effect of such documents or of applicable legal principles, no answer to such legal conclusions is required. Answering further, the allegations concerning "fiduciary" status are vague and undefined and, accordingly, Defendants deny those allegations. Defendants deny any remaining allegations of this paragraph.

155. Further, because the Northern Trust Defendants failed to comply with PTE 2006-16, their operation of the securities lending program for the Plans was a *per se* violation of § 406(a)(1) of ERISA. 29 U.S.C. § 1106.

**ANSWER TO PARAGRAPH 155:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required. Defendants deny any remaining allegations of this paragraph.

156. Northern Trust's violations of ERISA § 406 have caused the Plans to suffer substantial losses, and the risk of future losses, on account of their Collateral Pool investment holdings. Pursuant to ERISA §§ 409, 502(a)(2)-(3), 29 U.S.C. §§ 1109(a), and 1132(a)(2)-(3), Defendants are liable to restore the losses to the Plans caused by their violations of § 406, and to disgorge their compensation and profits thereon, and to be subject to other equitable relief as appropriate.

**ANSWER TO PARAGRAPH 156:** To the extent this paragraph purports to advance the prohibited transaction allegations dismissed by the Court, no answer is required. Defendants

deny any remaining allegations of this paragraph.

## IX.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

157.    Defendants breached their fiduciary duties in that they knew, or should have known, the facts as alleged above, and therefore knew, or should have known, that the securities lending program was imprudent. Defendants also violated ERISA's prohibitions on certain transactions involving plan assets.

**ANSWER TO PARAGRAPH 157:** Defendants deny the allegations of this paragraph.

158.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes the Secretary of Labor, or a participant, beneficiary or fiduciary, to bring a civil action for appropriate relief under section 1109. Section 1109 states:

> Any person who is a fiduciary . . . who breaches any of the
> responsibilities, obligations, or duties imposed upon fiduciaries by
> this subchapter shall be personally liable to make good to such
> plan any losses to the plan resulting from each such breach, and to
> restore to such plan any profits of such fiduciary which have been
> made through use of assets of the plan by the fiduciary, and shall
> be subject to such other equitable or remedial relief as the court
> may deem appropriate . . . .

**ANSWER TO PARAGRAPH 158:** To the extent this paragraph purports to characterize the cited ERISA provisions, Defendants refer to the statute for its contents and deny any allegations inconsistent therewith.  To the extent the allegations of this paragraph state legal conclusions, no answer is required.  Defendants deny any remaining allegations of this paragraph.

81

159. Plaintiffs, on behalf of the Plans and the Class, are therefore entitled to relief from Defendants in the form of: (i) a monetary payment to the Plans in an amount to be proven at trial, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, including on order permitting the Plans and the Class to withdraw assets from the Collective Trusts, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and(3); (iii) disgorgement of compensation and profits earned thereon as a result of prohibited transactions; (iv) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (v) taxable costs and interest on these amounts, as provided by law; and (vi) such other legal or equitable relief as may be just and proper.

**ANSWER TO PARAGRAPH 159:** Defendants deny the allegations of this paragraph

160. Under ERISA, each Defendant is jointly and severally liable.

**ANSWER TO PARAGRAPH 160:** Defendants deny the allegations of this paragraph.

## X. PRAYER FOR RELIEF

**ANSWER TO "PRAYER FOR RELIEF":** Defendants deny that Plaintiffs are entitled to any of their purported "prayers for relief." Defendants further deny that they committed any wrongdoing under ERISA or under any other law.

## AFFIRMATIVE DEFENSES

For further and separate defenses to the causes of action brought by Plaintiffs, and without admitting that they have the burden of proof on any fact, issue, element of a claim, or any of these matters, or that anything stated herein is intended or shall be construed as an acknowledgement that any particular issue or subject is relevant to Plaintiffs' allegations,

Defendants allege as follows. Defendants reserve the right to amend these defenses to assert additional defenses to the full extent permitted by the Federal Rules of Civil Procedure.

1.      Plaintiffs' claims are barred, in whole or in part, because the Second Amended Complaint fails to state a claim upon which relief may be granted.

2.      Plaintiffs' claims are barred, in whole or in part, because they lack standing to bring one or more of the claims alleged, including to bring claims as a class action.

3.      Plaintiffs' claims are barred, in whole or in part, because they may not assert claims on behalf of their respective plans under §§ 502(a)(2) and 409(a) of ERISA, 29 U.S.C. §§ 1132(a)(2) and 1109(a).

4.      Plaintiffs' claims are barred, in whole or in part, because they may not assert claims on behalf of plans in which they are not a participant under §§ 502(a)(2) and 409(a) of ERISA, 29 U.S.C. §§ 1132(a)(2) and 1109(a).

5.      Plaintiffs' claims are barred, in whole or in part, because their claims may not be maintained as a class action for failure to satisfy all of the requirements of Fed. R. Civ. P. 23.

6.      Plaintiffs' claims are barred, in whole or in part, because they sustained no losses or damages.

7.      Plaintiffs' claims are barred, in whole or in part, because they are not ripe.

8.      Plaintiffs' claims are barred, in whole or in part, because they seek relief not authorized by the provisions of ERISA.

9.      Plaintiffs' claims are barred, in whole or in part, to the extent they seek monetary relief, by § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

10.     Plaintiffs' claims are barred, in whole or in part, because Defendants acted reasonably and prudently and in good faith at all times and fulfilled all of their legal and other duties.

11.     Plaintiffs' claims are barred, in whole or in part, because Defendants acted at all times in accordance and consistent with the terms of plan documents, pursuant to § 404 of ERISA, 29 U.S.C. § 1104.

12.     Plaintiffs' claims are barred, in whole or in part, by virtue of the operation of Articles 2.03, 3.02, 4.08 and/or 5.02 of the Declaration of Trust.

13.     Plaintiffs' claims are barred, in whole or in part, by the terms of the Collective Fund Custody Agreements or other agreements between Defendants and the plans.

14.     Plaintiffs' claims are barred, in whole or in part, because collateral from securities lending was invested at all times pursuant to and in accordance with applicable investment guidelines.

15.     Plaintiffs' claims are barred, in whole or in part, because they did not rely on Defendants in making investment decisions or in taking any action referenced in the Second Amended Complaint.

16.     Plaintiffs' claims are barred, in whole or in part, because Defendants made all appropriate disclosures to investors and because none of Defendants' alleged statements or omissions was materially false or misleading at the time it was purportedly made.

17.     Plaintiffs' claims are barred, in whole or in part, because no act or omission of Defendants caused Plaintiffs to sustain any injury.

18.     Plaintiffs' claims are barred, in whole or in part, because they cannot prove

84

causation and damages.

19.     Plaintiffs' claims are barred, in whole or in part, because if Plaintiffs sustained any injury—which Defendants deny—any such injury was due, in whole or in part, to actions and/or omissions by Plaintiffs.

20.     Plaintiffs' claims are barred, in whole or in part, because if Plaintiffs sustained any injury—which Defendants deny—then Plaintiffs failed to mitigate such damages and their claims for damages should be barred or reduced accordingly.

21.     Plaintiffs' claims are barred, in whole or in part, because they ratified the alleged acts and omissions of Defendants as alleged in the Second Amended Complaint.

22.     Plaintiffs' claims are barred, in whole or in part, because Plaintiffs acquiesced in the alleged acts and omissions of Defendants as alleged in the Second Amended Complaint.

23.     Plaintiffs' claims are barred, in whole or in part, because they assumed the risk of the alleged acts and omissions of Defendants as alleged in the Second Amended Complaint.

24.     Plaintiffs' claims are barred, in whole or in part, because they are estopped from seeking or obtained any relief due to the alleged acts and omissions of Defendants alleged in the Second Amended Complaint.

25.     Plaintiffs' claims are barred, in whole or in part, because they have waived seeking or obtaining any relief due to the alleged acts and omissions of Defendants as alleged in the Second Amended Complaint.

26.     Plaintiffs' claims are barred, in whole or in part, by the statute of limitations.

27.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

28.     Plaintiffs' claims are barred, in whole or in part, in that Plaintiffs exercised independent control over their plan accounts pursuant to § 404(c) of ERISA, 29 U.S.C. § 1104(c).

29.     Plaintiffs' claims are barred, in whole or in part, because their own unclean hands prevent them from obtaining any relief from Defendants.

30.     Plaintiffs' claims are barred, in whole or in part, because their own "in pari delicto" conduct prevents them from obtaining any relief from Defendants.

31.     Plaintiffs' claims are barred, in whole or in part, because Defendants acted without negligence in all respects relevant to the Second Amended Complaint.

32.     Plaintiffs' claims are barred, in whole or in part, because, to the extent Defendants exercised discretion regarding the securities lending program, Defendants acted properly and within the scope of their discretion.

Dated: October 31, 2012                    Respectfully submitted,

                                           /s/ Caryn L. Jacobs
                                           Caryn L. Jacobs
                                           Todd J. Ehlman
                                           WINSTON & STRAWN LLP
                                           35 W. Wacker Drive
                                           Chicago, IL 60601
                                           United States
                                           (312) 558-5600
                                           (312) 558-5700 – Facsimile
                                           cjacobs@winston.com
                                           tehlman@winston.com

                                           Michele L. Odorizzi
                                           MAYER BROWN LLP
                                           71 S. Wacker Drive
                                           Chicago, IL 60606
                                           United States
                                           (312) 782-0600
                                           (312) 701-7711 – Facsimile

                                           *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies under penalty of perjury that a copy of the foregoing **DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT** was served on counsel for all parties electronically via the CM/ECF system on October 31, 2012.

Dated: October 31, 2012

Respectfully submitted,

By  /s/ Gregory M. Bassi