# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSEPH L. DIEBOLD, JR. on behalf of the EXXONMOBIL SAVINGS PLAN, and PAUL J. HUNDT, on behalf of the TEXAS INSTRUMENTS 401(K) SAVINGS PLAN, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHERN TRUST INVESTMENTS, N.A. and THE NORTHERN TRUST COMPANY,<br><br>Defendants. | CIVIL ACTION NO. 09-CV-1934<br><br>Hon. Charles Norgle<br>Hon. Susan E. Cox. |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR AN ORDER:

(1) **PRELIMINARILY CERTIFYING THE PROPOSED SETTLEMENT CLASS AND APPOINTING CLASS COUNSEL;**

(2) **PRELIMINARILY APPROVING PROPOSED SETTLEMENT OF CLASS ACTION;**

(3) **ESTABLISHING A PLAN FOR NOTICE OF THE SETTLEMENT AND PROVIDING CLASS MEMBERS WITH AN OPPORTUNITY TO EXCLUDE THEMSELVES FROM OR OBJECT TO THE SETTLEMENT;**

(4) **APPOINTING A SETTLEMENT ADMINISTRATOR; AND**

(5) **SCHEDULING A SETTLEMENT FINAL HEARING.**

## I.    INTRODUCTION

Plaintiffs Joseph L. Diebold, Jr., and Paul J. Hundt ("Plaintiffs") respectfully submit this memorandum in support of their request that this Court issue an Order preliminarily approving the proposed $36 million Settlement (the "Settlement") negotiated by Plaintiffs and Defendants Northern Trust Investments, N.A. ("NTI") and The Northern Trust Company ("NTC") (collectively, "Northern Trust" or "Defendants"; and together with Plaintiffs, the "Parties"), and related orders, as described herein.

With this motion, Plaintiffs submit copies of the fully executed Stipulation of Settlement and Release (the "Settlement Agreement"), with the following Exhibits thereto:

- Exhibit A, Preliminary Approval Order

- Exhibit A-1, Banking Notice

- Exhibit A-2, Cover Letter

- Exhibit A-3, Settlement Notice

- Exhibit A-3-Appendix 1, List of Covered Funds

- Exhibit A-3-Appendix 2, Plan of Allocation

- Exhibit A-4, Summary Notice

- Exhibit B, Judgment

The titles of the above-listed exhibits are from the Definitions section of the Settlement Agreement. The Settlement Agreement is Exhibit 1 to the supporting Declaration of Gregory Y. Porter ("Porter Decl.").

As reflected in the Settlement Agreement, the Parties want to compromise and settle all issues and claims relating to the allegations made in this action on behalf of all members of the proposed Settlement Class (the "Class"). Plaintiffs' proposed plan of allocation will fairly and

compensate Settlement Class Members in proportion to relative losses resulting from Defendants' alleged imprudent investment of their assets and other claims in connection with Northern Trust's securities-lending program, as described in the Complaint.

Preliminary approval is warranted when a proposed class action settlement is "within the range of possible approval" so as to provide a "reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980) (citing *Manual for Complex Litigation* § 1.46). In evaluating the terms of the Settlement Agreement, Class Counsel have concluded that the benefits provided to the Class make the Settlement in the best interests of Class Members in light of, among other considerations: (1) the substantial monetary relief afforded to Class Members; (2) the risks and uncertainties of complex litigation such as this action; (3) the expense and length of time necessary to prosecute this action through trial and any subsequent appeals; and (4) the desirability of consummating the Settlement Agreement to promptly provide effective relief to the Class Members.

The Parties reached their proposed Settlement after nearly five years of hard-fought litigation, including dispositive motions filed in this Court and extensive fact and expert discovery, leading to the development of a full legal and factual record. The proposed Settlement was agreed upon after extensive arm's length negotiations among experienced counsel, including an in-person mediation conducted by a seasoned and well-respected mediator. If approved, the Settlement will provide a substantial monetary benefit to Class Members, $36,000,000. Plaintiffs and their Counsel believe that the terms of the Settlement are fair, reasonable, adequate, and in the best interests of the Class. Accordingly, Plaintiffs petition this Court for an Order:

1. Preliminarily certifying the proposed Settlement Class and appointing Class Counsel;

2. Preliminarily approving the proposed class action settlement with Defendants;

3.     Directing notice to Class members and approving the proposed method and form of settlement notice and provisions setting deadlines for such persons to object to the fairness of the settlement, as set forth in the Settlement Agreement;

4.     Appointing Heffler Claims Group as Settlement Administrator and Branch Banking and Trust Company as Escrow Agent; and

5.     Scheduling a hearing to consider final approval of the Settlement, and also to consider the proposed Plan of Allocation and Class Counsel's application for attorneys' fees and expenses and Incentive Awards for Plaintiffs.

## II.     LITIGATION AND SETTLEMENT HISTORY

### A.     Class Claims and Defendants' Defenses

Plaintiffs are participants in two ERISA retirement plans that participated in Northern Trust's securities-lending program by investing in commingled "Lending Funds" managed by Northern Trust. The Lending Funds sought to generate incremental income by lending securities from their portfolios on a short-term basis and investing the cash collateral received from those loans in income-producing, safe, liquid instruments. Plaintiffs allege that Northern Trust failed to manage its securities-lending program prudently. Specifically, Plaintiffs allege that Northern Trust violated its fiduciary duties under ERISA in managing two "Collateral Pools" that held the cash collateral received from those who borrowed securities held by the Lending Funds. Plaintiffs also allege that Defendants charged excessive fees for their securities-lending services.

Plaintiffs allege that, instead of managing the Collateral Pools as conservative short-term cash investment vehicles consistent with an expected nominal return, Northern Trust caused the Collateral Pools to take on extraordinary levels of risk by making imprudent investments in subprime mortgages, special investment vehicles, and long-term floating-rate notes. Those investments eventually lost hundreds of millions of dollars in value. Thus, Plaintiffs allege that Northern Trust's imprudent management of the Collateral Pools caused the ERISA plans that participated in the securities-lending program to suffer large losses.

Plaintiffs also allege that Defendants took unreasonably high compensation for managing the securities-lending program. Plaintiffs allege that the compensation Defendants took from the Plans for managing this program exceeded both industry standards and the compensation that Defendants received from other institutional investors that negotiated with Defendants in arm's length transactions.

Accordingly, Plaintiffs asserted causes of action against Defendants for:

(1) breaching their duties of prudence, loyalty, and exclusive purpose under ERISA Section 404(a), 29 U.S.C. § 1104(a) (2006); and

(2) engaging in prohibited transactions involving plan assets under ERISA Section 406, 29 U.S.C. Section 1106 (2006).

In response to Plaintiffs' claims, Defendants deny any wrongdoing and assert numerous affirmative defenses, including that: (1) Plaintiffs lack standing; (2) the claims are barred by the applicable limitations period; (3) the allegations, even if true, do not give rise to a plausible claim; (4) Plaintiffs' claims may not be maintained as a class action; and (5) Plaintiffs have suffered no damages.

### B.    History of the Litigation

On March 30, 2009, Plaintiff Diebold filed a Class Action Complaint in this Court alleging that Defendants, among other things, imprudently invested client assets in connection with Northern Trust's securities-lending program. (Dkt. 1). The Class Action Complaint asserted claims against Defendants for breach of fiduciary duty, breach of contract, and breach of the duty of good faith and fair dealing. *Id.* On April 1, 2009, Plaintiff filed a corrected complaint. (Dkt. 5) On December 3, 2009, Plaintiffs filed an Amended Class Action Complaint, which added Hundt as an additional named Plaintiff and again alleged that Defendants, among other things, improperly invested assets of their clients that participated in Northern Trust's securities-lending program. (Dkt.

5

25-1). The Amended Complaint also asserted claims for breach of fiduciary duty, breach of contract, and breach of duty of good faith and fair dealing against Defendants.

From the outset of the litigation, the issues presented by Plaintiffs' allegations have been vigorously contested through motion practice and discovery. On February 16, 2010, Defendants moved to dismiss the Amended Complaint. (Dkt. 35). On March 25, 2010, Plaintiffs filed their opposition papers and, on April 15, 2010, Defendants filed their reply papers. (Dkts. 45, 54). On September 7, 2010, the Court issued a Memorandum Opinion and Order that granted in part and denied in part Defendants' motion to dismiss. (Dkt. 72). The Court specifically denied Defendants' motion to dismiss the breach of fiduciary duty claims against the Defendants for an alleged lack of specificity and rejected Defendants' arguments that Plaintiffs lacked standing or failed to allege individualized losses. On November 29, 2010, Defendants filed an Answer and Affirmative Defenses to the Amended Complaint. (Dkt. 89). Plaintiffs responded to the affirmative defenses on December 23, 2010. (Dkt. 92).

Plaintiffs then sought leave to file a Second Amended Class Action Complaint on February 15, 2012, to add claims that the Defendants had breached their fiduciary duties to Plaintiffs and the proposed Class by taking unreasonable fee compensation for securities-lending services and to re-assert a revised prohibited transaction claim. (Dkt. 116). On September 10, 2012, the Court permitted Plaintiffs to file their Second Amended Complaint to assert the excessive fee claim and a revised prohibited transaction claim. (Dkt. 165). Plaintiffs filed a revised Second Amended Complaint on October 1, 2012. (Dkt. 171). Defendants filed their Answer and Affirmative Defenses to the Second Amended Complaint on October 31, 2012. (Dkt. 180).

On February 27, 2012, Plaintiffs filed a Motion for Class Certification and supporting materials. (Dkt. 124). On May 16, 2012, Defendants filed their response; Plaintiffs filed their Reply on September 26, 2012, and Defendants requested, and were permitted, to file a Sur-Reply brief on

December 17, 2012. (Dkts. 152, 169, 189). Both Plaintiffs and Defendants also filed several notifications of supplemental authority to the Court based on subsequent U.S. Supreme Court and Seventh Circuit decisions. (Dkts. 185, 195, 229).

### C. Discovery

Discovery in the Action commenced in December 2010 with a Rule 26 discovery conference. Over the course of the following two years, the parties engaged in numerous discovery conferences. Defendants produced and Plaintiffs reviewed hundreds of thousands of pages of documents. Discovery also included several depositions of fact witnesses, including both the named Plaintiffs, a Fed. R. Civ. P. 30(b)(6) deposition of Northern Trust, consisting of depositions of two employees of Northern Trust, and two additional Northern Trust employees. In addition, the Parties submitted expert reports and took expert depositions in connection with the Motion for Class Certification. (Porter Decl. ¶ 5.)

### D. Settlement Negotiations

The Parties first began discussing a potential resolution of this action in the spring of 2013. On May 9, 2013, a private mediation was conducted by Judge Morton Denlow (Ret.), a former federal district court judge in the United States District Court for the Northern District of Illinois. The mediation concerned not only this action but also another action pending against Defendants, *Louisiana Firefighters Retirement System v. Northern Trust Investments, N.A.*, Case No. 09-7203 (N.D. Ill) (the "Firefighters Action"), which asserts claims on behalf of non-ERISA funds with respect to Defendants' securities lending activities. At the mediation, the parties made presentations about the strengths and weaknesses of their respective positions. Although the parties did not settle at the mediation, they continued to discuss resolving this action during informal communications thereafter. On January 12, 2014, the Parties agreed in principle to resolve this action. Thereafter, the Parties spent over a year negotiating the detailed terms of the settlement of this action in

coordination with the partial settlement of the Firefighters Action; prepared and executed the

Settlement Agreement and exhibits thereto presented to the Court on this motion, memorializing

the terms of the class action Settlement for which Plaintiffs now seek preliminary approval; and

developed the Plan of Allocation after multiple detailed conversations with Defendants about

available Class Member and investment data and in consultation with Plaintiffs' expert. (Porter Decl.

¶ 6.)

## III.   THE TERMS OF THE SETTLEMENT AGREEMENT

### A.   Benefits to Class Members

The Settlement Agreement provides a substantial cash benefit to the Settlement Class of $36

million. The cash will be deposited into an interest-bearing escrow account (the "Settlement Fund")

on or before ten business days after the later of: (i) the Court's entry of the Preliminary Approval

Order; and (ii) the provision by the Settling Plaintiffs to Northern Trust through its undersigned

counsel of the information necessary to effectuate a transfer of funds, including wiring instructions

to include the bank name and ABA routing number, account name and number, and a signed W-9

reflecting a valid taxpayer identification number for the qualified settlement fund in which the

Escrow Account has been established. *See* Settlement Agreement, p. 27, ¶ 9. Notice and

administrative costs, tax payments, an award of attorneys' fees and expenses, an award to Class

Representatives, and/or any additional costs approved by the Court will be paid from the Settlement

Fund. *Id.* at p. 30, ¶ 19. The remaining amount (the "Net Settlement Fund") will be distributed to

members of the Class pursuant to the terms of the Settlement Agreement and the proposed Plan of

Allocation, which is attached as Appendix 2 to the Settlement Notice.

Pursuant to the terms of the Settlement Agreement, the cash payment will be made to

Settlement Class Members who meet the class definition, without the need for submitting a claim

form or other request for payment. *See* Settlement Agreement, p. 38-39, ¶ 34. The Settlement

Agreement does not provide for a "claims made" Settlement, or for any "reversion" of the Settlement Fund to Defendants or any of their affiliates. *Id.* at 27, ¶ 11. The Plan of Allocation provides for redistributions to class members until less than $25,000 remains, at which time the remaining balance shall be contributed to a non-sectarian, not-for-profit 501(c)(3) organization(s), to be recommended by Settling Plaintiffs' Counsel and approved by the Court. Exhibit A-3-Appendix 2, Plan of Allocation, ¶ 13. All distributions of the Net Settlement Fund will be made according to the Plan of Allocation, based upon Defendants' records concerning the Commingled Lending Funds in which each Identified Settlement Class Member was invested on each of the Relevant Dates, the number of units held in each of the Commingled Lending Funds on each of the Relevant Dates, the dollar value of each such unit on each of the Relevant Dates, and each Commingled Lending Fund's pro rata interest in the Collateral Pools on the Relevant Dates. Settlement Agreement at p. 38, ¶ 34; Exhibit A-3-Appendix 2, Plan of Allocation. Although Class Members will not be required to submit claim forms to obtain a share of the Net Settlement Fund, the Settlement Agreement provides for detailed procedures that allow (1) retirement plans that are not among the initial list of Identified Settlement Class Members provided by Defendants to submit documentation to support membership in the Class, and (2) Class Members to submit documentation to challenge the accuracy of the data used to determine their specific distribution from the Net Settlement Fund (e.g., challenge the data as to amount in invested in a given Lending Fund on a given date). Settlement Agreement at p. 41-45, ¶¶ 41-43.

> **B.** **Attorneys' Fees, Costs and Service Award for Plaintiffs**

Plaintiffs' Counsels' fees, costs and expenses and Plaintiffs' Incentive Awards will be paid from the Settlement Fund as the Court may so order. Class Counsel will petition the Court for Incentive Awards not to exceed $15,000 each in recognition of the service of Plaintiff Diebold and

Plaintiff Hundt as Class representatives. Class Counsel will also petition the Court for an award of attorneys' fees and costs. All requests will be subject to Court approval.

### C.      Release of Claims

Under the terms of the Settlement Agreement, Settling Plaintiffs and the Settlement Class Members, on their own behalf; and on behalf of all persons or entities (including pension, retirement, savings, and 401(k) plans, systems, and funds)  on whose behalf each of the foregoing has standing to assert, individually or collectively, in full or in part, any Settlement Class Released Claims; and on behalf of each of all of the foregoing's respective past, present, or future settlors, sponsors, parents, subsidiaries, affiliates, divisions, partners, shareholders, fiduciaries, beneficiaries, and members; and on behalf of each of all of the foregoing's past, present, or future participants, employees, principals, managers, officers, directors, boards of trustees and trustees, boards and board members, insurers, reinsurers, heirs, executors, administrators, predecessors, successors, agents, and assigns, in their capacities as such; and on behalf of any other person or entity with standing to assert, in full or in part, any Settlement Class Released Claim on behalf of any Settling Plaintiff or Settlement Class Member, in their capacities as such, shall be deemed by operation of law (a) to have fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, discharged and dismissed with prejudice any and all Settlement Class Released Claims as against each and all of the Defendants' Releasees; and (b) to be forever enjoined from asserting or prosecuting an Settlement Class Released Claims as against each and all of the Defendants' Releasees. Settlement Agreement at p. 24-25. ¶ 4.

Similarly, Defendants, on their own behalf; and on behalf of all persons or entities on whose behalf any of the Defendants has standing to assert, individually or collectively, in full or in part, any Defendants' Released Claims; and on behalf of each of all of the foregoing's respective past, present, or future fiduciaries, beneficiaries, members, participants, affiliates, officers, directors, boards of

trustees and trustees, boards and board members, insurers, reinsurers, heirs, executors, administrators, predecessors, successors, agents, and assigns, in their capacities as such; and on behalf of any other person or entity with standing to assert, in full or in part, any Defendants' Released Claim on behalf of any Defendant, in their capacities as such, shall be deemed by operation of law (a) to have fully, finally, and forever compromised, settled, released, resolved, relinquished, waived, discharged and dismissed with prejudice any and all Defendants' Released Claims as against each and all of the Settling Plaintiffs and the other Settling Plaintiffs' Releasees; and (b) to be forever enjoined from asserting or prosecuting any Defendants' Released Claims as against each and all of the Settling Plaintiffs and the other Settling Plaintiffs' Releasees. Settlement Agreement at p. 25, ¶ 5. The full scope of the Parties' releases is set forth in the Settlement Agreement. *Id.* at 24-26, ¶¶ 4-8.

> **D.** **Notice and Objections.**

Pursuant to Federal Rule of Civil Procedure 23(e)(1) and (e)(5), the Settlement Agreement provides for notice to the Class and an opportunity for Class members to object to approval of the Settlement. *Id.* at pp. 34-36, ¶¶ 25-28. The Parties have agreed, subject to Court approval, to a notice plan that will provide the Class Members with sufficient information to make an informed decision about whether to object to the proposed Settlement. *Id.* The proposed Settlement Notice procedure includes direct mailing of the Settlement Notice, Exhibit A-3. It informs Class Members of the nature of the action, the litigation background and the terms of the Settlement Agreement, including the definition of the Settlement Class, the relief provided by the Settlement Agreement, the intent of Class Counsel to seek fees and costs, the proposed Incentive Awards payable to Plaintiffs, and the scope of the release and binding nature of the Settlement on Class Members. It also describes the procedure for objecting to the Settlement and states the date, time and place of the final approval hearing. *Id.*

11

The Settlement Agreement provides that Defendants will issue a Banking Notice, as that term is defined therein, to all Identified Settlement Class Members within ten business days after the entry of Settlement Hearing Scheduling Order. *Id.* at pp. 7, 34-35. ¶ 1(c), ¶ 26. The Banking Notice will inform Settlement Class Members that (a) the investor has been identified by Northern Trust as being a member of the Settlement Class; (b) in order for the investor to be eligible to receive a distribution from the Net Settlement Fund, the Settlement Administrator must be provided with the investor's name, address, and telephone number, identity as a Northern Trust client, and its Investment Data; (c) the information will be provided to the Settlement Administrator solely for the purpose of providing notice of the Settlement, calculating each Identified Settlement Class Member's pro rata share of the Net Settlement Fund, responding to Settlement Class Members' inquiries, dealing with Challenges (including submission of disputed Challenges to the Court), and as otherwise deemed necessary for the purpose of the administration of the Settlement; and (d) the information will be provided to the Settlement Administrator by Defendants fifteen business days after the Banking Notice was sent. *Id.* at pp. 34-36, ¶ 26. The Banking Notice will also inform the Identified Settlement Class Members that a full notice describing the Action, the proposed Settlement, Plan of Allocation for the proceeds of the Net Settlement Fund, and their rights with respect thereto, will be mailed to them by the Settlement Administrator on or about thirty-five business days after the entry of the Preliminary Approval Order and will then also become available for review on the website to be maintained by the Settlement Administrator. *Id.*

### E. Independent Fiduciary.

The Settlement Agreement further provides that the Parties will retain an Independent Fiduciary to evaluate the Settlement pursuant to Prohibited Transaction Exemption 2003-39 ("PTE 2003-39"). Settlement Agreement at pp. 27-28, ¶ 12. PTE 2003-39 provides an exemption from ERISA's prohibited transaction provisions for settlements of legal disputes between parties-in-

interest, here Defendants, and ERISA plans, here the Settlement Class Members. Among other

things, the exemption requires:

(a) There is a genuine controversy involving the plan. A genuine controversy will be deemed to exist where the court has certified the case as a class-action.

(b) The fiduciary that authorizes the settlement has no relationship to, or interest in, any of the parties involved in the litigation, other than the plan, that might affect the exercise of such person's best judgment as a fiduciary.

(c) The settlement is reasonable in light of the plan's likelihood of full recovery, the risks and costs of litigation, and the value of claims foregone.

(d) The terms and conditions of the transaction are no less favorable to the plan than comparable arms-length terms and conditions that would have been agreed to by unrelated parties under similar circumstances.

(e) The transaction is not part of an agreement, arrangement, or understanding designed to benefit a party in interest

68 Fed. Reg. 75,632 (a copy of the exemption is submitted as Porter Decl., Ex. 2). The Independent

Fiduciary, Fiduciary Counselors Inc., will serve in two capacities. First, the Independent Fiduciary

will evaluate the Settlement on behalf of Settlement Class Members to determine if the Settlement

satisfies the conditions of PTE 2003-39 and whether to approve the Settlement, and such report

may be relied on by authorizing fiduciaries in determining whether to participate in the Settlement.

Settlement Agreement at p. 27-28, ¶ 12-13. Second, the Independent Fiduciary will evaluate the

Settlement with respect to the ExxonMobil Savings Plan and the Texas Instruments 401(k) Savings

Plan and serve as the authorizing fiduciary for those plans with respect to the Settlement with full

and sole discretion to object or opt-out of the Settlement. *Id.* at p. 29, ¶ 14. In sum, the Settlement

will be evaluated by a fiduciary whose sole loyalty is the Settlement Class Members, and that

fiduciary will evaluate the Settlement as to whether it is (1) reasonable in the light of the litigation

risk and the value of the claims, (2) consistent with an arm's length agreement, and (3) not part of an

agreement or arrangement to benefit a party in interest. Two weeks before the deadlines for

objections and exclusions, the report of the Independent Fiduciary with respect to Settlement Class

Members generally will be made available to Settlement Class Members for review via the website that will be created for this Action.

## IV.   ARGUMENT

### A.   The Court should certify the Settlement Class because the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(g) are satisfied.

In connection with preliminary approval of the Settlement, Plaintiffs seek class certification for settlement purposes. As part of the Settlement, Plaintiffs propose, and Defendants do not object to, for settlement purposes only, certification of a Settlement Class defined as follows:

> All entities that are governed by ERISA and that participated in Indirect Lending during the Settlement Class Period (*i.e.*, the period beginning January 1, 2007 through and including October 31, 2010) and are alleged to have been damaged as a result of their participation in Indirect Lending[1] at issue in the Action. Excluded from the Settlement Class are: (i) entities that previously released or were caused to release Northern Trust from liability for alleged injury, damage, or loss arising from Indirect Lending during 2007-2009; (ii) Defendants and their successors, their respective officers and directors (former, current and future), members of the Immediate Families of the respective officers and directors (former, current and future), and the legal representatives, heirs, successors or assigns of any such excluded person, and any entity in which any Defendant has or had a controlling interest; and (iii) entities which exclude themselves by submitting a Request for Exclusion that is accepted by the Court.

> Certification of a class action is governed by Rule 23. Fed. R. Civ. P. Rule 23 (a) provides

that a class action may be maintained if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

---

[1] As used in this definition and in the Settlement Agreement, Indirect Lending means participation in or exposure to Northern Trust's securities lending program through the purchase and/or holding of "units" or interests in Commingled Lending Funds, as opposed to lending securities directly from one's own account. The terms and definitions of the Settlement Agreement control over anything different, or to the contrary, in this memorandum.

Fed. R. Civ. P. Rule 23(a). Moreover, a class action must satisfy at least one of the requirements set forth in Rule 23(b)(1), (2) or (3). Here, certification of the Settlement Class is appropriate under Rule 23(b)(3).

### 1.     The Class satisfies the requirements of Rule 23(a).

#### a)  The Class is so numerous that joinder is impracticable.

Rule 23(a)(1) requires that a class be so numerous that joinder of all class members is "impracticable." Generally, when putative class members number at least 40, joinder is considered impracticable, and numerosity is satisfied. *Oplchenski v. Parfums Givenchy, Inc.*, 254 F.R.D. 489, 495 (N.D. Ill. 2008); *see also Ringswald v. County of DuPage*, 196 F.R.D. 509, 512 (N.D. Ill. 2000); *Swanson v. American Consumer Indus.*, 415 F.2d 1326, 1333 (7th Cir. 1969). Documents produced by Defendants indicate that at least 270 ERISA Plans invested in the Lending Funds during the relevant time period. *See* Dkt. 126, Ex. H at 1-15. Each of the 270 Plans includes hundreds, if not thousands of individual Plan participants who invested in the Northern Trust Lending Funds. Joinder of the 270 ERISA Plans in this matter would be "impracticable" under Rule 23(a)(1), and the numerosity requirement is therefore met.

#### b)  There are questions of law and fact common to the Class.

Class certification is "'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and ... 'turn on questions of law applicable in the same manner to each [class] member.'" *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). Rule 23(a)(2) does not require that every question of law or fact be common to each member of the class, rather "[a] common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998); *see also George v. Kraft Foods Global, Inc.*, 270 F.R.D. 355 (N.D. Ill. 2010) (citations omitted).

In this case, the commonality requirement is readily satisfied because Plaintiffs' allegations arise from the same common nucleus of operative facts, and all members of the proposed Settlement Class will cite the same common evidence to prove their identical claims. Thus, in this case, a "classwide proceeding [will] generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (U.S. 2011).

First, despite the fact that at least 270 ERISA Plans are members of the proposed Class, there are only two Collateral Pools at issue — Core USA and the STIF/STEP Custom Pool — that Northern Trust used as cash collateral reinvestment vehicles for all Class Members. Both of the Collateral Pools were managed by the same two Northern Trust portfolio managers. Northern Trust's investment decisions affected all investors in the Lending Funds that used the Collateral Pools in precisely the same manner. *See* Dkt. 126, Ex. B at 89:1-89:8. Each Class Member's units or holdings in the Trust represent that Plan's pro rata share of the Trust. Thus, Defendants' management of the Collateral Pools was a common course of conduct that uniformly affected all Class Members. If the Court determines that Defendants failed to manage the assets of the two Collateral Pools prudently, then that determination will resolve the core element of the claim of every Class Member. *See, e.g., Alvidres v. Countrywide Fin. Corp.*, No. 07-5810, 2008 WL 1766927, at *2 (C.D. Cal. Apr. 16, 2008) (commonality in ERISA breach of fiduciary case established where, as here, "all claims and all alleged injuries arise from the very same alleged conduct by the same Defendants—i.e., all putative Plaintiff's claims 'stem from the same source'"); *Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 349-50 (N.D. Ill. 2007) (when plaintiffs' claims derive from defendants' actions (or inactions) with respect to the Plan, plaintiffs' claims arise from the same common nucleus of operative facts).

Second, all Class Members are ERISA Plans, which are owed identical fiduciary duties of prudence and loyalty under section 404(a) of ERISA, 29 U.S.C. § 1104(a). The Trust Declaration

(which applies to every Class Member) states in § 3.06 that, with regard to management responsibility of the Trust and each [Lending] Fund, "the Trustee [NTI] shall be deemed a "named fiduciary" as defined by Section 402(a)(1) of ERISA, of each Participating Trust with respect to the assets of such Participating Trust investment in the Trust, with responsibilities limited to managing and controlling such assets in accordance with this Declaration of Trust." *See* Dkt. 126, Ex. I at NTD0002451.

Under these circumstances, commonality is easily satisfied. The legal and factual questions linking Class Members are unquestionably related to the resolution of the litigation of every Class Member's claims. The many questions of law and fact common to the Class (and the nature of the common evidence used to prove these elements of the claims) include:

a.  Whether Defendants are fiduciaries under ERISA (answerable based on form documents);

b.  How Defendants selected assets for the Collateral Pools and managed those pools (focused exclusively on the conduct of Defendants);

c.  Whether Defendants, in arranging for, selecting, and executing the securities-lending transactions, and reinvesting the cash collateral on behalf of the Funds in various investments selected by NTI, discharged their fiduciary duties with respect to the Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to the participants and their beneficiaries (focused exclusively on the conduct of Defendants);

d.  Whether the Collateral Pools were properly managed for short term liquidity and preservation of principal (focused exclusively on each collateral pool, not any investor in such pool);

e.  When Defendants became aware of the inappropriate nature of the investments that caused the collateral deficiencies (focused exclusively on the conduct of Defendants);

f.  Whether and how the moral hazard created by Defendants' compensation scheme influenced their decision making (focused entirely on Defendants' conduct);

g.  Whether Defendants' actions proximately caused losses to the Plans and, if so, the appropriate relief to which the Plans are entitled (same, due to the *pro rata* allocation of collateral deficiencies to commingled funds).

These are the core issues in this case and the alleged bases for the harms that unify all Class Members. Northern Trust's alleged conduct impacted Class Members in precisely the same way — because the two Collateral Pools served as collateral reinvestment vehicles for all ERISA Plans, the management of those assets by Northern Trust had precisely the same impact upon all Class Members. Numerous courts have found that classes of participants in different ERISA Plans can satisfy the commonality requirement when, as here, Defendants' conduct impacted all Class Members in the same way. *E.g.*, *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993) (reversing denial of class certification of class consisting of participants in four different ERISA plans with the same fiduciary when the claims involved the fiduciary's "general practice" applicable to all four plans); *Bd. of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.,* 269 F.R.D. 340, 351 (S.D.N.Y. 2010) (certifying class of participants in different pension plans who suffered losses as a result of securities-lending in their funds); *Caranci v. Blue Cross & Blue Shield of R.I.*, 194 F.R.D. 27, 39-40 (D.R.I. 2000) (certifying class of participants in different plans); *McDaniel v. N. Am. Indem. N.V.*, No. 02-0422, 2003 WL 260704 (S.D. Ind. Jan. 27, 2003); *Ries v. Humana Health Plan, Inc.*, No. 94-6180, 1997 WL 158337 (N.D. Ill. Mar. 31, 1997); *Smith v. United Healthcare Servs. Inc.*, No. 00-1163, 2002 WL 192565 (D. Minn. Feb. 5, 2002). Thus, the commonality requirement is readily satisfied for the Class.

### c) Plaintiffs' claims are typical of the claims of the Class.

Rule 23(a)(3)'s typicality requirement is similar to the commonality requirement, *Keele* 149 F.3d at 595, but examines whether the proposed class representative has the same interests and seeks a remedy for the same injuries as other class members. *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele*, 149 F.3d at 595. "[T]here must be enough

18

congruence between the named representative's claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011).

In this context, the typicality requirement is satisfied if the class representative is "invested in the same funds as the class members." *Id.* There is no dispute that the ERISA plans in which Plaintiffs participated invested in Lending Funds that, in turn, shared an interest in the Core USA and the STIF/STEP Collateral Pools, in the same manner as all Class Members invested in Lending Funds that shared an interest in the same Collateral Pools. For the same reasons that Plaintiffs' claims are common to all Class Members, they are also typical. Plaintiffs, like other members of the Class, (1) seek relief for the same losses, (2) caused by the same alleged breaches of fiduciary duties, (3) affecting the same Collateral Pools. *Cf. Spano*, 633 F.3d at 586-87, 589-90. "Nothing more is required to satisfy Rule 23." *Kraft*, 270 F.R.D. at 367; *see also Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 350-55 (N.D. Ill. 2007) (holding that "plaintiffs' claims are typical of those of the putative class, principally because they seek relief on behalf of the Plan . . . for alleged fiduciary violations as to the Plan").

### d) Plaintiffs will fairly and adequately represent the Settlement Class.

Fed. R. Civ. P. 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." In order to satisfy the requirements of Rule 23(a)(4), the class representative must "possess the same interest and suffer the same injury as the class members." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978, 985 (7th Cir. 2002) (quoting *E. Tex. Motor Freight*, 431 U.S. at 403). The adequacy determination is two-pronged: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (quoting *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986) (en banc)).

19

Here, Plaintiffs, who are the proposed Class Representatives, are each ERISA plan participants whose plans invested in Northern Trust Lending Funds, had the cash collateral their funds received reinvested in the same two Collateral Pools used by every Class Member, and suffered a *pro rata* loss when Northern Trust declared a collateral deficiency and/or realized losses during the Class Period.

Like other members of the Class, the proposed Class Representatives seek to maximize the recovery to the Class through this litigation. *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111 (N.D. Cal. 2008). Neither of the proposed Class Representatives has any interest that is antagonistic to the claims of any Class Member. *George v. Kraft Foods Global, Inc.*, 251 F.R.D. 338, 348 (N.D. Ill. 2008). The proposed Class Representatives' interests are thus fully aligned with the interests of Class Members.

Furthermore, the proposed Class Representatives have been and remain willing and able to take the required role in the litigation to protect the interests of those they seek to represent. As one district court has noted, it is sufficient for purposes of an ERISA case if a proposed class representative "understands that she had a retirement plan and believes that defendants failed to protect the money in the Plan" and, further, that she "understands her obligation to assist her attorneys and testify." *Rankin v. Rots*, 220 F.R.D. 511, 521 (E.D. Mich. 2004). Both proposed Class Representatives have that required understanding and have demonstrated their commitment to this case by participating in discovery (each has prepared discovery responses and each has been deposed by Northern Trust's counsel). Both proposed Class Representatives were consulted about key terms of the Settlement. In addition, as discussed below, the proposed Class Representatives have retained counsel with significant experience in federal class actions, in particular, ERISA cases. In sum, the Named Plaintiffs are adequate representatives of the proposed Settlement Class.

### 2. The Class satisfies the requirements of Rule 23(b)(3).

Rule 23(b)(3) requires a plaintiff to demonstrate that common questions of law or fact predominate over any questions affecting only individual class members and that a class action is a superior method of adjudicating the controversy. In determining whether this "predominance" requirement is met, a court "looks to whether [the] proposed class [is] sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997); *Bailiff v. Village of Downers Grove,* No. 11-3335, 2011 WL 6318953 (N.D. Ill. Dec. 16, 2011); *Williams-Green v. J. Alexander's Restaurant, Inc.,* 2011 WL 3882797 at *9 (N.D. Ill. Sept. 1, 2011). "When the case involves standardized conduct towards the members of the class, predominance often is satisfied. The existence of standardized conduct also favors a finding of superiority . . . ." *Baxter v. Kawasaki Motors Corp.* 259 F.R.D. 336, 343 (N.D. Ill. 2009).

In undertaking a predominance analysis, the "first focus must be on the substantive elements of plaintiffs' cause of action and inquir[y] into the proof necessary for the various elements. Second, after examining the proof necessary [the court] must inquire into the form that trial on these issues would take." *Simer v Rios,* 661 F.2d 655, 672 (7th Cir. 1981). A claim for breach of fiduciary duty under ERISA § 502(a)(2) requires a showing that defendants acted as fiduciaries, breached their duties of prudence and loyalty, and thereby caused harm to a plan or plans. *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594-95 (8th Cir. 2009). Proving these elements will rely predominantly, if not exclusively, on common evidence that applies equally to all Class Members.

As explained above, Plaintiffs' claims focus exclusively on the alleged misconduct of the Defendants, which involved identical conduct towards Class Members. Decisions about selecting Collateral Pools and investments for the Collateral Pools were entirely made by Northern Trust, with no role for any Class Member. *See* Dkt. 126, Ex. B at 47:19-48:25. Class Members all suffered losses arising from the same collateral deficiency in the same Collateral Pools due to the same

alleged breaches of fiduciary duties by Defendants. Whether Defendants breached those duties and whether those breaches caused losses to Class Members are the core issues relating to Defendants' liability, and those questions can be answered without any inquiry unique to any Class Member.

Because resolving whether the Collateral Pool investments were imprudent in one proceeding would essentially resolve the claims of every Class Member (barring the computation of damages), a class action is the superior means for resolving this matter, and it is most efficient to have the claims of individual Class Members litigated through this action. Any questions relating to individual Class members, such as calculation of damages, would be minor and could be mechanically answered from computer records and form documents. The gravamen of Plaintiffs' Complaint does not rest on any individual relationship or communications between Northern Trust and Class Members, but rather on the mismanagement of the Collateral Pools in which securities-lending collateral was invested.

As to the issue of damages, the Seventh Circuit recently affirmed that, "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner v. Northshore Univ. Healthsystem,* 669 F.3d 802, 815, (7th Cir. 2012) (citing *Wal-Mart,* 131 S. Ct. at 2558, and *Arreola v. Godinez,* 546 F.3d 788, 801 (7th Cir. 2008)). This is particularly so when "'individual fact determinations with respect to [damages]… will depend on objective criteria that can be organized by a computer....'" *Klay v. Humana, Inc.,* 382 F.3d 1241, 1260 (11th Cir. 2004) (quoting *Roper v. Consure, Inc.,* 578 F.2d 1106, 1112 (5th Cir. 1978)). For this reason, "[a] court should direct its inquiry primarily toward the issue of liability, rather than damages, in determining whether common questions predominate." *Baxter* 259 F.R.D. at 343. Here, when Northern Trust declared a collateral deficiency, it expressly noted that this would apply *pro rata* to all Class Members, explaining that its intent in determining that a collateral deficiency existed was "to ensure that all clients share equally in these liquidity risks…." *See* Dkt. 126, Ex. G at N000167. Therefore,

22

demonstrating that Defendants' conduct caused losses to Class Member is a matter subject to common proof, and computing damages is simply a matter of allocating the aggregate losses resulting from Defendants' conduct *pro rata*, just as Northern Trust did and as the Plan of Allocation provides.

### 3. The Court should appoint Plaintiffs' Counsel as Class Counsel.

Fed. R. Civ. P. 23(g) requires a court to appoint class counsel. In appointing class counsel, the Court "must" consider:

- the work counsel has done in identifying or investigating potential claims in the action;

- counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

- counsel's knowledge of the applicable law; and

- the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). The court "may" also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Proposed Class Counsel, the law firms of Bailey & Glasser LLP, Berger Montague LLC, and Peiffer Rosca Wolf Abdullah Carr & Kane APLC, satisfy these criteria. This team of law firms expended a great deal of time, effort and expense investigating complex securities-lending practices prior to and since filing this action. Further, as set forth in the firm resumes submitted herewith, each proposed Class Counsel firm is highly experienced in ERISA and/or other complex class action litigation. *See* Porter Decl., Exs. 3-4. It is clear from each firm's track record of success that proposed Class Counsel are highly skilled and knowledgeable concerning ERISA law and class action practice.

At Bailey & Glasser, the primary ERISA attorney Gregory Porter has represented both plaintiffs and defendants in many ERISA class actions, including as lead counsel in a recent District of Massachusetts action involving securities-lending practices that settled earlier this year for $10

millon. *See Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Trust v. State Street Bank & Trust Co.*, Civ. Action No. 10-10588-FDS ("*Glass Dimensions*"). Mr. Porter also served as lead counsel in an ERISA class action styled *Bilewicz v. FMR LLC*, No. 13-10636 (D. Mass.), where the court entered final judgment on October 16, 2014 approving a $12 million class action settlement. A fuller description of Bailey & Glasser's experience litigating complex class actions, including a firm resume and Mr. Porter's individual resume, is included herewith. *See* Porter Decl., Ex. 3.

Berger & Montague, P.C., one of the oldest and most successful plaintiffs' class action firms in the nation, has for decades represented plaintiffs and plaintiffs' classes not only in ERISA actions, but also in the areas of antitrust, securities, mass tort, and consumer protection. Lead attorney Todd Collins served as co-lead counsel in *Glass Dimensions*, which, like the present action, successfully resolved claims concerning alleged breaches arising from securities-lending activities. The firm resume for Berger & Montague, P.C., including with respect to Mr. Collins and the other attorneys at the firm who litigated this action on behalf of Plaintiffs and the Class, is attached. *See* Porter Decl., Ex. 4.

Peiffer Rosca Wolf Abdullah Carr & Kane, APLC ("Peiffer Rosca Wolf") was founded in 2013 by Joe Peiffer, who previously was a litigation partner at Fishman Haygood LLP, in New Orleans. Peiffer Rosca Wolf handles a wide variety of cases from its offices in New Orleans, Cleveland, San Francisco, and Rochester, but its class action practice is focused on representing individuals and institutions that have suffered losses due to financial fraud or breaches of fiduciary responsibility. Peiffer Rosca currently serves as counsel for plaintiffs in numerous class actions. Peiffer Rosca Wolf's class action practice is headed by Joe Peiffer, who has litigated complex cases successfully around the country, in both trial and appellate courts and arbitral forums. Joe was one of three Louisiana lawyers ranked by Chambers USA for securities litigation in 2011 and has been named a 2013 Rising Star by his peers in the Class Action Administration organization. He has also

successfully risen into the leadership of several national bar associations. He twice served as the chairman of the Business Torts Section of the American Association for Justice. He currently serves as President of PIABA - a nationwide bar association of lawyers that represent individuals and institutions in arbitrations against investment banks and brokerage firms. A full description of Peiffer Rosca Wolf's qualifications is attached. *See* Porter Decl., Ex. 5.

As can be seen by their commitment to prosecuting this case thus far as well as their track record, Class Counsel have made the investment and have the experience to represent the Class vigorously. Accordingly, the appointment of the proposed Class Counsel under Rule 23(g) is warranted.

### B.     The Court Should Grant Preliminary Approval of the Settlement.

#### 1.     The Standard for Preliminary Approval

Courts favor settllng complex class action cases. *See, e.g., Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996); *Air Line Stewards & Stewardesses Ass'n v. Trans World Airlines, Inc.*, 630 F.2d 1164, 1169 (7th Cir. 1980); *Williams v. Quinn*, 748 F. Supp. 2d 892, 897 (N.D. Ill. 2010); William B. Rubenstein et al., *Newberg on Class Actions* § 11:41 (4th ed. 2009) (hereafter *"Newberg"*). Fed. R. Civ. P. 23(e) requires judicial approval of class action settlements:

> The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request

exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23(e).

Preliminary approval of a settlement "is the first step in a two-step process to determine whether a proposed Rule 23 settlement is fair, adequate, reasonable, and not a product of collusion." *Butler v. Am. Cable & Tel., LLC*, No. 09 CV 5336, 2011 WL 4729789, at *9 (N.D. Ill. Oct. 6, 2011). The Seventh Circuit explains:

> The first step is a preliminary, pre-notification hearing to determine whether the proposed settlement is within the range of possible approval. This hearing is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. If the district court finds a settlement proposal within the range of possible approval, it then proceeds to the second step in the review process, the fairness hearing. Class members are notified of the proposed settlement and of the fairness hearing at which they and all interested parties have an opportunity to be heard.

*Armstrong v. Bd. of Sch. Dirs. of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998); *see also Manual for Complex Litig.* § 21.632 (noting that at preliminary approval stage, the first task before the court is to make a preliminary determination as to the fairness, reasonableness, and adequacy of the settlement).

The Court must also consider whether the proposed plan for notifying the Class of the settlement is reasonable and satisfies Rule 23(e) and due process. *See Manual for Complex Litig.* § 21.632 (noting that at preliminary approval stage, the court must direct the preparation of notice informing the class about the terms of the settlement and the date of the final fairness hearing in addition to making a preliminary fairness determination); *In re Ready-Mixed Concrete Antitrust Litig.*, No. 05-cv-979, 2007 WL 3334787, at *2 (S.D. Ind. Nov. 8, 2007) (granting preliminary approval of settlement after finding that "[t]he form and manner of notice proposed in the settlement comply

26

with Rules 23(c) and (e) and the requirements of due process"). Due process does not require that every Class Member receive actual notice of the settlement. *See, e.g., Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008); *Mangone v. First USA Bank*, 206 F.R.D. 222, 231 (S.D. Ill. 2001). As the leading treatise on class actions explains:

> The notice of the Proposed Settlement, to satisfy both Rule 23(e) requirements and constitutional due process protections, need only be reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections. Thus, due process does not require actual notice, but rather a good faith effort to provide actual notice. Courts have consistently recognized that due process does not require that every class member receive actual notice so long as the court reasonably selected a means likely to apprize interested parties.

*Newberg* § 22:91. Courts have considerable discretion in approving an appropriate notice plan. *Eirhart v. Libbey-Owens-Ford Co.*, 921 F.2d 278, at *1 (7th Cir. 1990) (table op.) (observing that a district court "has 'virtually complete discretion' as to the manner in which notice of a proposed settlement be given."); *Manual for Complex Litig.* § 21.311 ("Determination of whether a given notification is reasonable under the circumstances of the case is discretionary.").

### 2. The Settlement Is Presumed Fair Because It Resulted From Lengthy, Hard-Fought Litigation And Arm's-Length Negotiations.

Arm's length negotiations, hard fought litigation, and extensive discovery and motion practice are the hallmarks of fair settlements. Where these factors are present, concerns that the Settlement Agreement might be the result of collusion are minimized.

Highly experienced counsel on both sides negotiated this Settlement. Class Counsel have extensive experience in the prosecution of complex commercial and class action litigation including ERISA class actions. During the nearly five years that the case has been vigorously litigated, counsel for both sides have developed a comprehensive knowledge of the relevant facts and law by conducting extensive discovery and engaging in substantial motion practice before this Court. By the time the Settlement was reached, counsel had a thorough understanding of the complexity of the

issues and the strengths and weaknesses of their respective claims, defenses and strategies. *E.g., In re Mexico Money Transfer Litig.*, 164 F. Supp.2d 1002, 1021-22 (N.D. Ill. 2000) (noting that at the time of settlement, plaintiffs' counsel had analyzed the strengths and weaknesses of available claims and "had ample opportunity to reach an informed judgment concerning the merits of the proposed settlements").

Further, the Settlement was made in good faith after fair and honest negotiations. The arms'-length negotiations took place over 18 months and included numerous telephonic meetings, as well as an in-person mediation session with Judge Denlow. *See Butler v. American Cable & Telephone, LLC*, No. 09 CV 5336, 2011 WL 2708399, at *8 (N.D. Ill. July 12, 2011) (approving settlement where "the parties participated in arm's length negotiations with the assistance of the Court," and citing *McKinnie v. JP Morgan Chase Bank*, 678 F. Supp.2d 806, 812 (E.D. Wis. 2009) (noting that arm's length negotiations facilitated by a neutral mediator is one factor, among others, that supports a finding that the settlement is fair)). Both sides zealously pressed their positions throughout the negotiation process, and have continued to do so even through the process of negotiating the language for their formal written agreement.

Class Counsel have made a considered judgment that the Settlement is not only fair, reasonable and adequate but a highly favorable result for the Class. As noted above, their opinion is entitled to great weight. *Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d 305, 325 (7th Cir. 1980) (citations omitted).

### 3. In View of the Litigation Risks, the Substantive Terms of the Settlement Are Highly Favorable to the Class.

It is well settled that a proposed settlement is not to be measured against a hypothetical ideal result that might have been achieved. *See, e.g., Linney v. Cellular Alaska Partnership*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("This court has aptly held that it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed

settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators."); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("The trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'") (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972).

A class settlement need not provide class members the maximum damages that would be provable after establishing liability at trial, as recovery of a fraction of that amount is reasonable, particularly in a complex and risky case such as the one at bar. Indeed, even recoveries representing a very small percentage of the defendant's maximum exposure may be found to be fair, adequate and reasonable *See, e.g., Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery."); *Newbridge Networks Sec. Litig.*, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) ("an agreement that secures roughly six to twelve percent of a potential recovery ... seems to be within the targeted range of reasonableness"); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses"); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 581 (E.D. Pa. 2003).

When weighed against the risks of continued litigation, the proposed Settlement compares favorably with the results the Class could have obtained after trial and exhaustion of appeals. The $36 million fund created for the benefit of the Class is a substantial recovery, both in the aggregate and for individual Class members. The Settlement Fund represents a recovery of over twenty-five

percent of Class Member losses on the riskiest investments and two of the biggest losses in the Collateral Pools, Structured Investment Vehicles.[2]

There will be no claims process and therefore no reversion of any part of the Settlement Fund to Defendants based upon the failure to make a claim. Under the Plan of Allocation proposed by Class Counsel, each Class Member will be entitled to recover its pro rata share of the Net Settlement Fund based upon such payee's Recognized Loss as compared to the total Recognized Loss of all Authorized Payees, as those terms are defined in the Settlement Agreement. *See* Settlement Agreement p. 38, ¶ 34. Although the amount Defendants have agreed to pay under the Settlement Agreement is less than the recovery sought by Plaintiffs in this action, it is well within the range of reasonableness for the settlement of a class action in which there are a number of contested issues of fact and law and a continuing controversy over the propriety of certification of the case as a class action, posing a substantial risk that Plaintiffs would not prevail on behalf of the Class at trial or that the court would not enter an order certifying the Class.

Plaintiffs were also likely to confront serious risks in regard to Defendants' defenses. The extent to which the financial crisis of 2008, as opposed to Defendants' allegedly imprudent investment decisions, was responsible for Collateral Pool losses raised barriers to proof of liability. Further, the complexity of proof on each allegedly imprudent investment would require extensive expert proof and analysis of dozens of securities. Moreover, Defendants have argued that there are no cognizable damages here notwithstanding losses in the Collateral Pools.

Further, each Collateral Pool had distinct investment guidelines and distinct portfolios. Thus, Plaintiffs would have to prove that each Collateral Pool, standing alone, had not been prudently managed. Further, with respect to each challenged investment, Plaintiffs would have to submit proof

---

[2] The Collateral Pools lost $405 million on SIV investments. The Class Members' share of those losses was approximately $131 million.

that the investment was imprudent and offer expert opinion and damages analyses to support recovery. Moreover, as noted above, the extent to which the turmoil in the financial markets caused the losses on the Collateral Pool investments would be a hotly-contested issue.

Moreover, the existence and measure of damages in this case would be the subject of conflicting expert reports and would be heavily disputed at trial. Defendants would no doubt present the testimony of multiple expert witnesses directly challenging the Plaintiffs' experts' opinions. Even if the Class ultimately secured a jury verdict, Defendants have demonstrated that they would certainly pursue an appeal, and success on appeal is not assured. Moreover, such an appeal likely would further delay a final resolution of this case by at least another two years.

Class Counsel took all of these considerations into account in negotiating and evaluating the fairness of the Settlement. Class Counsel determined that entering into the Settlement is in the best interests of the Class. As the case law establishes, courts should be hesitant to second-guess that determination so long as the proposed Settlement falls within a reasonable range of possible approval. Although continuing the litigation through trial and the appellate process could conceivably result in a greater recovery for the Class, the recovery offered through the Settlement is guaranteed, substantial, and not dependent on a claims process or other limitation in getting the proceeds of the Net Settlement Fund to Class Members. Under the circumstances presented in this case, and considering the substantial risks and considerable delay inherent in proceeding to trial and through the appellate process, it is likely that the Settlement Agreement for which the Plaintiffs seek this Court's approval represents the best realistic recovery for all members of the Class, and it is well within the range of possible approval. The immediacy of the recovery and the guarantee that all members of the Class will recover argue for approval of the Settlement Agreement.

## V.    PROPOSED SCHEDULE OF EVENTS

In connection with this motion, the Parties request that the Court establish dates by which notice of the Settlement will be provided to members of the proposed Settlement Class, dates by which such persons may request exclusion from the Settlement Class or object to the fairness of the Settlement, and the date on which the Court will hold the Final Approval Hearing. The following schedule is proposed and has been incorporated into the Preliminary Approval Order:

| Event | Time for Compliance |
|---|---|
| Setting the date for the Settlement Hearing: the "Settlement Hearing Scheduling Order" or "Scheduling Order" | At the Court's earliest convenience after the orders preliminarily approving the settlements in this Action and in the Firefighters Action have been entered. |
| Mailing of Banking Notice by Defendants | Within 10 business days after entry of the Settlement Hearing Scheduling Order in this Action or in the Firefighters Action, whichever is later. |
| Provision by Defendants to the Settlement Administrator of the required information for Identified Settlement Class Members | Not later than 26 business days after entry of the Settlement Hearing Scheduling Order in this Action or in the Firefighters Action, whichever is later. |
| Mailing of Settlement Notice by Class Counsel | Within 40 business days of entry of the Settlement Hearing Scheduling Order in this Action or in the Firefighters Action, whichever is later. |
| Publication of Summary Notice by Class Counsel | Within 10 business days of the mailing of the Settlement Notice. |
| Deadline for filing opening papers in support of final approval of the proposed Settlement, the proposed Plan of Allocation and Co-Lead Counsel's motion for an award of attorneys' fees, reimbursement of Litigation Expenses, and payment of Incentive Awards | Not later than 45 calendar days prior to the Settlement Hearing in this Action or the Settlement Hearing in the Firefighters Action, whichever is earlier. |
| Deadline for Settlement Class Members to file objections to the Settlement and notice of intention to appear at Settlement Hearing and to submit requests for exclusion from the Settlement Class | To be received not later than 21 calendar days prior to the Settlement Hearing in this Action or the Settlement Hearing in the Firefighters Action, whichever is earlier. |
| Deadline for responses to objections, and reply papers respecting final approval of the Settlement, the proposed Plan of Allocation and the motion for an award of attorneys' fees and reimbursement of Litigation Expenses | Not later than 7 calendar days prior to the Settlement Hearing. |
| Deadline for parties to file proof of mailings and publication | Not later than 7 calendar days prior to the Settlement Hearing |
| Settlement Hearing | To be determined. |

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue an Order:

1.    Certifying the proposed Settlement Class and appointing Class Counsel;

2.    Preliminarily approving the proposed class action settlement with Defendants;

3.    Directing notice to Class members and approving the proposed method and form of settlement notice and provisions setting deadlines for such persons to object to the fairness of the settlement, as set forth in the Settlement Agreement;

4.    Appointing Heffler Claims Group as Settlement Administrator, Branch Banking and Trust Company as Escrow Agent, and Fiduciary Counselors Inc. as the Independent Fiduciary; and

5.    Scheduling a hearing to consider final approval of the Settlement, and also to consider the proposed Plan of Allocation and Plaintiffs' Counsel's application for attorneys' fees and expenses and Incentive Awards for Plaintiffs.

Dated: February 18, 2015                                        Respectfully submitted,


                                                                **BAILEY & GLASSER LLP**


                                                                By: _/S/Gregory Y. Porter_____
Todd S. Collins                                                 Gregory Y. Porter
Ellen Noteware                                                  910 17th Street, NW
**BERGER & MONTAGUE, P.C.**                                     Suite 800
1622 Locust Street                                              Washington, DC  20016
Philadelphia, PA 19103                                          Tel:  (202) 463-2101
Tel: (215) 875-3000                                             Fax: (202) 463-2103
Fax: (215) 875-4604                                             gporter@baileyglasser.com

Joseph C. Peiffer                                               Elizabeth Hoskins Dow
Daniel Carr                                                     **BAILEY & GLASSER LLP**
**PEIFFER ROSCA WOLF**                                          3601 McDonough Street
  **ABDULLAH  CARR & KANE, APLC**                               Joliet, IL 60431
201 St. Charles Ave. Suite 4610                                 Telephone:  815-740-4034
New Orleans, LA 70170                                           ldow@baileyglasser.com
Tel: (504) 523-2434
Fax: (504) 388-3912
jpeiffer@prwlegal.com
dcarr@prwlegal.com


*Counsel for Plaintiffs Joseph L. Diebold, Jr. and Paul J. Hundt*