UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSEPH L. DIEBOLD, JR. on behalf of the EXXONMOBIL SAVINGS PLAN, and PAUL J. HUNDT, on behalf of the TEXAS INSTRUMENTS 401(K) SAVINGS PLAN, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHERN TRUST INVESTMENTS, N.A. and THE NORTHERN TRUST COMPANY,<br><br>Defendants. | CIVIL ACTION NO. 09-CV-1934<br><br>Hon. Charles Norgle |

### DECLARATION OF KENNETH A. WEXLER IN SUPPORT OF MOTION FOR AN AWARD OF REASONABLE ATTORNEYS' FEES AND <u>REIMBURSEMENT OF EXPENSES</u>

I, Kenneth A. Wexler, under penalty of perjury, and pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a member in good standing of the Bar of the State of Illinois, a member of this Court's Trial Bar, and the founder and managing partner of Wexler Wallace LLP. I have been asked to opine on the reasonableness of Class Counsel's request for attorneys' fees, and include an analysis of what the market rate would be for similar contingent fee litigation.[1] I focus my practice on complex litigation and class actions.

2. I was admitted to the Illinois bar in 1980, and have been practicing law since that time. My peers have given me the highest rating available through Martindale-Hubbell (AV®

---

[1] I charge $725.00 per hour for my work on this matter. Payment of my fees is not contingent upon the outcome of this matter, Class Counsel's fee request, or final approval of the Proposed Settlement.

Preeminent™), and I have been selected as an Illinois "Super Lawyer" and a *Benchmark Plaintiff* "local litigation star" in every year since 2008 and 2012, respectively. The same entity that publishes *Benchmark Plaintiff* also publishes a list of recommended law firms in *Benchmark Litigation*. In the Eighth Annual edition of *Benchmark Litigation*, released in 2015, Wexler Wallace LLP was the only plaintiffs' firm that received this recognition, alongside other prominent firms such as Bartlit Beck Herman Palenchar & Scott LLP, Jenner & Block LLP, Mayer Brown LLP, and Winston & Strawn (the latter two firms represent Northern Trust in this case). I have taught Complex Litigation as an adjunct professor at Loyola University Chicago School of Law. I have lectured and participated as a panel member at various conferences devoted to such subjects as class action litigation, antitrust, and the Federal Rules of Civil Procedure. This July, I will be a panel participant at the Duke Law Class Action Settlement Conference with respect to proposed changes to Rule 23(e).

3. My practice and that of my firm's is diverse; in addition to complex class-action litigation on behalf of consumers and private and public institutional clients, it includes private contingent fee litigation on behalf of individuals and businesses, as well as alternatives to hourly billing arrangements. These areas of practice, and our billing arrangements, are relevant to my opinions concerning Class Counsel's fee request.

4. As part of my work in private contingent fee litigation, I have negotiated with sophisticated clients who are referred to me by some of the largest law firms in Chicago (or elsewhere around the country). In some of these instances, these clients have retained—and I suggest they retain—counsel just to negotiate the retainer agreement. In other instances, I compete against firms typically known for their large-scale institutional hourly practices. In contrast to class action litigation, clients in private contingent fee litigation are often willing to advance expenses (virtually unheard of in class litigation), and agree to contingent fees that often exceed 33% and are routinely negotiated in the 35%-40% range. My discussions with colleagues who do similar work confirm that advancement of expenses in private contingent litigation (or a sharing of expenses by the client) is often discussed and is typically part of their retainer agreements.

5. Many alternative fee arrangements exist in private contingent litigation— including in my firm's work as described above—that reduce the risk of non-payment to counsel.

2

These arrangements, however, are unavailable to attorneys representing a putative class in civil litigation, meaning that the risk of pursuing a lawsuit is often borne largely (or entirely) by class counsel. For example, we have sometimes negotiated hybrid arrangements, which provide us with a portion of fees up-front, that are either based upon milestones in the litigation or hours in the case that reduce our risk of no payment at all (in other words, we obtain milestone payments, which are typically some version of a reduced hourly fee, along with a contingent fee). This is one of the creative arrangements that can and have been used to reduce risk in the private contingent fee market. While I am not aware of literature on the issue, and not every case is the same, it is my experience and my firm opinion that class counsel often take on significantly more risk—in terms of both time and the advancement of costs—than those engaged in private contingent fee representation.

6. In addition to private contingent fee litigation, I am routinely retained as class-action counsel on behalf of individuals, businesses, and institutions, and do significant work on behalf of plaintiffs in complex class action litigation. I have practiced in this area since 1986, and have been appointed to case leadership positions in both state and federal court. My leadership appointments include antitrust, consumer, and financial cases. A sampling of leadership appointments held by me and my firm include:

> a. *In re Pharmaceutical Industry Average Wholesale Price Litig.*, MDL No. 1456, No. 01-cv-12257-PBS (D. Mass.) (pharmaceutical overpricing) (settlements with various defendants totaling approximately $350 million; Co-Lead Counsel);
>
> b. *New England Carpenters Health Benefits Fund v. First Databank, Inc. and McKesson Corp.*, No. 05-cv-11148 (D. Mass.) (pharmaceutical overpricing) ($350 million settlement, exclusive of non-monetary relief valued at hundreds of millions of dollars; Co-Lead Counsel);
>
> c. *In re Pet Foods Pods. Liability Litig.*, MDL No. 1850 (D.N.J) ($24 million settlement; Co-Lead Counsel);
>
> d. *In re Niaspan Antitrust Litig.*, No. 13-md-2460 (E.D. Pa.) (generic suppression reverse payment antitrust case) (pending; Co-Lead Counsel);
>
> e. *In re Nexium Antitrust Litig.*, No. 12-md-02409 (D. Mass.) (generic suppression reverse payment antitrust case) (pending; Co-Lead Counsel); and

    f. *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. 2:13-md-02445 (E.D. Pa.) (generic suppression product hop antitrust litigation ) (pending; Co-Lead Counsel)

    g. *In re BP Propane Indirect Purchaser Antitrust Litig.*, No. 06-cv-3541 (N.D. Ill.) (antitrust case involving indirect purchasers of propane) ($15 million settlement; Co-Lead Counsel)

7. As part of my practice, I have to continually assess the risks of contingent fee litigation. It is well known that not every contingent fee case is successful, and my own experience, even of late, bears this out.

8. In October 2014, after engaging in complex and involved discovery and motion practice, I and my firm were part of a six-week jury trial in *In re Nexium Antitrust Litigation*, No. 12-md-02409, which is pending before the United States District Court for the District of Massachusetts. The case was the first trial of a "reverse payment" antitrust class action since the Supreme Court's *Actavis* decision. The jury returned a verdict on December 5, 2014, which made three key findings in favor of the plaintiffs, but ultimately found in favor of the defendants on causation. The plaintiffs have since moved for a new trial in that action. While plaintiffs are still hopeful for a positive recovery for the class in that case, the verdict exemplifies the significant risks associated with class action litigation.

9. As outlined above, my firm understands the risks and the market for contingent fee litigation, and knows very well both "the thrill of victory and the agony of defeat." We make it our job to assess and opine on risk attendant to contingent fee litigation. Over my nearly 35 years of practice, I have been involved in a multitude of class action cases that required court approval of attorneys' fees and costs.

**A. Basis for Opinion**

10. While I certainly do not intend to regurgitate case law to the Court concerning what Class Counsel must show in requesting attorneys' fees in a common-fund settlement such as the one proposed (cases of which the Court is already aware), I do wish to offer my considerable experience negotiating fee arrangements in the legal market—both in private contingent fee litigation (which almost never involves court approval) and class-action litigation. I have reached my opinion as to the reasonableness of Class Counsel's fee request based upon

that experience, as well as my review of the facts of this case and its fairly lengthy procedural history. I have also brought to bear my knowledge and experience relating to the various factors that are considered when awarding a fee (such as the risk of non-payment, the complexity of the litigation, the quality of opposing counsel, and the benefit provided to the Class in this common-fund settlement).

### B. Summary of Opinion

11. It is my opinion that the $12 million in fees requested by Class Counsel, which amounts to one-third (33 1/3%) of the common fund created through the Proposed Settlement, is well within the "market" for legal services, and is fair and reasonable based on the factors considered by courts in the Seventh Circuit when assessing the fairness of fee awards in common-fund settlements. This is particularly so where, as here, 33 1/3% is actually below a market-based fee in non-class action contingent fee litigation.

### C. Overview of the Case and Risks of the Specific Litigation

12. Based upon my investigation, including review of the relevant pleadings and facts, I have the following understanding of facts surrounding this case and the risks inherent in bringing the litigation.

13. Plaintiffs Joseph L. Diebold, Jr. and Paul J. Hundt, participants in two separate retirement plans, filed this class action lawsuit in 2009, alleging that Defendant Northern Trust imprudently invested collateral received to secure the loan of securities in Northern Trust's Commingled Lending Funds in connection with Northern Trust's securities lending program. (Dkt. Nos. 1, 5, 25-1).

14. Plaintiffs' Complaint, which was amended in 2012 (Dkt. 171), asserted claims against Defendants for breach of fiduciary duty, failure to prudently and loyally manage plan assets, and violations of "prohibited transaction" rules under the Employee Retirement Income Security Act of 1975, 29 U.S.C. § 1001.

15. As described in the Declaration of Todd S. Collins ("Collins Declaration"), during the six years that this case has been pending, Class Counsel has engaged in extensive discovery. The parties exchanged detailed discovery requests and participated in numerous discovery conferences, "meet and confers," and discovery hearings. In response to Plaintiffs' discovery requests, Defendants produced, and counsel reviewed, hundreds of thousands of pages of

documents and written responses to discovery promulgated. Discovery also included several depositions of fact witnesses, including both the named Plaintiffs and a Fed. R. Civ. P. 30(b)(6) deposition of Northern Trust, consisting of depositions of four Northern Trust employees. In addition, the parties retained experts, submitted expert reports, and took expert depositions in connection with the Motion for Class Certification, which was fully briefed.

16. As shown in the Collins Declaration, the parties first began discussing a potential resolution of this action in the spring of 2013 when a private mediation was conducted by Judge Morton Denlow (Ret.), a former federal Magistrate Judge, at which all parties made presentations to each other and to Judge Denlow regarding the strengths and weaknesses of their respective positions. Although the parties were unable to reach a resolution at the mediation, they continued to discuss resolving the case and, on January 12, 2014, agreed in principle to a settlement. The parties spent several months negotiating the detailed terms of the Settlement in coordination with the partial settlement of a non-ERISA action alleging many of the same claims against the same set of Defendants pending in this Court; prepared and executed the Stipulation of Settlement and exhibits thereto; and presented them to the Court with the motion for preliminary approval. *Id.* On March 17, 2015, the Court entered the Preliminary Approval Order ("PAO"). (Dkt. 260.)

### D. Overview of the Proposed Settlement

17. Based upon my review of the Stipulation and Agreement of Settlement of Class Action ("Settlement Agreement"), I understand that Defendants will pay $36 million into a Settlement Fund, from which attorneys' fees and expenses, administration costs, and a class representative incentive award, if allowed, will be paid. The net of the Settlement Fund will be used for payment to the Class Members according to the Plan of Allocation, based upon Defendants' records concerning the Commingled Lending Funds in which each Class Member invested, the number of units held, and the dollar value of each such unit on the Relevant Date. Significantly, Settlement Class Members will *automatically* receive a payment of their *pro rata* share of the Settlement Fund, and no claims process will be required for payment. There will be no reversion of the Settlement Fund to Northern Trust.

E. **Attorneys' Fee Request**

18. Class Counsel is seeking $12 million in attorneys' fees from the $36 million common fund created for the benefit of the Class Members in this case. The fee request is equal to one-third of the common fund.

19. In this Circuit, "when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time. . . . Although is it impossible to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation. . . ." *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) (internal citations omitted).

20. As the Court knows, in settlements where a common fund is created for the benefit of the class, Courts have often awarded between 30%-33% of the common fund to the attorneys for their fees and costs.[2] It is my opinion that the fee requested in this case is well within the market for similar cases, but it is also my opinion that a larger award is justified when one looks at the market for legal services in the private contingent space.

21. As I noted above, private fee agreements are often negotiated in the range of 35%-40%, *with* full payment or some sharing of costs. In complex business litigation, we typically require a considerable retainer when my firm is advancing costs. I know from discussions with my peers, and attendance at professional conferences, that this is common.

22. The financial area is in the same realm with respect to attorney fee requests. By way of example, in my firm's own experience, the Hon. Judge Gordon J. Quist of the United States District Court for the Western District of Michigan awarded my firm, as lead counsel, 35% of the recovery in hard-fought derivative litigation that was resolved before him. *Virginia M. Damon Trust v. Mackinac Financial Corp., et al.*, No. 03-cv-135, Transcript of Proceedings at 16 (W.D. Mich. May 1, 2008) (noting the fee award and "risky cases"). In other words, while

---

[2] The cases are extensively outlined by Class Counsel in their memorandum in support of their Motion for Attorneys Fees.

the fee request by Class Counsel is well within the market range, it is also my opinion that a larger award would be fair and reasonable under the circumstances of this class action..

### F. Fairness of the Attorneys' Fee Request

23. Several decisions by the Seventh Circuit, as well as by various district courts in this Circuit, articulate the criteria by which courts should assess the fairness of an attorneys' fee request in common fund cases. Based on this precedent, the Court may consider the market for similar cases and fee requests, the contingent nature of the case, the quality of legal services rendered, the risk of nonpayment, and the benefit obtained by the settlement class. *See, e.g., In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001); *Florin v. Nationsbank*, 34 F.3d 560, 565-66 (7th Cir. 1994).

24. **The contingent nature of the case.** Class Counsel prosecuted this case on a pure contingent-fee basis, agreeing to advance all necessary expenses with the understanding that a fee and the recovery of expenses would be forthcoming only if the case generated class-wide benefits. By necessity, Class Counsel had to forego potential fee generating work in order to devote the time and resources needed to handle this case.

25. **The quality of legal services.** Upon my review of the docket and the pleadings in this matter, it is clear to me that Class Counsel was tenacious in ferreting out a complicated breach of fiduciary duty in an esoteric financial area – securities lending.[3] Moreover, the actions complained of took place in the context of an economic crash, which created a hurdle to achieving a successful outcome. Class Counsel litigated this case against successful and prominent law firms, Winston & Strawn and Mayer Brown, which continuously represent large companies in high-profile, risky litigation. Both firms have demonstrated their sophistication in an increasingly competitive legal market, and are well-known for taking cases to trial. Class Counsel demonstrated a significant amount of legal prowess by achieving any settlement at all.

26. **Risk of the Litigation.** "Contingent fees compensate lawyers for the risk of nonpayment. The greater the risk of walking away empty-handed, the higher the award must be to attract competent and energetic counsel." *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013). The present case was extremely risky. From the outset, Class Counsel faced potentially case-ending defense arguments that were not easily dispatched.

---

[3] I know how esoteric securities lending is, as I have studied and written about it.

For instance, as I alluded to, Defendants argued the financial crisis of 2008, and not their conduct, caused the Collateral Pool losses at issue, thus creating a proof of liability hurdle for Plaintiffs to clear. Defendants also argued that Plaintiffs did not suffer cognizable damages. Overcoming both of these arguments and others raised by the defense would have required Plaintiffs to secure extensive expert analysis of complicated financial investments and decisions in the context of unprecedented economic conditions, with no guarantee of success. Plaintiffs also faced risks of surviving various dispositive motions and other pretrial motions, ultimately proving damages at trial, and surviving any appeals. It is not an understatement to say that Class Counsel took a large risk in prosecuting this litigation over the course of several years.

27. Class Counsel also faced significant risk that their case would not be certified as a class action given the challenges, including identification of cognizable damages, raised by Defendants. If Class Counsel could not establish that individualized issues would not overwhelm the litigation, leading to the denial of class certification, the case would have lost virtually all of its value. And, even if a class was certified, Defendants could have had a second bite at the apple via a Rule 23(f) appeal. Maintaining class certification, even if achieved in the District Court, was inherently uncertain.

28. **Benefit to the Class**. Class Counsel obtained a significant ERISA settlement in a complex area of the law. This is no small achievement. Moreover, Class Members will receive an *automatic* payment from the Settlement Fund, and will not be required to submit a claim form or go through the claim process; thus procedural hurdles will not deter Class Members from filing claims and participating in the settlement. That Class Counsel has been able to provide a sizable, automatic and expeditious payment to each Class Member, without requiring them to go through a claims process, is – in my view – an extraordinary achievement.

**G. Conclusion**

29. Class Counsel faced substantial risk in bringing this lawsuit on a pure contingent fee basis, and encountered—and overcame—significant hurdles to bring this case to a favorable conclusion. For this excellent recovery, Class Counsel has requested one-third of the $36 million common fund created for the benefit of Class Members, which is not only supported by the market, but also by other relevant factors considered by courts in this Circuit. Based upon my review of the docket, the relevant pleadings, the case law in this Circuit, my understanding of the

facts, and my own experience, it is my opinion that Class Counsel's fee request is both reasonable and fair.

I declare that the foregoing is true and accurate under penalty of perjury under the laws of the United States.

June 19, 2015

_____
Kenneth A. Wexler